## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

|  |  |
|---|---|
| *In re Orthofix Medical, Inc. Securities Litigation* | Master File No. 2:24-cv-00690 <br><br> <u>CLASS ACTION</u> <br><br> **FIRST AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** <br><br> <u>JURY TRIAL DEMANDED</u> <br><br> **ECF CASE** |

**FORMAN WATKINS & KRUTZ LLP**
Edwin S. Gault, Jr. (TX No. 24049863)
K. B. Battaglini (TX No. 01918060)
C. Mitch McGuffey (admitted *pro hac vice*)
4900 Woodway Drive, Suite 940
Houston, TX 77056-1800
Tel: (713) 402-1717
Fax: (713) 621-6746
win.gault@formanwatkins.com
kb.battaglini@formanwatkins.com
mitch.mcguffey@formanwatkins.com

*Local Counsel for Lead Plaintiff and the Proposed Class*

[Additional counsel in signature block]

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
Jan Messerschmidt (admitted *pro hac vice*)
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

Christina D. Saler (admitted *pro hac vice*)
100 N. 18th Street, Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707
Fax: (267) 479-5701
csaler@cohenmilstein.com

Alexandra Gray (admitted *pro hac vice*)
88 Pine St., 14th Floor
New York, NY 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
agray@cohenmilstein.com

*Attorneys for Lead Plaintiff and the Proposed Class*

**TABLE OF CONTENTS**

GLOSSARY OF TERMS.............................................................................................................v

I.      INTRODUCTION ....................................................................................................1

II.     JURISDICTION AND VENUE..............................................................................5

III.    PARTIES .................................................................................................................6

        A.      Plaintiffs .....................................................................................................6

        B.      Defendants ..................................................................................................6

                1.      Exchange Act Defendants..............................................................6

                2.      The Securities Act Defendants....................................................12

IV.     ORTHOFIX AND ITS BUSINESS .....................................................................12

V.      FACTUAL BACKGROUND ...............................................................................14

        A.      Orthofix Explores a Strategic Transaction ...........................................14

        B.      Orthofix's Deficient Due Diligence Process ...........................................17

        C.      Orthofix Touts a Merger with SeaSpine and the Appointment of
                Defendant Valentine to Lead the Combined Company ........................28

        D.      Orthofix Announces That it Carefully Selected the Incoming Executive
                Leadership Team and Announces its Selection of Defendants Bostjancic
                and Keran .................................................................................................31

        E.      Orthofix's Due Diligence Overlooked Discriminatory and Abusive
                Conduct at SeaSpine That Fostered a Hostile Work Environment......33

                1.      SeaSpine's "Good Old Boys' Club" Culture of Rampant Drinking
                        and Partying ...............................................................................35

                2.      SeaSpine's Deficient Human Resources Department .............37

                3.      SeaSpine's History of Sex-Based Discrimination....................41

                4.      SeaSpine's History of Sexual Harassment and Assault...........50

i

      5.      SeaSpine's Culture of Bullying ............................................... 51

F.      Orthofix Overlooked Issues at SeaSpine Because of Its Own Similar Issues ................................................................................................ 52

G.      Orthofix Files the Registration Statement and Joint Proxy Seeking Approval of the Merger .............................................................................. 55

H.      The Merger Closes ........................................................................ 61

I.      Problems at the Combined Company Persist Post-Merger .................. 66

J.      Orthofix Files Its 2022 Form 10-K Touting Its Compliance and Ethics Program and Its Robust Human Capital Resources .............................. 71

K.      Orthofix Touts the Stability of the Combined Company's Leadership, Its Application of the Codes of Conduct to Executives, and Its Implementation of Robust Risk Management Programs ...................... 72

L.      After Closing, Unbeknownst to the Market, Orthofix Launches an Internal Investigation into the Terminated Executive Defendants' Misconduct ............... 74

M.      Orthofix Announces That It Has Terminated the Terminated Executive Defendants "For Cause" ........................................................................ 77

N.      Orthofix Discloses That the Termination of the Terminated Executive Defendants Negatively Impacted Its Market Capitalization ................. 85

VI.    EXCHANGE ACT VIOLATIONS ................................................................ 86

A.      Defendants' Materially False and Misleading Statements and Omissions During the Class Period .................................................................... 86

      1.      October 11, 2022 Form 8-K ................................................ 87

      2.      November 8, 2022 Form S-4 ................................................ 89

      3.      November 18, 2022 Form 425 and Press Release ................. 93

      4.      November 22, 2022 Form S-4/A ......................................... 96

      5.      November 23, 2022 Joint Proxy Statement/Prospectus ........ 99

      6.      March 6, 2023 Form 10-K .................................................. 102

7. April 27, 2023 Definitive Proxy Statement ...........................................106

B. Loss Causation and Economic Loss ................................................................113

C. Summary of Scienter Allegations .....................................................................117

 1. The Severity and Systemic Nature of the Misconduct Establishes the Terminated Executive Defendants' Scienter....................................118

 2. The Terminated Executive Defendants' Control Over SeaSpine Pre-Merger and Orthofix Post-Merger Demonstrates Their Scienter .....119

 3. The Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Director Defendants Disregarded Red Flags at SeaSpine Pre-Merger and/or Orthofix Post-Merger, Which Demonstrates Scienter .........................................................................120

 4. The Exchange Act Defendants Had the Motive and the Opportunity to Perpetuate the Fraud .....................................................121

 5. The Scienter of the Legacy Orthofix Officer and Director Defendants, the Orthofix Post-Merger Director Defendants, and the Terminated Executive Defendants Is Imputed to Defendant Orthofix......................................................................................................123

 6. The Terminated Executive Defendants' Pre-Merger Scienter Is Imputed to SeaSpine........................................................................123

D. Inapplicability of Statutory Safe Harbor and Bespeaks-Caution Doctrine .........123

E. Presumption of Reliance ...................................................................................124

F. Exchange Act Class Action Allegations ...........................................................125

G. Exchange Act Causes of Action .......................................................................127

 COUNT I..............................................................................................................127

 COUNT II.............................................................................................................129

 COUNT III ...........................................................................................................131

 COUNT IV ...........................................................................................................132

VII.    SECURITIES ACT VIOLATIONS ................................................................133

    A.    False and Misleading Statements in the Offering Documents ...........134

        1.    November 22, 2022 Form S-4/A..........................................134

        2.    November 23, 2022 Joint Proxy Statement/Prospectus .........138

    B.    Documents Incorporated by Reference into the Registration Statement
        Contain Material Misstatements and Omit Material Facts.................140

    C.    Post-Merger Revelations ...................................................................143

    D.    Securities Act Class Action Allegations ............................................144

    E.    The Securities Act Defendants Failed to Conduct a Reasonable
        Investigation and Exercise Reasonable Care in Connection with the
        Offering Documents...........................................................................145

    F.    Securities Act Causes of Action .......................................................148

    COUNT V .....................................................................................................148

    COUNT VI....................................................................................................149

    COUNT VII...................................................................................................151

VIII.    PRAYER FOR RELIEF ......................................................................................154

IX.    JURY DEMAND ................................................................................................154

Appendix A.........................................................................................................1A

## GLOSSARY OF TERMS

| ABBREVIATION | DEFINITION |
|---|---|
| **PLAINTIFFS** | |
| Lead Plaintiff or SEPTA | Lead Plaintiff Southeastern Pennsylvania Transportation Authority |
| Securities Act Plaintiffs | SEPTA and additional named plaintiff Mark Bonta ("Bonta") |
| **DEFENDANTS** | |
| Exchange Act Defendants | Defendants Orthofix Medical Inc. ("Orthofix" or the "Company"), SeaSpine Holdings Corp. ("SeaSpine"), and the Individual Exchange Act Defendants |
| Individual Exchange Act Defendants | The Legacy Orthofix Officer and Director Defendants; the Orthofix Post-Merger Director Defendants; and the Terminated Executive Defendants |
| Legacy Orthofix Officer and Director Defendants | Defendants Jon C. Serbousek ("Serbousek"), Douglas C. Rice ("Rice"), Catherine M. Burzik ("Burzik"), Wayne Burris ("Burris"), Jason M. Hannon ("Hannon"), James F. Hinrichs ("Hinrichs"), Lilly Marks ("Marks"), Michael E. Paolucci ("Paolucci"), John E. Sicard ("Sicard"), Thomas A. West ("West"), and Kimberley A. Elting ("Elting") |
| Orthofix Post-Merger Director Defendants | Burzik, Hannon, Hinrichs, Paolucci, Serbousek, and the SeaSpine-Orthofix Director Defendants |
| SeaSpine-Orthofix Director Defendants | Stuart Essig ("Essig"), John Henneman, III ("Henneman"), Shweta Singh Maniar ("Maniar") |
| Securities Act Defendants | Defendant Orthofix, Defendant SeaSpine, and the Signer Defendants |
| Signer Defendants | The Legacy Orthofix Officer and Director Defendants, Defendant Keith Valentine ("Valentine"), and Defendant Patrick Keran ("Keran"), all of whom signed the Offering Documents |
| Terminated Executive Defendants | Defendants Valentine, John Bostjancic ("Bostjancic"), and Keran |
| **ADDITIONAL TERMS** | |
| 2022 Form 10-K | Orthofix Medical Inc., Form 10-K, for the year ended Dec. 31, 2022, filed Mar. 6, 2023. |
| Amended Registration Statement | Orthofix Medical Inc., Form S-4/A, filed Nov. 22, 2022. |
| Boston | Kathryn Boston |
| *Boston* Compl. | First Amended Compl., Sept. 25, 2019, *Boston v. Orthofix Medical, Inc.*, No. 4:19-cv-00438-ALM (E.D. Tex.) (ECF No. 26) |
| Burzik Declaration or Burzik Decl. | Decl. of Catherine Burzik in Support of Defs. Special Mot. to Strike Pursuant to California Code of Civil Procedure Section 425.16, Jan. 24, 2025, *Valentine v. Burzik*, No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) (ROA No. 15) |

| ABBREVIATION | DEFINITION |
|---|---|
| Class Period | October 11, 2022 to September 12, 2023 |
| CW | Confidential Witness |
| Defamation Complaint or Defam. Compl. | Compl., Sept. 10, 2024, *Valentine v. Burzik* No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) (ROA No. 4) |
| Defamation Lawsuit | *Valentine v. Burzik*, No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) |
| Defamation Motion to Strike or Defam. Mot. to Strike | Def.'s Special Mot. to Strike Pursuant to Cal. Code of Civ. Proc. Section 425.16, Jan. 24, 2025, *Valentine v. Burzik*, No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) (ROA No. 14) |
| Discrimination Class Action | *Johnson v. SeaSpine Holdings Corp.*, Case No. 30-2017-00949804-CU-OE-CXC (Cal. Super. Ct. Orange Cnty.) |
| Discrimination Class Action Settlement | Settlement agreement reached in the Discrimination Class Action |
| Exchange Act | The Securities Exchange Act of 1934 |
| Internal Investigation | Internal investigation at Orthofix that culminated in the termination of the Terminated Executive Defendants |
| Johnson | Maryanne Johnson |
| *Johnson* Complaint or *Johnson* Compl. | Second Amended Compl., July 20, 2020, *Johnson v. SeaSpine Holdings Corp.*, Case No. 30-2017-00949804-CU-OE-CXC (Cal. Super. Ct. Orange Cnty.) (ROA No. 154) |
| Merger | January 2023 stock-for-stock transaction by which Orthofix acquired and merged with SeaSpine |
| Merger Agreement | Agreement and Plan of Merger by and among Orthofix Medical Inc., Orca Merger Sub Inc., and SeaSpine Holdings Corporation, dated October 10, 2022 |
| O'Connor | Catherine O'Connor |
| *O'Connor* Complaint or *O'Connor* Compl. | Pl.'s First Amended Compl., Feb. 15, 2024, *O'Connor v. SeaSpine Holdings Corp.*, No. 37-2023-00051028-CU-OE-CTL (Cal. Super. Ct. San Diego Cnty.) (ROA No. 8) |
| Offering Documents | The Registration Statement and Prospectus (both of which are inclusive of amendments thereto, related prospectuses, and documents incorporated therein) issued in connection with the Merger |
| Orthofix Board | Orthofix Board of Directors |
| Prospectus | 424B3 Prospectus (inclusive of amendments thereto, related prospectuses, and documents incorporated therein) issued in connection with the Merger |
| Registration Statement | S-4 Registration Statement (inclusive of amendments thereto and documents incorporated therein) issued in connection with the Merger |
| SeaSpine Board | SeaSpine Board of Directors |
| Securities Act | The Securities Act of 1933 |

| ABBREVIATION | DEFINITION |
|---|---|
| Strategic Steering Committee | Orthofix Board's Strategic Steering Committee, formed in September 2021 |

Court-appointed Lead Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Lead Plaintiff") and additional named Plaintiff Mark Bonta ("Bonta"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning SEPTA and Bonta, which are alleged upon personal knowledge. SEPTA's and Bonta's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of (i) regulatory filings made by Orthofix Medical Inc. ("Orthofix" or the "Company") and SeaSpine Holdings Corporation ("SeaSpine") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by, disseminated by, or concerning the Company and SeaSpine; (iii) analyst reports concerning the Company and SeaSpine; (iv) transcripts of Orthofix's and SeaSpine's investor conference calls; (v) interviews of former Orthofix and SeaSpine employees; and (vi) other public information regarding the Company and SeaSpine.

## I.     INTRODUCTION

1.     Lead Plaintiff brings this federal securities class action (the "Action") against Orthofix, SeaSpine, and certain of Orthofix's and SeaSpine's current and former senior executives and directors under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 on behalf of all investors who purchased or acquired Orthofix's common stock between October 11, 2022 and September 12, 2023, inclusive (the "Class Period"). SEPTA and Bonta also bring exclusively non-fraud claims sounding in negligence and strict liability under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") against Orthofix, SeaSpine, and certain current and former officers and directors of Orthofix and SeaSpine, on behalf of all former SeaSpine shareholders who acquired newly issued Orthofix common stock pursuant to the S-4 registration statement (inclusive of amendments thereto and documents incorporated therein, the "Registration Statement") and the related 424B3 prospectus

(inclusive of amendments thereto, related prospectuses, and documents incorporated therein, the "Prospectus") (collectively, the "Offering Documents") issued in connection with the January 2023 stock-for-stock transaction by which Orthofix acquired and merged with SeaSpine.

2.     Lewisville, Texas-based Orthofix is a global spine and orthopedics company that offers biologics, spinal hardware, bone growth therapies, and specialized orthopedic solutions, among other things, to healthcare professionals throughout the world.

3.     When Orthofix announced on October 11, 2022 that it had entered into a definitive agreement (the "Merger Agreement") to combine in an all-stock merger of equals with SeaSpine, a California-based global medical technology company focused on surgical solutions for the treatment of spinal disorders, (the "Merger"), the market expressed excitement about what was to come. According to the press release and corresponding conference call with securities analysts, Defendant Keith Valentine ("Valentine"), SeaSpine's then-President and Chief Executive Officer ("CEO") and a well-known figure in the medical devices world, would serve as President and CEO of Orthofix following the Merger, and would be appointed to its Board of Directors (the "Board").

4.     In the following month, Orthofix and SeaSpine announced that after a purported evaluation process, it was determined that effective upon the completion of the Merger, Defendant Valentine's close friends and fellow SeaSpine executives would join the ranks of the combined Company's leadership: Defendant John Bostjancic ("Bostjancic"), SeaSpine's then-Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"), would serve as CFO of Orthofix; and Defendant Patrick Keran ("Keran"), SeaSpine's then-Senior Vice President and General Counsel, would serve as Orthofix's Chief Legal Officer ("CLO").

5.     Less than three months after the announcement of the Merger Agreement, in January 2023, Orthofix solicited and exchanged 16 million new shares of Orthofix common stock

directly to former shareholders of SeaSpine as follows: each former share of SeaSpine common stock was exchanged for 0.4163 shares of newly issued Orthofix common stock (and, if applicable, cash in lieu of fractional shares). All of these new shares of Orthofix common stock were registered, solicited, and exchanged pursuant to the Offering Documents.

6. On January 4, 2023, Orthofix and SeaSpine announced the successful completion of the Merger, which became effective as of 12:01 AM EST on January 5, 2023.

7. Throughout the Class Period, beginning on the day that the Merger Agreement was announced, the Exchange Act Defendants' (as defined below) statements to investors were knowingly or recklessly false when made and/or failed to disclose adverse facts relating to the extent of discrimination and misconduct that had been occurring at SeaSpine for years and the role that Defendants Valentine, Bostjancic, and Keran played in fostering SeaSpine's hostile and misogynistic workplace—information which would have been readily available to Orthofix during the due diligence process. Further, the Exchange Act Defendants made materially false and misleading statements about the robustness of Orthofix's ethics and compliance program, which, in reality, was grossly deficient.

8. Separately, the Offering Documents contained untrue statements of material fact and omitted material facts, both required by governing regulations, necessary to make the statements made not misleading. The Securities Act Defendants (as defined below) made a series of representations touting SeaSpine's and Orthofix's complementary cultures of integrity as a basis for the Merger and attesting to the absence of workplace misconduct at SeaSpine.

9. In truth, SeaSpine had a long-standing history of workplace discrimination and other forms of misconduct that belied Defendants' representations during the Class Period and in the Offering Documents. For years, the Terminated Executive Defendants (defined below), with

Defendant Valentine as their ringleader, engendered a "good old boys' club" culture at SeaSpine in which female employees were the targets of harassment, were paid less for equal work, and were silenced—and sometimes fired—when they tried to raise concerns. The situation at SeaSpine was so egregious that a former SeaSpine employee filed a lawsuit in California state court against SeaSpine alleging systemic gender discrimination. The court approved a class action settlement as recently as July 2021, which resulted in funds being disbursed to over 270 class members and required SeaSpine to undergo an overhaul to its compensation and job titling structures. All of this information would have been readily available to Orthofix during due diligence, had it put in the effort to investigate. But Orthofix's lackadaisical approach to conducting due diligence on HR and personnel issues was rooted in Orthofix's own indifference to those issues. Indeed, Orthofix too had a history of sex-based discrimination and harassment with a non-functional HR department.

10.     When the Terminated Executive Defendants took over Orthofix, they carried with them their problematic management style, continuing to devalue and discriminate against women, even in light of the problems that had been raised during the discrimination class action lawsuit. But eventually, Orthofix's Board of Directors (the "Orthofix Board") could not turn a blind eye. On September 12, 2023, Orthofix publicly disclosed that it had terminated "for cause" Defendants Valentine, Bostjancic, and Keran following an internal investigation that uncovered that they had "violated multiple code of conduct requirements," sharing with the market for the first time the egregious behavior of the Terminated Executive Defendants.

11.     When the "for cause" terminations were disclosed to the market on September 12, 2023, the price of Orthofix common stock plummeted by more than 30% on unusually high trading volume, wiping out $206.5 million of market capitalization. As a result, Plaintiffs and other Class members have suffered significant losses and damages.

12.     By this Complaint, SEPTA brings two different sets of claims on behalf of purchasers of Orthofix's securities during the Class Period. Counts I, II, III, and IV assert securities-fraud and related control-person claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 against the Exchange Act Defendants (defined below). SEPTA, with additional plaintiff Bonta joining, brings Counts V, VI, and VII, which assert strict liability, negligence, and control-person causes of action against those Securities Act Defendants (defined below) who are statutorily responsible under Sections 11, 12(a)(2) and 15 of the Securities Act for materially untrue statements and misleading omissions in the Offering Documents.

## II.     <u>JURISDICTION AND VENUE</u>

13.     The claims asserted in this Action arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), SEC Rules 10b-5 (17 C.F.R. §§ 240.10b-5), and Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77*l*, and 77o).

14.     This Court has jurisdiction over this Action under 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

15.     Venue is proper in this District under 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and Section 22 of the Securities Act (15 U.S.C. § 77v(a)), because Orthofix maintains its principal executive offices in Lewisville, Texas, which is located within this District, Defendants conduct business in this District, and many of the acts giving rise to the violations complained of in this Action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

16.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited

to the mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   <u>PARTIES</u>

#### A.   **Plaintiffs**

17.   Lead Plaintiff SEPTA is one of the largest transportation systems in the United States and is a sophisticated institutional investor based in Philadelphia, Pennsylvania. SEPTA purchased shares of Orthofix common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. SEPTA also owned SeaSpine shares, which it exchanged for shares of Orthofix common stock issued pursuant to certain offering materials issued in connection with the Merger, and suffered damages as a result of the violations of the federal securities laws alleged herein.

18.   Additional named plaintiff Bonta is a former SeaSpine shareholder who participated directly in the January 2023 stock-for-stock Merger and as a result suffered substantial losses. SEPTA and Bonta are collectively referred to herein as the "Securities Act Plaintiffs."

#### B.   **Defendants**

##### 1.   **Exchange Act Defendants**

###### a.   *Corporate Defendants*

19.   Defendant Orthofix is incorporated under the laws of Delaware and maintains its principal executive offices at 3451 Plano Parkway, Lewisville, Texas, 75056. The Company's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "OFIX."

20.   Defendant SeaSpine has been a wholly-owned subsidiary of Orthofix since the completion of the Merger on January 5, 2023. SeaSpine was incorporated in Delaware on February

12, 2015 and its headquarters were located in Carlsbad, California. SeaSpine formerly traded on the NASDAQ under the ticker symbol "SPNE."

b. *Officer Defendants*

21.     Defendant Jon C. Serbousek ("Serbousek") served as Orthofix's President, CEO, and Director before the Merger and then Executive Chairman of the Board after the Merger. He reviewed, contributed to, participated in the drafting of, and signed the Offering Documents, and otherwise participated in the process that allowed the Offering Documents to be completed; and also reviewed, contributed to, and participated in the drafting of Orthofix's periodic filings with the Securities and Exchange Commission ("SEC") throughout the Class Period.

22.     Defendant Douglas C. Rice ("Rice") provided, at the time of the Merger, assistance with integration activities. He was formerly Orthofix's Chief Financial Officer (principal financial and accounting officer). He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

23.     Defendant Valentine served as the Company's President and CEO upon the completion of the Merger and at all relevant times thereafter, until the Board terminated his employment in September 2023. He was formerly SeaSpine's President, CEO, and a member of its Board until the Merger. He reviewed, contributed to, participated in the drafting of, and signed the Offering Documents, and otherwise participated in the process that allowed the Offering Documents to be completed; and following the Merger he reviewed, contributed to, and participated in the drafting of Orthofix's periodic filings with the SEC. Defendant Valentine also signed a written consent to being named in the Offering Documents as an individual to become a director of the Company.

24.     Defendant Bostjancic served as the Company's CFO upon the completion of the Merger and at all relevant times thereafter, until the Board terminated his employment in September 2023. He was formerly the CFO, Treasurer, and Senior Vice President at SeaSpine until the Merger. As CFO of Orthofix, he reviewed, contributed to, participated in the drafting of, and signed Orthofix's periodic filings with the SEC.

25.     Defendant Keran served as the Company's CLO upon the completion of the Merger and at all relevant times thereafter, until the Board terminated his employment in September 2023. He was formerly SeaSpine's Senior Vice President, General Counsel, and Secretary until the Merger. He reviewed, contributed to, and participated in the drafting of, and signed the Offering Documents. As CLO of Orthofix, he reviewed, contributed to, and participated in the drafting of Orthofix's periodic filings with the SEC.

26.     Defendants Valentine, Bostjancic, and Keran are referred to herein as the "Terminated Executive Defendants." According to a complaint that they filed on September 10, 2024 to challenge Orthofix's public-facing statements about their termination ("Defamation Complaint" or "Defam. Compl."), the Terminated Executive Defendants "began working together at SeaSpine in 2015 and, over the following eight years, developed an extensive working relationship, and close friendship." *See* Compl., Sept. 10, 2024, *Valentine v. Burzik*, No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) ("Defamation Lawsuit"), ROA No. 4. They also "live[] close to each other, frequently interact[] outside of work, [are] familiar with intimate details of one another's personal and private lives, and ha[ve] a shared sense of humor." Defam. Compl. ¶39.

*c.  Director Defendants*

27.     Defendant Catherine M. Burzik ("Burzik") served, at the time of the Merger, as Orthofix's Chair of the Board of Directors, a position she held since 2021. After the Merger, she was named Lead Independent Director of Orthofix's Board. She reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

28.     Defendant Wayne Burris ("Burris") served, at the time of the Merger, as a member of Orthofix's Board and on its Audit and Finance Committee from September 2021 to the closing of the Merger. He also served on Orthofix's Compensation and Talent Committee from June 2022 until January 2023. He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

29.     Defendant Jason M. Hannon ("Hannon") served, at the time of the Merger, as a director on Orthofix's Board. He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents. Hannon had current social and former professional relationships with two of the SeaSpine executives in the months leading up to the Merger.

30.     Defendant James F. Hinrichs ("Hinrichs") served, at the time of the Merger, as a director on Orthofix's Board. He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents. Hinrichs had a former professional relationship with one of the then-current SeaSpine executives and a social relationships with a SeaSpine director leading up to the Merger.

31.     Defendant Lilly Marks ("Marks") served, at the time of the Merger, as a director on Orthofix's Board. She reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

32.     Defendant Michael E. Paolucci ("Paolucci") served, at the time of the Merger, as a director on Orthofix's Board, and also served on the Compensation and Talent Development Committee. He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

33.     Defendant John E. Sicard ("Sicard") served, at the time of the Merger, as a director on Orthofix's Board. He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

34.     Defendant Thomas A. West ("West") served, at the time of the Merger, as a director on Orthofix's Board, and also served on the Compensation and Talent Development Committee. He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

35.     Defendant Kimberley A. Elting ("Elting") served, at the time of the Merger, as the Company's Chief Legal and Development Officer where she assumed leadership responsibilities for Business Development and oversaw Orthofix's Legal, Business Development, and Corporate Communications teams. In April 2022, Ms. Elting also became the Company's President of Global Orthopedics. She reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

36.     Defendants Serbousek, Rice, Burzik, Burris, Hannon, Hinrichs, Marks, Paolucci, Sicard, West, and Elting are referred to below as the "Legacy Orthofix Officer and Director Defendants."

37.     Defendant Stuart Essig ("Essig"), served, following the Merger, as a Director on the Orthofix Board at all relevant times. He was formerly on the SeaSpine Board of Directors ("SeaSpine Board") from 2015 until the Merger, and was SeaSpine's Lead Independent Director.

He reviewed, contributed to, participated in the drafting of, and signed Orthofix's periodic filings with the SEC.

38.     Defendant John Henneman, III ("Henneman") served, following the Merger, as a Director on the Orthofix Board at all relevant times. He was formerly on the SeaSpine Board from 2015 until the Merger. He reviewed, contributed to, participated in the drafting of, and signed Orthofix's periodic filings with the SEC.

39.     Defendant Shweta Singh Maniar ("Maniar"), served, following the Merger, as a Director on the Orthofix Board at all relevant times. She was formerly on the SeaSpine Board from 2021 until the Merger. She reviewed, contributed to, participated in the drafting of, and signed Orthofix's periodic filings with the SEC.

40.     Defendants Essig, Henneman, and Maniar are referred to below as the "SeaSpine-Orthofix Director Defendants." The SeaSpine-Orthofix Director Defendants, together with Defendants Burzik, Hannon, Hinrichs, Paolucci, and Serbousek, are referred to as the "Orthofix Post-Merger Director Defendants").

*       *       *

41.     The Terminated Executive Defendants, together with the Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Director Defendants (the latter of which is inclusive of certain of the Legacy Orthofix Officer and Director Defendants), are hereinafter referred to as the "Individual Exchange Act Defendants."

42.     For purposes of Counts I, II, III, and IV under the Exchange Act, Orthofix, SeaSpine, and the Individual Exchange Act Defendants are referred to as the "Exchange Act Defendants."

43. The Individual Exchange Act Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Exchange Act Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Orthofix and SeaSpine which afforded them access to material information available to them but not to the public, the Individual Exchange Act Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Exchange Act Defendants are liable for the false statements and omissions pleaded herein.

## 2. The Securities Act Defendants

44. For purposes of Counts V, VI, and VII under Sections 11, 12(a)(2) and 15 of the Securities Act, the Legacy Orthofix Officer and Director Defendants, Defendant Valentine, and Defendant Keran are referred to as the "Signer Defendants." The Signer Defendants each signed and were identified as officers or directors or incoming officers or directors in the Offering Documents, solicited shareholder proxy votes in favor of the Merger, planned and contributed to the Merger and Offering Documents, and attended promotions to meet with and present favorable information to Orthofix and SeaSpine investors.

45. For purposes of Counts V, VI, and VII under the Securities Act, Orthofix, SeaSpine, and the Signer Defendants are referred to below as the "Securities Act Defendants."

## IV. ORTHOFIX AND ITS BUSINESS

46. Orthofix describes itself as a leading global spine and orthopedics company with a comprehensive portfolio of biologics, innovative spinal hardware, bone growth therapies,

specialized orthopedic solutions, and a leading surgical navigation system. It has been recognized as the eighth largest orthopedic medical device company in the world. Founded in Verona, Italy, Orthofix's medical device company is headquartered in Lewisville, Texas, where it conducts general business, product development, medical education, and manufacturing. Since the Merger, SeaSpine's former headquarters in Carlsbad, California has served as Orthofix's primary office to focus on spinal product innovation and surgeon education. Orthofix's Verona, Italy office has an emphasis on product innovation, production and medical education for orthopedics. The Company's global R&D, commercial, and manufacturing footprint also includes facilities and offices in Irvine, CA; Sunnyvale, CA; Toronto, Canada; Maidenhead, UK; Munich, Germany; Paris, France; and São Paulo, Brazil. Orthofix products are distributed in more than 60 countries worldwide.

47.     Orthofix manages the business by two reporting segments, Global Spine and Global Orthopedics, which accounted for 85% and 15% of their total net sales in 2023, respectively.

48.     Orthofix's Global Spine segment provides implantable medical devices, biologics, enabling technologies, and other regenerative solutions for patients suffering from diseases and traumas of the spine. The Global Spine reporting segment is largely represented by two principal product categories, (i) Bone Growth Therapies and (ii) Spinal Implants, Biologics, and Enabling Technologies.

49.     Orthofix's Global Orthopedics reporting segment offers products and solutions for limb deformity correction and complex limb reconstruction with a focus on use in trauma, adult and pediatric limb reconstruction, and foot and ankle procedures. This reporting segment specializes in the design, development, and marketing of external and internal fixation orthopedic products that are coupled with enabling digital technologies to serve the complete patient treatment

pathway. Orthofix sells these products through a global network of distributors and sales representatives to hospitals, healthcare organizations, and healthcare providers.

50.     Prior to the Merger, SeaSpine historically managed its business as one operating segment, but with revenue reported in two product categories: (i) Biologics (formerly recognized as Orthobiologics) and (ii) Spinal Implants and Enabling Technologies. Following the Merger, Orthofix stated that it would reassess its reporting segments.

## V.     FACTUAL BACKGROUND

### A.     Orthofix Explores a Strategic Transaction

51.     Orthofix began to contemplate engaging in a strategic transaction at least as early as September 2021, when the Orthofix Board formed a strategic steering committee ("Strategic Steering Committee") to assist Orthofix management in exploring, reviewing, and evaluating potential opportunities for corporate strategic planning. One of the primary responsibilities of the Strategic Steering Committee was to oversee a process to review and evaluate opportunities for strategic business combinations. The Strategic Steering Committee met periodically between October 2021 and February 2022, including with outside advisors, to identify, evaluate, and consider potential strategic opportunities for Orthofix.

52.     Orthofix already had experience with strategic transactions, having engaged in acquisitions previously in 2019, 2020 and 2022.

53.     Prior to the Class Period, Defendants repeatedly told investors that they take a disciplined approach to M&A activity such that when the SeaSpine Merger was announced, investors expected the same purported disciplined approach to be applied to the due diligence.

54.     On May 23, 2022, at the UBS Global Healthcare Conference, Defendant Serbousek touted Orthofix's "experienced management team with a strong corporate infrastructure, including finance, legal, compliance and other functions," and noted that Orthofix would be "investing in

strategic partnerships and continuing to look into disciplined M&A activities." Serbousek also noted that "[i]norganically, we will continue to be disciplined acquirers as we continue to look for a series of innovative or disruptive products and procedures." In response to a question from analyst Carlos Vazquez about Orthofix's appetite for M&A activity in light of current market dynamics, Serbousek boasted that Orthofix had already done "small tuck-ins and technology deals," including the FITBONE deal that closed on March 26, 2020 "right when everything was in pretty much a free spin." Serbousek also previewed that Orthofix had the "capacity . . . to do larger deals, should they be available." However, Serbousek hedged that Orthofix would "look within [its] capacity to do these deals" and would "always be disciplined," but that Orthofix was "actively pursuing those" opportunities. Then-Orthofix CFO and CAO Securities Defendant Rice echoed Serbousek's comments, stating, "[a]t our size, we have to be very disciplined and choosy about the assets that we go after and acquire. We can't simply buy revenue for the sake of buying revenue. We look to longer term, more strategic investments."

55.     On August 5, 2022, during the Q2 Earnings Call, Defendant Serbousek again made reference to Orthofix's ongoing "disciplined" approach to M&A: "[A]s previously demonstrated with our successful disciplined approach, we will continue our inorganic business development and see a great deal of opportunity with our balance sheet capacity to execute in the current macro environment."

56.     Orthofix made these references to "disciplined" M&A while it was in discussions with SeaSpine about a potential business combination. According to the Registration Statement that Orthofix filed in connection with the Merger, those discussions originated on January 20, 2022. The Orthofix Strategic Steering Committee concluded after discussion with advisors that a potential combination with SeaSpine would be a compelling strategic option for Orthofix and

determined that Orthofix should focus its analysis of a merger with SeaSpine before analyzing any other opportunities.

57.    On February 16, 2022, the Orthofix Strategic Steering Committee engaged in a discussion and concluded that an all-stock "merger of equals" transaction structure would be the most compelling transaction structure for Orthofix stockholders, including with respect to likelihood of consummation. At the conclusion of the meeting, the Orthofix Strategic Steering Committee directed Defendant Serbousek to contact Defendant Valentine to determine SeaSpine's level of interest for such a transaction.

58.    On February 23, 2022, Defendant Serbousek called Defendant Valentine to express Orthofix's interest in exploring a potential business combination with SeaSpine. Orthofix and SeaSpine signed a confidentiality agreement five days later.

59.    Going forward, Orthofix and SeaSpine and each of their advisors were in regular conversations with each other and internally about the potential strategic transaction through October 11, 2022, when the parties ultimately executed the Merger Agreement. All of these negotiations took place as Orthofix informed the market that it was engaging in a "disciplined" approach to M&A.

60.    Further, as Orthofix was touting its "disciplined" approach to M&A, it knew that the future CEO position would likely go to Defendant Valentine. On May 31, 2022, just about a week after the UBS Global Healthcare Conference and as SeaSpine and Orthofix were still negotiating the terms of a potential business combination, Serbousek previewed to Valentine on a phone call that Orthofix's next Indication of Interest ("IOI") would propose that Valentine serve as the combined Company's CEO and Serbousek would serve as the combined Company's Executive Chairman. Orthofix sent SeaSpine an updated IOI that same day. At the time that

Defendant Serbousek made the offer to Defendant Valentine, upon information and belief, Orthofix had not yet engaged in any diligence on SeaSpine.

### B. Orthofix's Deficient Due Diligence Process

61. Despite Orthofix's representations to investors that it would take a "disciplined" approach to any potential strategic business transactions, Orthofix engaged in a woefully inadequate due diligence process as to HR and personnel issues by disregarding the mountain of evidence that the Terminated Executive Defendants fostered a hostile and discriminatory environment at SeaSpine.

62. Most egregiously, Orthofix and the Legacy Orthofix Officer and Director Defendants disregarded and/or failed to probe into the history of pay inequity and gender-based discrimination at SeaSpine. It should have been obvious to Orthofix to ask questions about HR and personnel matters at SeaSpine, particularly in light of a class action lawsuit that SeaSpine had settled with a former employee relating to discriminatory compensation at the company, as described below. Information about this lawsuit was available in the public record, including the disclosure of the settlement payment in SeaSpine's Form 10-K for the year ended 2021, which stated that it had settled legal proceedings with current or formal employees and reported a loss of $919,000 as "Other" under its Operating Activities.

63. The discrimination lawsuit was brought in 2017 by former SeaSpine employee Maryanne Johnson ("Johnson"). She filed the lawsuit in the Superior Court of California on behalf of herself and all other aggrieved employees against SeaSpine and related defendants for their failure to provide equal pay to her and other women employed by SeaSpine in violation of the California Fair Pay Act and Private Attorneys General Act. *See Johnson v. SeaSpine Holdings Corp.*, Case No. 30-2017-00949804-CU-OE-CXC (Cal. Super. Ct. Orange Cnty.) ("Discrimination Class Action"). News of this complaint was reported in Law360. On July 20,

2020, Johnson filed a second amended complaint, which was a representative and class action complaint. Second Amended Compl., July 20, 2020, *Johnson*, (ROA No. 154) ("Johnson Complaint" or "Johnson Compl.").

64.     The Johnson Complaint alleged that the male-dominated, "exclusive leadership team"—whose eight-member Board and nine-member senior leadership team each had only one female member—"exemplifie[d] and perpetuate[d] SeaSpine's good old boys club, which is hostile to women." Johnson Compl. ¶3. As an example of this hostility, Johnson alleged that SeaSpine systemically paid women less than it paid men for performing substantially similar work. Johnson Compl. ¶4. Johnson also called out Defendants Bostjancic and Valentine by name, alleging that they "expressed their greater regard for men by favoring them in a variety of personnel decisions including but not limited to hiring, titling, and other terms and conditions of employment." Johnson Compl. ¶23. Johnson explained that to mask the unequal pay for women, Defendants created multiple job titles—"over 200 for only 300 employees"—to justify their illegal actions. *Johnson* Compl. ¶28. However, in reality, the titular differences did not correspond to differences in responsibilities. *Johnson* Compl. ¶28.

65.     A notice of settlement was filed in the *Johnson* case on September 3, 2019 (a condition of which included that Johnson would file a Second Amended Complaint containing PAGA and class claims against defendants based on violations of California's Fair Pay Act and related Labor Code violations), at which point the parties were negotiating the terms of the stipulated settlement. On June 17, 2021—less than a year before Defendant Serbousek told Defendant Valentine that Orthofix was interested in acquiring SeaSpine—Johnson filed a motion for final approval of a settlement, which stated that the settlement was the product of nearly 3.5 years of litigation, including a failed mediation and approximately eight months of intense

settlement negotiations. The court approved that settlement ("Discrimination Class Action Settlement") on July 26, 2021. As part of the settlement, SeaSpine was required to pay $919,500.87 in settlement funds, with over $600,500 of those funds disbursed to a total of 276 participating settlement class members. That class included all then-current and former female employees who worked for the defendants within the State of California from July 1, 2015 to December 31, 2019. The settlement funds were disbursed as of September 17, 2021. In addition, the settlement included targeted programmatic relief under which SeaSpine agreed to hire an outside vendor to review their work departments with an emphasis on high pay gaps including between male and female employees (when not controlling for title, job code, or other substantially similar criteria) to assess pay equity, to evaluate whether the titles and pay structures in those departments accurately reflected the work being performed, and to recommend adjustments to titles, pay, or both. This programmatic relief was to be funded separately at SeaSpine's expense. All of this information about the lawsuit was available to the public. Further, as described below (¶¶ 133-135), former employees said that the Discrimination Class Action Settlement led SeaSpine to hire a third-party investigator to analyze pay and equity at the company, and to attempt an overhaul of its compensation and titling structures to remediate the discrimination.

66.    All of this information should have surfaced during the due diligence process for the Merger, particularly given the nature of the Discrimination Class Action and the Discrimination Class Action Settlement, and the financial liability and systemic overhaul that the latter entailed. Documents involving the lawsuit would have been present across departments at SeaSpine, ranging from legal and compliance, to HR and personnel, to financial accounting.

67.    Indeed, SeaSpine's pay equity analyses were detecting discriminatory compensation and were still ongoing around the time that the Merger Agreement was signed.

According to a discrimination-based complaint filed post-Merger in California state court by Catherine O'Connor ("O'Connor"), a former SeaSpine attorney, Defendant Keran informed O'Connor in December 2022 that the SeaSpine HR team had conducted a compensation benchmarking exercise and determined that O'Connor's bonus target was below-market Pl.'s First Amended Compl., Feb. 15, 2024, *O'Connor*, No. 37-2023-00051028-CU-OE-CTL ¶ 33 ("*O'Connor* Complaint" or "*O'Connor* Compl."). O'Connor had also filed complaints with the California Civil Rights Department, which authorized O'Connor to file complaints in court. *See O'Connor* Compl. at Exhibits A, B. O'Connor alleged to have been underpaid since at least January 2022. *Id.* ¶ 28. If SeaSpine was conducting benchmark analyses for pay inequities, and these analyses were significant enough such that one or more of the Terminated Executive Defendants were aware of them, then a reasonable inquiry during due diligence should have led Orthofix to conclude that such analyses were ongoing and still required.

68.     Accordingly, Defendant Orthofix and the Legacy Orthofix Officer and Director Defendants ignored the red flags surrounding the Discrimination Class Action during the due diligence process and neglected to probe Defendant SeaSpine regarding the Discrimination Class Action, the Discrimination Class Settlement, the pay and equity remediation effort that resulted from them, and the current workplace conditions at SeaSpine.

69.     Other red flags about the severe workplace issues at SeaSpine were also available in the public record—namely, online employee reviews. Multiple current and former SeaSpine employees of SeaSpine posted anonymous reviews on platforms such as Glassdoor and Indeed that speak to the hostile and discriminatory culture of SeaSpine, as described below. These sorts of reviews should have prompted Defendant Orthofix and the Legacy Orthofix Officer and

Director Defendants to investigate more closely into the egregious conduct alleged in the reviews and in the Discrimination Class Action.

70. Many of the reviews expressed their abhorrence of the boys' club culture, and like Johnson did in her complaint, specifically called out the role of SeaSpine leadership in fueling such a culture. For instance, on March 8, 2020, a self-reported current employee posted a review titled, "Debilitating culture," which stated that SeaSpine had "[d]aily happy hour and cubicle parties" and that "***leadership hires their buddies to run things and they are all lazy, inadequate and untalented***, who hire their own of the same . . . ***They discriminate against gender and race and HR is incompetent***."

71. Further, on April 24, 2018, a self-reported then-current employee who had been at SeaSpine for over three years posted a review on Glassdoor titled "Unhappy Manager." The post insinuated that Defendant Valentine used SeaSpine as his "personal Tinder," stating:

> When will the BOD do something about the highest level of Senior Leadership? ***The CEO is self centered and everything revolves around his own self interests and not for the good of the company. Hires his friends to protect the cult.*** […] ***Stop using SeaSpine as your personal Tinder with the employees. Have some class! BOD…..time to make a few changes for those of us who are stockholders and want to grow this company and stay here***.

72. The same types of negative reviews of SeaSpine had been ongoing for years. For example, on April 6, 2018, a self-reported then-current Marketing employee posted a review on Glassdoor titled "Smoke and Mirrors," which stated that the SeaSpine Senior Leadership Team engaged in "cheesy, outdated and down-right patronizing corporate tactics of buying loyalty" through office perks and events, but ***failed to "truly respect[] employees," "embrac[e] diversity in opinions, backgrounds and personalities," and provide "fairness in compensation and benefits***." The post suggested that Senior Leadership

Team was overly interested in supporting people who were physically attractive. And a Glassdoor post by a former Manager on May 8, 2017, titled "Unemployment Might be Better," stated, "[t]here will always be a need for warm, breathing bodies here since turnover is high, ***especially if your breathing body is young, looks good in yoga pants and is comfortable with the role of eye candy for a C-suite full of male leaders.*** Stay politically correct, quiet and obedient [especially if female]."

73. Several other online reviews described the toxic culture of SeaSpine more generally. For example, shortly before the announcement of the Merger Agreement, a Glassdoor post from September 14, 2022 titled "Not a company I would recommend" stated that there was "***drinking at all hours of the day at cubicles***" and that there was "***favoritism when promotions come around, hiring friends with no skills relevant to the job.***" A post from about three months later agreed that "***employees tend to drink too much***." Earlier, on December 14, 2018, a former Material Handler and Forklift Operator posted an Indeed review titled, "Management is callous and inept. Not a good fit for industrious and conscientious workers," writing that SeaSpine had "***parties with alcohol provided during work hours***," which "***leaves the company wide open for liability lawsuits***." A May 15, 2018 Glassdoor post titled "Get Out While You Can" stated that "turnover is extremely high" and that there was a ***"[t]oxic environment"*** where ***"[p]romotions are based on popularity rather than merit***. Executive Assistants are the company mean girls." And a Glassdoor post from February 15, 2018 titled "Seacult" stated that SeaSpine had a "***cult environment that induces fear and insecurity in some departments coupled with a complete lack of accountability at the upper echelons for their poor leadership***" and complained that SeaSpine favored hiring "friends of the family with little or no experience over qualified candidates who are greatly lacking here." On January 29, 2018, a self-reported then-current Manufacturing Technician

went so far as to say on Indeed that SeaSpine engaged in "***[p]olitics, being petty, favoritism, nepotism, and good ol' discrimination***."

74.     These public complaints provide a wealth of information about which Defendant Orthofix and the Legacy Orthofix Officer and Director Defendants could or should have inquired to test validity, and in the case of the *Johnson* lawsuit, should have prompted Defendant Orthofix and the Legacy Orthofix Officer and Director Defendants to conduct additional due diligence into the executive leadership of SeaSpine. However, Defendant Orthofix and the Legacy Orthofix Officer and Director Defendants failed to take those steps, opening the Company to post-Merger risks.

75.     Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, SeaSpine, and the Terminated Executive Defendants are all responsible for the due diligence inadequacies relating to HR and personnel issues at SeaSpine, as they were involved in the due diligence process. On the SeaSpine side, the Terminated Executive Defendants stated in their Defamation Complaint that Defendants Bostjancic and Keran led the due diligence process. Defam. Compl. ¶11. On the Orthofix side, the Orthofix Board and Defendant Serbousek were particularly involved in the process.

76.     In sum, though the due diligence process would have revealed red flags relating to HR and personnel issues at SeaSpine, Orthofix disregarded those issues in order to proceed with the Merger. Had Orthofix probed further, it would have been easy to uncover the myriad troubling problems at SeaSpine. *See infra*, Section V.E. Orthofix's lack of due diligence into the competency of the Terminated Executive Defendants and related HR matters is not entirely surprising given that Orthofix has also ignored and/or condoned discriminatory employment matters that have targeted its own employees. *See infra*, Section V.F. Orthofix's disregard for these problems

ultimately manifested in the continuation of a hostile and discriminatory work environment, *see infra*, Section V.I , and ultimately, the investigation into and the termination of the Terminated Executive Defendants for their misconduct, to the shock of the public. *See infra*, V.L-M

77. The haphazardness of the due diligence process is underscored by the Terminated Executive Defendants' admissions of their own reckless approach to the due diligence process. As they admitted in contemporaneous text messages amongst themselves that were surfaced to the public in the Defamation Lawsuit,[1] the Terminated Executive Defendants recognized that SeaSpine fulfilled diligence requests and answered questions at a slow pace. Decl. of Catherine Burzik in Support of Defs.' Special Mot. to Strike Pursuant to Cal. Code of Civ. Proc. Section 425.16, Jan. 24, 2025, *Valentine*, No. 24CL010340C, at document page 24 (ROA No. 15) ("Burzik Declaration" or "Burzik Decl."). Further, they acknowledged on September 29, 2022 that if the Merger Agreement was signed on October 6, they were "unprepared," it might be a "train wreck," and they would not have answers to certain open diligence matters by then. Burzik Decl. at PDF pp. 21, 24, 25. In fact, the Terminated Executive Defendants admitted that there were at least seven open diligence issues as of that date. Burzik Decl. at PDF p. 24. However, these issues were not dealbreakers for SeaSpine: the Terminated Executive Defendants recognized that even if Deloitte, their auditing firm, could not finish its work by the target signing date, the Terminated Executive Defendants would still sign the Merger Agreement. Burzik Decl. at PDF p. 24.

---

[1] All descriptions and screenshots of the Terminated Executive Defendants' text messages in this Complaint come from Defs.' Special Mot. to Strike Pursuant to Cal. Code of Civ. Proc. Section 425.16, Jan. 24, 2025, *Valentine*, No. 24CL010340C (ROA No. 14) ("Defamation Motion to Strike" or "Defam. Mot. to Strike") and the Burzik Declaration in support thereof, to which Securities Act Defendant Burzik attached an exhibit containing text messages between the Terminated Executive Defendants.

78.     Ironically, as displayed in these due diligence text messages and several others, the Terminated Executive Defendants were sending each other barrages of inappropriate messages during the negotiation process and leading up through the Due Diligence Period, many of a sexually violent nature or that were demeaning to gay people, women, and racial minorities. Many of these text messages appeared to discuss individuals with whom the Terminated Executive Defendants worked, demonstrating their lack of fitness to lead the combined Company. However, it would take months following the Merger for the Orthofix Board to finally investigate workplace issues involving the Terminated Executive Defendants, which was when the Orthofix Board discovered these messages.

79.     For example, during a call between Orthofix executives and market makers, Defendant Valentine texted with Defendants Bostjancic and Keran that he "*is always so patient and happy to answer any and all questions in these investor meetings with cute chicks!*" Defendant Keran replied, "*I would like to get more involved in IR activities!*" Mr. Bostjancic responded, "*This one may not be of the drinking age yet! And seems fanatically over-interested in Orthobiologics.*" And Defendant Valentine said, "*She likes a good bone!*" This text exchange is reproduced below:



80. On August 27, 2022, Defendant Valentine wrote that a "female co-worker," Defam. Mot. to Strike at 3-4, was "***completely turned on***" by Defendant Keran, and added "***[t]hat could be a fun time, indeed***!" Defendant Valentine later wrote that the co-worker had "***[l]ovely bolt ons***" and "***[m]aybe too thick in the back for you, but shame on you if that's a deterrent.***" The text message exchange is reproduced below:



81. And during the midst of due diligence, in September 2022, the Terminated Executive Defendants engaged in the below exchanges:

- On September 14, 2022, Defendant Keran wrote, "Hey, you're not married to an Asian!" and Defendant Valentine replied, "***I meant you are gay! Could care less that you are Asian!***"



- The same day, Defendant Valentine texted, "***Rammed it up their…..errrrr….I mean down their throats…***"



- On September 29, 2022, Defendant Keran wrote that an Orthofix director, Defam. Mot. to Strike at 4, needed "to get off her ass[,]" and should plan to work until closing "***with my fist up her ass***." Defendant Bostjancic responded that his "fist will be right next to" Defendant Keran's. Defendant Keran wrote, "[r]ibbed, for her pleasure[,]" and Defendant Bostjancic replied "[***d]ry [f]ist fuck her ass, with a cast.***" Later in the morning, Defendant Bostjancic wrote, "***Lube up the thumb cast PK. You're gonna be shoving up multiple asses!***" Later in the chat, Defendant Keran said, "I can cast fuck you, too. No grease!"





- On September 30, 2022, Defendant Keran wrote, "Every time he opens his mouth he puts his dick in it." Defendant Valentine replied, "Phew….was worried it was your dick!" to which Defendant Keran said, "I'm saving that for closing." Defendant Bostjancic added, "***Keep the ass fucking cast for closing as well***." Keran then said that someone was on his "***ass fucking list***."

| | | |
|---|---|---|
| M | Mobile ▓▓▓▓▓▓ | 9/30/2022, 7:20 AM |
| | Every time he opens his mouth he puts his dick in it | |
| KV | Keith Valentine ▓▓▓▓▓ | 9/30/2022, 7:22 AM |
| | Phew….was worried it was your dick! | |
| M | Mobile ▓▓▓▓ | 9/30/2022, 7:22 AM |
| | I'm saving that for closing | |
| JB | John Bostjancic ▓▓▓▓▓▓ | 9/30/2022, 7:27 AM |
| | Keep the ass fucking cast for closing as well. | |
| M | Mobile ▓▓▓ | 9/30/2022, 7:57 AM |
| | ▓▓▓ is now on my ass fucking list. Dude is completely fucking useless | |

### C. Orthofix Touts a Merger with SeaSpine and the Appointment of Defendant Valentine to Lead the Combined Company

82. Following the deficient due diligence process, on October 11, 2022 after the market closed, Orthofix and SeaSpine issued a joint press release that they also filed with the SEC, announcing that they would combine in a "merger of equals" to create "a leading global spine and orthopedics company with highly complementary portfolios of biologics, innovative spinal hardware, bone growth therapies, specialized orthopedic solutions and a leading surgical navigation system." The press release touted a long list of strategic and financial benefits of the Merger, including to the benefits of their combined product folders, strengthened commercial reach, revenue synergies and cost savings, and enhanced opportunities for self-funded investment. Further, the press release stated that under the terms of the agreement, which was unanimously approved by the Boards of Directors of both companies, SeaSpine shareholders would receive 0.4163 shares of Orthofix common stock for each share of SeaSpine common stock owned. Following the Merger, Orthofix shareholders would own approximately 56.5% of the combined

Company, and SeaSpine shareholders would own approximately 43.6% of the combined Company, respectively, on a fully diluted basis.

83.     The press release also announced that Defendant Valentine would serve as President and CEO and member of the Board of Orthofix, and that Defendant Serbousek would serve as Executive Chairman of the Board. Valentine expressed his support for the Merger:

> This transaction brings together two complementary organizations to create an industry leader with the immediate financial strength to self-fund investments that deliver both growth and better patient outcomes. We are excited about the value we can create for the combined company's shareholders, the new opportunities opened for employees and our ability to now provide surgeons and hospital partners a complete procedural solution using cutting-edge technology at every level.

84.     The same day, Orthofix also filed with the SEC a Form 8-K that attached a copy of the Merger Agreement, stating that the Merger Agreement was "incorporated herein by reference." The Form 8-K, incorporating the Merger Agreement, represented that SeaSpine was in compliance with all employment and labor laws, including laws relating to civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. Further, it represented that there had been no formal or informal complaints of sexual or racial harassment, sexual or racial misconduct, sex/gender or racial discrimination, or similar behavior in the past four years against any officer, director, manager, or supervisory-level SeaSpine employee; that there were no misconduct-related allegations pending or threatened, nor is there any reasonable basis for such an allegation; and that in the past four years, SeaSpine had not entered into any settlement agreement, non-disparagement agreement, confidentiality agreement, non-disclosure agreement, or any other contract or similar provision relating to any misconduct-related allegation against SeaSpine or any SeaSpine officer, director, manager, employee, or independent contractor. The Form 8-K made the same representations as to Orthofix.

85. For reasons described further below (Section V.E), it was false and misleading for the Form 8-K to assert that SeaSpine was in compliance with labor laws, that there were no formal or informal complaints of misconduct against senior-level SeaSpine employees in the past four years, that there was no reasonable basis for any such allegations, and that SeaSpine had not entered into a settlement agreement involving misconduct in the past four years.

86. The market recognized the importance of leadership at Orthofix and SeaSpine in the success of the Merger, particularly as to Defendant Valentine and Defendant Bostjancic (who was announced the following month, per ¶¶ 92-94, below. On October 12, 2022, Ladenburg Thalmann published an analyst report on both Orthofix and SeaSpine that responded positively to the news of the Merger Agreement, recommending that the market buy both OFIX and SPNE shares. The analyst report recognized "Management and Board Stability" at SeaSpine as one of the primary risks to its recommendation to buy SeaSpine shares:

> Significant loss of key personnel could prove to be damaging toward the operational efficiencies and further growth of the company. The departure of key personnel could materially affect the overall performance and strategy of the company going forward. The company is highly dependent on the services of its current management team and board. Key to the company's progress over the past year are Keith Valentine, who currently serves as the company's CEO, President and Director and John Bostjancic, the company's Chief Financial Officer.

87. The merger was advertised to the market as mutually beneficial. Defendants described the merger as one of "equals," and touted that the combined company would be led by "an experienced Board of Directors and leadership team that leverages the talent within both organizations," and that the companies had highly synergistic portfolios and opportunities.

88. What the market did not know at the time was that Defendants Valentine, Bostjancic, and Keran had for years cultivated a toxic workplace culture at SeaSpine that

systematically discriminated against women. Indeed, just days before the announcement of the Merger Agreement, the Terminated Executive Defendants sent each other inappropriate text messages. Per the Burzik Declaration, Defendant Valentine sent a message asking, "*[c]an you still do this, Pat, with your thumb?*" He then sent a highly graphic, pornographic image, writing, "Dohhhh," "[n]ope," "[y]ou can't." Defendant Keran responded, "No, I don't have that reach." Defendant Valentine said, "[m]ore like a less shallow 'glide plane,'" and, "*I do like how she caresses her ass.*" Defendant Keran replied, "[c]lassy girl," and, "*[s]he ain't seen nothing yet.*"

89.     Although these texts were not shared company-wide, they only amplify the Terminated Executive Defendants' public objectification of and discrimination against women.

**D.     Orthofix Announces That it Carefully Selected the Incoming Executive Leadership Team and Announces its Selection of Defendants Bostjancic and Keran**

90.     Not too long after the announcement of the Merger Agreement, Orthofix touted to the market that it had carefully selected the incoming leadership team, and also announced in mid-November that two other key executive roles for the combined Company would come to be filled by Defendant Valentine's close friends and SeaSpine colleagues, Defendants Bostjancic and Keran.

91.     Specifically, on November 18, 2022, Orthofix filed with the SEC a Form 425 containing a letter that it had sent to employees dated November 17, 2022. The Form 425 stated that "*ELT candidates were selected based not only on their individual merit but also with consideration for the overall composition of the executive team.*" This statement was false and misleading because it conveys the misleading impression that Orthofix had engaged in a vetting process that evaluated candidates' competency and accomplishments that would warrant leading the combined Company. However, if Orthofix had engaged in such a process, the Terminated Executive Defendants' misconduct would have been exposed.

92.     Also on November 18, 2022, Orthofix and SeaSpine announced that Bostjancic would serve as CFO of the Combined Company. The announcement touted Bostjancic's industry and leadership experience, and Valentine assured the public that Bostjancic would excel in the role:

> John has been a key leader of SeaSpine dating back to the successful spin-out of the organization in 2015. I am confident his background and experience in the medical device industry coupled with his cultural influence will benefit the newly combined company as we continue to grow. . . . I believe John is well positioned to help lead us through the successful integration of the two companies, ensuring accountability across all levels of the organization, as we focus on the key initiatives that will drive growth, scalability and shareholder value.

93.     Defendant Valentine's statements were false and misleading because they assured the market that Defendant Bostjancic was a force for accountability, when in reality, Defendant Bostjancic—like the other Terminated Executive Defendants—perpetuated a hostile and discriminatory work environment.

94.     This news was reported by various news outlets. On November 18, 2022, *MassDevice* wrote that "SeaSpine CFO John Bostjancic will continue as the top financial officer of the to-be-named orthopedic device giant created through a merger with Orthofix," and added, "[w]hen the two companies announced their plans to merge last month, they said that Bostjancic's present boss, SeaSpine CEO Keith Valentine, would be CEO." The article quoted Defendant Valentine's false and misleading statements from the press release about Bostjancic.

95.     In addition, on November 21, 2022, Orthofix filed a Form 8-K with the SEC disclosing that four days prior, Defendants Serbousek and Valentine announced to Orthofix and SeaSpine employees the future Executive Leadership Team. That team included Defendant Keran

as Chief Legal Officer. According to Securities Act Defendant Burzik, Orthofix agreed to appoint Keran as CLO only at Valentine's urging. Burzik Decl. ¶ 5.

### E. Orthofix's Due Diligence Overlooked Discriminatory and Abusive Conduct at SeaSpine That Fostered a Hostile Work Environment

96. Despite the rosy image of the Merger that was presented to the public, there were severe HR and personnel issues at SeaSpine that had been ongoing for years. Given the pervasiveness of those issues, Orthofix's due diligence on SeaSpine clearly overlooked overwhelming evidence of discriminatory and abusive conduct at SeaSpine that fostered a hostile work environment.

97. Though this misconduct had long been lurking close to the surface of SeaSpine leading up to the Merger, it was not something investors would have known about. The public was first alerted to the existence of it on September 12, 2023, when Orthofix made the shocking disclosure that the Orthofix Board had terminated the Terminated Executive Defendants "for cause" following an internal investigation due to "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements." The termination is further described below (Sections V.L, V.N).

98. About a year later, on September 10, 2024, the Terminated Executive Defendants opened the door to greater public disclosure about their misconduct when they filed the Defamation Lawsuit, naming as defendants Defendants Burzik and Burris, and Does 1-10 . The Defamation Complaint disclosed to the public for the first time that the abrupt termination of the Terminated Executive Defendants was based in part on text message exchanges between them that were uncovered in the Orthofix internal investigation that took place in the summer of 2023 (the "Internal Investigation"). In defense of the veracity of their statements regarding the reasons for terminating the Terminated Executive Defendants, the Defamation Lawsuit Defendants via a

sworn statement from Securities Act Defendant Burzik submitted to the court screenshots of the Terminated Executive Defendants' offensive, sexually violent, and degrading text messages. Burzik Decl. ¶ 8. Further, Burzik's declaration stated that their termination was also due to "evidence that the former executives engaged in significant and repeated bullying and other mistreatment of Orthofix's employees, that the culture the three managed demeaned and devalued the contributions of female employees, and that the three executives acted frequently with aggression, and accepted and promoted vulgarity and personal attacks." Defam. Mot. to Strike at 1.

99. This late disclosure of the Terminated Executive Defendants' misconduct, which came on the heels of a woefully belated investigation into their fitness for leading the combined Company, is striking in light of the fact that the Terminated Executive Defendants had been engaging in workplace misconduct for years. In fact, multiple confidential witnesses confirmed that misconduct had been ongoing at SeaSpine long before and leading up to the Merger. In particular, former employees reported on the troubling "good old boys' club" culture fueled by the Terminated Executive Defendants, and in particular, Defendant Valentine; SeaSpine's toothless HR department, which the Terminated Executive Defendants controlled and strong-armed into discarding discrimination-related complaints; SeaSpine's history of sex-based discrimination and sexual harassment and/or assault; SeaSpine's pervasive culture of bullying; and pay inequities based on gender. Had Orthofix undertaken an adequate due diligence process, it would have readily uncovered all of these HR violations, wisely declined to bring the Terminated Executive Defendants to Orthofix and avoided the Internal Investigation and termination that culminated in a massive loss to investors.

1. **SeaSpine's "Good Old Boys' Club" Culture of Rampant Drinking and Partying**

100.    From a birds'-eye view, SeaSpine could have looked like a "fun" workplace with an informal start-up culture, where onsite happy hours were aplenty and where management went all out for company events. But in reality, the Terminated Executive Defendants—particularly Defendant Valentine—had cultivated a "good old boys' club" in the workplace, where they surrounded themselves with managers and employees who did not threaten their sense of control, and where they were free to do what they wanted: show up intoxicated to work, flirt with female employees, inappropriately touch female EAs at work parties, and more. Understandably, this boys' club culture that revolved around Defendant Valentine at its center made SeaSpine employees, particularly female employees, feel deeply uncomfortable and devalued, which was also reinforced by the known pay inequities.

101.    As described below, multiple former employees described the top-down, male-dominated culture at SeaSpine as a "good old boys' club" where rampant drinking and partying was pervasive, pointing to senior leadership as responsible for setting that tone.

102.    For example, CW 1, a former Operations Manager from SeaSpine and then Orthofix from 2019 until October 2024, said that SeaSpine was a very social environment, and that alcohol was the norm on the SeaSpine premises. He said that there were several refrigerators at SeaSpine that all contained alcohol, which he thought was a liability issue. In addition, CW 2, who worked as an EA for Defendant Bostjancic from February 2020 to September 2021 (and also provided support to Defendant Keran), recalled times that men were drinking in the office during the workday. CW 2 said that men at SeaSpine could do whatever they wanted.

103.    Further, CW 3, who worked as a Talent Acquisition Coordinator contractor for SeaSpine from July 2016 to October 2016 and overlapped with Johnson, said that the "the good

old boys' club" culture operated at the behest of Defendant Valentine. CW 3 said that whatever Valentine wanted as CEO is what happened, and that SeaSpine did a lot to protect Valentine. Further, CW 3 said that prior to filing the Discrimination Class Action lawsuit, Johnson made a formal internal complaint about the SeaSpine culture of following Valentine's every wish and protecting him at all costs, but that Johnson's concern was dismissed or not deemed important at the time.

104.    Echoing CW 3, CW 2 said that SeaSpine was essentially Defendant Valentine's world, where he was the villain and everyone else was just trying to survive. CW 2said that standing up to Valentine could get employees fired. Further, CW 2 said that SeaSpine's male-dominated leadership treated and reacted negatively to women who were straightforward and attempted to exert agency in their roles. By comparison, CW 2 said that leadership treated favorably women who were "cute and flirty," drank a lot of alcohol at firm events, and hung out and drank alcohol on the accounting floor after the workday with Defendant Valentine.

105.    Another defining feature of the SeaSpine culture, as described below by a former employee, SeaSpine executives often drank excessively at SeaSpine functions, sometimes even during the work hours. The executives also reportedly engaged in inappropriate and/or unprofessional behavior while intoxicated.

106.    CW 4, a former VP of Human Resources at SeaSpine from January 2020 to May 2020, said that alcoholism was a problem at the executive level at SeaSpine. She said that she saw the Terminated Executive Defendants intoxicated at almost every SeaSpine event, since the events all involved consuming large quantities of alcohol. CW 4 said that she was uncomfortable learning that this was the culture at SeaSpine, and did not want to be part of it. As a VP of HR, CW 4 felt uncomfortable and would leave the events. In addition, CW 4 could recall a time that she was on

a legal call with Defendant Keran and two other attorneys in March 2020, when Keran was "drunker than a skunk" leading the call, working while completely intoxicated. CW 4 said that Keran was slurring words, had delayed speech, was repeating things, and was saying things that did not make sense. According to CW 4, during the call, one of SeaSpine's two female attorneys texted CW 4, expressing that Keran's intoxication was a problem, and asking what they could do about it.

107. In addition, CW 4 described how there was an annual marketing summit in San Diego in April, and SeaSpine employees stayed in a hotel despite living in the city because they were consuming alcohol and "fucking around." Before departing from the event, CW 4 recalled seeing Defendant Valentine with his hands up the shirt of an EA. CW 4 said that Valentine did this in front of a packed room, and that he was "totally drunk." CW 4 said that Defendants Valentine, Keran, and Bostjancic had some sort of "dirty old boys' club," and that there was "weird stuff" that went on between the EAs and the executives, such as inappropriate relationships and interactions. CW 4 said that as a result of this conduct, there was high EA and HR turnover.

108. In addition, CW 4 described an annual SeaSpine event where executives would perform comedic acts, such as rapping and acting in skits. CW 4 explained that alcohol was a prevalent feature at the event, so SeaSpine bussed employees to and from the event. CW 4 said that a video was taken at the event of executives taking shots of alcohol backstage before going out and performing "completely obliterated." CW 4 said that people got so intoxicated such that one of the employees vomited on the bus.

### 2. SeaSpine's Deficient Human Resources Department

109. On top of SeaSpine's "good old boys" culture of drinking, partying, and executive worship, its HR department was woefully ineffective, in large part due to the Terminated Executive

Defendants' ultimate control over HR priorities and investigations, as well as the HR department's own history of enabling discrimination at SeaSpine.

110. Former SeaSpine employees remarked that the HR department was not independent from the Terminated Executive Defendants, in particular, Defendants Valentine and Keran. CW 4, a former VP of HR from January 2020 to May 2020, explained that in deciding whether to investigate complaints, she reported to Defendant Keran, but Defendant Keran received direction from Defendant Valentine. CW 4 found this highly problematic because the CEO should not have the authority to determine what HR investigated. As a result of the HR department's lack of independence and ability to investigate complaints, CW 4 struggled to be effective, explaining that people who worked at SeaSpine for long enough knew that her role as VP of HR had been replaced eight times in three years and that the role was powerless. CW 4 said that the lack of independence of the HR department was pervasive enough that no one would seek help from the HR department.

111. CW 4 also explained that the Terminated Executive Defendants intentionally tried to consolidate control over SeaSpine's HR department. According to CW 4, Defendant Valentine deliberately did not assign her (or anybody else) the role of Chief People Officer because he did not want anyone at SeaSpine to have the authority to conduct investigations without his sign-off. CW 4 said that Defendant Valentine wanted him and Defendant Keran to retain that investigative authority for themselves. Prior to her joining SeaSpine, CW 4 said that Defendant Bostjancic had overseen HR instead of Defendant Keran. However, CW 4 said that Defendant Valentine was concerned that Defendant Bostjancic was not exerting sufficient control over HR, and so he transferred oversight to Defendant Keran, whom Defendant Valentine considered to be more aggressive. Relatedly, CW 4 said that SeaSpine did not take seriously the turnover in its HR department and neglected to facilitate smooth transitions. When she showed up on her first day,

the VP of HR whom CW 4 was clearly sent to replace was still sitting on the office and had no idea that CW 4 was there to replace her. CW 4 said that she eventually because close friends with her predecessor as well as another VP of HR, since they all went through what CW4 described as "the same horrible experiences."

112.    In addition, CW 4 said that HR's inability to adequately process and investigate complaints deterred employees from raising issues with HR. CW 4 explained that people knew not to file complaints because nothing would happen. CW 4 said that her direct reports, who had worked at SeaSpine for longer than her, told her stories about how nothing ever happened in HR, nothing ever changed in HR, and no one in HR ever looked at anything. Even worse, CW 4 said that employees who filed complaints were targeted and let go from the company. As an example, CW 4 said that an individual who worked in marketing filed a complaint and was fired prior to when CW 4 joined the company.

113.    As described below, the ineffectiveness of SeaSpine's HR—and pressure from executive leadership—had the direct result of enabling the persistence of discrimination and harassment at SeaSpine. Former HR employees reported being hamstrung in, and at times actively prohibited from, addressing these issues, and other employees reported that they either were not comfortable raising discrimination- or harassment-related complaints, or that such complaints were ignored.

114.    For example, CW 4 stated that because of the HR's ineffectiveness, women were completely marginalized. CW 4 explained that she was asked either to not report incidents or to cover things up. Specifically, CW 4 said that she was asked to cover up issues relating to women's pay and women complaining about being uncomfortable.

115.    CW 2, Defendant Bostjancic's former EA, said that she had reported a (female) colleague who made openly made racist comments about Black people to HR. However, CW 2 said that nothing was done, because the perpetrator who CW 2 reported was protected from repercussions by Troy Woolley ("Woolley"), then-Vice President, Integrated Enabled Procedures at SeaSpine. As discussed *infra* ¶ 145, according to CW 4, Woolley himself was a problematic figure because he harassed women at company events.

116.    CW 5, who worked in a benefits role at SeaSpine from July 2022 to July 2024 and who handled SeaSpine employees' leaves of absence, also witnessed a complaint—this one relating to harassment—go unaddressed. Sometime in the last three months of 2022, CW 5 worked with another employee who had received a doctor's note to take stress leave for one month because she was being harassed by a male employee who had tried to commit suicide. CW 5 said that the male employee would not leave the female employee alone. The employee who took leave told CW 5 that she had submitted a complaint to SeaSpine's anonymous hotline, but that nothing was done. CW 5 also personally raised the issue with Chris Essman, who was Senior Manager, HR Business Partner at SeaSpine, but she does not know what happened from there. Regardless, despite the complaint, CW 5 said that SeaSpine continued to place the male employee on the same team as the female employee who filed the complaint. According to CW 5, that female employee was laid off during the Merger while she was on leave.

117.    Further, the HR department itself had a history of perpetuating gender discrimination within its own ranks, so much so that it propelled a former female employee to file a class action lawsuit against SeaSpine. As described below (¶¶ 63-66), former HR employee Johnson settled a class action lawsuit against SeaSpine relating to its discriminatory treatment of female employees based on her own experience of working in SeaSpine's HR department.

118.    In fact, several former female employees, including Johnson via her complaint and CW 3, discussed how Dennis Raposa ("Raposa"), who was the head of the HR department between 2015 and 2017, fostered an environment that was hostile to women, ranging from favoring men in hiring and compensation to making outright misogynistic comments about women in the workplace, as described below (¶¶ 120-121). According to CW 3, Raposa dictated what HR did and did not listen to others. And as Johnson alleged in the Discrimination Class Action, "Raposa admitted . . . that he knew there was inequity at the Company," *Johnson* Compl. ¶ 45, and "routinely expressed sexist attitudes that belied a lower value of women," *id.* ¶ 22. Based on the extent of Raposa's discriminatory practices, as Johnson alleged, SeaSpine's male-dominated senior leadership knew or should have known about Raposa's conduct but took no steps to correct it for over a year. *Johnson* Compl. ¶ 24.

### 3. SeaSpine's History of Sex-Based Discrimination

119.    Against this backdrop of the Terminated Executive Defendants' "good old boys' club" with heavy drinking and a toothless HR department, SeaSpine's workplace was ripe for discrimination towards female employees. This discrimination was evident during all stages of the employment relationship: from hiring, to pay inequity, and ultimately to retaliation and firing. Men at SeaSpine, including those in supervisory roles, also exhibited discriminatory and condescending attitudes towards female employees.

#### d.    *Discriminatory Hiring and Promotion Decisions*

120.    According to a former SeaSpine employee who worked at SeaSpine during the Discrimination Class Action class period, SeaSpine passed her over for a job opening due to being a woman. Defendant Bostjancic was involved in this decision-making. CW 3, a Talent Acquisition Coordinator contractor for SeaSpine from July 2016 to October 2016, shared that during her first week at SeaSpine, the Talent Acquisition Manager, Michael Galvin—to whom she was supposed

to report—vacated his role without notice, so Defendant Bostjancic and Raposa oversaw the HR department and told CW 3 to start recruiting for the now vacant position. CW 3 said that she was interested in that full-time role herself, but that Bostjancic and Raposa did not seem open to her applying, and that three months into her work at SeaSpine, Raposa excluded her from conversations about recruiting strategy all together. Indeed, Johnson also alleged in the Discrimination Class Action that Raposa had "discouraged" a female Talent Acquisition Coordinator (likely a reference to CW 3) from applying for the position even though she was already performing many of the tasks of the role's predecessor. *Johnson* Compl. ¶ 38.

121.    CW 3 suspected that Raposa had wanted to fill the position with one of his friends, and CW 3 spoke with Johnson and another HR Business Partner about her concern that SeaSpine would provide preferential treatment towards Raposa's friend. CW 3 ended up going through the interview process with Defendant Bostjancic, Raposa, and another HR Business Partner once she learned that SeaSpine policy technically required that she be allowed to interview, but the interview was a farce. CW 3 sensed that a decision had already been made about who would fill the role, and the position ultimately went to a friend of Raposa's, David Wallace, who had only one or two years more experience than CW 3. Johnson similarly alleged in the Discrimination Class Action that in or around October 2016, SeaSpine hired a personal friend of Raposa into a role with the title "Talent Acquisition Business Partner." *Johnson* Compl. ¶ 38. CW 3 felt that she did not receive an equal and fair opportunity to be considered for the position, since the person who was ultimately hired was "buddy buddy" with Raposa and that, at the end of the day, it was the "good old boys' club." According to Johnson's allegations in the Discrimination Class Action, Raposa's friend ended up receiving a significantly higher salary than both Johnson and the female Talent Acquisition Coordinator. *Johnson* Compl. ¶ 38.

122.     Further, CW 3 said that even outside of her own circumstances, Defendants Valentine and Bostjancic appeared to have a greater regard for men and favored them in personnel decisions. CW 3 explained that the executives would join the deliberation sessions after interviews to help determine who should be hired. CW 3 said that it was very apparent that the people they selected for leadership positions were almost always male.

e.     *Discriminatory Payment Practices*

123.     One of the most significant structural inequalities at SeaSpine (which necessarily leaked into Orthofix post-Merger when the workforces were combined), was its disparate pay for female and male employees of comparable backgrounds and responsibilities. Pay inequity at SeaSpine had been ongoing for years and still existed at the time of the Merger and featured heavily in the Discrimination Class Action described above (¶¶ 63-67) and the more recent *O'Connor* case.

124.     Multiple former employees described the discriminatory compensation structure at SeaSpine. CW 3 and Johnson spoke about the Talent Acquisition Manager (a man) that SeaSpine hired over CW 3 who received a salary of around $100,000 with only two or three years of experience, which was not warranted in the world of HR. CW 3 said that the $100,000 amount was a number that Raposa decided arbitrarily, so under most compensation practices, it could be deemed discriminatory. According to CW 3, it was possible to see the new hire's salary because everyone in the HR department had access to everyone's salary. CW 3 said that this salary was also higher than what Johnson and another HR Business Partner were making. CW 3 recalled that Johnson told her that she felt that the pay discrepancy was unjust.

125.     Similarly, Johnson's lawsuit against SeaSpine, described *supra* (¶¶ 63-66), alleged that there was widespread pay inequity at SeaSpine. According to Johnson, SeaSpine paid her tens of thousands of dollars per year less than it paid her male colleagues (whom often lacked her

qualifications, experiences, skills, and a strong record of performance), and Johnson was informed that the same was done to other female employees. *Johnson* Compl. ¶¶ 4, 6, 25, 29-43.

126.    Former employees also elaborated that the higher salaries received by men were not justified by additional experience or greater responsibilities. CW 3 said that the higher salary for the new Talent Acquisition Manager (a male, who was friends with Raposa) vis-à-vis the salaries of Johnson and another HR Business Partner was not warranted. He had only two to three years of experience, whereas Johnson and the other HR Business Partner had ten or fifteen years of experience in multiple industries. Further, CW 3 said that both Johnson and the other HR Business Partner had demanding roles requiring a lot of work. Similarly, Johnson alleged in the Discrimination Class Action that to mask the unequal pay for women, Defendants created multiple job titles—"over 200 for only 300 employees"—to justify their illegal actions. *Johnson* Compl. ¶ 28. However, in reality, the titular differences did not correspond to differences in responsibilities. *Johnson* Compl. ¶ 28.

127.    As referenced above (¶ 67), another former SeaSpine employee, O'Connor, raised issues of unequal pay in a complaint that she filed in November 2023 in the Superior Court of California. O'Connor joined SeaSpine as Corporate Counsel in November 2018 and was eventually promoted to Vice President, Legal about a year after the Merger. She named SeaSpine, Orthofix, and other related entities as defendants, and alleged that she experienced sexual harassment, gender discrimination, and retaliation during her employment. O'Connor alleged that despite her stellar performance, her assumption of responsibilities that belonged to more senior roles, and the internal recognition she received for contributing on the SeaSpine side to the Merger process, she was paid below-market. *See O'Connor* Compl. ¶¶ 3-34. O'Connor alleged that this problem existed before the Merger and persisted post-Merger as well. *See supra* ¶ 67 (pre-Merger);

*infra* ¶¶ 203-205 (post-Merger). O'Connor alleged that Orthofix retaliated against her and wrongfully terminated her employment in January 2024. *O'Connor* Compl. ¶¶ 48-61.

128.     Despite the fact that the *Johnson* and *O'Connor* lawsuits might have been the only way for the *public* to know about the flagrant compensation inequities at SeaSpine, SeaSpine had been aware of these issues for years, even prior to Johnson commencing her lawsuit in 2017.

129.     Before filing her lawsuit, Johnson had tried to raise her concerns internally while she worked at SeaSpine to no avail. CW 3 said that Johnson voiced her opinions on the pay discrimination to Raposa but he would dismiss them. Indeed, Johnson alleged in the Discrimination Class Action that she raised her concerns multiple times with senior leadership, including Defendant Bostjancic. Specifically, the *Johnson* Complaint alleges that Johnson: (i) made a verbal complaint to Raposa on or around January 2, 2016 raising concerns that a the salary of a male employee who was hired a few months ago was unjustifiably higher than hers; (ii) met with Raposa in or around April 2016 regarding gender discrimination against women; (iii) complained along with another female HR employee to Raposa around May 2016 that a new, inexperienced male hire in HR received a newly-coined job title and a salary that exceeded Johnson's; (iv) spoke with Raposa in September 2016 about receiving promotion for higher pay, which he refused; and (v) raised the pay disparity issue with Rsaposa on at least four other occasions. *Johnson* Compl. ¶¶ 31-36, 44-45. In one of the conversations, Raposa allegedly responded that SeaSpine was not "the right place" for Johnson, reminding her that SeaSpine was "Keith Valentine's Company." *Johnson* Compl. ¶ 6.

130.     Johnson also alleged that after SeaSpine hired Raposa's personal friend as a "Talent Acquisition Business Partner," she emailed Defendant Bostjancic in Fall 2016 and requested an in-person meeting to discuss pay equity at SeaSpine. *Johnson* Compl. ¶ 39. She alleged that when

Bostjancic wrote her back to schedule a meeting, he called it a "comp discussion," but she replied to correct him by stating that it was a meeting to discuss **pay equity** at the company. *Johnson* Compl. ¶ 39 (emphasis added). Further, Johnson alleged that she met with Bostjancic only after she sent several follow-up emails, and eventually told him about her concerns regarding pay inequities and gender discrimination. *Johnson* Compl. ¶ 40. Johnson alleged that after the meeting, Bostjancic told Johnson that he had contacted another female HR Business Partner and that they should discuss these concerns together, but there was no follow-up meeting. *Johnson* Compl. ¶ 40.

131. There were other women who were affected by the discriminatory payment practices and supported Johnson from the sidelines but were too afraid of retaliation or other professional repercussions to come forward. For example, CW 3 said that she would have joined in Johnson's legal action, but she was just starting her HR career and did not want to cause a stir. Female employees' reticence to support Johnson's efforts was warranted in the face of internal retaliation. *See infra* ¶¶ 136-143.

132. In at least tacit recognition of its unequal practices, SeaSpine ended up settling the Discrimination Class Action. As described *supra* (¶¶ 61-65, a notice of settlement was filed in the *Johnson* case on September 3, 2019, and on July 26, 2021 the court approved the settlement. SeaSpine was required to pay over $919,500 in settlement funds, with over $600,500 of those funds disbursed to a total of 276 participating settlement class members, which consisted of all then-current and former female employees who worked for the defendants within the State of California from July 1, 2015 to December 31, 2019.

133. The 2021 settlement also required SeaSpine to implement targeted programmatic relief under which SeaSpine would hire an outside vendor to review their work departments with an emphasis on high pay gaps including between male and female employees (when not

controlling for title, job code, or other substantially similar criteria) to assess pay equity, to evaluate whether the titles and pay structures in those departments accurately reflect the work being performed, and to recommend adjustments to titles, pay, or both. This programmatic relief was to be funded separately at SeaSpine's expense. This programmatic relief was still ongoing at the time between the signing of the Merger Agreement and the close of the Merger. Former employees, such as CW 4, stated that SeaSpine agreed to hire outside consultants for the purpose of assessing pay and gender equity and evaluating whether SeaSpine workers were receiving compensation in accordance with the law.

134.    However, despite SeaSpine's formal launch of the pay and gender equity audit, the actual process was riddled with problems that inhibited true progress and demonstrated the Terminated Executive Defendants' lack of genuine commitment to the effort. Former employees reported the difficulties that they faced in implementing equity remediation efforts.

135.    For instance, CW 4, a former SeaSpine VP of HR from January 2020 to May 2020, said that she joined SeaSpine amidst the pay and equity investigation and that there were mistakes everywhere. Further, she said that her predecessor had worked on the same project, and that her successor must have taken it over as well, since the project was so riddled with problems that SeaSpine was constantly trying to restructure everything to make it work. While CW 4 did not recall specific numbers, she thought that women comprised around less than 5% of all employees and less than 2% or 1% were in upper management. Thus, CW 4 said that SeaSpine was changing and playing around with its numbers to appease the outside third-party auditing company, including by making superficial changes to the titles of female employees to make it seem like there were more women in senior leadership positions than there were in practice. But CW 4 said

that SeaSpine was not doing more than merely changing titles, and neglected to actually change women's pay.

f.    *Discriminatory Retaliation*

136.    Another example of gender-based discrimination at SeaSpine was the culture of retaliation against female employees. As described below, multiple former female employees reported that they had been retaliated against for calling out gender inequality in the workplace. This was a stark contrast against the lack of or inadequate repercussions that many male employees accused of misconduct faced.

137.    For example, despite the extent of Raposa's discriminatory practices, as Johnson alleged in Discrimination Class Action, SeaSpine's male-dominated senior leadership knew or was reckless in not knowing about Raposa's conduct but took no steps to correct it for over a year. Johnson Compl. ¶ 24.

138.    A few years prior, SeaSpine terminated another woman employee who engaged in efforts to support other woman employees in the workplace. CW 4, a former VP of HR from January 2020 to May 2020, said that Defendant Keran told her that she was being fired because she put free tampons in the women's bathroom, rather than installing a new machine for quarters. SeaSpine ultimately allowed her to resign, even though they told her she was fired, and CW 4 received a very small severance. However, when CW 4 found a job four weeks later, SeaSpine spitefully sued her for the severance, saying that she had poached another female employee from their HR department, who had joined CW 4 at her next job. Because CW 4 could not afford the attorneys' fees to fight them, she paid SeaSpine.

139.    In addition, CW 2, Defendant Bostjancic's EA from February 2020 to September 2021 (who also supported Defendant Keran and CW 4), said that people like CW 4, who were

straightforward with the executive team and tried to maintain some sense of control over her responsibilities were fired for "being a woman." CW 2 said that CW 4 was directly fired for trying to create policies that furthered equality in the workplace.

140.     CW 4 also said that Troy Woolley, then-Vice President, Integrated Enabled Procedures at SeaSpine since 2015, made women very uncomfortable. Specifically, CW 4 said that before she began working at SeaSpine, Woolley was written up for showing up to work events (both during work and after work) intoxicated and harassing women. However, he continued his inappropriate behavior without repercussions, other than undergoing coaching regarding the situation.

###### g.     *Discriminatory Attitudes*

141.     Aside from overt retaliatory actions against women, men in leadership positions—including the Terminated Executive Defendants—made misogynistic remarks towards female employees and treated them with condescension.

142.     According to CW 3, a Talent Acquisition Coordinator contractor for SeaSpine from July 2016 to October 2016, Raposa made jokes that were uncomfortable, disrespectful, and not reciprocated by others, including by making sexual or discriminatory comments in a joking way. By way of example, CW 3 said that Raposa referred to a female employee with a Latina name as a "little Mexican girl doing her work job," and also made an inappropriate comment about another employee being gay. Similarly, Johnson alleged in the Discrimination Class Action that Raposa made "comments ranging from chauvinist to abusive," often referring to female employees as "gossipy" or "bitchy," and commenting on women's breasts, proposing to "do a brief walk around to take a look at the […] sisters." Johnson Compl. ¶ 22. CW 3 said that she had attended talent acquisition meeting with Raposa and Defendant Bostjancic before, and their jokes were definitely

"locker room talk." Similarly, CW 2 said that she heard the SeaSpine executives using derogatory language regarding women.

143. Relatedly, CW 4 recounted that Defendant Valentine had asked her to start a women's leadership or mentoring group. When CW 4 gathered ten of the most senior women employees at SeaSpine to discuss a vision for the group, word got back to Defendant Valentine about the meeting, and he told CW 4 that she invited the "wrong women" and that she had not received approval for the meeting. CW 4 then realized that the whole women's group was a farce, and that Valentine had just wanted to create the illusion of a women's group. Relatedly, CW 4 said she was asked to take down pictures of people she admired, which happened to be three women, because the pictures sent "the wrong message." CW 4 said that Defendant Keran told her it looked like she was too supportive of women.

### 4. SeaSpine's History of Sexual Harassment and Assault

144. SeaSpine also faced employee complaints of sexual harassment and/or assault based on conduct that took place during work-sanctioned events. Former employees stated that reporting these incidents did not yield adequate redress.

145. As referenced above, CW 4, said that Woolley made women very uncomfortable, as it was documented that Woolley was showing up to work events intoxicated and harassing women, both during and after the workday.

146. Separately, CW 2 shared that in 2019, a female employee was verbally and sexually assaulted by another (female) SeaSpine employee on a SeaSpine party bus. According to CW 2, the entire company—including the Terminated Executive Defendants—apparently knew about the incident because it was done so publicly. However, CW 2 said that even though the victim filed a complaint with HR, because the perpetrator was in the "in-crowd" there were no repercussions. The only fallout from the event was that SeaSpine got rid of party buses to events.

### 5. SeaSpine's Culture of Bullying

147. SeaSpine's hostile workplace environment was not limited to allegations of sex-based discrimination and harassment. As described further below, SeaSpine also had a pervasive culture of bullying among female employees, perpetrated by a certain group of EAs often referred to as the "Mean Girls." Defendant Valentine's EA, Chrissy Davis ("Davis") was the ringleader of this clique. Defendants Valentine, Bostjancic, and Keran endorsed the actions of these EAs, even amidst complaints from other female employees at the company.

148. The carte-blanche that SeaSpine leadership provided to the "Mean Girl" EAs to engage in bullying derived from their close relationships. Multiple former SeaSpine employees said that Defendants Valentine, Keran, and Bostjancic had personal relationships—likely romantic relationships—with the SeaSpine EAs who bullied other women.

149. According to CW 2—who was a target of bullying—one of the women who bullied her would go drinking with Defendant Valentine, and the two went on vacation together, including bourbon tasting in Tennessee. According to CW 2, the close relationship between the Terminated Executive Defendants and the EAs made it difficult to redress the bullying. CW 2 stated that early in her time at SeaSpine, she reported the culture of bullying to CW 4, then-VP of HR, and would talk to anyone who would listen to her and tell them about the treatment of herself, treatment against others, and racist comments that one of the Mean Girls made (and who received protection from Woolley in connection with these comments, *see supra* ¶¶ 109-114. However, CW 2 said that no one was able to rectify the situation, because it was a pointless effort and employees could be fired for trying. The Terminated Executive Defendants protected the "Mean Girls," even in the face of complaints to HR, and sometimes they even egged on the bullying.

150. Former SeaSpine employees recalled particularly egregious bullying by the "Mean Girls" towards a receptionist with learning disabilities, which the Terminated Executive

Defendants condoned. CW 2 said she witnessed the receptionist constantly being reduced to tears because the other EAs were so cruel to her, particularly Valentine's EA, Davis. At some point, CW 2 reported the bullying behavior towards the receptionist to CW 4.

151. CW 4—who had also received a complaint from the receptionist herself— brought the issue up the chain to Defendants Valentine, Keran, and Bostjancic, telling them that the EAs' behavior was unacceptable and asking that they write up the behavior, but the Terminated Executive Defendants responded that because Davis was the "lead" EA, she was free to do whatever she wanted and would be protected. CW 2 recalled that CW 4 told her that Defendant Valentine took particular offense, telling CW 4 to never come into his office again to complain about his EA.

152. The bullying at SeaSpine was so over-the-top that it caused former employees to leave SeaSpine, including CW 2. After announcing her notice to leave the company, CW 2 said that she sent a letter to Defendant Keran describing the behavior that she witnessed, and noting her concern for SeaSpine employees, shareholders, and herself. In that letter, she noted that she had voiced all her concerns to HR and to Defendant Bostjancic on many occasions, as had other employees, but nothing was ever done to correct the toxic work environment.

153. A few years later, after learning that Defendants Valentine, Bostjancic, and Keran were fired in September 2023, CW 2 sent a LinkedIn message to Puja Leekha ("Leekha"), SeaSpine's then-Senior VP, Chief Ethics & Compliance Officer, Chief Legal Officer & Corporate Secretary, about what she described as the terrible culture at SeaSpine. CW 2 also attached the letter that she had sent to Keran.

### F. Orthofix Overlooked Issues at SeaSpine Because of Its Own Similar Issues

154. In light of the pervasive and long-standing culture at SeaSpine of discriminatory practices, harassing behavior, and general toxicity—much of which has been documented in public

litigation—it is shocking that Orthofix would have agreed to install the very leaders of SeaSpine that oversaw such an environment into the leadership of the combined Company. But Orthofix's cavalier attitude towards investigating HR and personnel issues at SeaSpine made sense, as Orthofix similarly had a deficient HR department and a history of unredressed discrimination, assault, and harassment.

155. As with SeaSpine, former employees reported that Orthofix had a "good old boys' club" culture that propped up men who engaged in inappropriate behavior and disregarded women. CW 6, who worked in various marketing roles at Orthofix from January 2012 to August 2018, described Orthofix's leadership as being part of the "good old boys'" network, which believed that women were incompetent and would not be able to advance as far as men, even though at Orthofix the women tended to work harder than the men. CW 6 also said that male Orthofix leaders used their disproportionate amount of power in an "interpersonal" way, by engaging in sexual relations with other team members. For example, she said that two VPs of Biologics, Cory Brenner and Collin Begley, were both notorious for stories of engaging in extramarital affairs with colleagues.

156. In addition, former employees experienced or witnessed discrimination, harassment, and/or assault at Orthofix. Many of these former employees further stated that Orthofix's HR department had a reputation for ignoring employees' complaints, particularly Suzanne Armstrong, who worked in HR at Orthofix since July 2007 until September 2024, and who was selected as Senior Vice President, Global Human Resources for the combined Company's Executive Leadership Team pursuant to the Merger . For example, CW 8, who was employed as a member of the Regional Sales Team at Orthofix from Fall of 2016 to Fall of 2019, said that Armstrong was known for frequently "pushing things under the rug" and looking the other way in the face of serious misconduct, and that she had been doing this for years.

157. CW 6 said that in early 2018, a colleague told her that a woman who worked in sales was being harassed by either Brenner or Begley, which CW 6 ended up raising in her exit interview with HR. However, CW 6 said that to her understanding, nothing came of her report. CW 6 said that she did not think that any women would ever come forward themselves to report being subject to gender discrimination or sexual harassment, since that was the culture of Orthofix.

158. Similarly, CW 7, who worked in Bone Growth Therapies at Orthofix from January 2018 to March 2021, said that she reported to Armstrong an inappropriate, lewd comment that Brenner made at a dinner in 2018 or early 2019, and Armstrong responded that HR had previously received similar complaints about Brenner. However, to CW 7 knowledge, nothing came of her complaint and no further action was taken by HR. CW 7 said that she raised the disturbing incident again during her exit interview.

159. The condoning of discrimination and harassment was also the subject of litigation against Orthofix. In June 2016, a woman named Kathryn Boston ("Boston") filed a civil rights lawsuit—which ended up featuring in the news—against Orthofix in connection with its response to her being sexually harassed and assaulted by a surgeon while marketing Orthofix products. *See* First Amended Compl. Sept. 25, 2019, *Boston v. Orthofix Medical, Inc.*, No. 4:19-cv-00438-ALM (E.D. Tex.) (ECF No. 26). In Boston's amended complaint, filed on September 25, 2019 ("*Boston* Compl."), Boston alleged that she reported the harassment and assault around August 7, 2017 to Brad Niemann, who at the time of Boston's complaint was the President of Orthofix Spine. *Boston* Compl. ¶¶ 20-23. However, Boston alleged that Orthofix did not conduct any investigation into her complaint, but instead, the night after her report, Niemann invited Boston to go to a night club with her, and then asked one of Boston's colleagues to inform her that Niemann would like to date

her. *Boston* Compl. ¶ 23. According to CW 8, Niemann habitually sexually assaulted and/or harassed Orthofix female sales representatives and was inappropriate "all the time."

160. Further, due to the misogynistic culture at Orthofix, there was a fear of retaliation among female employees, particularly since many of the perpetrators were powerful men. According to CW 6, there were many instances at Orthofix of women being harassed but afraid to speak up. CW 6 said that the perpetrators' abuse of power and the misogynistic culture at Orthofix created a fear of retaliation. CW 6 felt that Orthofix's leaders were "grooming" young women who were impressionable, by using the Company's large entertainment budget to do fun things.

**G.    Orthofix Files the Registration Statement and Joint Proxy Seeking Approval of the Merger**

161. On November 8, 2022, Defendants filed its original Registration Statement with the SEC, which, with the other Offering Documents, were used to effectuate the Merger between Orthofix and SeaSpine.[2]

162. The November 8, 2022 Registration Statement, which described the Merger, stated that both Orthofix's and SeaSpine's boards of directors had approved the Merger and recommended to the shareholders of the respective companies that they approve the Merger at special shareholder meetings.

163. The November 8, 2022 Registration Statement included materially false and misleading statements about the Merger. For instance, according to the Registration Statement, Orthofix's then-serving board of directors unanimously approved the merger, in part, because of

---

[2] The November 8, 2022 Registration Statement was incorporated into the November 22, 2022 amended Registration Statement, the latter of which included the same false and misleading statements as the former.

the **"complementary cultures of Orthofix and SeaSpine, including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate responsibility."**

164.    In addition, the November 8, 2022 Registration Statement attached and incorporated by reference the Merger Agreement, with the "Summary" section of the joint proxy statement/prospectus stating, "[t]he terms and conditions of the merger are contained in the merger agreement, a copy of which merger agreement is attached as Annex A to this joint proxy statement/prospectus. We encourage you to read the merger agreement carefully and in its entirety, as it is the legal document that governs the merger."

165.    The section titled "The Merger Agreement" similarly stated:

> The descriptions of the merger agreement in this section and elsewhere in this joint proxy statement/prospectus are qualified in their entirety by reference to the complete text of the merger agreement, a copy of which merger agreement is attached as Annex A and is incorporated by reference into this joint proxy statement/prospectus. This summary does not purport to be complete and may not contain all of the information about the merger agreement that is important to you. You are encouraged to carefully read the entire merger agreement.

166.    Further, the section titled "SeaSpine Proposal I" also provided:

> The description of the merger agreement in this section and elsewhere in this joint proxy statement/prospectus is qualified in its entirety by reference to the complete text of the merger agreement, a copy of which is attached as Annex A, and is incorporated by reference into this joint proxy statement/prospectus.

167.    The November 8, 2022 Registration Statement, incorporating the Merger Agreement by reference, represented that SeaSpine was in compliance with all employment and labor laws, including laws relating to civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. Further, it represented that there had been no formal or informal complaints of sexual or racial harassment, sexual or racial misconduct,

sex/gender or racial discrimination, or similar behavior in the past four years against any officer, director, manager, or supervisory-level SeaSpine employee; that there were no misconduct-related allegations pending or threatened, nor was there any reasonable basis for such an allegation; and that in the past four years, SeaSpine had not entered into any settlement agreement, non-disparagement agreement, confidentiality agreement, non-disclosure agreement, or any other contract or similar provision relating to any misconduct-related allegation against SeaSpine or any SeaSpine officer, director, manager, employee, or independent contractor. The Registration Statement made the same representations as to Orthofix.

168.    The statements quoted in ¶¶ 163, 167 are at odds with the reported culture and history of SeaSpine as a company rife with discrimination, harassment, and retaliation, including allegations of the same against senior-level employees and managers as well as the class action settlement regarding many of these issues.

169.    On November 22, 2022, Orthofix filed an amendment to its Registration Statement on a Form S-4/A ("Amended Registration Statement"), and the SEC declared it effective the same day. Like the Registration Statement filed on November 8, 2022, the Amended Registration Statement attached and incorporated by reference the Merger Agreement, with the "Summary" section of the joint proxy statement/prospectus stating, "[t]he terms and conditions of the merger are contained in the merger agreement, a copy of which merger agreement is attached as Annex A to this joint proxy statement/prospectus. We encourage you to read the merger agreement carefully and in its entirety, as it is the legal document that governs the merger."

170.    The section titled "The Merger Agreement" similarly stated:

> The descriptions of the merger agreement in this section and elsewhere in this joint proxy statement/prospectus are qualified in their entirety by reference to the complete text of the merger agreement, a copy of which merger agreement is attached as Annex

A and is incorporated by reference into this joint proxy statement/prospectus. This summary does not purport to be complete and may not contain all of the information about the merger agreement that is important to you. You are encouraged to carefully read the entire merger agreement.

171.    Further, the section titled "SeaSpine Proposal I" also provided:

The description of the merger agreement in this section and elsewhere in this joint proxy statement/prospectus is qualified in its entirety by reference to the complete text of the merger agreement, a copy of which is attached as Annex A, and is incorporated by reference into this joint proxy statement/prospectus.

172.    The Amended Registration Statement, incorporating by reference the Merger Agreement, again made the same false and misleading statements as the Registration Statement.

173.    For instance, the Amended Registration Statement stated that Orthofix's then-serving board of directors unanimously approved the merger, in part, because of the ***"complementary cultures of Orthofix and SeaSpine, including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate responsibility."***

174.    On November 23, 2022, Orthofix and SeaSpine filed a Joint Proxy Statement pursuant to Rule 424(b)(3). The November 23, 2022 Joint Proxy Statement made the same false and misleading statements as the Registration Statement and Amended Registration Statement.

175.    For instance, the November 23, 2022 Joint Proxy Statement, which attached the Merger Agreement, represented that SeaSpine was in compliance with all employment and labor laws, including laws relating to civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. Further, it represented that there had been no formal or informal complaints of sexual or racial harassment, sexual or racial misconduct, sex/gender or racial discrimination, or similar behavior in the past four years against any officer, director, manager, or supervisory-level SeaSpine employee; that there were no misconduct-related

allegations pending or threatened, nor is there any reasonable basis for such an allegation; and that in the past four years, SeaSpine had not entered into any settlement agreement, non-disparagement agreement, confidentiality agreement, non-disclosure agreement, or any other contract or similar provision relating to any misconduct-related allegation against SeaSpine or any SeaSpine officer, director, manager, employee, or independent contractor. The Joint Proxy Statement made the same representations as to Orthofix.

176.     The statements quoted in ¶¶ 173, 175 are at odds with the reported culture and history of SeaSpine that was rife with discrimination, harassment, and retaliation, including allegations of the same against senior-level employees and managers, SeaSpine's settlement of a class action settlement regarding many of these issues, and was also failing to adequately implement the programmatic relief it had promised as part of that settlement.

177.     The Offering Documents also incorporated by reference documents that themselves contained materially false and misleading statements, namely the Form 8-K described above (¶84) that Defendants filed in connection with announcing the Merger Agreement.

178.     In addition, the Offering Documents incorporated by reference a SeaSpine Schedule 14A, dated April 22, 2022. That Schedule 14A represented that its code of business conduct and ethics applied to its officers:

> Our code of business conduct and ethics, corporate governance guidelines, audit committee charter, compensation committee charter and nominating and corporate governance committee charter are available, free of charge, under the "Investors > Governance > Governance Overview" section of our website at www.seaspine.com*. **Our code of business conduct and ethics applies to all our employees, officers and directors.** We intend to disclose any amendment to, or a waiver from, a provision of our code of conduct and ethics that applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions and that relates to any element of the code of ethics definition enumerated in

paragraph (b) of Item 406 of Regulation S-K by posting such information on our website at the address specified above.

179. SeaSpine's Code of Business Conduct and Ethics (the "SeaSpine Code") applied to all officers, employees, directors, and other representatives of SeaSpine. Ironically, Defendant Valentine signed the SeaSpine Code as the President and CEO of the company, despite the fact that he and the other Terminated Executive Defendants failed to abide by it and likely the worst offenders.

180. For instance, the SeaSpine Code noted that "[b]uilding and maintaining a culture of compliance and ethical behavior is a priority for the Company." The SeaSpine Code further stated that the company did not engage in discrimination and based employment decisions on experience and work performance:

> ***SeaSpine bases employment decisions on business needs, skills, experience, and work performance. We do not discriminate based on race, color, gender, marital status, disability, age, sexual orientation, religion, citizenship, ancestry, nationality, military history, or any other legally protected status.***

181. In addition, the SeaSpine Code explicitly prohibited harassment, and directed personnel to report acts of harassment:

> ***You are required to treat your colleagues with dignity and respect. Harassment of any kind is prohibited.*** Harassment can take many forms, including unsolicited and unwelcome comments about race, color, gender, marital status, disability, age, sexual orientation, religion, citizenship, ancestry, nationality, military history, or any other legally protected status. ***You should report any act of harassment to your manager, Human Resources, or the Legal Department.***

182. The SeaSpine Code also prohibited working under the influence of alcohol and stated that it was the "duty" of personnel to report violations:

> To ensure that our employees are kept healthy and safe, you must not only follow all health and safety requirements but must also take

personal responsibility for your safety and the safety of those you work with. ***This includes never reporting to work in a state that could impair your ability to work safely and conscientiously (such as under the influence of drugs or alcohol).***

***If you are involved in, or know of, an accident or dangerous situation in the workplace, it is your duty to report it promptly.***

183. The last section of the SeaSpine Code directed compliance with "policies and procedures," which included a requirement to report suspected misconduct:

SeaSpine is committed to complying with applicable local, state, and federal laws, rules and regulations, and its own policies and procedures. ***You are required to immediately report concerns about any business practice or individual conduct that you feel is unethical, illegal, or in violation of SeaSpine's policies and procedures.***

184. This section also specified that retaliation against an employee who reports suspected misconduct in good faith was "prohibit[ed]":

***The Company prohibits retaliation against any employee or director of the Company who, in good faith, seeks help, reports known or suspected violations, or participates in the investigation of such a report.*** Raising a concern in "good faith" means that you have made a genuine attempt to provide honest and accurate information even if you are later proven to be mistaken. If you believe that you have been retaliated against in association with reporting a concern in good faith, you should report this behavior to your manager, the Human Resources Department or the Legal Department. ***The Company takes allegations of retaliation very seriously and will review all complaints of threatened, attempted, or actual retaliatory action. Any reprisal or retaliation against an employee because the employee, in good faith, sought help, submitted a report, or participated in an investigation of such a report will be subject to disciplinary action, up to and including potential termination of employment.***

## H. The Merger Closes

185. On January 4, 2023, Orthofix and SeaSpine announced the completion of the Merger following the approval of each company's stockholders at their respective special meetings of stockholders held that day. The combined press release stated that of the votes cast, 99% of

SeaSpine common shares were voted in approval of the Merger, and 98% of Orthofix common shares were voted in approval of the same. The Merger became effective as of 12:01 AM EST on January 5, 2023.

186. Upon the completion of the Merger, the SeaSpine Executive Defendants became accountable to Orthofix's Code of Conduct, which was posted on Orthofix's website under the section "Investors."

187. According to the "Workplace Conduct" section in Orthofix's Code of Conduct in place at that time, Orthofix had a number of policies regarding "*respectful employee conduct, safety, and diversity and inclusion.*" For example, Orthofix had a policy "*to provide equal opportunities to all qualified employees and job applicants, regardless of numerous categories of characteristics, including race, color, sex, sexual orientation, or gender identity or expression, and any characteristic protected by applicable federal, state, or local laws.*"

188. The Code of Conduct further stated:

> *We expect all employees to be respectful of the diversity of our employees. . . Orthofix is also committed to providing fair and/or living wages to all our employees.*

189. The Orthofix Code of Conduct also had a policy on "Alcohol and Substance Abuse." That section stated:

> *The possession, consumption, sale or purchase of alcohol or illegal drugs on Orthofix property is prohibited. Orthofix also prohibits the use of alcohol or illegal drugs by employees either directly before or during the workday.*

190. Accordingly, the Code of Conduct laid out certain "responsibilities" for Orthofix employees regarding Workplace Conduct, including:

> • *Never treat another employee differently because of their race, color, age, sex, religion, sexual orientation, gender identity or expression, disability, ancestry, marital status,*

*national origin, pregnancy or because of any other protected characteristic.*

- *Ensure your actions and words toward other employees are respectful and not harassing or discriminatory in violation of policy or law.*

- *Never drink alcohol before or during your working hours* or have possession of or use illegal drugs.

191.    Further, the Code of Conduct stated that "*[m]anagers must ensure that their teams comply with laws, regulations, and policies, and must work to resolve ethical dilemmas.*"

192.    The Orthofix Code of Conduct included a certification for employees and officers to sign and provide to the Company, which included a representation that the signatory was "*not in violation of any of the policies of the Code of Conduct*" and would "*abide by and support the policies set forth in the Code of Conduct.*"

193.    The Terminated Executive Defendants, for reasons described above, had been acting in contravention to these codes of conduct for years, as well as in the lead up to the consummation of the Merger. For instance, in the time between the announcement of the Merger Agreement on October 11, 2022 and the closing of the Merger after market close on January 4, 2023, the Terminated Executive Defendants had continued to send each other inappropriate messages. Many of these inappropriate messages appeared to demean and degrade women with whom the Terminated Executive Defendants conducted business in their roles as leaders of SeaSpine.

194.     For instance, on October 28, 2022, Defendant Bostjancic wrote, "*[w]ho is that hot little minky?*" Defendant Valentine responded, "*[l]ove that librarian look.*"



195.     Further, on November 9, 2022, Defendant Bostjancic inquired about a "a female employee," Defam. Mot. to Strike at 4, "*[h]ot or Not?*" Defendant Keran wrote that the matter "*[w]ill require an in person evaluation...*" to which Defendant Bostjancic replied, "*[j]ust keep your fist away from her.*" Defendant Keran then replied, "*[n]o promises.*"



196.     The next day, Defendant Keran reiterated, "*[m]y fist remains ready and eager...*" Defendant Bostjancic noted that the individual being discussed "*is a weak and ignorant dipshit of a leader.*"



197.     On November 22, 2022, Defendant Bostjancic wrote that a woman had "*been up my butt to book travel,*" to which Defendant Keran later responded "*[d]o you want her out?*"

Defendant Valentine noted "*I love butt play now!*" In response, Defendant Keran stated, "*[y]ou pervert!*"



198.    On November 25, 2022, Defendant Valentine wrote, in reference to a colleague, that Defendant Bostjancic "*would give him ass play......*" Defendant Bostjancic responded "*[a]s long as I can wear gloves.*" Defendant Keran added that it was "*Time to step up to the big time. Mr. CFO.... You need to demonstrate that you're ready.*"

199.     On December 20, 2022, Defendant Keran wrote Defendant Valentine "love[d]" the "former President of an Orthofix business unit" (Defam Mot. to Strike at 4), and that he thought she was "***blowing [Defendant Valentine].***" Then, he wrote that Defendant Valentine was "***absolutely jerking her off***" during "a work call" (Defam Mot. to Strike at 4). Defendant Keran then wrote, "***I think she has a small penis,***" to which Defendant Bostjancic added that she "***has a little nub.***"



## I.     Problems at the Combined Company Persist Post-Merger

200.     Unsurprisingly, the cult of the Terminated Executive Defendants, with Defendant Valentine at its helm, did not slow down following the Merger. Rather, the Terminated Executive Defendants continued with business as usual—that is, treating the Company like a social playground where they demeaned and discriminated against female employees. The ability of this type of behavior to persist unchecked for so long made sense in light of the fact that Orthofix blatantly disregarded SeaSpine's history of such problems—particularly at the time Orthofix was conducting due diligence—and the fact that Orthofix had similar problems at home leading up to the Merger. Following the Merger, in recognition of the injustice at the workplace, several employees attempted to raise their concerns about these issues to leadership in the combined Company. However, Orthofix—now under the control of the Terminated Executive Defendants—for the most part ignored those concerns.

201. As one prominent example, gender-based pay inequity continued to persist at the combined Company. As set forth above, SeaSpine did not sufficiently address the systemic inequalities that the Discrimination Class Action Settlement were intended to address, as former employees noted that the remediation effort was riddled with errors and falsification of information (¶¶ 133-135).

202. In addition, former employees shared individual accounts of facing gender-based discrimination at the combined Company after the Merger.

203. Most significantly, O'Connor, a former attorney for SeaSpine and the combined Company, alleged in her 2023 lawsuit referenced above that even after her promotion to Vice President, Legal in around January 30, 2023, and even after she attempted to negotiate a higher salary than what she was offered, the final salary she received was below that of her male peers in the legal department. *See O'Connor* Compl. ¶¶ 35-38. O'Connor alleged that she worked directly with Defendant Keran during the salary negotiation process. *See O'Connor* Compl. ¶¶ 37-38. However, the Terminated Executive Defendants did not take seriously O'Connor's request for greater pay equity. As O'Connor would come to learn during the course of the Internal Investigation, a text exchange between Defendant Bostjancic and Defendant Keran that was discussing O'Connor's request for a salary increase referred to "balls on her chin" or words to that effect. *See O'Connor* Compl. ¶ 40. O'Connor alleged that she was "humiliated" upon learning about these exchanges, particularly since the comments were made at the same time that O'Connor was engaging in salary negotiations with the Company. *O'Connor* Compl. ¶ 40.

204. Such a text message exchange was revealed to the public in the Burzik Declaration that was part of the Defamation Lawsuit, where Defendant Bostjancic wrote,

"**balls are on her chin**," per the below. According to the Defamation Motion to Strike (Defam. Mot. to Strike at 4), this text exchange involved "an issue with a human-resources executive."



205.     Notably, O'Connor alleged that after the termination of the Terminated Executive Defendants, O'Connor filed a complaint with Interim CLO Leekha and Armstrong to discuss the text messages about her, but that Leekha and Armstrong stopped responding. *See O'Connor* Compl. ¶ 42 O'Connor also alleged that around September 2023, she filed a complaint with HR and Leekha regarding allegedly demeaning and discriminatory treatment by Orthofix's VP of IP, Pete Lando, towards multiple female employees, but she received no response. *See O'Connor* Compl. ¶¶ 43-47. Instead, O'Connor alleged that the Company began to retaliate against O'Connor by removing essential job duties, abruptly placing her on leave, and then ultimately wrongfully terminating her employment. *See O'Connor* Compl. ¶¶ 47-61.

206.     These problems at Orthofix post-Merger are no different from what was happening at SeaSpine before the Merger. Employees continued to post anonymously about the conditions of the combined Company online. For example, on March 29, 2023, a self-reported then-current employee posted a review on Glassdoor titled, "Don't Drink the Kool-Aid," which stated, "[p]eople will try to get any excuse to have a drink at this place. Good luck getting promoted as it's based on favoritism and not skill. *If you don't fit what they're looking for in terms of physical appearance or personality, you'll have a hard time here . . . Managers can get away with a lot and the C-suite is a complete joke*."

207.    And as previewed above, the Terminated Executive Defendants continued to engage in the same type of inappropriate conversations as leaders of the newly combined Company. On February 9, 2023, in reference to "a human-resources executive," Defam. Mot. to Strike at 4, Defendant Keran wrote "***I kinda don't give a shit, but I also don't want to ramrod it up her ass.***"



208.    On May 8, 2023, Defendant Bostjancic, commenting on the city of Las Vegas, wrote, "***I'd actually rather be in jail or a gay bar than this fucking shithole city.***" Later, Defendant Bostjancic wrote "of a former executive" (Defam. Mot. to Strike at 4), "***Verbal diarrhea,***" to which Defendant Keran replied, "***I figured you'd be into that kind of thing, maybe after a few hours in the gay bar.***"



Image: tmp_136.gif (3 MB)

**209.** The next day, Defendant Valentine asked Defendants Bostjancic and Keran "about recommending a female former board member for a new position," Defam. Mot. to Strike at 4, and Defendant Keran replied, "[w]ill you use the phrase '***tits on a bull***' in your response***?***" Defendant Bostjancic piled on: "***Seems like a totally appropriate response!***"



**J.      Orthofix Files Its 2022 Form 10-K Touting Its Compliance and Ethics Program and Its Robust Human Capital Resources**

210.    On March 6, 2023, the combined Company filed with the SEC its annual report on Form 10-K for the full fiscal year 2022 ("2022 Form 10-K"). The 2022 Form 10-K was signed by Defendants Valentine, and Bostjancic, as well as the Orthofix Post-Merger Director Defendants.

211.    The 2022 Form 10-K included multiple materially false and misleading statements, such as that it was Orthofix's "*fundamental policy to conduct business in accordance with the highest ethical legal standards*," that it had a "*comprehensive compliance and ethics program*," and that the program was "*intended to promote lawful and ethical business practices throughout [their] domestic and international business*" and was "*designed to prevent and detect violations of applicable federal, state, and local laws*."

212.    The 2022 Form 10-K also made several materially false and misleading statements relating to Human Capital Resources at Orthofix. For example, the 2022 Form 10-K said that Orthofix's "key human capital objectives in managing [their] business" included "*attracting, developing, and retaining top talent while integrating diversity, equity, and inclusion principles and practices into our core values*." Relatedly, the 2022 Form 10-K touted that as part of "Talent Development," Orthofix "*believe[d] that success comes from investing in our people and ensuring our workforce is aligned with our mission and values*" and "*str[o]ve to support [their] teams in the areas of development, mentoring, engagement, and health and wellness, enabling them to do their best work as they grow in their careers*." Orthofix also touted that it supported initiatives within Orthofix such as "*the Orthofix Women's Network, a program that provides opportunities for women to learn from each other and grow within our company and industry.*" Further, Orthofix stated that it "*[sought] to embrace and encourage our employees' differences*

*and know that diversity, equity and inclusion help build a truly global, transformative business and will continue to be a source of our strength*."

213.     This statement, like the others, is at odds with the reported manner in which Orthofix handled personnel matters. The Terminated Executive Defendants' troubled approach to leadership at SeaSpine carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation

### K.     Orthofix Touts the Stability of the Combined Company's Leadership, Its Application of the Codes of Conduct to Executives, and Its Implementation of Robust Risk Management Programs

214.     The same day that Orthofix filed its 2022 Form 10-K, on March 6, 2023, it hosted an earnings call. During the earnings call, an analyst asked about the stability of the sales force at the Company for the fourth quarter of 2022 and for commentary on retaining employees. Defendant Valentine answered the analyst, commenting generally that there was "a great deal of strength" in the kick-off to the new fiscal year, and stating, "*I think the sales management process and the selections we've made and what the team looks like is a nice combination of leadership that also brings with it, I think, a good stability to those sales teams.*"

215.     This statement was at odds with Defendants' actual adherence to the corporate governance and codes of conduct set forth in the Definitive Proxy Statement on a Schedule 14A, which Defendants filed on April 27, 2023.

216.     For example, the Proxy stated that Orthofix maintained codes of conduct for each of its legacy Orthofix and SeaSpine businesses (together, "Codes of Conduct"), and that the Code of Conduct for the legacy Orthofix business *applied to all directors and executive officers,* and that this Code of Conduct was available for review on the Orthofix website. Orthofix posited that its Codes of Conduct and its general corporate compliance and ethics program had the goals of "*deter[ring] wrongdoing and promot[ing] (i) honest and ethical conduct, including the ethical*

*handling of actual or apparent conflicts of interest between personal and professional relationships, (ii) full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in other public communications made by us, (iii) compliance with applicable governmental laws, rules, and regulations, (iv) the prompt internal reporting of violations of our Codes of Conduct to appropriate persons identified therein, and (v) accountability for adherence to our Codes of Conduct.*" The Proxy Statement further stated that their "*Codes of Conduct apply to all areas of professional conduct,*" including "*workplace conduct*." Later in the document, the Proxy reiterated that it "*maintain[ed] corporate codes of conduct*" and stated that they were "*applicable to all [their] directors, officers, and employees.*"

217.    In addition the Proxy represented that Orthofix "*demonstrate[d] [their] commitment to providing equal and equitable opportunities to all employees through training, mentoring, education and an inclusive culture,*" and that it "*engage[d] employees in a number of ways, including [their] Moving 4ward Program, which was created to improve diversity equity and inclusion, and through the Orthofix Women's Network, which strives to support the women of Orthofix around the globe in the areas of development, mentoring and engagement.*" Similarly, the Proxy Statement stated that Orthofix "*[sought] to embrace and encourage [their] employees' differences and [knew] that diversity, equity, and inclusion help build a truly global, transformative business and will continue to be a source of [Orthofix's] strength.*"

218.    Finally, the Proxy Statement touted the governance of Orthofix, stating that Orthofix had a "*fundamental policy to conduct business in accordance with the highest ethical and legal standards*" and a "*comprehensive compliance and ethics program to promote lawful and ethical business practices throughout [their] domestic and internal businesses.*" Orthofix

also represented that it "***implement[s] robust risk management programs to ensure compliance with applicable laws and regulations governing ethical business practices, including [Orthofix's] relationships with suppliers, customers and business partners, and our industry.***"

219.    During this time, the market looked favorably upon Orthofix's new management team and expressed that integration risks were already baked into the Company's share price. For example, on July 19, 2023, BTIG published a positive analyst report about Orthofix, writing:

> The merger establishes a leading global spine and orthopedics company with significant portfolio depth and scale. The new Orthofix is targeting sizable markets with solid growth opportunities by leveraging a larger, combined distribution network. ***We believe that the new Orthofix leadership team has proven its ability to execute, is well-known by investors, and with shares assuming some integration risk based on current valuation, we think OFIX shares are inexpensive enough that risk is accounted for.*** We recognize that there is a period over the next few quarters where investors may take a wait-and-see approach before owning the stock. It's incumbent upon Orthofix to exceed expectations early on and this isn't a given. That said, as we move past the integration period, we think the company is well-positioned to execute within its given markets.

**L.    After Closing, Unbeknownst to the Market, Orthofix Launches an Internal Investigation into the Terminated Executive Defendants' Misconduct**

220.    Though the newly-combined Company touted the progress of its integration and forecasted success for the future of the Company, in reality, behind closed doors it was undergoing internal turmoil during integration. Once the Orthofix Board recognized that it had committed a grave error during the due diligence process by failing to properly vet the Terminated Executives, thereby exposing the Company and its investors to significant risks, it launched an Internal Investigation into the conduct of the Terminated Executive Defendants.

221.    According to the Burzik Declaration and the Defamation Complaint, roughly six months after the Merger closed, Orthofix's Board received a complaint from then-President of Orthofix Global Spine, Kevin Kenny, detailing multiple workplace issues and inappropriate

conduct by the Terminated Executive Defendants. Burzik Decl. at 1; Defam. Compl. ¶ 18. This complaint—lodged by a senior, male officer of the Company—finally prompted the Board to take action and commence an investigation, spending millions of dollars in the process. *See* Burzik Decl. ¶ 7. At this point, however, the Terminated Executive Defendants had already been wreaking havoc within their workplace and towards female employees for ***years***, as discussed at detail above.

222.    According to the Defamation Complaint, the investigation was initially spearheaded by a Board member, Defendant Hannon, and outside counsel DLA Piper, and eventually was transferred to the purview of Burzik and Burris, who brought on Latham & Watkins. Defam. Compl. ¶ 19.

223.    This Internal Investigation was a Company-wide affair and involved interviewing employees about the Company's operations. According to CW 9, a former employee, Orthofix employees received a litigation hold in connection with the Internal Investigation. In addition, CW 9 said that attorneys from Latham & Watkins asked CW 9 and O'Connor about their work on Sunshine Act reporting and physician consulting agreements reporting. The Terminated Executive Defendants were also involved in the Internal Investigation. For instance, Valentine sat for multiple interviews and Keran participated in numerous meetings, sat for an interview, and assisted Latham with contacting witnesses and facilitating the collection of documents. Defam. Compl. ¶ 21.

224.    Despite the wide reach of the investigation, the Company did not divulge much to employees about the investigation's purpose or its trigger. Some employees who came from SeaSpine were under the impression that the investigation began as a way to look into compliance concerns relating to SeaSpine's practices. For instance, CW 9 said that based on her understanding,

the Internal Investigation was spurred by compliance-related concerns. Similarly, CW 2 thought that Orthofix was (at least ostensibly) investigating payments to doctors.

225.    Around August 17, 2023 members of the Board and Latham told Valentine that they required the Terminated Executive Defendants to provide their phones to be imaged for purposes of the Internal Investigation. Defam. Compl. ¶ 22. Valentine's personal phone was imaged around August 18, 2023, Keran's on August 25, 2023, and Bostjancic's on September 5, 2023. Defam. Compl. ¶¶ 22, 23, 27. According to CW 9, Latham had asked not only Valentine, Bostjancic, and Keran to provide their devices, but also O'Connor.

226.    At this time, the Terminated Executive Defendants continued to demean women that they encountered in a professional capacity, including those who assisted with the internal investigation. Per the below, Defendant Valentine wrote, "Fuckin' prick auditors have more questions so I have another 1-2 hours," and Defendant Bostjancic replied, "***Insist on the hot one to interview you***":



227.    According to the Burzik Declaration, the Orthofix Board reviewed evidence that the Terminated Executive Defendants sent multiple inappropriate text messages, Burzik Decl. ¶ 7, many of which are included herein. The Terminated Executive Defendants were alerted that their text messages raised concerns among the Orthofix Board. Defam. Compl. ¶30. As detailed above in this Complaint, the inappropriate text message exchanges between the Terminated Executive Defendants are in line with the discriminatory and abusive conduct that former employees experienced at SeaSpine and the combined Company.

228.    Shortly before firing the Terminated Executive Defendants, Orthofix was concerned about being subject to legal liability for their misconduct. Apparently, Orthofix asked some employees to sign an agreement releasing the Company from liability relating to sexual assault and/or discrimination in the days leading up to the executives' termination. But their attempt to silence women was not completely successful, as evidenced by the lawsuit that O'Connor filed against Orthofix, as described above.

229.    Despite the internal turmoil at Orthofix, as the Internal Investigation was ongoing, the market continued to view the Merger as a success, which depended in part on the new Orthofix management team. (However, the market was unaware of this Internal Investigation into the conduct of the new management team.) For example, on August 9, 2023, Ladenburg Thalmann published a positive analyst report about Orthofix, noting that they were "encouraged by the company's progress related to integration following the merger." However, the analyst report recognized "Management and Board Stability" at Orthofix as one of the primary risks to its recommendation to and price target of an investment in Orthofix shares:

> Significant loss of key personnel could prove to be damaging towards the operational efficiencies and further growth of the company. The departure of key personnel could materially affect the overall performance and strategy of the company going forward. ***The company is highly dependent on the services of its current management team and board.***

**M.    Orthofix Announces That It Has Terminated the Terminated Executive Defendants "For Cause"**

230.    The truth about Orthofix's failure to properly vet the Terminated Executive Defendants and probe the widespread misconduct at SeaSpine during the due diligence period was first revealed on September 12, 2023, when Orthofix issued a press release announcing the termination of the Terminated Executive Defendants for cause as a result of the Internal Investigation, effective immediately. The press release stated in relevant part:

Orthofix Medical Inc. (NASDAQ: OFIX), a leading global spine and orthopedics company, today announced that Catherine Burzik, Chair of the Orthofix Board of Directors, has been appointed Interim Chief Executive Officer; Geoffrey Gillespie, Orthofix Vice President, Corporate Controller, has been appointed Interim Chief Financial Officer; and Puja Leekha, Orthofix Senior Vice President, Chief Ethics and Compliance Officer, has been appointed Interim Chief Legal Officer. The appointments are effective immediately and follow the ***unanimous decision by the Board's independent directors to terminate for cause Keith Valentine, John Bostjancic and Patrick Keran from those respective roles. The Board also requested that Mr. Valentine resign from the Board.*** The Board will immediately begin a search for permanent successors.

231.     The press release explained that the termination was the result of an internal investigation at the company, which was conducted by outside legal counsel and directed and overseen by the Orthofix Board, and which revealed that the Terminated Executive Defendants had engaged in inappropriate and offensive conduct:

> ***The Board's decision follows an investigation conducted by independent outside legal counsel and directed and overseen by the Company's independent directors. As a result of the investigation, the Board determined that each of these executives engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture***. These matters are unrelated to and do not impact the Company's strategy, results of operations or previously filed financial statements.

232.     Burzik, Chair of the Orthofix Board, was quoted and emphasized that Orthofix did not "condone harassing or inappropriate conduct or statements of any kind":

> Catherine Burzik, Chair of the Orthofix Board, said, "***Orthofix's core values are built around fostering, cultivating and preserving a culture that is respectful, and we do not condone harassing or inappropriate conduct or statements of any kind. We require all employees – and especially our leaders – to behave in accordance with the Company's values. The Board did not make these decisions lightly. We believe they are necessary to ensure our employees, investors, customers, and other stakeholders have confidence in the Company's leaders.***"

233. On this news, the Company's stock declined $5.62 per share, or over 30%, to close at $13.01 per share on September 13, 2023, on unusually heavy volume, wiping out $206.5 million of market capitalization.

234. Though the Internal Investigation revealed that the Terminated Executive Defendants, in their capacities as leaders of Orthofix, were sending degrading text messages to each other, those text messages were not the sole cause of their termination. As Burzik attested to in her declaration, their termination was based on "multiple workplace issues and inappropriate conduct," in violation of the code of conduct requirements, Burzik Decl. ¶ 6, which is fully corroborated by the extensive allegations herein.

235. The stock drop evidenced investors were shocked and concerned by Orthofix's sudden termination of the new management team that it had been led to believe would lead the successful integration of the combined Company and create value for shareholders.

236. For example, on the day of the press release, BTIG downgraded its rating of Orthofix and expressed serious concerns about the sudden change in leadership impacting the value of the business. BTIG wrote:

> *We are downgrading to Neutral, suspending our PT, and moving to the sidelines in reaction to the updates announced today. There is a lot to unpack here, but OFIX surprised investors this morning with a sudden leadership change.* Management of the company was terminated with cause, including the CEO, CFO, and GC. Interim management was appointed effective immediately. We spoke with Board members and interim management of the company and while they highlighted that this was confined to personal matters (and code of conduct) and not specific to company financials, *it's hard to separate the public-facing management that investors knew well and the potential impact to the business. Interim management can put their positive spin on it, but Keith Valentine was a well-known entity in the spine market between customers, distributors, and investors. It's unknown at this time, but we worry about potential business fallout. Interim management did not reiterate guidance on the update this morning (and are likely to address this on 3Q),*

*but in the context of integrating two companies, this throws further risk into a successful merger (and sadly gives more ammunition to the adage that 'spine mergers are largely unsuccessful')*. From a share perspective, while shares are down ~20% on the news and were already reflecting a meaningful discount prior to this, *we think shares are unlikely to recover until new permanent leadership is put in place* (likely in early 2024).

237. BTIG also made clear that the termination created increased risk to the value of the

Company:

*Much of the basis of the merger was to bring in SeaSpine's leadership into Orthofix*, bring over SeaSpine's ability to innovate, replenish the product pipeline, grow at multiples of the spine market, and capitalize on Orthofix's cashflow generation from legacy businesses. *The collective value proposition of this is what drove our prior view, but with a lack of permanent leadership and the increased risk to the company coming from this update, we worry that competition will use this to win share away from Orthofix as well as talent from inside the combined company.*

238. BTIG stated that the unexpected derailment caused a risk to the existing business

fundamentals, which might allow competition to flourish:

When the merger took place, the combined Orthofix-SeaSpine provided investors with a small-cap play in orthopedics and spine that had combined revenue of $700M with a ~3.5% WAMGR and adj. EBITDA margins that could grow into the MSD at a very reasonable valuation. *Unfortunately this was derailed by sudden and unexpected leadership changes that are likely to constrain shares until permanent management is put in place. We think with management having such a strong presence with distributors, investors, and surgeons, there is risk to existing business fundamentals and competition is likely to capitalize on the disruption*. We think it's best to remain on the sidelines until these dynamics are cleared up.

239. Finally, BTIG concluded that there might be "longer-term potential business

impacts" and new risks to their rating:

Valuation: Our OFIX rating is Neutral. While shares are inexpensive at current levels, *given the lack of permanent leadership, the timelines to stabilize the company in the midst of a merger, and the*

*longer-term potential business impacts from the lost leadership, we believe remaining on the sidelines is best.* BTIG does not provide PTs on Neutral-rated stocks. Risks are discussed below.

Risks: *Risks to our rating include further business fall out from the loss of leadership, timing of new permanent management, competition, integration risk, legacy performance, and a softer-than-expected procedure environment*. Upside risk could come from faster recovery in the spine market, new leadership filling the roles sooner than expected, and limited fallout to competition.

240.    JMP also reacted to the termination of the Terminated Executive Defendants on the day of the announcement, repeating the shocking news:

*Of note, the release indicated that the move came as a result of "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements",* and that the matters are unrelated to results of operations nor do they impact previously filed financial                                                    statements.

OFIX also appointed interim executives to fill these roles which include, Catherine Burzik as CEO (Chair of the OFIX Board of Directors), Geoffrey Gillespie as CFO (VP and Corporate Controller), and Puja Leekha (SVP and Chief Ethics and Compliance Officer) as Chief Legal Officer. In our discussion with the interim management team, OFIX commented that they have business leaders in place to continue to execute on the ongoing strategic and merger integration efforts.

241.    JMP remarked that it had never seen a situation like this, and expected that there could be a "prolonged integration process between the two companies":

*We cannot recall another managerial change involving 3 senior positions concurrently during our tenure in medtech equity research, so we are not surprised at the stock's initial reaction (it is off ~25% today). While we acknowledge Orthofix has experienced and well respected leaders in various high-level positions, the timing in our opinion could lead to a prolonged integration process between the two companies* — SeaSpine and Orthofix completed a merger of equals in early 2023. In prior notes, we had highlighted that the progress of the combination is still very much in the early days and likely would be the sole focus throughout 2023 and into early 2024. Our 2024 combined sales estimate of $815 mln implies an EV/revenue multiple of ~1x, and while this valuation

level appears low on a comparative basis, with this most recent update, ***the timeline could remain fluid as the company will now look to deploy damage control and find permanent replacements for those released***.

242. The announcement also resulted in news coverage of the incident. For example, on the day of the announcement, *FierceBioTech* published an article titled, "Orthofix Board Gives CEO, Other C-Suite Members the Boot for Offensive Conduct," summarizing Orthofix's press release and noting that "Orthofix's stock price dropped about 25% following its announcement, down to about $13.56."

243. The same day, *Orthopedics This Week* published an article titled "Purge at Orthofix," describing the shock of the news—particularly as to Defendant Valentine:

> ***In a shocking move, Orthofix's board of directors announced today that they have terminated for cause three of the top executives in the world of spinal implant manufacturing: Keith Valentine, John Bostjancic and Patrick Keran***. Valentine was also asked to resign from Orthofix's board of directors.
>
> Keith Valentine was President and Chief Executive Officer at Orthofix. Over the course of his more than 30 years in the spine industry, Valentine rose from Vice President of Marketing at Medtronic Spine & Biologics to President and Chief Operating Officer at NuVasive, Inc. to President and CEO of SeaSpine. ***He is one of the most respected and admired executives in the industry.***
>
> John Bostjancic has spent more than a quarter century in key executive positions in healthcare starting as Senior Associate at PricewaterhouseCoopers, then Manager of Accounting Standards for Merck, followed a long career at Integra LifeSciences where he started as the Senior Director of Finance and progressed up through the ranks to Senior Vice President, Global Supply Chain. He joined the SeaSpine spin off as its Chief Operating and Financial Officer and then was Chief Financial Officer at Orthofix.
>
> Patrick Keran is a 20-year industry veteran who was Orthofix's chief legal officer and before that SeaSpine's Senior Vice President, Corporate Development and General Counsel.

*      *      *

> *We, like everyone, are shocked and wait for more explanations and information.*

244. Analyst reactions carried over to the next day as well. On September 13, 2023, Ladenburg Thalmann published a report titled, "Orthofix Sudden Changes to Leadership Resulting in Updates to Our Models" and stated that it was lowering its price target. The analyst report summarized the announcement, and describing the event as involving "***significant leadership changes***" and noting that the decision was to terminate was based on the result of the Internal Investigation.

245. In addition, Ladenburg Thalmann expressed surprise that the Company had not yet at that time issued a Form 8-K, since it considered the announcement and change to corporate valuation to be material:

> As a result of the news, we are making the following modifications to our financial models. ***We are somewhat surprised that no SEC documentation as of the time of this report has been released as we believe the announcement and change to corporate valuation is material.*** Although we are confident with the leadership changes and future modifications, we believe that there is a higher level of risk related to the potential negative impact to commercial channels (both direct and distributors)

246. As foreshadowed by Ladenburg Thalmann, on September 14, 2023, Orthofix filed with the SEC a Form 8-K disclosing its termination of the Terminated Executive Defendants and attaching the September 12, 2023 press release, stating:

> *On September 11, 2023, the Board of Directors (the "Board") of Orthofix Medical Inc. ("Orthofix" or the "Company") terminated the employment of Keith Valentine, the Company's Chief Executive Officer, John Bostjancic, the Company's Chief Financial Officer and Patrick Keran, the Company's Chief Legal Officer. The Board's decision follows an investigation conducted by independent outside legal counsel and directed and overseen by the Company's independent directors. As a result of the investigation, the Board determined that each of these executives*

*engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture.*

247.    The Form 8-K explained that because the termination was due to repeated violations of the code of conduct requirements and therefore for cause, Orthofix did not believe that it was required to make any further payments to the Terminated Executive Defendants:

> The Company has notified Mr. Valentine, Mr. Bostjancic and Mr. Keran that such terminations have been made for "Cause," as defined in applicable employment-related agreements (including each executive's respective Change in Control and Severance Agreement, dated June 19, 2023). As a result, the Company does not believe it is required to make any further payments to the terminated executives, other than payment of salary for the days worked in the current pay period through September 12, 2023 and unused paid time off. In connection with Mr. Valentine's termination, the Board has asked him to resign from the Board.

248.    Analyst reactions to the termination of the Terminated Executive Defendants continued in the following months. For example, on October 19, 2023, Roth MKM expressed that the for-cause terminations would continue to weigh on shares:

> *While we view the SeaSpine acquisition positively, we believe the overhang of senior management terminations (for cause) will weigh on shares.* Catherine Burzik, who is board chair and a well-regarded healthcare executive, has taken over on an interim basis, but there remains increased execution risk.

249.    Roth MKM summarized the circumstances of the termination, and remarked that Valentine, Bostjancic, and Keran were all the "primary architects" of the Merger:

> *Management ouster: On September 12th, OFIX announced the forced resignations of CEO Keith Valentine, CFO John Bostjancic and Chief Legal Officer Patrick Kernan [sic], all of whom came from SeaSpine and were primary architects of the merger with OFIX. Keith Valentine is a well-established executive in the spine industry, with previous experience as a VP of Marketing at Medtronic and as COO of Nuvasive. The ousting of senior executives follows an internal investigation by the board that found each of these executives "engaged in repeated*

*inappropriate and offensive conduct that violated multiple codes of conduct and violated OFIX values and culture.*" Importantly, these were unrelated to the company's strategy, results, or previously filed financial statements. Catherine Burzik, who is the current chairman and a well-regarded healthcare executive, has taken over as CEO. In addition, controller Geoffrey Gillespie assumes the role of CFO and Puja Leekha takes over as chief legal counsel, all on an interim basis.

250.     Even after new management was selected, analysts remarked that the effects of the termination still weighed on Orthofix's share price. On January 17, 2024, BTIG published an analyst report titled, "Orthofix With a New Team Finally in Place, the Real Work Begins." The analyst report stated that because the management had "such a strong presence with distributors, investors, and surgeons," the effects of the departure would continue to negative impact stock prices until a permanent team was put in place:

> When the merger took place, the combined Orthofix-SeaSpine provided investors with a small-cap play in orthopedics and spine that had combined revenue of $700M with a ~3.5% WAMGR and adj. EBITDA margins that could grow into the MSD at a very reasonable valuation. *Unfortunately this was derailed by sudden and unexpected leadership changes that are likely to constrain shares until permanent management is put in place. We think with management having such a strong presence with distributors, investors, and surgeons, there is risk to existing business fundamentals and competition is likely to capitalize on the disruption*. We think it's best to remain on the sidelines until these dynamics are cleared up.

**N.     Orthofix Discloses That the Termination of the Terminated Executive Defendants Negatively Impacted Its Market Capitalization**

251.     About two months after the Orthofix Board terminated the Terminated Executive Defendants, Orthofix admitted that the termination negatively impacted the Company's market capitalization. On November 8, 2023, with the filing of its Form 10-Q for the third quarter of 2023, Orthofix disclosed there was a decrease in the Company's market capitalization following the termination of the SeaSpine Executive Defendants:

> *In the third quarter of 2023, the Company announced the termination of the former President and Chief Executive Officer, former Chief Financial Officer, and former Chief Legal Officer, from their respective roles. Immediately following the announcement, the Company's market capitalization decreased by approximately 30%,* indicating that an impairment may exist. As a result, the Company performed an interim quantitative assessment of its goodwill as of September 30, 2023.

252. Defendants also made the same statement in their annual report for the year ended December 31, 2023, which they filed on a Form 10-K on March 5, 2024:

> *In the third quarter of 2023, we announced the termination of the former President and Chief Executive Officer, former Chief Financial Officer, and former Chief Legal Officer, from their respective roles. Immediately following the announcement, our market capitalization decreased by approximately 30%, indicating that an impairment may exist.* As a result, we performed an interim quantitative assessment of our goodwill as of September 30, 2023. Upon performing our assessment, we determined the Global Spine reporting unit's fair value exceeded its carrying value as of September 30, 2023.

## VI. EXCHANGE ACT VIOLATIONS

### A. Defendants' Materially False and Misleading Statements and Omissions During the Class Period

253. Defendants made several materially false and/or misleading statements or omissions throughout the Class Period. As detailed further below, these misstatements generally concerned: (1) SeaSpine's purported compliance with employment laws, the absence of misconduct allegations at SeaSpine, and the absence of settlement agreements involving misconduct; (2) the purported performance-based culture at SeaSpine that focused on integrity, diversity, and corporate responsibility; (3) the deliberate selection of the executive leadership team and their ability to lead the successful integration of SeaSpine and Orthofix; (4) Orthofix's supposed implementation of a robust, comprehensive compliance and ethics program post-Merger;

(5) Orthofix's purported commitment to equity and supporting women employees post-Merger; and (6) Orthofix's enforcement of corporate codes of conduct post-Merger.

1. **October 11, 2022 Form 8-K**

254.    On October 11, 2022, Orthofix filed a Form 8-K that attached and incorporated by reference Merger Agreement. The Form 8-K included the following false and misleading statements:[3]

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("<u>WARN</u>") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "<u>Misconduct Allegation</u>") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such***

---

[3] Plaintiffs allege that the statements in ***bold and italics*** within this Section were materially false, misleading, and/or omitted to disclose material information.

*person's capacity as such or, to the knowledge of SeaSpine, in any other capacity,*

*nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine,*

*threatened, nor is there any reasonable basis for such a Misconduct Allegation.*

(c) *Within the past four (4) years, SeaSpine has not entered into any settlement*

*agreement, tolling agreement, non-disparagement agreement, confidentiality*

*agreement or non-disclosure agreement, or any Contract or provision similar to*

*any of the foregoing relating directly or indirectly to any Misconduct Allegation*

*against SeaSpine or any person who is or was an officer, director, manager,*

*employee or independent contractor of SeaSpine*.

255.    The statements set forth in ¶ 254 above were false and misleading when made for

the following reasons.

(a) Defendants SeaSpine's and Valentine's statement set forth in ¶ 254(a) ("SeaSpine

Compliance Statement") was materially false and misleading because it falsely

represented that SeaSpine was in compliance with employment laws, including

relating to wages, civil rights, harassment, discrimination and/or retaliation in

employment, pay equity, and employment equity. However, as described above (¶¶

119-146), multiple former employees indicated that the behavior of senior

management at SeaSpine was blatantly inconsistent with such employment laws.

In addition, as described above (¶ 135), former employees stated that SeaSpine did

not meaningfully redress the pay and equity issues raised in the Discrimination

Class Action, and actually changed its numbers to appear compliant—indicating

noncompliance with pay equity laws.

(b) Defendants SeaSpine's and Valentine's statement set forth in ¶ 256(c) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for such allegations. For instance, as mentioned above, Woolley, a VP, had been written up for harassing women while intoxicated (¶ 145); former employees' statements that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 114); retaliation for placing tampons in the women's bathroom (¶ 138); and gender-based pay inequity (¶ 67). And it was false and misleading to suggest that there were no misconduct allegations "pending" when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 109-114).

(c) Defendants SeaSpine's and Valentine's statement set forth in ¶ 254(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 132-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement— less than four years before the misstatement was made.

### 2. November 8, 2022 Form S-4

256. On November 8, 2022 Orthofix and SeaSpine filed with the SEC a Draft Registration Statement on Form S-4, which, incorporating and in combination with related documents including a proxy statement and prospectus, would be used to effectuate the Merger between Orthofix and SeaSpine with the SEC. The Form S-4 included the following false and misleading statements:

(a) In recommending that Orthofix stockholders vote their shares of Orthofix common stock in favor of the Orthofix share issuance, the Orthofix Board considered a number of factors, including the following (not necessarily listed in order of relative importance): . . . *The complementary cultures of Orthofix and SeaSpine, including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate social responsibility.*.

(b) *SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages*, *hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,* reasonable accommodation, unfair competition, affirmative action, *pay equity, employment equity*, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(c) *No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity,*

*nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine,*

*threatened, nor is there any reasonable basis for such a Misconduct Allegation.*

(d) *Within the past four (4) years, SeaSpine has not entered into any settlement*

*agreement, tolling agreement, non-disparagement agreement, confidentiality*

*agreement or non-disclosure agreement, or any Contract or provision similar to*

*any of the foregoing relating directly or indirectly to any Misconduct Allegation*

*against SeaSpine or any person who is or was an officer, director, manager,*

*employee or independent contractor of SeaSpine.*

257. The statements set forth in ¶ 256 above were false and misleading when made for the following reasons.

(a) Defendant Orthofix's and the Orthofix Officers and Directors Defendants'

statement set forth in ¶ 256(a) ("Integrity Statement") was materially false and

misleading. It was materially false and misleading for Defendants to represent that

Orthofix and SeaSpine had "complementary cultures" that included "a strong

performance-based culture focused on integrity . . . diversity and corporate

responsibility" when Defendants knew or recklessly disregarded that this statement

did *not* describe the culture of SeaSpine. Indeed, as set forth above, Defendants

knew that SeaSpine had a culture of favoring male employees in hiring and pay,

regardless of "performance," as SeaSpine was still ostensibly resolving systemic

gender-based pay and equity issues following the Discrimination Class Action

Settlement. Further, as described above, SeaSpine and the Terminated Executive

Defendants knew or recklessly disregarded that SeaSpine was a hostile work

environment where senior leaders demeaned, devalued, and silenced female employees.

(b) Defendants SeaSpine's and Valentine's statement set forth in ¶ 256(b) ("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine was blatantly inconsistent with such employment laws. In addition, as described above (¶ 135), former employees stated that SeaSpine did not meaningfully redress the pay and equity issues raised in the Discrimination Class Action, and actually changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(c) Defendants SeaSpine's and Valentine's statement set forth in ¶ 256(c) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for such allegations. For instance, as mentioned above, Woolley, a VP, had been written up for harassing women while intoxicated (¶ 140). There was also ample "reasonable basis" for allegations involving misconduct, including based on former employees' statements that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 114), retaliation for placing tampons in the women's bathroom (¶ 138), and gender-based pay inequity (¶ 67). And it was false and misleading to suggest that there were no misconduct allegations "pending"

when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 109-114).

(d) Defendants SeaSpine's and Valentine's statement set forth in ¶ 256(d) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 132-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement— less than four years before the misstatement was made.

### 3. November 18, 2022 Form 425 and Press Release

*a. November 18, 2022 Form 425*

258. On November 18, 2022, Orthofix filed with the SEC a Form 425 containing a letter that it had sent to employees dated November 17, 2022. The Form 425 included the follow false and misleading statements.

(a) ***ELT candidates were selected based not only on their individual merit but also with consideration for the overall composition of the executive team.*** It was critical to appoint leaders from both legacy organizations to bring forth the best of both                                                                                       worlds. [...] Looking ahead, there are numerous details to be worked out as part of the integration planning. We know you are eager to know who will be a part of the next level of leadership but there is still much work to be done to align our organizations as we harmonize our processes and systems. Leadership teams are continuing to work together to shape the organization to determine what is best to drive the combined company's success and ensure we are competitive. This work is ongoing

and we will keep you informed as the integration progresses. For now, please focus on the great work you do and help us finish the year strong. We would like to close by saying that we are both very excited about our bright future ahead. Our new Executive Leadership Team brings the experience and strategic vision to drive our business to new heights. Each of our leaders has shared their enthusiasm for what lies ahead, and we are confident our combined businesses will be Stronger Together!

259. The statements set forth in ¶ 258 above were false and misleading when made for the following reasons.

(a) Defendants Orthofix's, Serbousek's, SeaSpine's, and Valentine's statement set forth in ¶ 258(a) ("ELT Selection Statement") was false and misleading because it conveys the misleading impression that Orthofix had engaged in a vetting process that evaluated candidates' competency and accomplishments that would warrant leading the combined Company. However, as set forth above (¶¶ 61-81), Orthofix's due diligence was minimal into HR and personnel issues despite the presence of red flags surrounding misconduct by SeaSpine leadership. If Orthofix had engaged in such a process, the Terminated Executive Defendants' misconduct would have been exposed.

b. *November 18, 2022 Press Release*

260. That same day, on November 18, 2022, Orthofix issued a press release entitled, "Orthofix and SeaSpine Announce John Bostjancic to Serve as CFO for Combined Company Post Closing." The Form 8-K included the following false and misleading statements:

(a) "John has been a key leader of SeaSpine dating back to the successful spin-out of the organization in 2015. ***I am confident his background and experience in the medical device industry coupled with his cultural influence will benefit the newly combined company as we continue to grow***," said Keith Valentine, President and CEO of SeaSpine. "I believe ***John is well positioned to help lead us through the successful integration of the two companies, ensuring accountability across all levels of the organization, as we focus on the key initiatives that will drive growth, scalability and shareholder value***."

261.     The statements set forth in ¶ 260 above were false and misleading when made for the following reasons.

(a) Defendants Orthofix's, SeaSpine's, and Valentine's statement set forth in ¶ 260(a) ("Bostjancic Statement") was false and misleading because they assured the market that Defendant Bostjancic was a force for accountability, and omitted facts that in reality, Defendant Bostjancic—like the other Terminated Executive Defendants— perpetuated a hostile and discriminatory work environment. Indeed, Defendant Valentine knew that Defendant Bostjancic, with whom he worked closely and shared a years-long friendship, was a co-conspirator in maintaining the hostile and discriminatory workplace at SeaSpine. Indeed, the allegations set forth above demonstrate that Defendant Bostjancic's "cultural influence" would *not* "benefit the newly combined company," nor would he "ensur[e] accountability across all levels of the organization." In addition, as set forth above, former employees stated that Defendant Bostjancic (in many circumstances, along with Defendant Valentine) expressed discriminatory preferences for men, engaged in inappropriate

behavior with EAs, failed to sufficiently redress complaints about pay equity, and endorsed bullying at SeaSpine.

**4. November 22, 2022 Form S-4/A**

262.     On November 22, 2022, Orthofix filed a Form S-4/A amendment to its November 8, 2022 Registration Statement, which attached and incorporated by reference the Merger Agreement. The Form S-4/A included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine***.

(d) In recommending that Orthofix stockholders vote their shares of Orthofix common stock in favor of the Orthofix share issuance, the Orthofix Board considered a number of factors, including the following (not necessarily listed in order of relative importance): . . . ***The complementary cultures of Orthofix and SeaSpine, including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate social responsibility.***

263. The statements set forth in ¶ 262 above were false and misleading when made for the following reasons.

(a) Defendant SeaSpine's and Defendant Valentine's statement set forth in ¶ 262(a) ("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine was blatantly inconsistent with such employment laws. In addition, as described above (¶ 135), former employees stated that SeaSpine did not meaningfully redress the pay and equity issues raised in the

Discrimination Class Action, and actually changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(b) Defendant SeaSpine's and Defendant Valentine's statement set forth in ¶ 262(b) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for such allegations. For instance, as mentioned above, Woolley, a VP, had been written up for harassing women while intoxicated (¶ 140). There was also ample "reasonable basis" for allegations involving misconduct, including based on former employees' statements that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 114), retaliation for placing tampons in the women's bathroom (¶ 138), and gender-based pay inequity (¶ 67). And it was false and misleading to suggest that there were no misconduct allegations "pending" when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 109-114).

(c) Defendant SeaSpine's and Defendant Valentine's statement set forth in ¶ 262(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 132-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement—less than four years before the misstatement was made.

(d) Defendant Orthofix's and the Legacy Orthofix Officer and Director Defendants' statement set forth in ¶ 262(d) ("Integrity Statement") was materially false and misleading. It was materially false and misleading for Defendants to represent that Orthofix and SeaSpine had "complementary cultures" that included "a strong performance-based culture focused on integrity . . . diversity and corporate responsibility" when Defendants knew or recklessly disregarded that this statement did *not* describe the culture of SeaSpine. Indeed, as set forth above, Defendants knew that SeaSpine had a culture of favoring male employees in hiring and pay, regardless of "performance," as SeaSpine was still ostensibly resolving systemic gender-based pay and equity issues following the Discrimination Class Action Settlement. Further, as described above, SeaSpine and the Terminated Executive Defendants knew or recklessly disregarded that SeaSpine was a hostile work environment where senior leaders demeaned, devalued, and silenced female employees.

**5. November 23, 2022 Joint Proxy Statement/Prospectus**

264. On November 23, 2022, Orthofix and SeaSpine filed a Joint Proxy Statement/Prospectus pursuant to Rule 424(b)(3), which incorporated by reference the Merger Agreement. The Joint Proxy Statement/Prospectus included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment***, reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker

classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("<u>WARN</u>") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) *No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "<u>Misconduct Allegation</u>") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.*

(c) *Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine.*

265.     The statements set forth in ¶ 264 above were false and misleading when made for the following reasons.

(a)    Defendants SeaSpine's and Valentine's statement set forth in ¶ 264(a) ("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine was blatantly inconsistent with such employment laws. In addition, as described above (¶ 135), former employees stated that SeaSpine did not meaningfully redress the pay and equity issues raised in the Discrimination Class Action, and actually changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(b)    Defendants SeaSpine's and Valentine's statement set forth in ¶ 265(b) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for such allegations. For instance, as mentioned above, Woolley, a VP, had been written up for harassing women while intoxicated (¶ 140). There was also ample "reasonable basis" for allegations involving misconduct, including based on former employees' statements that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 114), retaliation for placing tampons in the women's bathroom (¶ 138), and gender-based pay inequity (¶ 67). And it was false and misleading to suggest that there were no misconduct allegations "pending"

when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 109-114).

(c) Defendants SeaSpine's and Valentine's statement set forth in ¶ 264(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 132-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement— less than four years before the misstatement was made.

**6. March 6, 2023 Form 10-K**

266. On March 6, 2023, the combined Company filed with the SEC its annual report on Form 10-K for the full fiscal year 2022.. The 2022 Form 10-K was signed by Defendants Valentine and Bostjancic and the Orthofix Post-Merger Director Defendants. The Form 10-K contains the following materially false and misleading statements:

(a) ***It is our fundamental policy to conduct business in accordance with the highest ethical and legal standards. We have a comprehensive compliance and ethics program***, which is overseen by a Chief Ethics and Compliance Officer, who reports directly to our Chief Executive Officer and the Compliance Committee of the Board of Directors. ***The program is intended to promote lawful and ethical business practices throughout our domestic and international businesses. It is designed to prevent and detect violations of applicable federal, state, and local laws*** in accordance with the standards set forth in guidance issued by the U.S. Department of Justice ("U.S. DOJ") ("Evaluation of Corporate Compliance Programs" (updated June 2020)), the Office of Inspector General (HCCA-OIG "Measuring Compliance

Program Effectiveness: A Resource Guide" (March 2017)), and the U.S. Sentencing Commission ("Effective Compliance and Ethics Programs" (November 2014)).

(b) ***Our key human capital objectives in managing our business include attracting, developing, and retaining top talent while integrating diversity, equity, and inclusion principles and practices into our core values.***

(c) ***We believe that success comes from investing in our people and ensuring our workforce is aligned with our mission and values.*** To achieve this goal, we devote time and resources to assist our employees in being familiar with our business, industry, and product offerings. We have developed a robust onboarding program for our newly hired associates that provides a comprehensive overview of our product portfolio and company history. We put an emphasis on training our employees and sales representatives to understand our business, including the underlying medical conditions that our products treat. ***In addition, we strive to support our teams in the areas of development, mentoring, engagement, and health and wellness, enabling them to do their best work as they grow their careers.***

(d) ***We are committed to fostering, cultivating, and preserving a culture that promotes diversity, equity, and inclusion. We seek to demonstrate our commitment to providing equal and equitable opportunities to all employees through programs*** such as our Moving 4ward initiative, a program created to embrace the value of diversity and reflect the communities where we live and work. ***Additionally, we proudly support the Orthofix Women's Network, a program that***

*provides opportunities for women to learn from each other and grow within our*

*company and our industry.* Throughout the year, we promote a variety of diverse

voices to our employees by recognizing events such as Black History Month,

Martin Luther King Jr. Day, Women's History Month, Asian Pacific American

Heritage Month, LGBTQ Pride Month, Juneteenth, and Hispanic Heritage Month.

*We seek to embrace and encourage our employees' differences and know that*

*diversity, equity and inclusion help build a truly global, transformative business*

*and will continue to be a source of our strength.* Building on this belief, we

launched companywide, and incorporated into our new hire orientation, a training

titled, "Hiring, Leading and Fostering Diverse and Inclusive Teams". We intend

that by end of 2023, all hiring managers, leaders, and interviewers will have

completed this training.

267. The statements set forth in ¶ 266 above were materially false and misleading when

made for the following reasons.

(a) Defendants Orthofix's, Valentine's, and Bostjancic's and the Orthofix Post-Merger

Director Defendants' statement set forth in ¶ 266(a) ("Compliance and Ethics

Program Statement 1") was materially false and misleading because in stating that

Orthofix had a "fundamental policy to conduct business in accordance with the

highest ethical and legal standards" and had a "comprehensive compliance and

ethics program," the Exchange Act Defendants falsely assured the market that it

had robust protections against unethical behavior, including workplace misconduct.

In reality, as set forth above, Orthofix did not have a comprehensive compliance

and ethics program, which resulted in lax vetting of incoming executive hires;

senior management and directors engaging in rampant harassment and other inappropriate misconduct in violation of the Company's purported ethical and professional standards; and the Company's failure to ensure that its SEC filings and public disclosures were free of material misstatements.

(b) Defendants Orthofix's, Valentine's, and Bostjancic's and the Orthofix Post-Merger Director Defendants' statement set forth in ¶ 266(b) ("Human Capital Statement") was false and misleading because it falsely suggests that Defendants operated a merits- and performance-based workplace culture that was based on equity. But as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them, denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation.

(c) Defendants Orthofix's, Valentine's, and Bostjancic's and the Orthofix Post-Merger Director Defendants' statement set forth in ¶ 266(c) ("Talent Development Statement") was false and misleading because it falsely suggested that Defendants supported their employees, including by supporting them in the areas of "development, mentoring, engagement, and health and wellness" so as to help employees "do their best work as they grow in their careers." But as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them,

denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation.

(d) Defendants Orthofix's, Valentine's, and Bostjancic's and the Orthofix Post-Merger Director Defendants' statement set forth in ¶ 266(d) ("Equal Opportunity Statement") was false and misleading because it falsely suggested that Orthofix made efforts to cultivate a diverse and equitable culture and that Orthofix championed programming that provided opportunities to women to "grow within our company and our industry." But as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them, denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation.

**7. April 27, 2023 Definitive Proxy Statement**

268.    On April 27, 2023, Orthofix filed a Definitive Proxy Statement on a Schedule 14A. The Definitive Proxy Statement made the following false and misleading statements:

(a) Corporate Governance Highlights

\*       \*       \*

- *Corporate codes of conduct enforced at all levels of the Company and its subsidiaries*
- *Commitment to attracting, retaining, and promoting a diverse workforce through programs such as the Moving 4Ward Diversity, Equity & Inclusion Program, the Orthofix Women's Network ("OWN"), and the Orthofix Young Professionals Group*

(b) *We maintain codes of conduct (our "Codes of Conduct") for each of our legacy Orthofix and SeaSpine businesses that are applicable to all employees worldwide of the respective business. The Code of Conduct for the legacy Orthofix business, to which all of our directors and executive officers are subject*, is available for review under the "Investors > Governance > Governance Documents" section of our website at www.orthofix.com. *The goals of our Codes of Conduct, as well as our general corporate compliance and ethics program (which we have branded the Integrity Advantage™ Program), are to deter wrongdoing and to promote (i) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, (ii) full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in other public communications made by us, (iii) compliance with applicable governmental laws, rules, and regulations, (iv) the prompt internal reporting of violations of our Codes of Conduct to appropriate persons identified therein, and (v) accountability for adherence to our Codes of Conduct. Our Codes of Conduct apply to all areas of professional conduct, including*

customer relationships, conflicts of interest, financial reporting, use of company assets, insider trading, intellectual property, confidential information, and *workplace conduct.* Under our Codes of Conduct, employees, directors, and executive officers are responsible for promptly reporting potential violations of any law, regulation, or our Codes of Conduct to appropriate personnel or via a hotline we have established.

We intend to disclose any substantive amendment to, or a waiver from, a provision of the Code of Conduct for the legacy Orthofix business that applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions and that relates to any element of the code of ethics definition enumerated in paragraph (b) of Item 406 of Regulation S-K by posting such information on our website at the address specified above.

(c) Our People: *We demonstrate our commitment to providing equal and equitable opportunities to all employees through training, mentoring, education, and an inclusive culture. We engage our employees in a number of ways, including our Moving 4ward Program, which was created to improve diversity, equity and inclusion, and through the Orthofix Women's Network, which strives to support the women of Orthofix around the globe in the areas of development, mentoring and engagement. Throughout the year, we promote a variety of diverse voices to our employees by* recognizing events such as Black History Month, Martin Luther King Jr. Day, Women's History Month, Asian Pacific American Heritage Month, LGBTQ Pride Month, Juneteenth, and Hispanic Heritage Month. *We seek to*

*embrace and encourage our employees' differences and know that diversity, equity and inclusion help build a truly global, transformative business and will continue to be a source of our strength.* Building on this belief, we launched a new companywide, training titled, "Hiring, Leading and Fostering Diverse and Inclusive Teams". We intend that by end of 2023, all hiring managers, leaders, and interviewers will have completed this training.

(d) Governance: *It is our fundamental policy to conduct business in accordance with the highest ethical and legal standards. We have a comprehensive compliance and ethics program to promote lawful and ethical business practices throughout our domestic and international businesses* and offer compliance training to all of our employees. Similarly, we require that our suppliers adopt sound human rights practices designed to treat workers fairly and with dignity and respect. We responsibly manage and influence the impacts of our distributors through our robust compliance and governance training. *We implement robust risk management programs to ensure compliance with applicable laws and regulations governing ethical business practices, including our relationships with suppliers, customers and business partners, and our industry.*

(e) *Codes of Conduct: We maintain corporate codes of conduct that are applicable to all our directors, officers, and employees.* The codes of conduct set forth our policies and expectations on several topics, including conflicts of interest, compliance with laws, human rights, use of our assets, business conduct and fair dealing. All employees and directors participate in annual training on our corporate codes of conduct and related Company policies.

269.     The statements set forth in ¶ 268 above were materially false and misleading when made for the following reasons.

(a) Defendants Orthofix's, Burzik's, and Keran's statement set forth in ¶ 268(a) ("Corporate Governance Highlights Statement") was false and misleading because it falsely suggested that Orthofix's codes of conduct were being "enforced at all levels," including at the senior leadership level, and that Orthofix endeavored to "attract[], retain[], and promote" a diverse workforce. In reality, as set forth above, Orthofix did not enforce its code of conduct, which resulted in lax vetting of incoming executive hires and senior management and directors engaging in rampant harassment and other inappropriate misconduct in violation of the Company's purported ethical and professional standards. In addition, as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them, denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation. And as was revealed by Orthofix in the September 12, 2023 press release, the Terminated Executive Defendants' conduct "violated multiple code of conduct requirements and was inconsistent with the Company's values and culture."

(b) Defendants Orthofix's, Burzik's, and Keran's statement set forth in ¶ 268(b) ("Code of Conduct Statement 1") was false and misleading because it falsely

suggested that Orthofix "maintained" codes of conduct "appl[ied]" the codes of conduct to "workplace conduct." In reality, as set forth above, Orthofix did not enforce its code of conduct, which resulted in lax vetting of incoming executive hires and senior management, and directors engaging in rampant harassment and other inappropriate misconduct in violation of the Company's purported ethical and professional standards. In addition, as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them, denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation. And as was revealed by Orthofix in the September 12, 2023 press release, the Terminated Executive Defendants' conduct "violated multiple code of conduct requirements and was inconsistent with the Company's values and culture."

(c) Defendants Orthofix's, Burzik's, and Keran's statement set forth in ¶ 268(c) ("Equal Opportunity Statement 2") was false and misleading because it falsely suggested that Orthofix made efforts to cultivate a diverse and equitable culture and that Orthofix championed programming that supported women in "development, mentoring and engagement." But as set forth above, the Terminated Executive Defendants had for years declined to support women competent and qualified women in the workplace, instead demeaning and devaluing them, denying them

equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation

(d) Defendants Orthofix's, Burzik's, and Keran's statement set forth in ¶ 268(d) ("Compliance and Ethics Program Statement 2") was false and misleading because in stating that Orthofix had a "fundamental policy to conduct business in accordance with the highest ethical and legal standards" and a "comprehensive compliance and ethics program," and that Orthofix "implement[s] robust risk management programs," the Exchange Act Defendants falsely assured the market that Orthofix took proactive steps to effectuate robust protections against unethical behavior, including workplace conduct. In reality, as set forth above, Orthofix did not have such a policy, nor did it implement any comprehensive or robust program, which resulted in lax vetting of incoming executive hires; senior management and directors engaging in rampant harassment and other inappropriate misconduct in violation of the Company's purported ethical and professional standards; and the Company's failure to ensure that its SEC filings and public disclosures were free of material misstatements.

(e) Defendants Orthofix's, Burzik's, and Keran's statement set forth in ¶ 268(e) ("Code of Conduct Statement 2") was materially false and misleading because it falsely suggested that Orthofix "maintained" codes of conduct "to which all our directors, officers, and employees," including the Terminated Executive Defendants, were

subject. In reality, as set forth above, Orthofix did not maintain its code of conduct, which resulted in lax vetting of incoming executive hires and senior management, and directors engaging in rampant harassment and other inappropriate misconduct in violation of the Company's purported ethical and professional standards. In addition, as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them, denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation. And as was revealed by Orthofix in the September 12, 2023 press release, the Terminated Executive Defendants' conduct "violated multiple code of conduct requirements and was inconsistent with the Company's values and culture."

**B.      Loss Causation and Economic Loss**

270.    During the Class Period, as detailed in this Complaint, the Exchange Act Defendants made materially false and misleading statements and omissions, including statements regarding the Merger, and engaged in a scheme to deceive the market. This artificially inflated the price of Orthofix common stock and operated as a fraud or deceit on the Class. Later, when the Exchange Act Defendants' prior misrepresentations and risks concealed by the fraudulent conduct alleged in this Complaint materialized and were disclosed to the market starting on September 12, 2023, the price of Orthofix common stock fell precipitously. As a result of their acquisition of Orthofix common stock during the Class Period and the Exchange Act Defendants' material

misstatements and omissions, Plaintiff and other members of the Class (defined below) suffered economic loss, *i.e.*, damages, under the federal securities laws.

271.    The artificial inflation in Orthofix's stock price began to be removed when the conditions and risks misstated and omitted by the Exchange Act Defendants began to be revealed to the market on September 12, 2023. That day, as set forth above, Orthofix reported in a press release that it had terminated the Terminated Executive Defendants for cause following an Internal Investigation conducted by outside counsel. Orthofix explained in the press release that as a result of the investigation, its Board determined that each of the Exchange Act Defendants Valentine, Bostjancic, and Keran had engaged in "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture." Further, Defendant Burzik was quoted in the press release as stating that Orthofix did "not condone harassing or inappropriate conduct or statements of any kind."

272.    In response to the September 12, 2023 disclosures, Orthofix shares declined $5.62 per share, or over 30%, to close at $13.01 per share on September 13, 2023, on unusually heavy volume, wiping out $206.5 million of market capitalization.

273.    Analysts were shocked by the news about the termination, viewing the sudden departure of the Terminated Executive Defendants as the cause for the price drop and expecting that Orthofix shares would feel the impact for some time, as set forth above (¶¶ 235-250) and as described below:

    (a) On the day of the press release, BTIG analysts downgraded its rating of Orthofix to neutral and suspended its price target, "***moving to the sidelines in reaction to the updates announced today***." The BTIG analysts that they were "***worr[ied] about potential business fallout***" and concluded that Orthofix shares were "***unlikely to***

***recover until new permanent leadership is put in place,*** " noting that as a result of the "***sudden and unexpected leadership changes***," the combined Company's post-Merger valuation had been "***derailed.***" Further, BTIG analysts stated that even for long-term investors, planning on profiting from the low share price in the future was "***a big IF and not necessary a WHEN.***" BTIG analysts cautioned, "***given the lack of permanent leadership, the timelines to stabilize the company in the midst of a merger, and the longer-term potential business impacts from the lost leadership, we believe remaining on the sidelines is best.***"

(b) Also on September 12, 2023, JMP analysts also attributed the stock decline to the sudden announcement, noting that they were not able to recall another managerial change involving three senior possessions concurrently during their tenure in medical technology equity research. Accordingly, they stated that they were "***not surprised at the stock's initial reaction***" and commented that the "***timing***" of the termination "***could lead to a prolonged integration process between the two companies***."

(c) On September 13, 2023 Ladenburg Thalmann reported that it was lowering its price target and that as a result of the news, it was making certain modifications to its financial models because they "***believe[d] that there is a higher level of risk related to the potential negative impact to commercial channels***."

274. On September 14, 2023, Orthofix filed with the SEC a Form 8-K disclosing its termination of the Terminated Executive Defendants and attaching the September 12, 2023 press release.

275. Analyst reactions on the termination of the Terminated Executive Defendants continued in the following months, as described below:

(a) On October 19, 2023, Roth MKM wrote that "*the overhang of senior management terminations (for cause) will weigh on shares*."

(b) On January 17, 2024 BTIG stated that the combined Company's post-Merger valuation "*was derailed by sudden and unexpected leadership changes that are likely to constrain shares until permanent management is put in place,*" and "*[w]e think with management having such a strong presence with distributors, investors, and surgeons, there is risk to existing business fundamentals and competition is likely to capitalize on the disruption. We think it's best to remain on the sidelines until these dynamics are cleared up*."

276. Orthofix also admitted that the termination of the Terminated Executive Defendants negatively impacted its share price in its Form 10-Q for the third quarter of 2023, filed November 8, 2023. Orthofix disclosed that there may be an impairment in their calculation of goodwill due to the decrease of the Company's market capitalization following the termination of the SeaSpine Executive Defendants:

> *In the third quarter of 2023, the Company announced the termination of the former President and Chief Executive Officer, former Chief Financial Officer, and former Chief Legal Officer, from their respective roles. Immediately following the announcement, the Company's market capitalization decreased by approximately 30%, indicating that an impairment may exist*. As a result, the Company performed an interim quantitative assessment of its goodwill as of September 30, 2023.

277. Defendants also made the same statement in their annual report for the year ended December 31, 2023, which they filed on a Form 10-K on March 5, 2024:

> ***In the third quarter of 2023, we announced the termination of the former President and Chief Executive Officer, former Chief Financial Officer, and former Chief Legal Officer, from their respective roles. Immediately following the announcement, our market capitalization decreased by approximately 30%, indicating that an impairment may exist.*** As a result, we performed an interim quantitative assessment of our goodwill as of September 30, 2023. Upon performing our assessment, we determined the Global Spine reporting unit's fair value exceeded its carrying value as of September 30, 2023.

278. Orthofix's September 12, 2023 and September 14, 2023 disclosures corrected Defendants' prior materially misleading statements and omissions concerning the leadership team and culture of ethics and compliance at the Company.

279. The declines in Orthofix's stock price were a direct and proximate result of the Exchange Act Defendants' scheme being revealed to investors and to the market. The timing and magnitude of Orthofix's stock price declines negate any inference that the economic losses and damages suffered by Plaintiffs and the other members of the Class were caused by changed market conditions, macroeconomic factors, or even Orthofix-specific facts unrelated to Defendants' fraudulent conduct.

### C.  Summary of Scienter Allegations

280. As set forth above and below, numerous facts demonstrate that the Exchange Act Defendants knew or were deliberately reckless in not knowing that the statements identified in Section VI.A above were materially false or misleading when made. The Terminated Executive Defendants' scienter is clear given the severity and systemic nature of the misconduct at SeaSpine, some of which was the subject of litigation; the Terminated Executive Defendants' active role in facilitating that culture and as agents of the misconduct themselves; and their control over

SeaSpine pre-Merger and Orthofix post-Merger. In addition, the scienter of the Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Director Defendants is demonstrated through their controlling role at Orthofix before and/or after the Merger, through which they deliberately or recklessly disregarded red flags concerning the Terminated Executive Defendant's misconduct. All the Exchange Act Defendants also had the motive and opportunity to perpetuate the fraud, concealing the misconduct to close the Merger and/or facilitate the post-Merger integration of the companies. Finally, the scienter of Defendants SeaSpine and Orthofix as corporate entities is derived from the scienter of the Individual Exchange Act Defendants.

   1.  **The Severity and Systemic Nature of the Misconduct Establishes the Terminated Executive Defendants' Scienter**

281.    As alleged in this Complaint, the discrimination and harassment at SeaSpine was open, notorious and widespread, and was spearheaded by the Terminated Executive Defendants. The misconduct also continued at Orthofix after the Terminated Executive Defendants took over post-Merger. The accounts of former female SeaSpine and Orthofix employees set forth above, including women who had to resort to litigation against SeaSpine or Orthofix, demonstrate that misogyny was endemic to SeaSpine's culture. Indeed, the Terminated Executive Defendants were the engines of this hostile environment, which they carried with them to Orthofix. As described in detail above, for years, they had fueled a toxic workplace culture, organizing alcohol-fueled events where they engaged in inappropriate conduct; developing inappropriate relationships with female employees; promoting and condoning discriminatory behavior at the company; overseeing a compensation system that systematically underpaid women employees; retaliating against women who attempted to achieve greater gender equality in the workplace; and engaging in demeaning, lewd conversations about women with whom they worked, just to name a few examples. The

extent and severity of the misconduct, and the Terminated Executive Defendants' leading role in perpetuating it at SeaSpine pre-Merger and Orthofix post-Merger, demonstrate their scienter.

### 2. The Terminated Executive Defendants' Control Over SeaSpine Pre-Merger and Orthofix Post-Merger Demonstrates Their Scienter

282. In their roles as leaders of SeaSpine, and then the combined Company, the Terminated Executive Defendants were required to keep themselves informed of SeaSpine's and the combined Company's day-to-day business and operations. Their seniority at SeaSpine and then Orthofix and their control over each company's operations demonstrates their scienter. Indeed, in the words of CW 2 and Raposa, SeaSpine had been "[Defendant] Valentine's world."

283. As set forth above, the Terminated Executive Defendants exerted control and influence across SeaSpine, including over HR and personnel matters (¶¶ 111-118). Most egregiously, the Terminated Executive Defendants—particularly Defendant Valentine, but all three—deliberately prevented the HR department from operating independently, and hampered its ability to conduct investigations without the approval of the Terminated Executives Defendants. In fact, former HR employees reported that they were told to ignore discrimination-related complaints. Further, Defendant Valentine was responsible for overseeing the creation of a women's mentorship group at SeaSpine, but then disbanded the group when he was displeased with its members (¶ 143). Defendant Keran even reprimanded women for hanging posters in the workplace that depicted inspirational women, saying that it sent the wrong message. (¶ 143).

284. Further, the Terminated Executive Defendants were aware of material litigation facing SeaSpine, such as the Discrimination Class Action, which spanned multiple years and resulted in a settlement in 2021 that required SeaSpine to pay $900,000 and to implement a company-wide program to assess and redress pay and equity at SeaSpine. They were also aware

that gender disparities in pay and titling at SeaSpine. These disparities continued during their time at Orthofix, as evidenced by the accounts of former employees, such as O'Connor.

285. In sum, the Terminated Executive Defendants' ultimate control over SeaSpine, including their efforts to conceal complaints and HR investigations involving misconduct, demonstrates their scienter for the pre-Merger statements. Further, their seniority at Orthofix after the Merger—where gender based pay-inequity persisted—demonstrates their scienter for post-Merger statements.

### 3. The Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Director Defendants Disregarded Red Flags at SeaSpine Pre-Merger and/or Orthofix Post-Merger, Which Demonstrates Scienter

286. The Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Officer Defendants (which is inclusive of certain of the Legacy Orthofix Officer and Director Defendants) were also responsible with overseeing the operations of Orthofix. As the President, CEO, and Director of Orthofix before the Merger, Defendant Serbousek was required to keep himself informed of Orthofix's day-to-day business and operations—including during the due diligence process involving SeaSpine. As the CFO of Orthofix before the Merger, Defendant Rice was required to be attendant to the financial aspects of due diligence and related risks that might be attendant to the Merger—including liabilities standing from litigation. Further, the other Legacy Orthofix Officer and Director Defendants were responsible for overseeing Orthofix's pursuit of a strategic transaction. The Legacy Orthofix Officer and Director Defendants were heavily involved in the negotiation process, and Defendant Serbousek specifically liaised with Defendant Valentine on several occasions. However, despite this involvement, the Legacy Orthofix Officer and Director Defendants deliberately or recklessly ignored severe red flags at SeaSpine relating to the Terminated Executive Defendants' misconduct and other related troubling aspects of SeaSpine, as set forth above. For instance, at the very least, the Legacy Orthofix Officer

and Director Defendants necessarily learned about the Discrimination Class Action and the ongoing company-wide pay equity remediation effort.

287. In addition, the Orthofix Post-Merger Director Defendants—with Serbousek leading as the Executive Chairman of Orthofix's Board after the Merger—were required to oversee the Company, including its senior management, the Terminated Executive Defendants. Once again, the Orthofix Post-Merger Director Defendants ignored or recklessly disregarded red flags regarding the Terminated Executive Defendants. The SeaSpine-Orthofix Director Defendants in particular would have had even greater insight into the issues with the Terminated Executive Defendants due to their oversight of SeaSpine affairs prior to the Merger. It took months after the Merger for the Orthofix Board to decide that it could no longer look away from the misconduct, ultimately firing the Terminated Executive Defendants.

### 4. The Exchange Act Defendants Had the Motive and the Opportunity to Perpetuate the Fraud

288. The Exchange Act Defendants had the motive and opportunity to perpetuate the fraud. As set forth herein, the Individual Exchange Act Defendants held senior officer and director positions at SeaSpine and Orthofix, which provided them with the opportunity to know the true state of affairs at their respective companies and to disseminate materially false and misleading information about them.

289. Pre-Merger, on the SeaSpine side, the Terminated Executive Defendants were knowledgeable of—and direct participants in—the misconduct at SeaSpine, controlled the company's HR department, and involved in the resolution of material litigation. Defendant Serbousek similarly was the leader of Orthofix and he and the other Legacy Orthofix Officer and Director Defendants were involved in the negotiation and due diligence processes leading up to the Merger. As parties to the impending Merger, the Exchange Act Defendants were incentivized

to push the Merger through at all costs, even if it involved deliberately or recklessly disregarding mountains of evidence of misconduct; and were incentivized to ignore or downplay the misconduct at SeaSpine so as to minimize the touted enterprise risk of the post-Merger Company.

290.     There were also professional and financial incentives to complete the Merger. For example, the Terminated Executive Defendants were motivated to obscure their discriminatory conduct and commit the fraud alleged herein so they could secure employment contracts at the combined Company and obtain lucrative pay. As the Terminated Executive Defendants conceded in the Defamation complaint, their compensation in 2023 ended up being "significant," which value expected to collectively exceed $10 million, and included base compensation, target bonuses, and LTIP grants as well as additional miscellaneous compensation and benefits. Defam. Compl. ¶ 32. Securities Act Defendant Burzik also stated in her declaration that the Terminated Executive Defendants had signed "lucrative contracts" with Orthofix. Burzik Decl. ¶ 5. So too were the SeaSpine-Orthofix Director Defendants incentivized to complete the Merger, since they would be able to secure spots on the combined Company's Board as part of the integration.

291.     After the Merger, the Terminated Executive Defendants and the Orthofix Post-Merger Director Defendants were all control persons of Orthofix, and thus had insight into misconduct at the Company that the Terminated Executive Defendants' brought with them— particularly the SeaSpine-Orthofix Director Defendants, who had served on SeaSpine's Board of Directors until the Merger. The Terminated Executive Defendants and the Orthofix Post-Merger Director Defendants were incentivized to conceal the truth and to ignore or downplay the misconduct to facilitate the integration process and minimize risk to the Company after the Merger.

**5. The Scienter of the Legacy Orthofix Officer and Director Defendants, the Orthofix Post-Merger Director Defendants, and the Terminated Executive Defendants Is Imputed to Defendant Orthofix**

292.    By virtue of their high-level positions as the most senior officers or directors of the Company; participation in and awareness of Orthofix's day-to-day operations; oversight over the SeaSpine executive leadership team; and/or control over the issuance of the false or misleading statements alleged above Section VI.A; the knowledge or recklessness of the Legacy Orthofix Officer and Director Defendants (pre-Merger) and the Terminated Executive Defendants and the Orthofix Post-Merger Director Defendants (post-Merger) concerning the Exchange Act Defendants' false or misleading statements is imputed to Defendant Orthofix. In addition, the knowledge or recklessness of other senior employees and managers, whether or not named herein, concerning the false or misleading statements alleged above Section VI.A, is also imputed to Orthofix.

**6. The Terminated Executive Defendants' Pre-Merger Scienter Is Imputed to SeaSpine**

293.    Further, by virtue of their high-level positions as the most senior officers of SeaSpine pre-Merger, participation in and awareness of SeaSpine's day-to-day operations, and control over the issuance of the false or misleading statements alleged above in Section VI.A, the knowledge or recklessness of the Terminated Executive Defendants concerning SeaSpine's false or misleading statements is imputed to SeaSpine. In addition, the knowledge or recklessness of other former SeaSpine senior employees and managers, whether or not named herein, concerning the false or misleading statements alleged above in Section VI.A, is also imputed to SeaSpine.

**D.    Inapplicability of Statutory Safe Harbor and Bespeaks-Caution Doctrine**

294.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint. Many of

the specific statements described in this complaint were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described in this complaint, the Exchange Act Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of SeaSpine or Orthofix who knew that the statement was false or misleading when made.

### E. Presumption of Reliance

295.    At all relevant times, the market for Orthofix's common stock was an efficient market for the following reasons, among others:

(a) Orthofix stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) Orthofix filed periodic public reports with the SEC and NASDAQ;

(c) As a "well-known seasoned issuer," as defined by SEC Rule 405, Orthofix was eligible to and did register securities for public offerings on Form S-3;

(d) Orthofix regularly publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e) Orthofix was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

296.    As a result of the foregoing, the market for Orthofix securities promptly digested current information regarding Orthofix from all publicly available sources and reflected that information in the price of Orthofix stock. Under these circumstances, all purchasers of Orthofix common stock during the Class Period suffered similar injury through their purchase of Orthofix common stock at artificially inflated prices, and the presumption of reliance applies.

297.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against the Exchange Act Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## F.    Exchange Act Class Action Allegations

298.    SEPTA brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Orthofix between October 11, 2022 and September 12, 2023, inclusive, and who were damaged thereby. Excluded from the Class are the Exchange Act Defendants; the officers and directors of Orthofix and SeaSpine at all relevant times; members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns; the Exchange Act Defendants' liability insurance carriers and any affiliates or subsidiaries thereof; and any entity in which the Exchange Act Defendants or their immediate families have or had a controlling interest.

299. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Orthofix shares were actively traded on the NASDAQ Stock Market.

300. As of August 4, 2023, Orthofix had 36,738,681 shares of common stock outstanding, owned by thousands of investors. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are tens of thousands of members in the proposed Class. Class members who purchased Orthofix common stock may be identified from records maintained by Orthofix or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

301. SEPTA's claims are typical of Class members' claims, as all members of the Class were similarly affected by the Exchange Act Defendants' wrongful conduct in violation of federal law as complained of herein.

302. SEPTA will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

303. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether the federal securities laws were violated by the Exchange Act Defendants' acts and omissions as alleged herein;

(b) whether the Exchange Act Defendants made statements to the investing public during the Class Period that were false, misleading, or omitted material facts;

(c) whether the Exchange Act Defendants acted with scienter; and

(d) the proper way to measure damages.

304.     A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## G.     Exchange Act Causes of Action

305.     The claims alleged in this complaint under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), 78t-1, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, sound in fraud and are based on knowing or reckless misconduct the Exchange Act Defendants. These claims are independent of all other claims asserted in this complaint, and the allegations of fraud pertaining to the claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief asserted in this complaint.

## <u>COUNT I</u>

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
Against Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix
Post-Merger Director Defendants**

306.     SEPTA repeats, incorporates, and realleges every allegation above in as if fully set forth herein.

307.     During the Class Period, Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did (i) deceive the investing public, including SEPTA and other Class members, as alleged in this complaint; and (ii) cause SEPTA and other Class members to purchase Orthofix common stock at artificially inflated prices.

308.     Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Orthofix common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

309.     Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

310.     During the Class Period, Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

311.     Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this complaint, or recklessly disregarded the true facts that were available to them. These Defendants engaged in this misconduct to conceal Orthofix's true

condition from the investing public and to support the artificially inflated prices of the Company's common stock.

312.    SEPTA and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Orthofix common stock. SEPTA and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Orthofix common stock had been artificially inflated by Defendant Orthofix's, the Legacy Orthofix Officer and Director Defendants', and the Orthofix Post-Merger Director Defendants' fraudulent course of conduct.

313.    As a direct and proximate result of Defendant Orthofix's, the Legacy Orthofix Officer and Director Defendants', and the Orthofix Post-Merger Director Defendants' wrongful conduct, SEPTA and other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

314.    By virtue of the foregoing, Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT II

**For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5
Against SeaSpine and the Terminated Executive Defendants**

315.    SEPTA repeats, incorporates, and realleges every allegation above in as if fully set forth herein.

316.    During the Class Period, Defendant SeaSpine and the Terminated Executive Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did (i) deceive the investing public, including SEPTA and other Class members,

as alleged in this complaint; and (ii) cause SEPTA and other Class members to purchase Orthofix common stock at artificially inflated prices.

317.     Defendant SeaSpine and the Terminated Executive Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Orthofix common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

318.     Defendant SeaSpine and the Terminated Executive Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SeaSpine and the Company's financial well-being, operations, and prospects.

319.     During the Class Period, Defendant SeaSpine and the Terminated Executive Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

320.     Defendant SeaSpine and the Terminated Executive Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this complaint, or recklessly disregarded the true facts that were available to them. These Defendants engaged in this misconduct to conceal SeaSpine's and Orthofix's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

321. SEPTA and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Orthofix common stock. SEPTA and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Orthofix common stock had been artificially inflated by the Defendant SeaSpine's and the Terminated Executive Defendants' fraudulent course of conduct.

322. As a direct and proximate result of Defendant SeaSpine's and the Terminated Executive Defendants' wrongful conduct, SEPTA and other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

323. By virtue of the foregoing, Defendant SeaSpine and the Terminated Executive Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT III

**For Violations of Section 20(a) of the Exchange Act**
**Against the Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Director Defendants**

324. Lead Plaintiff SEPTA repeats, incorporates, and realleges every allegation above in as if fully set forth herein.

325. As alleged above, Orthofix violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged in this complaint.

326. Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants acted as controlling persons of Orthofix within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Orthofix, Defendant Orthofix, the

Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants had the power and ability to control the actions of Orthofix and its employees. By reason of this conduct, Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants are liable under Section 20(a) of the Exchange Act.

## COUNT IV

### For Violations of Section 20(a) of the Exchange Act
### Against the Terminated Executive Defendants

327.     Lead Plaintiff SEPTA repeats, incorporates, and realleges every allegation above in as if fully set forth herein.

328.     As alleged above, Orthofix and SeaSpine violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged in this complaint.

329.     During their tenure at SeaSpine before the Merger, the Terminated Executive Defendants acted as controlling persons of SeaSpine within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the SeaSpine's operations, direct involvement in the day-to-day operations of SeaSpine, and intimate knowledge of SeaSpine's actual performance, and their power to control public statements about SeaSpine, the Terminated Executive Defendants had the power and ability to control the actions of SeaSpine and its employees. By reason of this conduct, the Terminated Executive Defendants are liable for pre-Merger statements under Section 20(a) of the Exchange Act

330.     In addition, during their tenure at Orthofix after the Merger, the Terminated Executive Defendants acted as controlling persons of Orthofix within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in

and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Orthofix, the Terminated Executive Defendants had the power and ability to control the actions of Orthofix and its employees. By reason of this conduct, the Terminated Executive Defendants are liable for post-Merger statements under Section 20(a) of the Exchange Act.

## VII.   <u>SECURITIES ACT VIOLATIONS</u>

331.    The Securities Act Plaintiffs bring the claims in Counts V, VI, and VII under Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of former SeaSpine shareholders who acquired newly issued Orthofix common stock pursuant to the Offering Documents issued in connection with the January 2023 stock-for-stock Merger.

332.    The Sections 11, 12(a)(2), and 15 claims are based solely on negligence or strict liability. They are not based on any knowing or reckless conduct by or on behalf of any Defendant, and the Securities Act Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims, except that any challenged statements of opinion or belief made in the Offering Documents are alleged to have been materially misstated statements of opinion or belief when made and at the time the Registration Statement was filed and stockholders voted on the Merger.

333.    As explained herein, the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained in them not misleading, and failed to make adequate disclosures required under the statute, rules, and regulations governing the preparation of public offering documents for securities.

334. To the extent that any challenged statement is construed as a statement of opinion, belief, or projection made in connection with the Offering, any such statement is alleged to have been a materially misstated statement of opinion, belief, or projection when made at and at the time of the Offering.

335. This action was originally brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years of the Offering.

**A.** **False and Misleading Statements in the Offering Documents**

336. The Offering Documents multiple following false and misleading statements, as described below.[4]

**1. November 22, 2022 Form S-4/A**

337. On November 22, 2022, Orthofix filed a Form S-4/A amendment to its November 8, 2022 Registration Statement, which attached and incorporated by reference the Merger Agreement. The Form S-4/A included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-

---

[4] Plaintiffs allege that the statements in ***bold and italics*** within this Section were materially false, misleading, and/or omitted to disclose material information.

exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) *No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.*

(c) *Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine*.

(d) In recommending that Orthofix stockholders vote their shares of Orthofix common stock in favor of the Orthofix share issuance, the Orthofix Board considered a number of factors, including the following (not necessarily listed in order of relative importance): . . . *The complementary cultures of Orthofix and SeaSpine, including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate social responsibility.*

338.     The statements set forth in ¶ 337 above were false and misleading when made for the following reasons.

(a) Defendants SeaSpine's and Valentine's statement set forth in ¶ 337(a) ("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine was blatantly inconsistent with such employment laws. In addition, as described above (¶ 135), former employees stated that SeaSpine did not meaningfully redress the pay and equity issues raised in the Discrimination Class Action, and actually changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(b) Defendants SeaSpine's and Valentine's statement set forth in ¶ 337(b) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for such allegations. For instance, as mentioned above, Woolley, a VP, had been written up for harassing women while intoxicated (¶ 145). There was also ample "reasonable basis" for allegations involving misconduct, including based on former employees' statements that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 114), retaliation for placing tampons in the women's bathroom (¶ 138), and gender-based pay inequity (¶ 67). And it was false and misleading to suggest that there were no misconduct allegations "pending"

when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 109-114).

(c) Defendants SeaSpine's and Valentine's statement set forth in ¶ 337(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 132-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement— less than four years before the misstatement was made.

(d) Defendant Orthofix's and the Orthofix Officers and Directors Defendants' statement set forth in ¶ 337(d) ("Integrity Statement") was materially false and misleading. It was materially false and misleading for Defendants to represent that Orthofix and SeaSpine had "complementary cultures" that included "a strong performance-based culture focused on integrity . . . diversity and corporate social responsibility" when Defendants' conduct at SeaSpine did not promote the type of corporate culture described in this statement. Indeed, as set forth above, Defendants were aware that SeaSpine had a culture of favoring male employees in hiring and pay, regardless of "performance," as SeaSpine was still ostensibly resolving systemic gender-based pay and equity issues following the Discrimination Class Action Settlement. Further, as described above, SeaSpine and the Terminated Executive Defendants engaged in conduct that fostered a hostile work environment at SeaSpine where senior leaders demeaned, devalued, and silenced female employees.

## 2. November 23, 2022 Joint Proxy Statement/Prospectus

339.    On November 23, 2022, Orthofix and SeaSpine filed a Joint Proxy Statement/Prospectus pursuant to Rule 424(b)(3), which attached and incorporated by reference the Merger Agreement. The Joint Proxy Statement/Prospectus included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment***, reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine.***

340. The statements set forth in ¶ 339 above were false and misleading when made for the following reasons.

(a) Defendants SeaSpine's and Valentine's statement set forth in ¶ 339(a) ("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine was blatantly inconsistent with such employment laws. In addition, as described above (¶ 135), former employees stated that SeaSpine did not meaningfully redress the pay and equity issues raised in the Discrimination Class Action, and actually changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(b) Defendants SeaSpine's and Valentine's statement set forth in ¶ 339(b) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for such allegations. For instance, as mentioned above, Woolley, a VP, had been written up for harassing women

while intoxicated (¶ 145). There was also ample "reasonable basis" for allegations involving misconduct, including based on former employees' statements that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 114), retaliation for placing tampons in the women's bathroom (¶ 138), and gender-based pay inequity (¶ 67). And it was false and misleading to suggest that there were no misconduct allegations "pending" when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 109-114).

(c) Defendants SeaSpine's and Valentine's statement set forth in ¶ 339(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 132-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement—less than four years before the misstatement was made.

## B. Documents Incorporated by Reference into the Registration Statement Contain Material Misstatements and Omit Material Facts

341. On October 11, 2022, Orthofix filed a Form 8-K that attached the Merger Agreement. The Registration Statement incorporated the entire Form 8-K by reference, stating that it "contain[s] important information about Orthofix and SeaSpine and their respective financial performance."

342.     The October 11, 2022 Form 8-K incorporated by reference in the Registration Statement included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to***

*any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine.*

343.    The statements set forth in ¶ 342 above were false and misleading when made for the following reasons.

(a)  Defendant SeaSpine's and Defendant Valentine's statement set forth in ¶ 342(a) ("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶119-146), multiple former employees indicated that the behavior of senior management at SeaSpine was blatantly inconsistent with such employment laws. In addition, as described above (¶ 135), former employees stated that SeaSpine did not meaningfully redress the pay and equity issues raised in the Discrimination Class Action, and actually changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(b)  Defendant SeaSpine's and Defendant Valentine's statement set forth in ¶ 342(b) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for such allegations. For instance, as mentioned above, Woolley, a VP, had been written up for harassing women while intoxicated (¶ 145). There was also ample "reasonable basis" for allegations involving misconduct, including based on former employees' statements that they were asked to not report or to cover up issues relating to

women's pay and women's complaints about discrimination (¶ 114), retaliation for placing tampons in the women's bathroom (¶ 138), and gender-based pay inequity (¶ 67). And it was false and misleading to suggest that there were no misconduct allegations "pending" when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 109-114).

(c) Defendant SeaSpine's and Defendant Valentine's statement set forth in ¶ 342(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 132-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement—less than four years before the misstatement was made.

## C.    Post-Merger Revelations

344.    Orthofix's and SeaSpine's stockholders approved the Merger at special meetings on January 4, 2023, and the Merger became effective the following day.

345.    On September 12, 2023, as set forth above (¶¶ 230-231, 245-247), Orthofix issued a press release announcing the termination of the Terminated Executive Defendants for cause based on the unanimous decision by the Board's independent directors. The press release explained that the termination was the result of an internal investigation at the company, which was conducted by outside legal counsel and directed and overseen by the Orthofix Board, and which revealed that the Terminated Executive Defendants had engaged in inappropriate and offensive conduct.

346.     Two days later, Orthofix filed with the SEC a Form 8-K disclosing its termination of the Terminated Executive Defendants and attaching the September 12, 2023 press release.

### D.     Securities Act Class Action Allegations

347.     The Securities Act Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all SeaSpine stockholders at the time of the Merger who acquired the common stock of Orthofix in or traceable to the Offering in exchange for their shares of SeaSpine pursuant to the Offering Documents and who were damaged thereby. Excluded from the Class are the Securities Act Defendants; the officers and directors of Orthofix and SeaSpine at all relevant times; members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns; the Securities Act Defendants' liability insurance carriers and any affiliates or subsidiaries thereof; and any entity in which the Securities Act Defendants or their immediate families have or had a controlling interest.

348.     The members of the Class are so numerous that joinder of all members is impracticable. Orthofix shares were actively traded on the NASDAQ Stock Market. As of August 4, 2023, Orthofix had 36,738,681 shares of common stock outstanding, owned by thousands of investors. Although the exact number of Class members is unknown to the Securities Act Plaintiffs at this time and can only be ascertained through appropriate discovery, the Securities Act Plaintiffs believe that there are at least tens of thousands of members of the proposed Class. Class members who acquired Orthofix common stock through the Merger may be identified from records maintained by SeaSpine and/or Orthofix or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

349.     The Securities Act Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Securities Act Defendants' wrongful conduct in violation of federal law as complained of herein.

350. The Securities Act Plaintiffs will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation.

351. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether the federal securities laws were violated by Securities Act Defendants' acts and omissions as alleged herein;

(b) whether the Securities Act Defendants made statements to the investing public in the Offering Documents that were inaccurate or omitted material facts; and

(c) the proper way to measure damages.

352. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

**E.     The Securities Act Defendants Failed to Conduct a Reasonable Investigation and Exercise Reasonable Care in Connection with the Offering Documents**

353. None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete and not misstated in all material respects.

354. Red flags should have been uncovered during the Merger due diligence process in which SeaSpine and Orthofix engaged.

355. Even a cursory review of SeaSpine's practices and circumstances—including its company-wide pay and equity remediation effort following the Discrimination Class Action

Settlement and the volume of HR complaints about SeaSpine management—would have revealed to the Legacy Orthofix Officer and Director Defendants that there were systemic deficiencies in SeaSpine's ability to maintain a workplace free of discrimination and harassment, particularly against women employees, and that the Terminated Executive Defendants fueled the hostile environment.

356. Given Orthofix's stated importance of engaging in "disciplined" M&A and bringing in SeaSpine management to lead the "complementary cultures" of the combined Company, it was incumbent upon the Legacy Orthofix Officer and Director Defendants to determine whether the Terminated Executive Defendants would be fit to lead the post-Merger Company. Yet, none of the Legacy Orthofix Officer and Director Defendants made a reasonable investigation regarding the severe compliance and personnel issues that pervaded SeaSpine, even in light of the public information that SeaSpine settled a pay equity lawsuit shortly before SeaSpine and Orthofix began negotiations. By failing to adequately investigate and ensure that public statements regarding the two companies' complementary cultures, SeaSpine's purported compliance with employment laws the absence of **any** allegations or complaints, formal or otherwise, of discrimination and harassment at SeaSpine in the past four years, and the absence of **any** settlements relating to discrimination or harassment against SeaSpine or its officers or employees in the past four years, the Legacy Orthofix Officer and Director Defendants did not possess reasonable grounds for the belief that the statements on those topics were accurate and complete and not misstated in material respects.

357. Similarly, given Defendant Valentine's and Keran's involvement with SeaSpine HR, their role in fostering the hostile work environment at SeaSpine in advance of filing the Offering Documents, and their involvement in resolving the Discrimination Class Action, they

also did not possess reasonable grounds for the belief that the statements regarding SeaSpine's compliance with laws and regulations, the absence of any allegations or complaints, formal or otherwise, of discrimination and harassment at SeaSpine in the past four years, and the absence of any settlements relating to discrimination or harassment against SeaSpine or its officers or employees in the past four years, were accurate and complete and not misstated in material respects.

358.    The foregoing red flags should have caused the Legacy Orthofix Officer and Director Defendants, who signed the Offering Documents, to conduct additional due diligence before disseminating the Offering Documents. By overlooking these red flags, the Legacy Orthofix Officer and Director Defendants negligently failed to conduct reasonable due diligence into the accuracy and completeness of the representations contained in the Offering Documents and are liable for the misstatements and omissions contained therein. Had the Legacy Orthofix Officer and Director Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

359.    Similarly, Defendants Valentine and Keran, who signed the Offering Documents, failed to conduct a reasonable investigation of the statements contained in those documents and the documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. A reasonable investigation would have disclosed to Defendants Valentine and Keran that the Offering Documents contained material misstatements and omissions concerning the subjects noted above.

360.    These Signer Defendants were sophisticated in financing and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the misstatements and omissions notwithstanding numerous "red flags" noted above.

**F.      Securities Act Causes of Action**

## COUNT V

**For Violations of Section 11 of the Securities Act Against Defendant Orthofix and the Signer Defendants**

361.    The Securities Act Plaintiffs repeat, incorporate, and reallege every allegation in the Factual Background Section and the Securities Act Violations Section above as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Securities Act Defendants to defraud the Securities Act Plaintiffs or members of the Class.

362.    This claim is brought by the Securities Act Plaintiffs under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who acquired the common stock of Orthofix in exchange for their shares of the common stock of SeaSpine pursuant to the Offering Documents.

363.    For the purposes of this Section 11 claim, the Securities Act Plaintiffs do not allege that any Securities Act Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act. This claim is predicated upon the Securities Act Defendants' liability for making false and materially misleading statements in the Offering Documents.

364.    The Offering Documents were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated in it.

365.    Orthofix is the registrant for the shares issued and distributed to the Class members in the Merger. The Securities Act Defendants named in this Count were responsible for the contents and dissemination of the Offering Documents.

366. At a minimum, as the issuer of the shares, the Securities Act Defendants are strictly liable to the Securities Act Plaintiffs and the Class for the Offering Documents' material misstatements and omissions.

## COUNT VI

### For Violations of Section 12(a)(2) of the Securities Act Against the Securities Act Defendants

367. The Securities Act Plaintiffs repeat, incorporate, and reallege every allegation in the Factual Background Section and the Securities Act Violations Section above as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Securities Act Defendants to defraud the Securities Act Plaintiffs or members of the Class.

368. This Count is brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*, against the Securities Act Defendants, on behalf of all persons who acquired the common stock of Orthofix in exchange for their shares of the common stock of SeaSpine pursuant to the Offering Documents.

369. For the purposes of this Section 12(a)(2) claim, the Securities Act Plaintiffs do not allege that any Securities Act Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 12(a)(2) of the Securities Act. This claim is predicated upon the Securities Act Defendants' liability for making false and materially misleading statements in the Offering Documents.

370. By means of the defective Prospectus and related oral communications, the Securities Act Defendants promoted, solicited, and sold Orthofix shares to Plaintiff and other members of the Class.

371.     The Prospectus and related oral communications contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. The Securities Act Defendants owed the Securities Act Plaintiffs and the other members of the Class who acquired Orthofix shares pursuant to the Merger the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading. The Securities Act Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus and related oral communications as set forth above.

372.     By means of the Prospectus and related oral communications, the Securities Act Defendants promoted, solicited, and sold Orthofix shares to the Securities Act Plaintiffs and Class members. The Securities Act Defendants were sellers to and direct solicitors of purchasers of the Company's securities offered pursuant to the Merger. The Securities Act Defendants issued, caused to be issued, or signed or authorized the signing of the Prospectus in connection with the offering, and used it to directly induce investors, including the Securities Act Plaintiffs and the other Class members, to purchase the Company's shares.

373.     The Securities Act Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time they acquired Orthofix shares.

374.     By reason of the conduct alleged herein, the Securities Act Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, the Securities Act Plaintiffs and the other members of the Class who acquired Orthofix shares pursuant to the Merger sustained substantial damages in connection with their purchases of the stock.

Accordingly, the Securities Act Plaintiffs and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the Securities Act Defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

**COUNT VII**

**For Violations of Section 15 of the Securities Act Against the Securities Act Defendants**

375. The Securities Act Plaintiffs repeat, incorporate, and reallege every allegation in the Factual Background Section and the Securities Act Violations Section above as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Securities Act Defendants to defraud the Securities Act Plaintiffs or members of the Class.

376. This Count is brought under Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Signer Defendants, on behalf of all purchasers of Orthofix common stock in connection with, and traceable to, the Merger. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is expressly disclaimed.

377. Each of the Legacy Orthofix Officer and Director Defendants was a control person of Orthofix by virtue of his or her position as a director or senior officer of the Company. Similarly, Defendant Valentine was a control person of SeaSpine by virtue of his position as a director and senior officer of SeaSpine. Each of the Signer Defendants (inclusive of the Legacy Orthofix Officer and Director Defendants and Defendant Valentine) was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts V and VI above,

based on having signed the Offering Documents and having otherwise participated in the process that allowed the Merger to be completed.

378.    Because of their high-ranking positions and direct involvement in the everyday business of the Company, the Legacy Orthofix Officer and Director Defendants directly participated in the management of Orthofix's operations, including its accounting and reporting functions, and possessed and exercised the power and authority to control the contents of Orthofix's Offering Documents. Similarly, because of their high-ranking positions and direct involvement in the everyday business of SeaSpine, Defendants Valentine and Keran directly participated in the management of SeaSpine's operations, including its accounting and reporting functions, and possessed and exercised the power and authority to control the contents of Orthofix's Offering Documents.

379.    The Signer Defendants were directly involved in controlling the content of and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these misstatements and omissions in violation of the federal securities laws. The Signer Defendants are liable for the false statements and omissions pleaded herein under the Securities Act.

380.    Each of the Signer Defendants, by virtue of his or her management or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related to their respective companies (either Orthofix or SeaSpine). The Signer Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial reporting of their respective companies. By virtue of these duties, these officers and directors were required to

supervise the preparation of and dissemination of the Offering Documents and ensure that they were accurate and complete.

381.     All of the Signer Defendants were control persons of their respective companies within the meaning of Section 15 of the Securities Act by reason of their own involvement in the daily business of their respective companies and as senior executives or directors of their respective companies. The Signer Defendants, at the time they held positions with their respective companies, were able to, and did, exercise substantial control over the operations of their respective companies, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

382.     As officers, directors, and/or controlling persons of a publicly held company and under the federal securities laws, the Signer Defendants had a duty (a) to disseminate promptly complete, accurate, and truthful information with respect to their respective companies; (b) to correct any previously issued statements that had become materially misleading or untrue; and (c) to disclose any trends, events, and uncertainties that would materially affect their respective companies' earnings and present and future operating results, so that the market price of their respective companies' publicly traded securities would be based upon truthful and accurate information.

383.     Defendants Serbousek, Rice, Valentine, and Keran, because of their high-ranking officer positions and direct involvement in the everyday business of their respective companies (Orthofix in the case of Serbousek and Rice, and SeaSpine in the case of Valentine and Keran), directly participated in the management of their respective companies' operations, including their accounting and reporting functions; possessed and exercised the power and authority to control the contents of the Offering Documents; and were privy to confidential information concerning their

respective companies and their respective business, operations and financial statements, and strategy. Defendants Serbousek, Rice, Valentine, and Keran were directly involved in controlling the content of and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged, and approved or ratified these misstatements and omissions in violation of the federal securities laws. Serbousek, Rice, Valentine, and Keran are liable for their respective companies' false statements and omissions pleaded under the Securities Act, as well as any of their own.

## VIII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A.  determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.  awarding compensatory or rescissory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C.  awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.  awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## IX.    <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury.

Dated: April 17, 2025

Respectfully submitted,

By: */s/ Edwin S. Gault, Jr.*
**FORMAN WATKINS & KRUTZ LLP**
Edwin S. Gault, Jr. (TX No. 24049863)
C. Mitch McGuffey (admitted *pro hac vice*)
4900 Woodway Drive, Suite 940
Houston, TX 77056-1800
Tel: (713) 402-1717
Fax: (713) 621-6746
win.gault@formanwatkins.com
mitch.mcguffey@formanwatkins.com

*Local Counsel for Lead Plaintiff SEPTA and the Class*

**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
Jan Messerschmidt (admitted *pro hac vice*)
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

Christina D. Saler (admitted *pro hac vice*)
100 N. 18th Street, Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707
Fax: (267) 479-5701
csaler@cohenmilstein.com

Alexandra Gray (admitted *pro hac vice*)
88 Pine St., 14th Floor
New York, NY 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
agray@cohenmilstein.com

*Attorneys for Lead Plaintiff SEPTA and Lead Counsel for the Class*

**GIRARD SHARP LLP**
Adam E. Polk (admitted *pro hac vice*)
601 California Street, Suite 1400

San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
apolk@girardsharp.com

**THE HALL FIRM, LTD**
David W. Hall (*pro hac vice forthcoming*)
Four Embarcadero Center, Suite 1400
San Francisco, CA 94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058
dhall@hallfirmltd.com

*Attorneys for Mark Bonta*

**Appendix A**

**<u>CONFIDENTIAL WITNESSES</u>**

**Confidential Witness #1 ("CW 1")** worked at SeaSpine and then Orthofix post-Merger from 2019 until 2024 as an Operations Manager. While at SeaSpine, he reported to a Director of Logistics and then Vice President ("VP") of Supply Chain, Ray McDonagh. After the Merger, he reported to Bill Boykin at Orthofix.

**Confidential Witness #2 ("CW 2")** was employed as an Executive Assistant at SeaSpine from the first quarter of 2020 to the third quarter of 2021. She reported to Defendant Bostjancic during her entire tenure and also provided support to Defendant Keran and two different VPs of Human Resources ("HR").

**Confidential Witness #3 ("CW 3")** held a contract position as a Talent Acquisition Coordinator at SeaSpine from July 2016 to October of 2016. She first reported to Michael Galvin, and upon his departure, reported to Defendant Bostjancic and Dennis Raposa.

**Confidential Witness #4 ("CW 4")** was employed at SeaSpine from January 2020 to May 2020. She was the VP of HR and reported to Defendant Keran.

**Confidential Witness #5 ("CW 5")** was employed in the HR team at SeaSpine and then Orthofix post-Merger from July of 2022 until July 2024. CW 5 reported to Kaylo Greenwell while at SeaSpine and Christina Penland after the Merger.

**Confidential Witness #6 ("CW 6")** worked at Orthofix as a Marketing/Sales Assistant from January 2012 to November 2014, an Associate Marketing Manager until December 2016, and then a Marketing Manager until August 2018. She reported to Cory Brenner while she was a Marketing/Sales Assistant and then to Terry Riley Hudak while she was an Associate Marketing Manager and Marketing Manager.

**Confidential Witness #7 ("CW 7")** was employed at Orthofix from January 2018 to March 2021. She started as an Associate Biologics Account Manager and worked her way up to Marketing Associate for Bone Growth Therapies and then to Associate Product Manager for Bone Growth Therapies.

**Confidential Witness #8 ("CW 8")** was employed as a member of the Regional Sales Team at Orthofix from autumn of 2016 to autumn of 2019.

**Confidential Witness #9 ("CW 9")** was employed at a predecessor of SeaSpine, Integra Life Sciences Corp., and then eventually SeaSpine, beginning in January 2013. She stayed at SeaSpine through the Merger and left Orthofix in September 2023 as a Senior Manager, Strategic Contracting & Compliance. She worked in each company's legal department during her tenure, reporting to Defendant Keran pre-Merger and Catherine O'Connor post-Merger.