**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | |
|---|---|
| *In re Orthofix Medical, Inc. Securities Litigation* | Master File No. 2:24-cv-00690 <br><br> <u>CLASS ACTION</u> <br><br> **ECF CASE** <br><br> ORAL ARGUMENT REQUESTED |

**PLAINTIFFS' OMNIBUS RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTIONS TO DISMISS THE FIRST AMENDED CONSOLIDATED COMPLAINT**

**FORMAN WATKINS & KRUTZ LLP**
Edwin S. Gault, Jr. (TX No. 24049863)
K. B. Battaglini (TX No. 01918060)
C. Mitch McGuffey (admitted *pro hac vice*)
4900 Woodway Drive, Suite 940
Houston, TX 77056-1800
Tel: (713) 402-1717
Fax: (713) 621-6746
win.gault@formanwatkins.com
kb.battaglini@formanwatkins.com
mitch.mcguffey@formanwatkins.com

*Local Counsel for Lead Plaintiff and the Proposed Class*

**COHEN MILSTEIN SELLERS
 & TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
Jan Messerschmidt (admitted *pro hac vice*)
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

Christina D. Saler (admitted *pro hac vice*)
100 N. 18th Street, Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707
Fax: (267) 479-5701
csaler@cohenmilstein.com

Alexandra Gray (admitted *pro hac vice*)
88 Pine St., 14th Floor
New York, NY 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
agray@cohenmilstein.com

[Additional counsel in signature block]

*Attorneys for Lead Plaintiff and the Proposed Class*

Case 2:24-cv-00690-JRG     Document 58     Filed 06/18/25     Page 2 of 59 PageID #:  1079

**TABLE OF CONTENTS**

Table of Authorities.................................................................................................................................ii

Glossary of Terms ...................................................................................................................................x

Introduction..............................................................................................................................................1

Background................................................................................................................................................3

I.      Defendants announce merger of equals between Orthofix and SeaSpine.......................................3

II.     Unbeknownst to investors, SeaSpine had a longstanding culture of discrimination. ...................6

III.    Valentine, Bostjancic, and Keran continue to foster a discriminatory culture at Orthofix. ...........9

IV.    Orthofix announces termination of Valentine, Bostjancic, and Keran "for cause."......................11

Response to Statements of Issues .......................................................................................................13

Legal Standard .......................................................................................................................................13

Argument .................................................................................................................................................14

I.      The Complaint Adequately Alleges Actionable Material Misrepresentations...............................14

        A.    The SeaSpine Merger Representations are actionable..................................................14

        B.    The Pre-Merger and Post-Merger Statements are actionable. ...................................20

              1.    The Pre- and Post-Merger Statements are material...........................................20

              2.    The Pre-Merger Statements were false and misleading. ..................................26

              3.    The Post-Merger Statements were false and misleading. ................................28

        C.    The Court should credit allegations based on confidential witnesses. ....................30

II.     The Complaint Adequately Alleges a Strong Inference of Scienter.................................................33

        A.    The Terminated Executives made false statements with scienter................................33

        B.    The scienter of the Terminated Executives is imputed to Orthofix and SeaSpine. ..............37

        C.    Scienter is adequately alleged as to the other Individual Defendants. ....................40

III.    The Complaint Adequately Alleges Loss Causation........................................................................41

IV.    The Complaint Adequately Alleges Securities Act Claims .............................................................43

V.     The Complaint Adequately Alleges Control Person Liability.........................................................44

Conclusion ..............................................................................................................................................45

i

## TABLE OF AUTHORITIES

**Pages(s)**

**Cases**

*ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*,
667 F. Supp. 3d 411 (S.D. Tex. 2023) ................................................................28

*In re Alta Mesa Res., Inc. Sec. Litig.*,
2024 WL 3760481 (S.D. Tex. Aug. 12, 2024) ....................................................26

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) ...............................................................41

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017)..........................................................25, 26

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*,
757 F. Supp. 2d 260 (S.D.N.Y. 2010)........................................................... 17, 18

*Barrie v. Intervoice-Brite, Inc.*,
397 F.3d 249 (5th Cir. 2005)......................................................................... 14, 32

*BCCI Holdings (Luxembourg), S.A. v. Clifford*,
964 F. Supp. 468 (D.D.C. 1997) ..........................................................................40

*Belmont v. MB Inv. Partners, Inc.*,
708 F.3d 470 (3d Cir. 2013) ......................................................................... 39, 40

*Belton v. Fibreboard Corp.*,
724 F.2d 500 (5th Cir. 1984)................................................................................19

*In re BHP Billiton Limited Sec. Litig.*,
276 F. Supp. 3d 65 (S.D.N.Y. 2017).....................................................................22

*In re BofI Holding, Inc. Sec. Litig.*,
2017 WL 2257980 (S.D. Cal. May 23, 2017) .......................................................30

*Bondali v. YUM! Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) .........................................................................25

*Born v. Quad/Graphics, Inc.*,
521 F. Supp. 3d 469 (S.D.N.Y. 2021).................................................................18

*Britton v. Parker*,
2009 WL 3158133 (D. Colo. Sept. 23, 2009) .......................................................21

*Brody v. Zix Corp.*,
  2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) ................................................................ 28, 34

*Budde v. Glob. Power Equip. Grp., Inc.*,
  2018 WL 4623108 (N.D. Tex. Sept. 26, 2018) ...................................................................31

*Carlton v. Cannon*,
  184 F. Supp. 3d 428 (S.D. Tex. 2016) ................................................................................32

*In re Cassava Scis., Inc. Sec. Litig.*,
  2023 WL 3442087 (W.D. Tex. May 11, 2023) ....................................................................21

*In re ChinaCast Educ. Corp. Sec. Litig.*,
  809 F.3d 471 (9th Cir. 2015) ......................................................................................... 39, 40

*City of Fort Lauderdale Police & Firefighters' Retirement System v. Pegasystems Inc.*,
  683 F. Supp. 3d 120 (D. Mass 2023) .............................................................................. 23, 34

*City of Philadelphia v. Fleming Cos.*,
  264 F.3d 1245 (10th Cir. 2001) ...........................................................................................35

*City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) ..................................................................................20

*Collmer v. U.S. Liquids, Inc.*,
  268 F. Supp. 2d 718 (S.D. Tex. 2001) .................................................................................26

*Constr. Laborers Pension Tr. for S. California v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020) .......................................................................21, 27, 39

*Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*,
  620 F. Supp. 3d 603 (S.D. Tex. 2022) .................................................................................27

*Dura Pharm., Inc. v. Broudo*,
  544 U.S. 336 (2005), ...........................................................................................................14

*In re Dynex Cap., Inc., Sec. Litig.*,
  2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ......................................................................32

*Edwards v. McDermott Int'l, Inc.*,
  2021 WL 1421609 (S.D. Tex. Apr. 13, 2021) ......................................................................22

*In re Eletrobras Sec. Litig.*,
  245 F. Supp. 3d 450 (S.D.N.Y. 2017) ..................................................................................23

*Emp's Ret. Sys. v. Whole Foods Mkt., Inc.*,
  905 F.3d 892 (5th Cir. 2018) ...............................................................................................43

*In re Enron Sec. Litig.*,
  258 F. Supp. 2d 576 (S.D. Tex. 2003) ..........................................................................................44

*FDIC v. Nathan*,
  804 F. Supp. 888, (S.D. Tex. 1992)...............................................................................................40

*Fleming Cos. Sec. & Derivative Litig.*,
  2004 WL 5278716, at *13 (E.D. Tex. June 16, 2004) ...........................................................33

*Everest Nat'l Ins. Co. v. Tri-State Bancshares, Inc.*,
  2016 WL 5062155 (W.D. La. Aug. 2, 2016) .........................................................................40

*First New York Sec. LLC v. United Rentals Inc.*,
  391 F. App'x 71 (2d Cir. 2010)...................................................................................................35

*Fitzpatrick v. Uni-Pixel, Inc.*,
  35 F. Supp. 3d 813 (S.D. Tex. 2014) .................................................................................. 32, 37

*In re Friedman's, Inc. Sec. Litig.*,
  385 F. Supp. 2d 1345 (N.D. Ga. 2005) .................................................................................44

*Ga. Firefighters' Pension Fund v. Anadarko Petrol. Corp.*,
  514 F. Supp. 3d 942 (S.D. Tex. 2021) ...................................................................................30

*Glazer Cap. Mgmt., LP v. Magistri*,
  549 F.3d 736 (9th Cir. 2008).................................................................................15, 16, 17, 18

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
  2014 WL 2815571 (S.D.N.Y. June 23, 2014) ................................................................. 21, 23

*Goldstein v. MCI WorldCom*,
  340 F.3d 238 (5th Cir. 2003)......................................................................................................35

*Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*,
  313 F.3d 305 (5th Cir. 2002)......................................................................................................45

*Gross v. GFI Grp., Inc.*,
  784 F. App'x 27 (2d Cir. 2019)..................................................................................................25

*In re Grupo Televisa Sec. Litig.*,
  368 F. Supp. 3d 711 (S.D.N.Y. 2019).....................................................................................23

*Hall v. Rent-A-Ctr., Inc.*,
  2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ................................................................ 22, 36

*Hammers v. Mayea-Chang*,
  2019 WL 6728446 (E.D. Tex. Dec. 11, 2019) (Gilstrap, J.).............................................15

iv

*Herman & MacLean v. Huddleston*,
 459 U.S. 375 (1983)........................................................................................................................43

*HRSA-ILA Funds v. Adidas AG*,
 745 F. Supp. 3d 1127 (D. Or. 2024)..............................................................................................24

*Huddleston v. Herman & MacLean*,
 640 F.2d 534 (5th Cir. 1981), *aff'd in part, rev'd in part,* 459 U.S. 375 (1982).....................................26

*Jaroslawicz v. M&T Bank Corp.*,
 2017 WL 1197716 (D. Del. Mar. 30, 2017) ......................................................................... 17, 18

*Johnson v. CBD Energy Ltd.*,
 2016 WL 3654657 (S.D. Tex. July 6, 2016) ..................................................................................43

*Kakkar v. Bellicum Pharms., Inc.*,
 2020 WL 2845279 (S.D. Tex. May 29, 2020) ...............................................................................35

*Kaltman v. Key Energy Servs., Inc.*,
 447 F. Supp. 2d 648 (W.D. Tex. 2006) ........................................................................................35

*Kaplan v. Utilicorp United, Inc.*,
 9 F.3d 405 (5th Cir. 1993).............................................................................................................40

*Kapps v. Torch Offshore, Inc.*,
 379 F.3d 207 (5th Cir. 2004)........................................................................................................20

*In re KBR, Inc., Sec. Litig.*,
 2018 WL 4208681 (S.D. Tex. Aug. 31, 2018) .............................................................................25

*In re Kosmos Energy Ltd. Sec. Litig.*,
 955 F. Supp. 2d 658 (N.D. Tex. June 24, 2013) .........................................................................43

*Krim v. BancTexas Grp., Inc.*,
 989 F.2d 1435 (5th Cir. 1993) ......................................................................................................22

*Lapin v. Goldman Sachs*,
 506 F. Supp. 2d 221 (S.D.N.Y. 2006).........................................................................................23

*Lee v. Active Power, Inc.*,
 29 F. Supp. 3d 876 (W.D. Tex. 2014) .........................................................................................40

*In re Liberty Tax, Inc. Sec. Litig.*,
 828 F. App'x 747 (2d Cir. 2020) .................................................................................................24

*Linenweber v. Southwest Airlines Co.*,
 693 F. Supp. 3d 661 (N.D. Tex. 2023).........................................................................................25

*Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*,
    238 F.3d 363 (5th Cir. 2001)...................................................................................................44

*Lopez v. CTPartners Exec. Search Inc.*,
    173 F. Supp. 3d 12 (S.D.N.Y. 2016)......................................................................................24

*Lormand v. U.S. Unwired, Inc.*,
    565 F.3d 228 (5th Cir. 2009)..........................................................................13, 14, 42, 43

*Lovelace v. Software Spectrum Inc.*,
    78 F.3d 1015 (5th Cir. 1996)..................................................................................................18

*Mancuso v. Douglas Elliman LLC*,
    808 F. Supp. 2d 606 (S.D.N.Y. 2011)...................................................................................38

*MAZ Partners LP v. First Choice Healthcare Sols., Inc.*,
    2019 WL 5394011 (M.D. Fla. Oct. 16, 2019) .....................................................................38

*McNamara v. Bre-X Mins. Ltd.*,
    197 F. Supp. 2d 622 (E.D. Tex. 2001) ................................................................................19

*Melder v. Morris*,
    27 F.3d 1097 (5th Cir. 1994)..................................................................................................44

*In re Moody's Corp. Sec. Litig.*,
    599 F. Supp. 2d 493 (S.D.N.Y. 2009)...................................................................................23

*Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
    935 F.3d 424 (5th Cir. 2019)..................................................................................................14

*Naglich v. Applied Optoelectronics*,
    436 F. Supp. 3d 954 (S.D. Tex. 2020) ..................................................................................34

*In re Netsolve, Inc. Sec. Litig.*,
    185 F. Supp. 2d 684 (W.D. Tex. 2001) ...............................................................................38

*Nykredit Portefolje Admin. A/S v. Propetro Holding Corp.*,
    2021 WL 9037758 (W.D. Tex. Sept. 13, 2021)......................................................23, 39, 43

*Okla. L. Enf't Ret. Sys. v. Papa John's Int'l, Inc.*,
    517 F. Supp. 3d 196 (S.D.N.Y. 2021)...................................................................................24

*Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*,
    58 F.4th 195 (5th Cir. 2023) .........................................................................................*passim*

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015)..................................................................................................................27

*Owens v. Jastrow,*
    789 F.3d 529 (5th Cir. 2015)...............................................................................35

*Parmelee v. Santander Consumer USA Holdings, Inc.,*
    2018 WL 276338 (N.D. Tex. Jan. 3, 2018)..........................................................42

*In re Petrobras Sec. Litig.,*
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)....................................................................38

*In re Pilgrim's Pride Corp. Sec. Litig.,*
    2010 WL 3257369 (E.D. Tex. Aug. 17, 2010) ............................................... 44, 45

*Pipefitters Loc. No. 636 Defined Ben. Plan v. Zale Corp.,*
    499 F. App'x 345 (5th Cir. 2012) .........................................................................35

*Plaisance v. Schiller,*
    2019 WL 1205628 (S.D. Tex. Mar. 14, 2019) ......................................................34

*Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.,*
    2024 WL 5399664 (N.D. Cal. Sept. 18, 2024) .....................................................17

*Plymouth Ct. Ret. Sys. v. Patterson Co., Inc.,*
    2019 WL 3336119 (D. Minn. July 25, 2019) .......................................................23

*Police and Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline,*
    777 F. App'x 726 (5th Cir.)............................................................................. 25, 30

*Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.,*
    769 F.3d 313 (5th Cir. 2014) (Gilstrap, J.) ...................................................... 42, 43

*Pugh v. Trib. Co.,*
    521 F.3d 686 (7th Cir. 2008)................................................................................40

*Puskala v. Koss Corp.,*
    799 F. Supp. 2d 941 (E.D. Wis. 2011) .................................................................39

*Reiner v. Teladoc Health, Inc.,*
    2021 WL 4451407(S.D.N.Y. Sept. 29, 2021) ......................................................24

*Retail Wholesale v. Hewlett-Packard Co.,*
    845 F.3d 1268 (9th Cir. 2017) ............................................................................24

*Richman v. Goldman Sachs Grp., Inc.,*
    868 F. Supp. 2d 261 (S.D.N.Y. 2012)...................................................................23

*Rubinstein v. Collins,*
    20 F.3d 160 (5th Cir.1994).............................................................................. 18, 26

vii

*RYH Props., LLC v. West,*
    2009 WL 10676645 (E.D. Tex. Aug. 3, 2009) ..................................................................28

*San Antonio Fire & Police Pension Fund v. Syneos Health Inc.,*
    75 F.4th 232 (4th Cir. 2023) ........................................................................... 35, 37

*SEC v. Southwest Coal & Energy Co.,*
    624 F.2d 1312 (5th Cir. 1980) ...............................................................................34

*SEC v. Wyly,*
    788 F. Supp. 2d 92 (S.D.N.Y. 2011)......................................................................19

*Shivangi v. Dean Witter Reynolds, Inc.,*
    825 F.2d 885 (5th Cir. 1987)...................................................................................34

*In re Signet Jewelers Ltd. Sec. Litig.,*
    2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018).....................................................22, 28, 34

*Simons v. Dynacq Healthcare, Inc.,*
    2006 WL 1897270 (S.D. Tex. July 10, 2006).........................................................22

*Singh v. 21Vianet Grp., Inc.,*
    2017 WL 4322483 (E.D. Tex. Sept. 13, 2017) ......................................................34

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.,*
    365 F.3d 353 (5th Cir. 2004).......................................................................... 33, 37

*Spitzberg v. Houston Am. Energy Corp.,*
    758 F.3d 676 (5th Cir. 2014).......................................................................... 28, 37

*In re Sunpoint Sec., Inc.,*
    377 B.R. 513 (Bankr. E.D. Tex. 2007) ..................................................................38

*In re Superior Offshore Int'l., Inc. Sec. Litig.,*
    2009 WL 82064 (S.D. Tex. Jan. 12, 2009) ............................................................43

*Taylor v. Charter Med. Corp.,*
    162 F.3d 827 (5th Cir. 1998)...................................................................................18

*Taylor v. Scheef & Stone, LLP,*
    2020 WL 4432848 (N.D. Tex. July 31, 2020)........................................................40

*Teachers' Ret. Sys. Of LA v. Hunter,*
    477 F.3d 162 (4th Cir. 2007)...................................................................................43

*In re Tenaris S.A. Sec. Litig.,*
    493 F. Supp. 3d 143 (E.D.N.Y. 2020).....................................................................23

*In re Tesla S'holder Deriv. Litig.*,
    2023 WL 6060349 (W.D. Tex. Sept. 15, 2023) .................................................................24

*Twin Master Fund, Ltd. v. Akorn, Inc.*,
    2020 WL 564222 (N.D. Ill. Feb. 5, 2020) ....................................................................17

*U.S. v. Skilling*,
    554 F.3d 529 (5th Cir. 2009), *aff'd in part, vacated in part on other grounds, remanded*,
    561 U.S. 358 (2010) ....................................................................................................22

*In re Venator Materials PLC Sec. Litig.*,
    547 F. Supp. 3d 624 (S.D. Tex. 2021) ................................................................. 34, 45

*Walker v. Rent-A-Ctr.*,
    2005 WL 8161388 (E.D. Tex.) ....................................................................................44

*In re Zoran Corp. Derivative Litig.*,
    511 F. Supp. 2d 986 (N.D. Cal. 2007) ........................................................................21

**Rules**

Fed. R. Civ. P. 12(b)(6) .......................................................................................................13

Fed. R. Civ. P. 8 ........................................................................................................... 42, 44

Fed. R. Civ. P. 9(b) ....................................................................................................... 44, 45

Fed. R. Civ. P.  15(a) ..........................................................................................................45

**GLOSSARY OF TERMS**

| ABBREVIATION | DEFINITION |
|---|---|
| **PLAINTIFFS** | |
| Lead Plaintiff or SEPTA | Lead Plaintiff Southeastern Pennsylvania Transportation Authority |
| Plaintiffs | SEPTA and additional named plaintiff Mark Bonta |
| **DEFENDANTS** | |
| Individual Defendants | The Terminated Executive Defendants, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants |
| Legacy Orthofix Officer and Director Defendants | Defendants Jon C. Serbousek, Douglas C. Rice, Catherine M. Burzik, Wayne Burris, Jason M. Hannon, James F. Hinrichs, Lilly Marks, Michael E. Paolucci, John E. Sicard, Thomas A. West, and Kimberley A. Elting |
| Orthofix Defendants | Orthofix Medical Inc. ("Orthofix"), SeaSpine Holdings Corp. ("SeaSpine"), Jon C. Serbousek, Douglas C. Rice, Catherine M. Burzik, Wayne Burris, Jason M. Hannon, James F. Hinrichs, Lilly Marks, Michael E. Paolucci, John E. Sicard, Thomas A. West, Kimberley A. Elting, Stuart Essig, John Henneman, III, and Shweta Singh Maniar |
| Orthofix Post-Merger Director Defendants | Defendants Catherine M. Burzik, Jason M. Hannon, James F. Hinrichs, Michael E. Paolucci, Jon C. Serbousek, Stuart Essig, John Henneman, III, Shweta Singh Maniar |
| Terminated Executives or Terminated Executive Defendants | Defendants Keith Valentine, John Bostjancic, and Patrick Keran |
| **CASE FILINGS** | |
| Complaint or Compl. | Plaintiffs' First Amended Consolidated Complaint for Violation the Federal Securities Laws, filed April 17, 2025, ECF No. 49 |
| Defendants' Motions | OFIX Br. and TE Br. |
| Ex. | Exhibits to the Declaration of Jan E. Messerschmidt in Support of Plaintiffs' Omnibus Response in Opposition to Defendants' Motions to Dismiss the Consolidated Amended Class Action Complaint, filed herewith |
| OFIX Br. | Orthofix, SeaSpine, and Certain Individual Defendants' Motion to Dismiss the First Amended Consolidated Complaint, filed May 19, 2025, ECF No. 50 |
| OFIX Ex. | Exhibits to the Declaration of Jeffrey T. Scott, filed May 19, 2025, ECF No. 50-1 |
| TE Br. | Defendants Bostjancic, Keran and Valentine's Motion to Dismiss the First Amended Consolidated Complaint, filed May 19, 2025, ECF No. 51 |

x

| ABBREVIATION | DEFINITION |
|---|---|
| **ADDITIONAL TERMS** | |
| Amended Registration Statement | Orthofix Medical Inc., Form S-4/A, filed Nov. 22, 2022 |
| Class Period | October 11, 2022 to September 12, 2023 |
| Code of Conduct | Orthofix Code of Conduct |
| CW | Confidential Witness |
| Defamation Complaint | Compl., Sept. 10, 2024, *Valentine v. Burzik* No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) (ROA No. 4) |
| Exchange Act | The Securities Exchange Act of 1934 |
| Internal Investigation | Internal investigation at Orthofix that culminated in the termination of the Terminated Executive Defendants |
| Johnson | Maryanne Johnson |
| *Johnson* Action | *Johnson v. SeaSpine Holdings Corp.*, Case No. 30-2017-00949804-CU-OE-CXC (Cal. Super. Ct. Orange Cnty.) |
| *Johnson* Settlement | Settlement agreement reached in the *Johnson* Action |
| Merger | January 2023 stock-for-stock transaction by which Orthofix acquired and merged with SeaSpine |
| Merger Agreement | Agreement and Plan of Merger by and among Orthofix Medical Inc., Orca Merger Sub Inc., and SeaSpine Holdings Corporation, dated October 10, 2022 |
| O'Connor | Catherine O'Connor |
| Offering Documents | The Registration Statement and Prospectus (both of which are inclusive of amendments thereto, related prospectuses, and documents incorporated therein) issued in connection with the Merger |
| Orthofix Board | Orthofix Board of Directors |
| Prospectus | 424B3 Prospectus (inclusive of amendments thereto, related prospectuses, and documents incorporated therein) issued in connection with the Merger |
| PSLRA | Private Securities Litigation Reform Act |
| Registration Statement | S-4 Registration Statement (inclusive of amendments thereto and documents incorporated therein) issued in connection with the Merger |
| Securities Act | The Securities Act of 1933 |
| September 12, 2023 Press Release | Press release issued by Orthofix on September 12, 2023 that announced the termination of the Terminated Executives |
| Special Motion to Strike the Defamation Complaint | Def.'s Special Mot. to Strike Pursuant to Cal. Code of Civ. Proc. Section 425.16, Jan. 24, 2025, *Valentine v. Burzik*, No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) (ROA No. 14) |

## INTRODUCTION

This is a securities case arising from the Merger[1] of Orthofix and SeaSpine, two medical device companies, and the abrupt termination of the combined Company's most senior executives just nine months later. Announcing their "merger of equals" in October 2022, Orthofix and SeaSpine touted their shared commitment to a culture of integrity, diversity, and compliance. A central pillar of the Merger was the selection of three senior SeaSpine executives—Keith Valentine, John Bostjancic, and Patrick Keran (the "Terminated Executives")—who would lead the combined Company with fidelity to these common values.

But mere months after the Merger closed, Orthofix's Board announced that it had fired Valentine, Bostjancic, and Keran for committing "willful and material misconduct." Among other things, the Board found that, under their leadership, the Terminated Executives had managed a workplace culture of harassment, bullying, and discrimination. The market was stunned by the news that Orthofix had fired its entire C-suite, who had been billed as one of the Merger's chief assets, causing the Company's stock price to plummet by more than 30%.

While investors were understandably surprised, none of this was news to employees of SeaSpine or Orthofix. Based on legal filings and first-hand witness accounts from former employees, the Complaint describes in detail how Valentine, Bostjancic, and Keran had fostered a longstanding and continuous culture of discrimination and harassment at SeaSpine. These accounts are corroborated in graphic detail by the Terminated Executives' own text messages with each other, illustrating their pervasive and continuous misconduct both before and after the Merger.

In seeking dismissal, Defendants strive hard to avoid confronting these facts. That is hardly

---

[1] Capitalized and defined terms have the same meaning as in the First Amended Consolidated Complaint for Violations of the Federal Securities Laws, filed April 17, 2025 (ECF No. 49) ("Complaint"), unless otherwise indicated. Emphasis is added and citations and internal quotations are omitted throughout this brief, unless otherwise indicated.

1

surprising, given that Defendants do not and cannot dispute that many of their statements were false and that the Terminated Executives knew as much. Defendants seek to overcome that problem with the remarkable claim that, even if some of their statements were knowingly false, the Court should still find Plaintiffs' claims fail as a matter of law. But none of those arguments support dismissal.

First, Defendants do not dispute that SeaSpine made false representations in the Merger Agreement about its compliance with discrimination and harassment laws. But Defendants claim that those statements are nonetheless not actionable "as a matter of law" because they were accompanied by a disclaimer warning investors not to rely on them. But nearly every court to consider that argument has rejected it, reasoning that given the significance of a merger, a generic non-reliance disclaimer is not enough to conclude that no reasonable investor would rely on representations in a merger agreement. Similarly, Defendants argue that the rest of their statements, even if false, are nonetheless immaterial "as a matter of law" because they were "general" statements about "reputation," "integrity," or "compliance." Setting aside that Defendants make no effort to even explain why the statements here are insufficiently specific, courts routinely find that even general statements about integrity or compliance can be actionable when they are, like here, contrary to the facts alleged.

Second, Defendants concede that the Terminated Executives knew about their own misconduct but claim that knowledge of omitted facts is not enough to give rise to a strong inference of scienter. But that is simply wrong. This Court has recognized the well-settled principle that a strong inference of scienter is shown with allegations that a defendant knew facts suggesting that their statements were inaccurate. And at any rate, Defendants can hardly dispute that the Terminated Executives acted with scienter given that Orthofix has recognized that they "committed willful and material misconduct." The Orthofix Defendants alternatively argue that even if the Terminated Executives acted with scenter, that scienter cannot be imputed to Orthofix because they acted "adversely" to Orthofix's

interest. But courts have refused to apply the "adverse-interest exception" in securities cases like this one, because that exception is inapplicable when the plaintiff relied in good faith on an executive's statements made on the company's behalf.

Third, Defendants argue that Plaintiffs fail to plead loss causation because the Complaint does not allege that news of the executives' termination "revealed the falsity of the challenged statements." But Orthofix's announcement that the Terminated Executives committed willful and material misconduct is directly contrary to the alleged misrepresentations.

At the end of the day, Defendants cannot dispute that the Complaint adequately alleges material misrepresentations that were knowingly false when made. That is enough to state a claim. Defendants will have ample opportunity to raise their arguments at summary judgment or trial, but they do not support dismissal. Defendants' Motions should thus be denied in their entirety.

## BACKGROUND

### I. Defendants announce merger of equals between Orthofix and SeaSpine.

On October 11, 2022, Orthofix, a medical device company focused on orthopedics, and SeaSpine, a medical technology company focused on surgical treatments of spinal disorders, announced their plans for a "merger of equals" that would create "a leading global spine and orthopedics company" with "highly complementary portfolios." ¶ 82.[2] This announcement came after Orthofix had been assuring investors that it took a "disciplined" approach to M&A activity. ¶¶ 53-56.

On the day of the October 2022 announcement, and in the weeks that followed, Orthofix and SeaSpine both touted the Merger to their shareholders, hailing their "complementary cultures," "including a strong performance-based culture focused on integrity, collaboration, innovation, diversity

---

[2] ¶ __ refers to citations to the Complaint unless otherwise noted. Ex. __ refers to exhibits to the Declaration of Jan E. Messerschmidt in Support of Plaintiffs' Omnibus Response in Opposition to Defendants' Motions to Dismiss the Consolidated Amended Class Action Complaint, filed herewith.

3

and corporate social responsibility." ¶¶ 163, 256(a), 262(d), 337(d) ("Integrity Statement").

Orthofix and SeaSpine also announced the executive leadership team that would lead Orthofix after the Merger. The combined Company, which would retain the Orthofix name, would be led by Defendant Keith Valentine, then the President, CEO, and a director of SeaSpine, who would serve in the same roles at Orthofix. Along with Valentine, Defendants John Bostjancic and Patrick Keran, both senior executives at SeaSpine, would serve as Chief Financial Officer and Chief Legal Officer, respectively. ¶ 23-25. Defendants told investors that Orthofix's post-Merger executive team was carefully and purposefully vetted, explaining that Valentine, Bostjancic, and Keran, as well as the other senior executives, were "selected based not only on their individual merit but also with consideration for the overall composition of the executive team." ¶¶ 91, 258(a) ("ELT Selection Statement"). On the same day, the two companies issued a press release that touted Bostjancic specifically, with Valentine stating that Bostjancic's "cultural influence" would "benefit the newly combined company" and that he would "ensur[e] accountability across all levels of the organization." ¶¶ 92, 260(a) ("Bostjancic Statement," and together with the Integrity Statement and the ELT Selection Statement, the "Pre-Merger Statements"). *See* Ex. A (Table of Misstatements) at 3-5.

In soliciting votes for the Merger from their shareholders, Orthofix and SeaSpine incorporated the Merger Agreement (executed on October 10, 2022) into multiple SEC filings, including the Registration Statement and Joint Proxy/Prospectus. ¶¶ 84, 164, 169, 175. In those filings, the two companies both repeatedly "encourage[d]" their shareholders to "read the merger agreement carefully and *in its entirety*, as it is the *legal document that governs the merger*." ¶ 164; Ex. E (November 23, 2022 Joint Proxy/Prospectus) at 14. The two companies stressed that the Joint Proxy was "qualified in its entirety" by the "*complete text* of the merger agreement," ¶ 171, telling investors that they should "rely *only* on the information contained in or incorporated by reference into" the Joint Proxy to "vote on the

SeaSpine merger proposal." Ex. E (November 23, 2022 Joint Proxy/Prospectus) at ii. The terms of the Merger Agreement included a set of representations from both companies on specific topics that were deemed essential to the Merger. Indeed, the Merger was contingent on the truth of those representations, providing either party the ability to terminate the Merger if those representations proved inaccurate under the terms of the Merger Agreement. Ex. E (November 23, 2022 Joint Proxy/Prospectus) at A-73.

Those terms included specific representations from SeaSpine that it was "in compliance in all material respects" with "all Laws" relating to employment, including laws relating to wages, human rights, harassment, discrimination, retaliation in employment, pay equity, and employment equity. ¶¶ 84, 167, 172, 175, 254(a), 256(b), 262(a), 264(a), 337(a), 339(a), 342(a) ("SeaSpine Compliance Statement"). SeaSpine also represented that "[n]o allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment," "misconduct," "discrimination," or "similar behavior" had been "made at any time" within the past four years against "any Person" who was an officer, director, manager, or supervisory-level employee, nor were there any allegations that were pending, threatened, or had a "reasonable basis." ¶¶ 84, 167, 172, 175, 254(b), 256(c), 262(b), 265(b), 337(b), 339(b), 342(b) ("SeaSpine Misconduct Statement"). Finally, SeaSpine represented that it had entered into no settlement agreements that related directly or indirectly to "any Misconduct Allegation" against SeaSpine or any person who was an officer, director, manager, employee, or independent contractor of SeaSpine. ¶¶ 84, 167, 172, 175, 254(c), 256(d), 262(c), 264(c), 337(c), 339(c), 342(c) ("SeaSpine Settlements Statement," together with the SeaSpine Compliance and Misconduct Statements, "SeaSpine Merger Representations"). *See* Ex. A at 1-2, 15-16. These representations were all false.

These SeaSpine Merger Representations would have been particularly important to Orthofix, which had its own history of discrimination- and harassment-related complaints from female

5

employees, including some that resulted in litigation. ¶¶ 154-160.

## II.    Unbeknownst to investors, SeaSpine had a longstanding culture of discrimination.

Unbeknownst to investors, SeaSpine had a longstanding culture of discrimination, bullying, harassment, and excessive drinking that had been fostered and perpetuated by the Terminated Executives. SeaSpine's culture and the role of the Terminated Executives is detailed in the Complaint with consistent accounts of first-hand witnesses that are documented in two lawsuits filed by former SeaSpine and Orthofix employees, as well as accounts by nine separate confidential witnesses ("CWs") who served as former employees of SeaSpine or Orthofix (or both) from 2012 to 2024. *See* Compl., App'x A. These first-hand accounts are further corroborated by the Terminated Executives' text messages, some of which were filed in litigation between the Terminated Executives and Orthofix.

Since as early as 2015, the Terminated Executives had openly fostered a "good old boys club" workplace culture at SeaSpine, that promoted discriminatory hiring, promotion, and compensation, ¶¶ 120-122, 124, 126, 131 (CW-3), widespread harassment and abusive language, ¶¶ 118, 140, 142, 145, 146 (CW-2, 3, 4), and active efforts by the Terminated Executives and others to conceal the discriminatory practices and hamstring any attempts at accountability, ¶¶ 137, 142 (CW-2, 3).

Though women accounted for roughly half of SeaSpine's workforce, the company's executive leadership was predominantly male, with only one female member of the company's Board and senior leadership. ¶ 64. In a class action discrimination lawsuit brought in 2017 by Maryanne Johnson, a former human resources ("HR") employee at SeaSpine, Johnson explained how SeaSpine systematically paid women less than men for the same work. *Id.*; *see also* ¶¶ 63-65, 117-118, 125, 126, 129-130, 132-133. Johnson and other CWs confirmed that complaints relating to discrimination and harassment went unaddressed. ¶¶ 115-116 (CW-2, 5). Indeed, though Johnson reported the discriminatory compensation to SeaSpine's male senior leaders, including Bostjancic and its Senior Director of HR, Dennis Raposa, no action was taken. ¶¶ 103, 129-30. Instead, Raposa told Johnson that SeaSpine was not

6

"the right place" for her, reminding her that SeaSpine was "Keith Valentine's Company." ¶¶ 129.

The *Johnson* Action resulted in a nearly $1 million settlement for a class of 276 class members—all current or former female SeaSpine employees in California from July 2015 to December 2019. ¶ 65. As part of the settlement, SeaSpine had agreed on paper to hire an outside vendor to review SeaSpine's work department, identify evidence of potential pay inequity, and overhaul its compensation and titling structures to remediate the discrimination. *Id.*

The Terminated Executives took active steps to conceal their discriminatory practices and frustrate attempts to enforce company policies. To conceal SeaSpine's discriminatory compensation, the company created multiple job titles for positions that performed substantially the same work. ¶ 64. As a result, even though SeaSpine had only 300 employees, the company had more than 200 different job titles, which were designed to prevent evidence of pay inequity for employees with the same job title. *Id.* And according to CW-4, who served as Vice President of HR, SeaSpine deliberately altered its employment data to make SeaSpine appear more equitable than it was in practice, providing that altered data to the outside vendor charged with overseeing the pay and equity investigation that resulted from the *Johnson* Action. ¶ 135.

Even after the settlement of the *Johnson* Action, the Terminated Executives' discriminatory misconduct continued. Their primary mechanism for concealing their discriminatory practices was to ensure that they had ultimate control over SeaSpine's HR department and its investigations, preventing independent investigations and the filing of complaints. CW-4, who served as Vice President of HR for SeaSpine in 2020, explained that the Terminated Executives consolidated their control over the company's HR department. ¶¶ 109-113. Valentine and Keran refused to permit HR to conduct any investigations without their sign-off, preventing HR from independently investigating complaints and, in turn, deterring employees from raising concerns. *Id.* Apart from controlling investigations, CW-4

7

explained that she was also asked not to report certain incidents and even cover up complaints relating to discriminatory pay and other practices. ¶ 114. When CW-4 tried to spearhead efforts that would support women at SeaSpine, she was chastised by Keran and eventually terminated by Valentine. ¶¶ 138-139, 143. Due to frustration by the HR department's lack of independence and ability to investigate complaints, SeaSpine had eight VPs of HR in just three years. ¶ 110.

Having cemented their control over HR, the Terminated Executives were free to continue their hostile and discriminatory practices unchecked. In addition to pay discrimination, the Terminated Executives also actively engaged in sexual harassment and other misconduct, including "inappropriate relationships" with their executive assistants ("EAs"), ¶ 107 (CW-4). For example, Valentine drunkenly put his hands up the shirt of an EA "in front of a packed room" at a company event, *id.*, and encouraged and protected a culture of bullying between female employees, led by the Terminated Executives' EAs, ¶¶ 147-153.[3]

Unsurprisingly, the long-standing hostile environment prompted Catherine O'Connor, a former SeaSpine attorney from 2018 to 2024, to sue SeaSpine and Orthofix after the Merger, alleging that she experienced sexual harassment, gender discrimination, and retaliation during her employment (which had occurred both before and after the Merger). *See* ¶¶ 67, 127. Among other adverse employment actions, O'Connor alleged that she had been underpaid since at least January 2022 and that Keran had informed her in December 2022 that her bonus target was below market. *See* ¶ 67.

There were plenty of red flags at SeaSpine that Orthofix would have confronted during the due

---

[3] The Complaint contains a scrivener's error in ¶¶ 147, 149, 151 by erroneously stating the name of Defendant Valentine's EA, who was Emi Aquino. Lead Plaintiff's counsel has conferred with counsel for the Orthofix Defendants and the Terminated Executive Defendants, and if the Court does not grant the Defendants' Motions in their entirety, both the Orthofix Defendants and Terminated Executive Defendants have agreed that Lead Plaintiff will file an amended complaint, which will not trigger a new round of dispositive motions (assuming the only change in the amended complaint is the correction of the aforementioned scrivener's error).

diligence process, which should have prompted Orthofix to take a closer look at personnel and HR issues and decline to install the Terminated Executives into the combined Company's leadership. But Orthofix's cavalier attitude towards HR and personnel issues is not overly surprising, as Orthofix similarly had a deficient HR department and a history of unredressed discrimination, assault, and harassment, to which multiple former employees attested. ¶¶ 155, 157, 160 (CW-6 describing "good old boys" network, sexual harassment, and fear of retaliation); ¶ 158 (CW-7 describing unaddressed report of sexual harassment); ¶¶ 156, 159 (CW-8 stating that HR ignored serious misconduct and that the former President of Orthofix Spine habitually sexually assaulted and/or harassed female employees).

### III. Valentine, Bostjancic, and Keran continue to foster a discriminatory culture at Orthofix.

On January 4, 2023, Orthofix and SeaSpine announced the completion of the Merger, which became effective as of 12:01 AM on January 5, 2023. ¶ 185. Relying on Defendants' assurances of the Merger's value, shareholders of both companies had overwhelmingly voted for the Merger. *Id.* Under the terms of the Merger, all SeaSpine shareholders acquired shares of Orthofix stock. ¶ 82.

The Terminated Executives continued to perpetuate SeaSpine's discriminatory culture at Orthofix after the Merger. For instance, O'Connor alleged that she worked directly with Keran to negotiate her salary, but the Terminated Executives did not take her request for equitable pay seriously. Indeed, as O'Connor later learned, a text exchange between Bostjancic and Keran discussing O'Connor's request for an equitable salary increase illustrated their dismissive and demeaning attitudes. ¶¶ 203-204.

Though the Terminated Executives continued to foster a discriminatory and hostile culture at Orthofix, Defendants presented a contrary image of the Company to investors.

- Defendants assured investors that Orthofix's "fundamental policy" was to conduct its business "in accordance with the highest ethical legal standards" and that it had a "comprehensive compliance" program that promoted "lawful and ethical business practices" and was "designed to prevent and detect violations of applicable federal, state, and local laws," as well as that it "implement[ed] robust risk management programs." ¶¶ 211, 218, 266(a), 268(d) ("Compliance and Ethics Program Statements").

9

- Defendants touted the Company's "key human capital objectives" included "attracting, developing, and retaining top talent" while "integrating diversity, equity, and inclusion principles and practices into our core values." ¶¶ 212, 266(b) ("Human Capital Statement").

- Defendants stated that Orthofix "str[ove] to support [its] teams in the areas of development, mentoring, engagement, and health and wellness, enabling them to do their best work as they grow their careers." ¶¶ 212, 266(c) ("Talent Development Statement").

- Defendants repeatedly stated that Orthofix had a "commitment" to "equal and equitable opportunities" an "an inclusive culture," which was reflected by programs specifically designed to "improve diversity equity and inclusion" and "support the women of Orthofix." ¶¶ 217, 266(d), 268(c) ("Equal Opportunity Statements," and together with the "Human Capital Statement" and the "Talent Development Statement," the "Workforce Management Statements"). *See* Ex. A at 8-11.

This commitment, Defendants told investors, was enforced through Orthofix's Code of Conduct, which "applied to all directors and executive officers" and "all areas of professional conduct," including "workplace conduct." ¶¶ 216, 268(b) ("Code of Conduct Statement 1"); *see also* ¶ 268(a) ("codes of conduct enforced at all levels") ("Corporate Governance Highlights Statement"); ¶ 268(e) (Orthofix "maintain[ed]" codes of conduct "applicable to all our directors, officers, and employees'") ("Code of Conduct Statement 2, and together with Code of Conduct Statement 1 and Corporate Governance Highlights Statement, the "Code of Conduct Statements"); Ex. A at 12-14. The Code of Conduct included specific terms that prohibited discriminatory treatment, harassment, or the "possession" or "consumption" of alcohol on Orthofix Property or "before or during the workday." ¶¶ 187-190. The Code of Conduct also required managers to ensure that "their teams comply with laws, regulations, and policies, and must work to resolve ethical dilemmas," ¶ 191, and required all employees and officers to sign a certification that they were "not in violation of any of the policies of the Code of Conduct" and would "abide by and support the policies set forth in the Code of Conduct," ¶¶ 192. Those Codes of Conduct were repeatedly violated and not sufficiently applied, contrary to what investors were led to believe.

10

**IV.    Orthofix announces termination of Valentine, Bostjancic, and Keran "for cause."**

On September 12, 2023, just shy of nine months after the closing of the Merger, Orthofix issued a press release announcing that the Board's independent directors unanimously decided to "terminate" the Terminated Executive Directors "for cause," as defined in their employment agreements ("September 12, 2023 Press Release"). ¶ 230. In the press release, Orthofix explained that the terminations resulted from an internal investigation that revealed that the Terminated Executives had "engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture." ¶ 231. The press release quoted Defendant Burzik, then-Chair of the Orthofix Board, as stating that "Orthofix's core values are built around fostering, cultivating and preserving a culture that is respectful, and we do not condone harassing or inappropriate conduct or statements of any kind" and that the terminations were "necessary to ensure our employees, investors, customers, and other stakeholders have confidence in the Company's leaders." ¶ 232.

Under the terms of the Terminated Executives' employment agreements, terminations "for cause" required the Board to find that the executives had engaged in both "willful" and "material" misconduct. Ex. F. Indeed, the termination notices sent to each of the Terminated Executives explained that Orthofix had found the executives had "breached multiple duties, obligations and agreements held with the Company," which included that they had (a) "caused material and demonstrable injury to the Company" as a result of their "commission of willful misconduct" in connection with the performance of their duties, and (b) "committed willful and material violations of applicable Company policies and codes of conduct." Ex. G.

The market was stunned by the announcement and Orthofix's stock price plummeted by more than 30%, closing at $13.01 per share on September 13, 2023, on unusually high trading volume, wiping out $206.5 million of market capitalization. ¶¶ 233, 235. Reporting on the news, analysts noted

11

that "[m]uch of the basis of the merger was to bring in SeaSpine's leadership into Orthofix," ¶ 237; *see also id.* ¶¶ 236-39, 250. Indeed, analysts dismissed Orthofix's claims that the terminations were "not specific to company financials" as "positive spin," explaining that "it's hard to separate the public-facing management that investors knew well and the potential impact to the business." ¶ 236. Because "Keith Valentine was a well-known entity in the spine market between customers, distributors, and investors," analysts noted that "in the context of integrating two companies, this throws further risk into a successful merger (and sadly gives more ammunition to the adage that 'spine mergers are largely unsuccessful')." *Id.* Indeed, in another report, analysts for JMP observed that the terminations were unprecedented in the industry, noting that they could not "recall another managerial change involving 3 senior positions concurrently during our tenure in medtech equity research." ¶ 241.

Soon after the terminations, the Terminated Executives filed several lawsuits in California State Court against Orthofix and its Board. One lawsuit alleged, among other things, that Orthofix's Board members had defamed the Terminated Executives when they announced their terminations. ¶¶ 77, 98. In response, Orthofix's Board members filed a Special Motion to Strike the Defamation Complaint, in which the Company provided more details on the background and reasons for the terminations. In the filing, Orthofix explained that in June 2023, the Board had received a complaint from the then-President of Orthofix Global Spine about the Terminated Executives workplace misconduct, which included "overconsumption of alcohol, regular inappropriate comments, vulgarity, harassment of employees, and disregard of compliance obligations." ¶ 221; Ex. H at 3. An internal investigation then "uncovered proof" that the Terminated Executives "each repeatedly made gross and improper sexist, homophobic, racist, and other vulgar and demeaning comments about co-workers and third-parties in the workplace," often "*during* meetings and calls while the very individuals that the former executives demeaned were speaking." Ex. H at 1. Orthofix also "discovered evidence that the former

12

executives engaged in significant and repeated bullying and other mistreatment of Orthofix's employ-

ees, that the culture the three managed demeaned and devalued the contributions of female employees,

and that the three executives acted frequently with aggression, and accepted and promoted vulgarity

and personal attacks." ¶ 98. Ex. H at 1.

**RESPONSE TO STATEMENTS OF ISSUES**

1.  With all reasonable inferences drawn in its favor, does Lead Plaintiff state a claim under Section 10(b) of the Exchange Act, and SEC Rule 10b-5 thereunder, based on the SeaSpine Merger Representations, the Pre-Merger Statements, and the Post-Merger Statements? (Count I, ¶¶306-314; Count II, ¶¶315-323)?

2.  With all reasonable inferences drawn in its favor, does Lead Plaintiff state a claim for control person liability under Section 20(a) of the Exchange Act (Count III, ¶¶324-326; Count IV, ¶¶327-330)?

3.  With all reasonable inferences drawn in their favor, do Plaintiffs state a claim under Section 11 of the Securities Act based on the Employment & Labor Statements and the Integrity Statement, which were contained in the Offering Documents (Count V, ¶¶361-366)?

4.  With all reasonable inferences drawn in their favor, do Plaintiffs state a claim under Section 12(a)(2) of the Securities Act based on the November 23, 2022 Joint Proxy Statement/Prospectus (Count VI, ¶¶367-374)?

5.  With all reasonable inferences drawn in their favor, do Plaintiffs state a claim for control person liability under Section 15 of the Securities Act (Count VII, ¶¶375-383)?

**LEGAL STANDARD**

In the Fifth Circuit, motions to dismiss under Federal Rule 12(b)(6) are "viewed with disfavor"

and "rarely granted." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009). A complaint will

survive a Rule 12(b)(6) motion if, "accepting its factual allegations as true, the complaint plausibly

states a claim for relief." *Okla. Firefighters Pension & Ret. Sys. v. Six Flags Ent. Corp.*, 58 F.4th 195, 206

(5th Cir. 2023).

To state a Section 10(b) and Rule 10b-5 claim, a plaintiff must allege: "(1) a material misrepresen-

tation or omission; (2) scienter (a 'wrongful state of mind'); (3) a connection with the purchase or sale

of a security; (4) reliance; (5) economic loss; and (6) a 'causal connection between the material

misrepresentation and the loss.'"[4] *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 429 (5th Cir. 2019) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005)).

The Private Securities Litigation Reform Act ("PSLRA") imposes two additional pleading requirements, requiring complaints to allege with "particularity" (1) "why each one of defendants' representations or omissions was misleading," and (2) if the claim requires proof of scienter, "facts giving rise to a strong inference" that the defendant acted with that state of mind. The reason for these requirements was to prevent "abusive, frivolous strike suits, not to raise the pleading burdens to such a level that facially valid claims must be routinely dismissed." *Six Flags,* 58 F.4th at 207, 214 (cleaned up).

## ARGUMENT

### I.    The Complaint Adequately Alleges Actionable Material Misrepresentations

To allege falsity, Plaintiffs need only specify the statements they claim are fraudulent and why, the speaker, and when and where the statements were made. *See Barrie v. Intervoice-Brite, Inc.*, 397 F.3d 249, 255-56 (5th Cir. 2005). Statements that are literally true can, taken in context, materially mislead investors. *See Lormand*, 565 F.3d at 248. Accordingly, once defendants "engage[] in public discussions," they have "a duty to disclose a 'mix of information' that is not misleading." *Six Flags*, 58 F.4th at 217.

### A.  The SeaSpine Merger Representations are actionable.

There is no dispute that each of the three SeaSpine Merger Representations, *see* Ex. A at 1-2, 15-16, were false when made. Nor could there be. Each representation is contrary to the concrete allegations:

- **SeaSpine Compliance Statement.** SeaSpine was *not* in compliance "in all material respects" with employment laws relating to harassment and discrimination because the Terminated

---

[4] In their Motions, Defendants do not challenge the third, fourth, or fifth factors.

14

Executives perpetuated a workplace culture that promoted harassment, discrimination, and noncompliance with such laws.[5] *See generally* ¶¶ 96-153.

▪ **SeaSpine Misconduct Statement.** SeaSpine employees *had* raised formal and informal complaints relating to sexual harassment, misconduct, or discrimination in the last four years, and there *was* reasonable basis for such complaints. *See, e.g.,* ¶¶ 67, 127, 135, 138-39, 140, 143, 145.

▪ **SeaSpine Settlements Statement.** SeaSpine *had* entered into at least one settlement of a complaint relating to sex discrimination in the last four years—entering into the *Johnson* Settlement, a class action based on discriminatory compensation, just one year before the Merger. ¶¶ 62-65, 132-133.

Each of the SeaSpine Merger Representations is thus demonstrably false and Defendants do not contend otherwise. *See Glazer Cap. Mgmt., LP v. Magistri*, 549 F.3d 736, 741-42 (9th Cir. 2008) (concluding that merger agreement representations that company was "in compliance in all material respects with all laws" were adequately pled to be false because complaint also "pled facts demonstrating" that company "was *not* in compliance" with the law).

Unable to dispute falsity of the SeaSpine Merger Representations, Defendants urge the Court to adopt two per se rules. First, Defendants claim that a non-reliance disclaimer renders representations in a merger agreement not actionable as a matter of law. Second, the Terminated Executives contend that Rule 408 bars evidence of a settlement from being used to support any allegations of a misrepresentation. Neither argument has merit.

Defendants argue that the SeaSpine Merger Representations are not actionable as a matter of law because they were contractual representations in the Merger Agreement that were made were made

---

[5] The Orthofix Defendants mischaracterize the Complaint as construing this statement as an assurance that "no SeaSpine employee had ever complained about the 'behavior of senior management.'" OFIX Br. at 3, 20-21. But the Complaint alleges instead that the statement "falsely represented that SeaSpine was in compliance with employment laws" because accounts by former employees showed that "the behavior of senior management at SeaSpine was blatantly inconsistent with such employment laws." ¶ 257(b). The Orthofix Defendants do not dispute, and thus concede, that basis for falsity. *See Hammers v. Mayea-Chang*, 2019 WL 6728446, at *8 (E.D. Tex. Dec. 11, 2019) (Gilstrap, J.) ("It is black-letter law that arguments raised for the first time in a reply brief are waived 'as a matter of litigation fairness and procedure.'").

"solely to Orthofix, not investors." TE Br. at 2, 8, 14. Though the Merger Agreement was incorporated into multiple SEC filings, Defendants contend that those SEC filings included an "explanatory note" that conveyed to investors that they "should not rely on the representations and warranties" as "characterizations of the actual state of facts or condition of the parties" to the Merger Agreement. OFIX Br. at 20-21; OFIX Ex. 1 at 13; TE at Br. 14-15.[6] Thus, Defendants claim, the SeaSpine Merger Representations are not actionable as a matter of law. That is wrong.

Nearly every court that has considered the issue has rejected the argument that non-reliance disclaimers and similar provisions can render merger agreement representations not actionable as a matter of law. In *Glazer,* for instance, the defendant moved to dismiss securities claims based on a representation of regulatory compliance in a merger agreement, asserting that no reasonable investor would consider those representations as "factual communications *to investors.*" 549 F.3d at 741. The defendant pointed to provisions like the ones Defendants point to here, including a provision specifying that there were no third-party beneficiaries to the agreement and a term making the entire agreement subject to a private disclosure schedule that was never released to the public. *Id*; *see* TE Br. at 9, 15 n.6. Rejecting that argument, the Ninth Circuit held that those provisions were not enough to render the representations "inactionable *as a matter of law,*" noting that the proposed merger was a "very significant event for the company" and there would have been "intense investor interest in the details" of the merger agreement. 549 F.3d at 741. Thus, the Ninth Circuit concluded that a reasonable investor might rely on the merger agreement's terms. *Id.*

In the years since *Glazer* was decided, courts in other circuits have followed and approved its

---

[6] The Orthofix Defendants claim both that the SeaSpine Merger Representations were "contractual representation[s]" in an "agreement to which Plaintiffs were not parties" *and* that Plaintiffs "agreed not to rely upon" those representations. OFIX Br. at viii; OFIX Ex. 1 at 10. Even though Plaintiffs were not parties to the Merger Agreement, they never "agreed" not to rely on any statement.

reasoning, applying it to merger agreements with provisions nearly identical to those that Defendants rely on here. In *Twin Master Fund, Ltd. v. Akorn, Inc.,* for example, the defendant argued that representations of regulatory compliance in a merger agreement were not actionable because they were accompanied with a disclaimer warning investors that the representations were "made only for purposes of the merger transaction" and "involved risk allocation, not communication of facts." 2020 WL 564222, at *9 (N.D. Ill. Feb. 5, 2020). Dismissing that contention, the court followed *Glazer* and explained that given the significance of the merger, the company should have anticipated "high investor interest in the details of the agreement." *Id.* The court also noted that investors reviewing the merger agreement would have seen not only the regulatory compliance statement, but also "the provision making the merger contingent on the truth of its regulatory compliance statement." *Id.* A reasonable investor, the court explained, could thus conclude that the company "would not have agreed to this condition if it had serious regulatory compliance problems." *Id.* Other courts have reached the same conclusions.[7]

Defendants point to the one contrary decision, *Jaroslawicz v. M&T Bank Corp.,* but the reasoning in that case amounts to a single conclusory (and unsupported) assertion that "[n]o reasonable shareholder" would look at such a disclaimer and then "rely on the representations and warranties." 2017 WL 1197716, at *5 (D. Del. Mar. 30, 2017). To the extent *Jaroslawicz* can be read as broadly as Defendants claim—holding that non-reliance disclaimers automatically render merger agreement

---

[7] *See, e.g., Plumbers & Pipefitters Loc. Union #295 Pension Fund v. CareDx, Inc.,* 2024 WL 5399664, at *12 (N.D. Cal. Sept. 18, 2024) (finding actionable company's representations in agreements with underwriters that it complied with certain healthcare laws, notwithstanding disclaimers that the representations were not intended "to provide investors with any other factual information regarding the Company or its business"); *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.,* 757 F. Supp. 2d 260, 298 (S.D.N.Y. 2010) (similar); *see also Titan Report,* SEC Release No. 51283, 2005 WL 1074830, at *2 (Mar. 1, 2005) (explaining that when a company discloses information, whether via "a proxy statement or otherwise," the company must ensure that information is not misleading and "cannot avoid this disclosure obligation simply because the information published was contained in an agreement or other document not prepared as a disclosure document.").

17

representations not actionable as a matter of law—it would run counter to the Fifth Circuit's longstanding rejection of the notion that cautionary language can serve as per se bars to liability. *See Rubinstein v. Collins*, 20 F.3d 160, 162 (5th Cir.1994) (rejecting application of the bespeaks caution doctrine as a per se bar to liability). Instead, the Fifth Circuit has consistently instructed that whether cautionary language affects the reasonableness of reliance or materiality of a disclosure is an inquiry that cannot be judged in the abstract, but in the context and circumstances of each case. *Id.* At bottom, the inquiry is whether, under all the circumstances, the statement or omission at issue is one a reasonable investor would consider significant in deciding whether to invest. *Id.*

*Glazer* and *Akorn* applied that same principle and those cases, not *Jaroslawicz,* chart the correct course here. As in *Glazer* and *Akorn,* the Merger was a significant event, and Defendants should have anticipated high investor interest in the details of the Merger Agreement. ¶¶ 82-87, 94. Indeed, in the Joint Proxy/Prospectus, Orthofix and SeaSpine repeatedly "encourage[d]" their shareholders to "read the merger agreement carefully and *in its entirety*, as it is the *legal document that governs the merger*." Ex. E (November 23, 2022 Joint Prospectus/Proxy) at 14.[8] Further, the two companies stressed that it was "qualified in its entirety" by the "*complete text* of the merger agreement," *id.* at 59, telling investors that they should "rely *only* on the information contained in or incorporated by reference into" the Joint Proxy/Prospectus to "vote on the SeaSpine merger proposal," *id.* at 193. Given those directions, "[a] reasonable investor would have understood the Merger Agreement to constitute a statement of fact." *Bank of Am. Corp.*, 757 F. Supp. 2d at 280 (rejecting argument that statements in merger agreement were not actionable, noting that joint proxy stated agreement was "the legal document governing the

---

[8] The Court may take judicial notice of the contents of relevant public disclosure documents that the law requires be filed with the SEC, and are actually filed with the SEC, *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1018 (5th Cir. 1996), as well as of documents filed in other courts to establish the fact of such litigation, *Taylor v. Charter Med. Corp.*, 162 F.3d 827, 830 (5th Cir. 1998); *see also Born v. Quad/Graphics, Inc.*, 521 F. Supp. 3d 469, 488 n.14 (S.D.N.Y. 2021) (similar).

merger" and advised shareholders to "read the merger agreement carefully and in its entirety"). And, as in *Akorn,* a reasonable investor reviewing the agreement would have seen that its terms made the Merger contingent on the truth of the SeaSpine Merger Representations and could conclude that SeaSpine would not have agreed to those terms if it had serious compliance problems. Ex. E at A-73.

In short, the "explanatory note" is hardly enough for the Court to conclude that "reasonable minds could not differ" *McNamara v. Bre-X Mins. Ltd.*, 197 F. Supp. 2d 622, 631 (E.D. Tex. 2001).

In an argument that is even further afield, the Terminated Executives also contend that Federal Rule of Evidence 408 prohibits Plaintiffs from using the *Johnson* Settlement to support any allegations that a disclosure was "materially false or misleading." TE Br. at 15-16. [9] That is wrong. Rule 408 governs the admissibility of evidence relating to settlement negotiations, under which acceptance of a settlement of a claim is inadmissible to prove liability for *that* claim. But Plaintiffs do not rely on the *Johnson* Settlement to prove liability for the discrimination claims at issue in that action. Instead, Plaintiffs merely rely on the fact that SeaSpine entered the *Johnson* Settlement in 2021 as evidence that SeaSpine falsely represented that it agreed to no such settlements in the four years before the Merger. As one of the Terminated Executives' own cited cases recognizes, "the fact of settlement" is admissible under Rule 408 because it is not "offered to prove liability" for the settled claims. *Belton v. Fibreboard Corp.*, 724 F.2d 500, 505 (5th Cir. 1984) (admitting evidence of settlement to prevent confusion of the jury was not an abuse of discretion). In short, there is no bar to using the fact of a settlement to

---

[9] The Terminated Executives also suggest that the *Johnson* Settlement was immaterial because the action was first filed in 2017, the settlement was announced in 2019, and the settlement amount was less than 0.5% of 2021 revenues. But the Terminated Executives provide no further reasoning, explanation, or authority for why any of those facts makes the *Johnson* Settlement immaterial. After all, SeaSpine agreed to represent that it had not entered *any* settlements, regardless of the monetary settlement amount, relating to discrimination in the last four years. "Given the importance that the [defendants] attached to this information, it is hard for them now to protest at the motion to dismiss stage that no reasonable investor could have found it material." *SEC v. Wyly*, 788 F. Supp. 2d 92, 123 (S.D.N.Y. 2011); *Akorn,* 2020 WL 564222, at 9.

support an allegation that the settlement exists. Indeed, if the rule were otherwise, it would be impossible to allege (much less prove) that a representation about the existence of settlements was false. That is, unsurprisingly, not the law.[10]

### B.  The Pre-Merger and Post-Merger Statements are actionable.

The Complaint alleges that Defendants made other material misrepresentations before and after the Merger that misled investors to believe that Orthofix and SeaSpine shared a common commitment to diversity, compliance, and accountability, and that this commitment would continue (and had continued) under the leadership of the Terminated Executives. *See* Ex. A at 3-14. Defendants argue that (a) these statements are all immaterial as a matter of law, (b) certain statements are not false or not actionable opinion or forward-looking statements. None of these arguments have merit.

### 1.  The Pre- and Post-Merger Statements are material.

Materiality typically presents "a mixed question of law and fact" that is inappropriate for resolution on a motion to dismiss unless the misrepresentation is "so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality." *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 216 (5th Cir. 2004).

Defendants can hardly argue that the remaining Pre-Merger and Post-Merger statements are immaterial. After all, Orthofix's Board concluded unanimously that the Terminated Executives' management of a workplace "culture" that was "inconsistent" with Orthofix's "values and culture," ¶ 231, was "material" misconduct that merited their termination for cause. *See supra* at 1, 11. Further, as the Complaint alleges, analysts specifically noted that the Terminated Executives were critical to the success of the companies and the Merger. *See supra* at 11-12; ¶¶ 86, 236-37, 249; *City of Pontiac Gen. Employees' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (analyst reaction

---

[10] The Terminated Executives do not contest that falsity is adequately alleged for the other portions of the SeaSpine Merger Representations.

supports materiality). Indeed, as the Complaint alleges, analysts specifically noted that the Terminated Executives were critical to the success of the companies and the Merger.[11] What is more, the Pre-Merger Statements were made as the companies were soliciting votes for the Merger from their shareholders and were presented as essential information that informed shareholders about the value of the Merger. *See supra* at 3-4; *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) ("Particularly in light of Goldman's statements prior to the class period regarding its 'aligned incentives' with its clients, the Court cannot say that as a matter of law no reasonable investor would have relied on the statements above in making an investment decision.").[12] Any remaining doubt about the materiality of the misrepresentations is dispelled by the significant drop in Orthofix's stock price when the Company announced the terminations. ¶ 233. *See In re Cassava Scis., Inc. Sec. Litig.*, 2023 WL 3442087, at *7 (W.D. Tex. May 11, 2023) (stating that stock price drop supports materiality).

Lumping the Pre-Merger Statements and Post-Merger Statements together, Defendants argue that "even if false," they are all generalized statements and non-actionable "puffery" that are per se "immaterial as a matter of law." OFIX Br. at 14-18; TE Br. at 17-20. The Orthofix Defendants claim that the fact that "an executive engaged in inappropriate conduct" is irrelevant "[b]ecause materiality

---

[11] *See, e.g.*, ¶ 86 (analyst commenting pre-merger that Valentine and Bostjancic were "key" to SeaSpine's "progress over the past year"); ¶ 237 (analyst commenting that "[m]uch of the basis of the merger was to bring in SeaSpine's leadership into Orthofix"); ¶¶ 236, 249 (analysts lamenting that Valentine was a "well-known" and "well-established" executive in the spine industry).

[12] *See also Constr. Laborers Pension Tr. for S. California v. CBS Corp.*, 433 F. Supp. 3d 515, 539-40 (S.D.N.Y. 2020) (holding that former CEO's allegedly false and misleading statement that concealed his sexual misconduct was adequately alleged to be material because investors might view it as "a liability 'during a time of concern'"); *Britton v. Parker*, 2009 WL 3158133, at *7 (D. Colo. Sept. 23, 2009) (on § 14(a) claim, concluding that "it does not strain credulity to believe that an investor ... would likely consider it important to know that the company's Directors had previously disregarded and abused a similar Incentive Plan ... when considering whether to re-elect that Director"); *In re Zoran Corp. Derivative Litig.*, 511 F. Supp. 2d 986, 1015 (N.D. Cal. 2007) (on § 14(a) claim, concluding that "[a] reasonable shareholder would consider information revealing self-dealing by the board material in deciding how to vote").

focuses on the specificity of the statement at issue and not whether it was false or misleading." OFIX Br. at 15. Defendants misstate the law.

The Fifth Circuit does not have a *per se* rule for dismissing puffery. *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421609, at *7-8 (S.D. Tex. Apr. 13, 2021). Rather, because "[m]ateriality is not judged in the abstract, but in light of the surrounding circumstances," *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993), "courts in this Circuit must 'examine each corporate statement in the context in which it was made,'" *Edwards*, 2021 WL 1421609, at *8. For that reason, statements that could be seen as puffery "standing alone" can be material when "used to emphasize and induce reliance" as part of a broader pattern, *Simons v. Dynacq Healthcare, Inc.*, 2006 WL 1897270, at *2 (S.D. Tex. July 10, 2006), or when the topic is "particularly important" to investors, *In re BHP Billiton Limited Sec. Litig.*, 276 F. Supp. 3d 65, 79 (S.D.N.Y. 2017). And even if statements are deemed to be mere "puffery," courts in this Circuit agree "that does not negate the duty to disclose other information necessary to make those statements not misleading." *Hall v. Rent-A-Ctr., Inc.*, 2017 WL 6398742, at *20 (E.D. Tex. Oct. 19, 2017), *report and recommendation adopted,* 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017). In other words, even a vague, optimistic statement is not puffery, when the statement is "so contrary to the verifiable historical facts" that it "mislead[s] about the stated subject matter." *U.S. v. Skilling*, 554 F.3d 529, 553 (5th Cir. 2009), *aff'd in part, vacated in part on other grounds*, *remanded*, 561 U.S. 358 (2010).

Defendants' argument for dismissal flouts those well-settled principles. To be sure, "generalized, open-ended or aspirational statements" often are deemed to be "mere puffery," but courts routinely find statements about integrity, compliance, or a code of conduct to be "actionable where they are directly at odds with the conduct alleged in a complaint." *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018) (denying motion to dismiss because code of conduct statements that decisions were based solely on merit were "directly contravened by allegations" to the

contrary); *Nykredit Portefolje Admin. A/S v. Propetro Holding Corp.*, 2021 WL 9037758, at *23 (W.D. Tex. Sept. 13, 2021) ("A CEO's violations of a code of conduct and insider trading policy is material regardless of whether they appear in SEC filings.").[13]

For instance, in *City of Fort Lauderdale Police & Firefighters' Retirement System v. Pegasystems Inc.*, the court found that alleged misconduct at the top level of the company—a conspiracy to misappropriate trade secrets—rendered statements within the company's code of conduct actionable. 683 F. Supp. 3d 120, 134 (D. Mass. 2023). The court reasoned that even if the code's attestation that the company would not illegally acquire a competitor's trade secrets were "general or aspirational," it was "so anathema to the alleged internal wrongdoing" that it was adequately alleged to be materially false. 683 F. Supp. 3d 120, 134 (D. Mass. 2023). Likewise, in *Lapin v. Goldman Sachs,* where plaintiffs alleged that the company was beset by conflicts, the defendant argued that statements concerning "integrity" in a press release announcing a "new leadership team" and its "business principles" was immaterial puffery. 506 F. Supp. 2d 221, 240–41 (S.D.N.Y. 2006). But the court rejected the argument because "it defies logic to suggest" that "an investor would not reasonably rely on a statement" in a company's

---

[13] *See also In re Tenaris S.A. Sec. Litig.*, 493 F. Supp. 3d 143, 159 (E.D.N.Y. 2020) (code of conduct statement "[the company] will not condone, under any circumstances, the offering or receiving of bribes" was actionable); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 718, 721 (S.D.N.Y. 2019) (code of conduct statement "compliance with its content is mandatory" was actionable where officers were required to attest to their adherence to the code but defendants had engaged in a bribery scheme); *Plymouth Ct. Ret. Sys. v. Patterson Co., Inc.*, 2019 WL 3336119, at *16 (D. Minn. July 25, 2019) (code of ethics and conduct regarding compliance with antitrust laws contained actionable misstatements); *In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 508-09 (S.D.N.Y. 2009) (code of conduct statements about independence actionable when company "did not address or manage its conflicts of interest"); *In re Eletrobras Sec. Litig.*, 245 F. Supp. 3d 450, 463 (S.D.N.Y. 2017) ("repeated assertions about [ ] strong ethical standards" actionable where they "stand in stark contrast with" reality); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (statements such as "[w]e have extensive procedures and controls that are designed to address conflicts of interest" actionable when company had "clear and egregious conflicts of interest"); *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 278, 280 (S.D.N.Y. 2012) ("repeated assertions that [issuer] complies with letter and spirit of the law, values its reputation, and is able to address 'potential' conflicts of interest" actionable when alleged conduct "involved both client conflicts and outright fraud").

23

business principles that recognized its "dedication to complying with the letter and spirit of the laws and that Goldman's success depended on such adherence." *Id.* at 240.

None of Defendants' cited cases suggest otherwise and do not involve the factual circumstances at issue here: an impending or recent merger, a new executive leadership team cited as a key feature of the merger, and a sudden termination of those executives "for cause" because of their willful and material misconduct that is directly contrary to the statements at issue. *See* OFIX Br. at 16 n.9, 17; TE Br. at 17. Indeed, the key cases that Defendants highlight involved far different facts and statements than those at issue here:

- *Hewlett-Packard:* The CEO resigned voluntarily after the Board's investigation into his alleged sexual harassment of a single employee "did not find evidence of sexual harassment" and all challenged misstatements were all contained *within* Hewlett-Packard's Standards of Business Conduct. 845 F.3d at 1272.

- *Liberty Tax:* The case turned on the actionability of a statement that a compliance task force was "very successful." 828 F. App'x 747, 750 (2d Cir. 2020).

- *Papa John's:* The allegations turned on vague statements that were "not statements of material fact," 517 F. Supp. 3d at 207, *e.g.*, that employees had "the right to expect Papa John's to conduct its business ... with the highest moral and ethical standards," *id.* at 203-04.

- *Adidas:* The case turned on alleged misconduct committed by musical artist Ye (formerly known as Kanye West) through his business partnership with Adidas and "diversity, equity, and inclusion" statements "made explicit that Adidas was reforming its policies in an attempt to achieve something resembling a 'zero-tolerance approach,' not that it had an existing [one]." 745 F. Supp. 3d 1138 1145 (D. Or. 2024).

- *Teladoc Health:* The "undisclosed misconduct that allegedly rendered the Company's statements false and misleading was a single 'inappropriate' (but apparently consensual) relationship conducted between one senior executive and one 'mid-level employee,'" which was "a far cry from the culture of 'pervasive sexual harassment." 2021 WL 4451407, at *11 (S.D.N.Y. Sept. 8, 2021).

- *CTPartners:* Statements did "not address any concrete policy or practice, let alone policies or practices aimed at preventing workplace hostility or discrimination."[14] *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 30 (S.D.N.Y. 2016).

---

[14] The Terminated Executives mischaracterize *Tesla,* which did not state that statements at issue were not actionable "no matter how inconsistent with internal reports or the 'true state of affairs." TE Br. at 18. *See In re Tesla S'holder Deriv. Litig.*, 2023 WL 6060349, at *5 (W.D. Tex. Sept. 15, 2023) (referencing the plaintiff's' argument that the statements "misrepresented the true state of affairs").

Far from supporting a rule of per se immateriality, these cases illustrate the basic principle that materiality is a necessarily fact-specific inquiry that turns on the context and circumstances of the case.[15] Defendants make no attempt to show that any one statement should be deemed immaterial. Instead, the Orthofix Defendants simply offer conclusory assertions that the statements were "inherently aspirational" and did not guarantee "perfect compliance" by "every employee." OFIX Br. at 18-19. But Plaintiffs' claims turn on neither guarantees of "perfect compliance" nor compliance by "every employee." Rather, Plaintiffs need only show that the Pre-Merger and Post-Merger Statements, at the very least, conveyed the impression that there were not widespread and repeated violations of the Company's policies and codes of conduct by its most senior executives. *See Meyer*, 761 F.3d at 251 (acknowledging that total compliance all the time "may often be unobtainable," but clarifying that specific statements were misleading by contradicting the reality that specific compliance procedures "were then failing to prevent substantial violations of ... regulations"). And "even to the extent these statements were merely aspirational, investors could have relied at least on the notion that the Company held such aspirations." *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660-62 (S.D.N.Y. 2017). Given that "executives in the highest echelons of the Company were actively involved" in

---

[15] Defendants' other cases are similarly distinguishable. *See Linenweber v. Southwest Airlines Co.*, 693 F. Supp. 3d 661, 677 (N.D. Tex. 2023) (alleged misstatements did not pertain to actual "widespread issues" and were thus too general to mislead); *Police and Fire Ret. Sys. of Detroit v. Plains All Am. Pipeline*, 777 F. App'x 726, 731 (5th Cir.) (same); *Bondali v. YUM! Brands, Inc.*, 620 F. App'x 483, 489 (6th Cir. 2015) (alleged food and safety protocol misstatements not actionable because defendants could not guarantee that "in all instances" its suppliers "abide" by the protocols); *Gross v. GFI Grp., Inc.*, 784 F. App'x 27, 28 (2d Cir. 2019) (finding conflicted controlling shareholder's alleged misstatements that he sought to "optimize [shareholder] value" not to be a guarantee of any concrete fact); *In re KBR, Inc., Sec. Litig.*, 2018 WL 4208681, at *6 (S.D. Tex. Aug. 31, 2018) ("the alleged misrepresentations ... merely state the indisputably true fact that KBR is 'subject to' and 'governed by' these laws and corporate policies"). By contrast, here, Plaintiffs allege that Defendants made multiple affirmative statements relating to compliance that could be tested by objective facts, such as the Post-Merger Statements, "[w]e implement robust risk management" and "[c]orporate codes of conduct enforced at all levels." Ex. A at 7, 12.

discriminatory misconduct "during the time these statements were made," the Complaint has "adequately alleged that no such aspirations were at play." *Id.*[16]

### 2. The Pre-Merger Statements were false and misleading.

The Complaint pleads ample facts showing that the Pre-Merger Statements, Ex. A at 3-5, were false and misleading:

- **Integrity Statement.** Orthofix and SeaSpine did not have "complementary cultures" focused on "integrity," "diversity," and "corporate responsibility." To the contrary, as Orthofix acknowledged, the Terminated Executives managed a "culture" that "demeaned and devalued the contributions of female employees," ¶ 98, which was "inconsistent" with Orthofix's "values and culture," ¶ 231.

- **ELT Selection Statement.** Orthofix did not select its executive leadership team based on individual merit. To the contrary, as Burzik later admitted, Keran was not selected because of his merit, but because Valentine demanded that Orthofix hire him as a senior executive as well. ¶ 95; Special Motion at 3. Nor did Orthofix engage in careful vetting of its executive leadership team and personnel issues of the company it acquired. ¶¶ 61-81.

- **Bostjancic Statement.** Bostjancic's "cultural influence" would not "benefit the newly combined company" and "ensure accountability." As Orthofix acknowledged, Bostjancic managed a culture that "demeaned and devalued the contributions of female employees." Ex. H at 1. Nor did he "ensure accountability," given his oversight of discriminatory hiring and compensation practices and refusal to address complaints raised with him about those practices. *See, e.g.*, ¶¶ 64, 120-22, 129-30, 142, 203.[17]

---

[16] Nor were any of the misstatements "accompanied by extensive disclosures and warnings about the very risks of employee misconduct that Plaintiffs allege were concealed," as the Orthofix Defendants claim. OFIX Br. at 3. Defendants point only to cautionary language in Orthofix's annual reports that its internal controls over financial reporting "may not always be effective." *Id.* at 18. But they do not explain why the Company's supposed internal controls—which describe "processes directly related to financial reporting" and not "a company's compliance with applicable laws and regulations," *In re Alta Mesa Res., Inc. Sec. Litig.*, 2024 WL 3760481, at *17 (S.D. Tex. Aug. 12, 2024)—have anything to do with compliance and enforcement of its Code of Conduct or other policies. Even if there were some plausible connection, cautionary language cannot "excuse the alleged failure to reveal known, material adverse facts." *Collmer v. U.S. Liquids, Inc.*, 268 F. Supp. 2d 718, 745 (S.D. Tex. 2001) (citing *Rubinstein,* 20 F.3d at 171); *see Huddleston v. Herman & MacLean*, 640 F.2d 534, 544 (5th Cir. 1981) ("To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit."), *aff'd in part, rev'd in part,* 459 U.S. 375 (1982).

[17] For this reason, Plaintiffs' falsity allegations do not, as the Terminated Executives wrongly claim, rest solely on "Bostjancic's private text messages," but instead on consistent and corroborated evidence of his role in perpetuating SeaSpine's discriminatory culture. *See infra* note 18.

26

*See CBS*, 433 F. Supp. 3d at 539-40 ("A reasonable investor could have understood Moonves's statement to mean that he did not have exposure to sexual misconduct allegations, thus providing reassurance that Moonves, the one executive that the Company and analysts viewed as crucial to CBS's continued success, would not be compromised by the #MeToo Movement."). Defendants offer two arguments to contest the falsity of only the Integrity Statement and ELT Selection Statement,[18] neither of which has merit.

First, Defendants claim that the Integrity Statement is not actionable because it was a statement of opinion and not fact. OFIX Br. at 19, TE Br. at 8. The Integrity Statement is not an opinion, as it is not prefaced with language like "we think" or "we believe" that might "convey some lack of certainty." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 188 (2015) (explaining that such prefatory phrases are "especially" important "when the phrases appear in a registration statement, which the reasonable investor expects has been carefully wordsmithed to comply with the law"). Even if the Integrity Statement were an opinion statement, it would be actionable, because investors would have "expect[ed] such an assertion to rest on some meaningful ... inquiry" and because the statement did not "'fairly align[] with the information in the [speaker]'s possession at the time.'" *Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, 620 F. Supp. 3d 603, 622 (S.D. Tex. 2022). Rather, Defendants knew that the so-called "complementary cultures" of Orthofix and SeaSpine did *not* "includ[e] a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate social responsibility." Ex. A at 3, 16.

---

[18] The Orthofix Defendants do not contest that the Bostjancic Statement was false and misleading. And the Terminated Executives only wrongly suggest that Bostjancic's "private text messages" are the sole basis for Lead Plaintiff's falsity. TE Br. at 10 (citing ¶ 261). But falsity is supported by a host of allegations, including the admissions from Orthofix itself. ¶¶ 98, 231-32.

Second, the Terminated Executives contend that certain statements that purportedly relate to the "expected success of integration and leadership continuity" are forward-looking statements protected by the PSLRA's safe harbor. TE Br. at 20.[19] To begin with, the Terminated Executives do not identify the statements to which they are referring. But at any rate, none of the challenged statements qualify for protection under the safe harbor because they "described events that should have already occurred or conditions that were supposedly already in existence." *RYH Props., LLC v. West*, 2009 WL 10676645, at *11 (E.D. Tex. Aug. 3, 2009); *see, e.g.*, Ex. A at 4-5 ("*including* a strong performance-based culture"; "ELT candidates *were selected*"; "John *is* well positioned"). Even if parts of the challenged statements could be construed as forward-looking, "mixed present/future statements" are "not entitled to the safe harbor with respect to the part of the statement that refers to the present." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 691 (5th Cir. 2014). And even if certain statements were deemed forward-looking, they still would not qualify for protection under the safe harbor. The Terminated Executives do not point to anything showing that any challenged statement was "identified as a forward looking statement" or "accompanied by meaningful cautionary statements." There is also no dispute that the Terminated Executives had actual knowledge of their own behavior, which bars protection under the safe harbor. *Brody v. Zix Corp.*, 2006 WL 2739352, at *5 (N.D. Tex. Sept. 26, 2006) (citing 15 U.S.C. § 77z-2(c)(1)(A)-(B)).

### 3. The Post-Merger Statements were false and misleading.

Like the Pre-Merger Statements, the Post-Merger Statements were false and misleading because they are "directly at odds with the conduct alleged in [the] complaint." *Signet*, 2018 WL 6167889, at *17. The Post-Merger Statements conveyed that Orthofix's "fundamental policy" was a

---

[19] The Orthofix Defendants make a conclusory argument that the ELT Selection Statement did not give a "misleading impression," without offering any further reasoning or authority. "[B]ecause Defendants did not adequately brief its assertion, the Court [need] not address it." *ADR Int'l Ltd. v. Inst. for Supply Mgmt. Inc.*, 667 F. Supp. 3d 411, 422, n. 4 (S.D. Tex. 2023).

28

"comprehensive compliance and ethics program," that it operated a merits- and performance-based workplace culture rooted in equity principles, and that maintained its codes of conduct at all levels of the Company, including at the senior leadership level. Ex. A at 6-14. But in truth, as Orthofix admitted, the Terminated Executives oversaw a culture that "demeaned and devalued the contributions of female employees," ¶ 98, which was "inconsistent" with Orthofix's "values and culture," ¶ 231; *see also, e.g.*, ¶¶ 96-209. Further, the Terminated Executives engaged in "repeated inappropriate and offensive conduct," ¶¶ 231-32, which constituted "willful and material violations of applicable Company policies and codes of conduct," Ex. H at 12.

Defendants contend that these statements were not false because Orthofix eventually investigated and then terminated the Terminated Executives. OFIX Br. at 19 (citing OFIX Ex. 9 at 17); TE Br. at 11. But that Orthofix eventually investigated and found that the Terminated Executives violated the Company's Code of Conduct does not render the statements any less false.[20] If it was truly Orthofix's "fundamental policy to conduct business in accordance with the highest ethical and legal standards" and it truly "implement[ed] robust risk management programs," then the Terminated Executives— who had a history of facilitating misconduct in the workplace—would not have become leaders of the combined Company. ¶ 99.

The Terminated Executives also contend that the Complaint does not cite specific instances demonstrating their failure to provide equal opportunities to women and retaliation against women who spoke up. TE Br. at 11. But the Complaint is replete with such allegations. *See, e.g.*, ¶¶ 104, 114, 120, 122, 136-139, 143, 203.[21]

---

[20] The Orthofix Defendants also incorrectly insinuate that Plaintiffs attempt to argue that Orthofix "should have disclosed the allegations against the Former Executives the moment it received the misconduct complaint." OFIX Br. at 20. Plaintiffs make no such argument.

[21] The Terminated Executives cite to ¶ 277, which is unrelated to these allegations.

**C.  The Court should credit allegations based on confidential witnesses.**

The Terminated Executives broadly challenge the reliability of allegations based on accounts by confidential witnesses. Those challenges fail.

In the Fifth Circuit, "[c]ourts may rely on assertions from confidential sources if the person is 'described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Six Flags*, 58 F.4th at 208.

First, the Terminated Executives argue that six of the nine CWs left SeaSpine a year or more "before the Merger, rendering their observations temporally irrelevant." TE Br. at 21. But the fact that these CWs were employed by SeaSpine before the Class Period "does not diminish the probative value" of their allegations, because they "corroborate the allegations of other CWs" and "tend to indicate" that the Company "was engaged in a pattern of misconduct that began before the Class Period and extended into it." *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *8 n.6 (S.D. Cal. May 23, 2017); *Ga. Firefighters' Pension Fund v. Anadarko Petrol. Corp.*, 514 F. Supp. 3d 942, 951-52 (S.D. Tex. 2021) (pre-class period statements provided relevant "background and context" for class period misrepresentations). Together with the accounts of other CWs, the allegations from these CWs show that the conduct at SeaSpine in the years before the Merger were not "isolated past events," as the Terminated Executives wrongly claim, TE Br. at 22, but pervasive and widespread misconduct that had begun years before the Merger and lasted continuously until their eventual terminations, *see supra* at 6-11.[22]

Second, the Terminated Executives claim that the remaining three CWs do not "tie their accounts to any specific challenged statement or investor communication" or show their participation in the

---

[22] Thus, this case is a far cry from the cases cited by Defendants. *See, e.g.*, *In re Plains All Am. Pipeline, LP Sec. Litig.*, 307 F. Supp. 3d 583, 617 (S.D. Tex. Mar. 30, 2018) (pipeline rupture causing oil spill off coast of California); *Sw. Airlines Co.*, 693 F.3d at 670 (airline safety failure that was "isolated" event not "widespread").

preparation of the challenged statements. TE Br. at 21. But confidential sources need only be described with enough particularity to credit the reliability of the information they provide, *Six Flags,* 58 F.4th at 208, and the Terminated Executives do not point to any allegation that fails to meet this standard. Not every allegation attributed to a confidential witness must be tied a "specific challenged statement" and show their "participation" in the preparation of that statement. And while the Terminated Executives argue that "[n]o CW links the Former Executives to the cultural allegations," TE Br. at 21, the Complaint is replete with allegations to the contrary. *See, e.g.,* ¶¶ 103, 104, 106-108, 110-114, 120-122, 138, 142-43, 149-152.

Third, Defendants assert that the CWs are "lower-level employees lacking personal knowledge of the alleged fraud or interactions with the defendants." TE Br. at 22; *see also* OFIX Br. at 24-25. But there is no requirement that a confidential witness be a "higher-level" employee and "[a] confidential witness does not need to be a fly on every relevant wall." *Six Flags*, 58 F.4th at 216. Rather, a confidential witness must only be a person who served in a position that provided them with first-hand knowledge of the information they provide. *Six Flags,* 58 F.4th at 208. Here, the CWs include senior supervisory-level personnel, including CW-4, the Vice President of HR, who interfaced with Defendants Valentine and Keran and could have known about misconduct at SeaSpine.[23] While some of the other CWs served in lower-level positions, that does not make their accounts any less reliable, and CWs need not have direct communication with defendants to be credited. *See Budde v. Glob. Power Equip. Grp., Inc.,* 2018 WL 4623108, at *4 (N.D. Tex. Sept. 26, 2018) ("CWs are often reporting hearsay, but that does not 'automatically disqualify [their] statement from consideration in the scienter calculus' ... because 'the rigorous standards for pleading securities fraud do not require a plaintiff to

---

[23] CW-2, whose tenure overlapped with CW-4, also had insight into the misconduct as an EA for Defendant Bostjancic (and she also provided support to Defendant Keran).

31

plead evidence.'"). Indeed, the Terminated Executives' discriminatory practices ensured that there were few women in managerial-level positions at SeaSpine. ¶¶ 64, 122, 135. As lower-level personnel, these CWs were among those most affected by the hostile workplace environment and discriminatory practices, and thus best positioned to possess relevant knowledge. *See Carlton v. Cannon*, 184 F. Supp. 3d 428, 473-74 (S.D. Tex. 2016) (crediting lower-level employees who were "several levels removed from any operational authority"); *Fitzpatrick v. Uni-Pixel, Inc.*, 35 F. Supp. 3d 813, 832 (S.D. Tex. 2014) (crediting "a low-level former employee"); *In re Dynex Cap., Inc., Sec. Litig.*, 2009 WL 3380621, at *7, *13-14 (S.D.N.Y. Oct. 19, 2009) (relying on reports by "low-level" employees with first-hand knowledge of loan operation).

Here, the reliability of the CWs is bolstered by the consistency of their accounts and "corroborating evidence," including other "corroborating witnesses." *Six Flags*, 58 F.4th at 208-09 (5th Cir. 2023); *see Barrie*, 397 F.3d at 259 (CWs' statements sufficiently reliable to establish falsity where corroborated by other CWs). Each of the CW-accounts is consistent with and corroborated by the accounts of other CWs, allegations in the *Johnson* and *O'Connor* complaints, court filings by Orthofix and its Board members, the Terminated Executives' text messages, and Orthofix's disclosure about the findings of its investigation. ¶¶ 64-65, 57, 77-81, 88, 98, 118, 120-21, 125-27, 129-30, 137, 142, 193-199, 203-5, 207-9, 230-32.[24]

---

[24] The Terminated Executives also argue that the Glassdoor and Indeed employee reviews about SeaSpine are "immaterial" to assessing falsity. But Plaintiffs cite these reviews to show that Defendants should have been primed to conduct more comprehensive due diligence. ¶¶ 69, 74. And at any rate, while the Fifth Circuit has instructed that courts must discount the accounts of anonymous or confidential sources, "[d]iscount does not mean unfettered discretion to discard" and "[t]he degree of discounting depends on the circumstances involved. *Six Flags,* 58 F.4th at 208. Contrary to the Terminated Executives' claim, the employee reviews expressly reference the Terminated Executives, *see, e.g.*, ¶¶ 70, 71-73, 206, and otherwise corroborate the accounts of CWs and other sources. Thus, even if these reviews were significantly discounted, they still contribute to the overall and consistent evidence supporting falsity and scienter.

**II.   The Complaint Adequately Alleges a Strong Inference of Scienter**

Scienter is the "intent to deceive, manipulate, or defraud or severe recklessness." *Six Flags*, 58 F.4th at 214. The Fifth Circuit has provided a three-step framework for assessing scienter. First, the Court must accept "all factual allegations in the complaint as true." *Id.* Second, the Court conducts a holistic inquiry, considering "the complaint's allegations in their entirety." *Id.* Third, the Court considers "plausible inferences that both oppose and support a strong inference of scienter." *Id.* To find a strong inference of scienter, the inference "need not be irrefutable," a "smoking gun", or "even the most plausible of competing inferences." *Id.* at 324. A strong inference of scienter is alleged so long as it is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged"—and a "tie favors the plaintiff." *Six Flags*, 58 F.4th at 214.[25]

The Complaint alleges that Defendants acted with scienter for two main reasons. First, the Terminated Executives made false and misleading statements knowingly (or at least with severe recklessness). Second, the remaining Individual Defendants made their false and misleading statements with severe recklessness.

**A.  The Terminated Executives made false statements with scienter.**

The Complaint alleges highly particularized facts that support a strong inference of scienter as to the Terminated Executives.

*Actual Knowledge.* This Court and others in the Fifth Circuit have long recognized the well-

---

[25] The Complaint does not engage in "group pleading," OFIX Br. at 22, TE Br. at 12-13, which would "allow[] unattributed corporate statements to be charged to one or more individual defendants based solely on their corporate titles." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 363 (5th Cir. 2004). Rather, Lead Plaintiff alleges scienter as to statements made by Defendants who "signed a corporate document containing a misrepresentation" or were otherwise "involve[d] in the formulation" of the document or "specific portion of the document containing the statement." *Fleming Cos. Sec. & Derivative Litig.*, 2004 WL 5278716, at *13 (E.D. Tex. June 16, 2004) (citing *Southland,* 365 F.3d at 365); *see* Ex. A at nn. 1, 3-16. (describing signatories to and parties involved in the documents containing Plaintiffs' alleged misstatements).

settled principle that "a strong inference of scienter may arise" when Defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Singh v. 21Vianet Grp., Inc.*, 2017 WL 4322483, at *3 (E.D. Tex. Sept. 13, 2017), *report and recommendation adopted,* 2017 WL 4310154 (E.D. Tex. Sept. 28, 2017) (Gilstrap, J.).[26] As the Orthofix Defendants concede, the Terminated Executives "undoubtedly knew about their own behavior." OFIX Br. at 28. Thus, because the Terminated Executives were "personally involved" in the concealed misconduct, there is "little doubt" that they "knew" or were "reckless in not knowing" that their "statements posed a substantial danger to mislead investors." *Pegasystems Inc.*, 683 F. Supp. 3d at 130-32; *Signet*, 2018 WL 6167889, at *18 (holding that strong inference of scienter alleged where defendants had "knowledge of the allegations" of a sex discrimination lawsuit that implicated senior management "in the very sexual misconduct that was alleged in that ligation").

Unable to dispute that the Terminated Executives had actual knowledge of information contradicting their public statements, Defendants instead assert that actual knowledge is somehow not enough. OFIX Br. at 26-28; TE Br. at 24-26. That is incorrect and Defendants cite no case that stands for that proposition. Instead, Defendants cite cases reviewing district court findings as to proof of scienter after a bench trial,[27] as well as cases where the complaint failed to allege any duty to disclose,[28] where the complaint failed to allege that the defendants had knowledge of facts concealed from

---

[26] *See In re Venator Materials PLC Sec. Litig.*, 547 F. Supp. 3d 624, 663 (S.D. Tex. 2021) (same); *Brody v. Zix Corp.*, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006) (same).

[27] Those decisions concerned whether a district court clearly erred when it found the plaintiffs "failed to *prove* scienter," not with whether they failed to *plead a strong inference* of scienter under the PSLRA. *See Shivangi v. Dean Witter Reynolds, Inc.*, 825 F.2d 885, 889 (5th Cir. 1987); *SEC v. Southwest Coal & Energy Co.*, 624 F.2d 1312, 1321 (5th Cir. 1980) (same).

[28] *See Naglich v. Applied Optoelectronics*, 436 F. Supp. 3d 954, 977 (S.D. Tex. 2020) (finding because defendants had no duty to update previous statements, there was no duty to disclose, and thus the failure to disclose was "incapable of raising a strong inference of scienter"); *Plaisance v. Schiller*, 2019 WL 1205628, at *21 (S.D. Tex. Mar. 14, 2019) (finding scienter not alleged where defendant had no duty to disclose information needed to correct allegedly misleading statements made by others).

34

investors,[29] and where there was no evidence that the defendant was even aware of the public statements at issue.[30] OFIX Br. at 27.

There is also no merit to the Terminated Executives' contention that Plaintiff needed to "allege" that they "believed" that their conduct rendered their statements false or misleading. TE Br. at 8, 24, 25. "Requiring a plaintiff to allege that a defendant did not honestly believe a statement when made is inconsistent with the standard in this circuit, which permits scienter to be shown either by knowledge a defendant is publishing materially false information or by severe recklessness in publishing such information." *Owens v. Jastrow*, 789 F.3d 529, 543, n. 14 (5th Cir. 2015).

***Terminations.*** Apart from their actual knowledge, the termination of the Terminated Executives is another factor that supports a strong inference of scienter. After all, in terminating the executives for cause, the Board unanimously concluded that the executives each committed "willful" and "material" misconduct that was directly contrary to the misrepresentations at issue here. *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006) (finding company's termination of CEO "for cause" because company needed management who was not involved in possible restatement

---

[29] *See Kakkar v. Bellicum Pharms., Inc.*, 2020 WL 2845279, at *4, n. 2 (S.D. Tex. May 29, 2020) (no allegations that defendants knew about concealed information or that tied scienter allegations to any specific misstatement); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 251 (5th Cir. 2003) (no allegations that executives had any role in offering the misleading statements); *First New York Sec. LLC v. United Rentals Inc.*, 391 F. App'x 71, 72 (2d Cir. 2010) (allegations showed that company believed its alleged misstatements); *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1265-68 (10th Cir. 2001) (no allegations that company's "potential exposure" to litigation was known to the defendants at the time); *San Antonio Fire & Police Pension Fund v. Syneos Health Inc.*, 75 F.4th 232, 242-43 (4th Cir. 2023) (finding it could not be inferred "from the mere fact" that the defendants "learned *general* information about" the business of a company it was acquiring that they also learned the specific facts that would render their "future predictions" misleading "without including that information").

[30] *See Pipefitters Loc. No. 636 Defined Ben. Plan v. Zale Corp.*, 499 F. App'x 345, 348 (5th Cir. 2012) (finding motivation of marketing officer to make the marketing department "appear to be efficient, organized, and well-managed" was not enough to support the inference of a "company-wide fraud" as there were "few facts alleged which suggest Higgins was even aware her actions could potentially lead to fraudulent financial statements on behalf of the entire company").

35

supported strong inference of scienter on the part of the company); *Rent-A-Ctr.*, 2017 WL 6398742, at *34, *report and recommendation adopted,* 2017 WL 6379334 (E.D. Tex. Dec. 14, 2017) (finding sudden terminations of executives that company acknowledged was "a change aimed at improving share-holder value" supported a strong inference of scienter). Given that conclusion, the Orthofix Defend-ants can hardly claim now that the Terminated Executives did not act with scienter.

*Motive.* Though pleading motive is not required, the Complaint also pleads ample facts that the Terminated Executives had a motive to defraud. Pleading motive requires showing only that "concrete benefits" could be "realized by one or more of the false statements and wrongful nondisclosures alleged." *Six Flags*, 58 F.4th at 215. Here, Defendants do not dispute that the Complaint adequately alleges that the Terminated Executives "were plainly motivated to keep" their misconduct "hidden from Orthofix's Board." OFIX Br. at 29; TE Br. at 24 (acknowledging that "Plaintiffs allege an intent to keep their private conversations private"). If the Terminated Executives were motivated to conceal their misconduct from Orthofix's Board, then they were no less motivated to make false and mislead-ing statements that concealed that misconduct from the Company's investors.

In addition, the Terminated Executives had "professional and financial incentives to complete the Merger" to "secure employment contracts at the combined Company and obtain lucrative pay." ¶ 290. This was not merely "a generic desire to close a deal" that might apply to any executive involved in an acquisition, as Defendants claim. OFIX Br. at 22; TE Br. at 25. To the contrary, the successful closure of the Merger was essential to the Terminated Executives securing "lucrative contracts" with Orthofix to serve in the C-suite of the combined Company. ¶ 290; *Six Flags*, 58 F.4th at 215 (stating that high performance-based compensation can establish motive in certain circumstances).[31]

---

[31] For that reason, this case bears little resemblance to *Shaw Group,* where the complaint at issue advanced only a generic motive allegation that executives wanted to artificially inflate the company's

Finally, Defendants fail to offer an opposing inference that is compelling. Defendants merely speculate that the Terminated Executives "might well have believed" that the business was "unaffected" by their misconduct. OFIX Br. at 28; TE Br. at 25-26.[32] But the Fifth Circuit has explained that assertions about what Defendants "actually believed" are "irrelevant at this stage of an action under Rule 10b-5 and the PSLRA." *Fitzpatrick*, 35 F. Supp. 3d at 832-33 (citing *Spitzberg*, 758 F.3d at 685). If defendants could defeat scienter by merely asserting that it was possible that they believed their statements were true or immaterial, no securities fraud case could ever be successfully pled. Instead, the question is only whether Plaintiffs "have alleged facts capable of proving that defendants were severely reckless when they allegedly misled investors." *Fitzpatrick,* 35 F. Supp. 3d at 832.

## B.  The scienter of the Terminated Executives is imputed to Orthofix and SeaSpine.

In the Fifth Circuit, the state of mind of a corporate officer who made false or misleading statements with sufficient or apparent authority is generally imputed to the corporation. *INSpire*, 365 F.3d at 366. That principle is rooted in general agency principles that an agent's knowledge is imputed to a principal when the agent is acting within its scope of authority. *Id.* Here, the Terminated Executives made false and misleading statements on behalf of SeaSpine and Orthofix, and thus, their scienter is imputed to the two companies.

Though the Orthofix Defendants recognize the general principle of imputation, they argue that the "adverse interest" exception to that principle applies because the Terminated Executives engaged in misconduct that was "indisputably contrary to Orthofix's interests." OFIX Br. at 28-29.[33] But the

---

stock price and credit rating to increase its value in acquiring a variety of companies. *Shaw Grp.*, 537 F.3d at 544.

[32] The Fourth Circuit's decision in *Syneos* is not to the contrary. In that case, the Fourth Circuit found that it could not be inferred "from the mere fact" that the defendants "learned *general* information about" the business of a company it was acquiring that they also learned the specific facts that would render their "future predictions" misleading "without including that information." *Id.* at 242-43.

[33] Defendants do not dispute, and thus concede, that the Terminated Executives' scienter can be imputed to SeaSpine.

37

Orthofix Defendants misconstrue the adverse interest exception, which is inapplicable.

The adverse interest exception to the imputation rule applies only when an agent "acts adversely to the principal in a transaction or matter" and "intend[s] to act solely for the agent's own purposes." Restatement (Third) of Agency § 5.04 (2006). Courts have explained that this standard requires a showing that the agent "totally abandoned" the principal's interests. *In re Sunpoint Sec., Inc.*, 377 B.R. 513, 564 (Bankr. E.D. Tex. 2007). In securities cases, courts have analyzed the question as whether "an executive's fraud operates to benefit the company or whether the fraud is committed against the company." *MAZ Partners LP v. First Choice Healthcare Sols., Inc.*, 2019 WL 5394011, at *16-17 (M.D. Fla. Oct. 16, 2019), *report and recommendation adopted,* 2020 WL 1072582 (M.D. Fla. Feb. 14, 2020). Even when an executive "personally benefited" from the concealment of information, courts consistently find that the executive's interests are still not "totally adverse" to the company's interests because the company "would have benefitted from the rise in the value of [their] stock." *MAZ Partners LP*, 2019 WL 5394011, at *16-17; *In re Netsolve, Inc. Sec. Litig.*, 185 F. Supp. 2d 684, 697 (W.D. Tex. 2001) (finding individual defendants' scienter imputable to company, notwithstanding claim that they "plotted to harm the company," because they acted to "artificially raise" the company's "stock price").[34] Indeed, "[i]f the Court were to accept the defendants' argument," securities fraud cases would be effectively "eliminated." *Netsolve*, 185 F. Supp. 2d at 697.

---

[34] *Accord Mancuso v. Douglas Elliman LLC*, 808 F. Supp. 2d 606, 630 (S.D.N.Y. 2011) (knowledge of corporate spokesperson's discriminatory acts was imputable to employer, even though spokesperson's conduct violated company rules and "caused adverse consequences to" the company); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 382-83 (S.D.N.Y. 2015) (knowledge of executives' bribes was imputable to company, because officers' "failure to correct Petrobras' various statements about its integrity ... clearly benefitted the Company, which was able to continue to attract investment and to complete its large-scale expansion plans.").

Applying these principles, courts have refused to adopt the adverse interest exception in cases with similar facts. For example, in *CBS,* the court declined to apply the adverse interest exception to the scienter of Les Moonves, then the CEO of CBS, concluding it could be imputed to CBS even though Moonves had "tried to frustrate the Company's internal investigations" into his own sexual harassment "to protect himself." *CBS*, 433 F. Supp. 3d at 549. The court explained that because Moonves acted as CBS's agent when making his statements, it was "not a fraud" against the company. *Id.* Likewise, here, because the Terminated Executives made "statements to the market while acting with apparent authority," Orthofix and SeaSpine are liable for their fraud even if they were "not trying to further the company's goals." *Puskala v. Koss Corp.*, 799 F. Supp. 2d 941, 948 (E.D. Wis. 2011); *Propetro,*2021 WL 9037758, at *27 (concluding that knowledge of CEO imputed to company and explaining that while the CEO's violations of internal policies "certainly benefit[ed] himself," they "also benefitted" the company "in its efforts to bolster its perception in the eyes of investors").

Even if the Court found that the Terminated Executives' interests were "totally adverse" to the interests of Orthofix and SeaSpine, the adverse interest exception would still not apply. That is because the adverse interest exception is inapplicable where, as here, the plaintiff is an innocent "third party who dealt with the principal in good faith." Restatement (Third) of Agency § 504 (2006). *See In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 477 (9th Cir. 2015) (explaining that "the adverse interest rule collapses in the face of an innocent third party who relies on the *agent's* apparent authority"). That rule makes sense because the "underlying purpose of imputation" is "fair risk-allocation, including the affordance of appropriate protection to those who transact business with corporations." *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 496 (3d Cir. 2013). "When a corporate officer commits wrongdoing, the 'principal who has placed the agent in the position of trust and confidence should suffer, rather than an innocent stranger.'" *ChinaCast*, 809 F.3d at 477 (quoting *Belmont*, 708 F.3d at 496). Thus, courts

39

agree that the adverse interest exception is inapplicable where shareholders have "understandably relied" on an executive's representations, "which were made with the imprimatur of the corporation that selected him to speak on its behalf and sign SEC filings." *ChinaCast*, 809 F.3d at 477.

None of the cases that the Orthofix Defendants cite are on point. For instance, Defendants cite *Kaplan v. Utilicorp United, Inc.*, 9 F.3d 405, 407 (5th Cir. 1993), but courts in this Circuit have distinguished that case because, unlike here, it involved company employees who acted solely for their own interests and made no statements on behalf of the company. *Lee v. Active Power, Inc.*, 29 F. Supp. 3d 876, 886 (W.D. Tex. 2014) (*Kaplan* inapplicable because officers did not "secretly embezzle[e] money from the company"). The other cases that the Orthofix Defendants cite are even less relevant. *See Everest Nat'l Ins. Co. v. Tri-State Bancshares, Inc.*, 2016 WL 5062155, at *10 n.8 (W.D. La. Aug. 2, 2016) (examining adverse interest exception in bank fraud case where no third party relied on the agent's actual authority to act on the principal's behalf and noting, "the Court is not faced with similar considerations of innocent third parties"); *BCCI Holdings (Luxembourg), S.A. v. Clifford*, 964 F. Supp. 468, 478 (D.D.C. 1997) (similar); *Pugh v. Trib. Co.*, 521 F.3d 686, 698 (7th Cir. 2008) (concluding that where complaint failed to plead scienter of any individual defendant, principles of *respondeat superior* did not permit imputation of scienter of employee of corporate subsidiary to its corporate parent).

Finally, even if the adverse interest exception could plausibly apply, courts agree (including cases cited by Defendants) that it is a question of fact that cannot be resolved on the pleadings. *See Taylor v. Scheef & Stone, LLP*, 2020 WL 4432848, at *3 (N.D. Tex. July 31, 2020) (finding adverse-interest defense raised factual issue that "may be better decided" on summary judgment) (citing *FDIC v. Nathan*, 804 F. Supp. 888, 894-95 (S.D. Tex. 1992)); *accord ChinaCast*, 809 F.3d at 479; *Clifford*, 964 F. Supp. 468 at 479 (question of imputation "does not dispose of the case at the motion to dismiss stage").

### C.  Scienter is adequately alleged as to the other Individual Defendants.

The Complaint also alleges facts sufficient to support a strong inference of scienter as to the

remaining Individual Defendants based on their oversight of Orthofix and disregard of red flags regarding misconduct before and after the Merger. ¶¶ 286-87. The Legacy Orthofix Officer and Director Defendants were actively involved in the strategic transaction on behalf of Orthofix, conducting what they touted as a "disciplined" approach to due diligence. ¶¶ 51-60. Yet the Legacy Orthofix Officer and Director Defendants—who are liable for the Pre-Merger Statements in the original and amended Registration Statement—ignored red flags, including the *Johnson* Action settlement with a class of female employees employed between 2015 and 2019—only about two years before the Orthofix Board identified SeaSpine as a target. ¶¶ 61-76. Despite those red flags, the Legacy Orthofix Officer and Director Defendants nonetheless made their false and misleading statements due to their "refusal to see the obvious, or to investigate the doubtful." *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 732 (W.D. Tex. 2010). The same goes for the Orthofix Post-Merger Defendants and the Post-Merger Statements in the March 6, 2023 Form 10-K. ¶ 287. Plaintiffs do not "speculate" about ongoing problems at the time of the Merger, OFIX Br. at 25, but rather, the Complaint alleges a series of consistent evidence of ongoing misconduct, along with systemic discrimination and improper business practices, at the time of the Merger.[35] And just months later, the Orthofix recognized that the Internal Investigation uncovered evidence of consistent misconduct that both pre- and post-dated the Merger and required the terminations "for cause." Ex. H, at 3-4.

## III.  The Complaint Adequately Alleges Loss Causation

To plead loss causation, Plaintiffs need only allege "a facially plausible causal relationship between the fraudulent statements or omissions and plaintiff's economic loss." *Lormand*, 565 F.3d at 258. This

---

[35] *E.g.*, ¶ 135 (CW-4, a former VP of HR, stated that SeaSpine had lied about its data to appease the third-party auditor as part of the *Johnson* Action); ¶ 67 (O'Connor alleged that she had been underpaid since at least January 2022 and received a below-market bonus at the end of 2022); ¶ 116 (CW-5, who worked in HR, said a harassment complaint went unaddressed in the last three months of 2022); ¶¶ 78-81, 193-199 (the Terminated Executives were sending each other offensive and vulgar text messages during the negotiation and due diligence stage and leading up to the Merger).

requires showing only a disclosure of a "relevant or related truth about the fraud that caused a significant part of the depreciation of the stock" and investor loss. *Id.* "The test for relevant truth simply means that the truth disclosed must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true." *Pub. Emps. Ret. Sys. of Mississippi, Puerto Rico Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 321 (5th Cir. 2014) (Gilstrap, J.). Rule 8's notice pleading standard governs the inquiry. *Id.* Plaintiffs easily satisfy that standard here.

The Complaint alleges that Orthofix's September 2023 Press Release disclosed that the Company had terminated the Terminated Executives "for cause" because of "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements [that] was inconsistent with the Company's values and culture." ¶ 231; *see generally* ¶¶ 270-79. That disclosure revealed the truth about Orthofix's and SeaSpine's workplace culture, compliance with employment laws, and enforcement of its own policies and codes of conduct that were concealed by the Terminated Executives' misrepresentations. *See supra* at 14-32. And the revelation of that truth resulted in more than a 30% drop in Orthofix's stock price. ¶¶ 11, 233. *See Parmelee v. Santander Consumer USA Holdings, Inc.*, 2018 WL 276338, at *6 (N.D. Tex. Jan. 3, 2018) (holding that allegations that "company's stock price dropped" upon corrective information pled loss causation). Nothing more is required.

In contending otherwise, Defendants wrongly claim that Plaintiffs must plead that a stock drop occurred because the market "understood the company's earlier generic statements were untrue." OFIX Br. at 30; TE Br. at 27. But the Fifth Circuit has rejected the argument that pleading loss causation requires allegations that "establish prior statements of compliance to be actually false," *Amedisys,* 769 F.3d at 325, and "arguments about what the market believed" and the consideration of other effects "on the market require the Court to draw inferences adverse to Plaintiffs, which is inappropriate at the motion to dismiss stage." *Propetro Holding Corp.*, 2021 WL 9037758, at *29. Plaintiffs need

42

only show that the corrective disclosure is "relevant to" a prior misrepresentation, *Lormand*, 565 F.3d at 256 n.20, a standard which they easily satisfy. *See Amedisys*, 769 F.3d at 321 ("standard of relevance" of a corrective disclosure "in an evidentiary context is not a steep or difficult one to satisfy").[36]

## IV.    The Complaint Adequately Alleges Securities Act Claims

Sections 11 and 12(a)(2) both create liability for untrue statements or omissions of material fact in a registration statement and prospectus, respectively. *Johnson v. CBD Energy Ltd.*, 2016 WL 3654657, at *2-3 (S.D. Tex. July 6, 2016). Both provisions were designed to "create liability regardless of fault" and thus do "not require a plaintiff to plead or prove scienter." *Fleming*, 2004 WL 5278716, at *45. Instead, "liability against the issuer of a security is virtually absolute, even for innocent misstatements." *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 (1983); *see also In re Superior Offshore Int'l., Inc. Sec. Litig.*, 2009 WL 82064, at *2 (S.D. Tex. Jan. 12, 2009).[37] Because scienter is not an element, Section 11 and 12(a)(2) claims need only satisfy Rule 8's notice pleading standard, *see In re Kosmos Energy Ltd. Sec. Litig.*, 955 F. Supp. 2d 658, 664 (N.D. Tex. June 24, 2013), which places "a relatively minimal burden on a plaintiff." *Huddleston*, 459 U.S. 375 at 382. The Terminated Executives nonetheless argue that Plaintiffs' Securities Act claims should be dismissed "for failure to plead scienter" because the claims rest on similar alleged misrepresentations. TE Br. at 28. But Plaintiffs specifically pled their Securities Act claims separately, disavowed fraud allegations, and expressly alleged strict liability and negligence for those claims. ¶ 332; *see generally* ¶¶ 331-383; *see also Lone Star Ladies Inv. Club v. Schlotzsky's Inc.*, 238

---

[36] Defendants mischaracterize *Hunter*, which did not purport to make any holding that a reason for a stock price decline was insufficient "as a matter of law," OFIX Br. 5, but only that it was not enough for "the plaintiffs in th[at] case" *Teachers' Ret. Sys. Of LA v. Hunter*, 477 F.3d 162, 188 (4th Cir. 2007) (rejecting loss causation analysis where, contrary to plaintiff's theory that a lawsuit "finally revealed the 'true facts' of fraud," the complaint contained no new information regarding the fraud). Nor does this case remotely resemble *Whole Foods,* where the complaint did not allege that the defendants "revealed any new information" about the overcharging matter at issue, which had been revealed a month earlier and did not result in a market reaction, "even amidst considerable national media coverage" of the issues. 905 F.3d at 904–05.

[37] Plaintiffs' standing for their Securities Act claims is uncontested.

F.3d 363, 369 (5th Cir. 2001); *In re Pilgrim's Pride Corp. Sec. Litig.*, 2010 WL 3257369, at *31 (E.D. Tex. Aug. 17, 2010) ("this Court has held that the heightened pleading requirements of Rule 9(b) do not apply to 1933 Securities Act claims when the plaintiffs expressly disavow all allegations of fraud or scheme"); *In re Enron Sec. Litig.*, 258 F. Supp. 2d 576, 639 (S.D. Tex. 2003) (similar).[38]

Even if Rule 9(b) were to be applied to the Securities Act claims, that still would not mean that those claims could be "dismissed for failure to plead scienter." TE Br. at 28. Rule 9(b)'s heightened pleading standard is just that—a pleading standard—and it does not (and could not) alter the statutory elements of Securities Act claims, which do not require pleading scienter. *In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1366-67 (N.D. Ga. 2005) (explaining that even when Rule 9(b) is found to apply, that only requires that "the circumstances of the fraud be pleaded with particularity, it does not require scienter to plead Section 11 and 12 claims").

The Offering Documents contained the SeaSpine Merger Representations and the Integrity Statement, which were false and misleading as discussed. *See supra* at 14-32; ¶¶ 336-343; Ex. A at 15-16. The Orthofix Defendants do not dispute their liability under the Securities Act for those statements. *Walker v. Rent-A-Ctr.*, 2005 WL 8161388, at *19 (E.D. Tex.) ("As defendants only address plaintiffs' [Securities Act] claims under Rule 9(b) and PSLRA standards, viewing the facts as pleaded in the light most favorable to plaintiffs, the court finds these claims should be sustained.").[39]

## V.    The Complaint Adequately Alleges Control Person Liability

Defendants move to dismiss Plaintiffs' control person liability claims under Section 20(a) of the

---

[38] Defendants' cited cases miss the mark. *See* TE Br. at 13, 28. For instance, as this Court has recognized, *Melder* applied Rule 9(b) to Section 11 claims because of the complaint's "wholesale adoption" of fraud allegations. *Pilgrim's Pride*, 2010 WL 3257369, at *31. But there is no "wholesale adoption" where, as here, a complaint "specifically disavow[s] its fraud allegations." *Id.*; *see* ¶¶ 331, 361, 367, 375.

[39] Even if Rule 9(b) applied, Plaintiffs' Securities Act claims are still sufficient. *See, e.g., Venator*, 547 F. Supp. 3d at 669 (holding that Section 11 claims withstood Rule 9(b) where Section 10(b) claims based on the same statements withstood Rule 9(b)).

44

Exchange Act and Section 15 of the Securities Act only if Plaintiffs fail to allege a primary violation of either Act. OFIX Br. at 30; TE Br. at 28-29. Defendants thus concede that Plaintiffs adequately allege control liability as to all Defendants for any primary claim that the Court finds to be adequately alleged. *See Six Flags*, 58 F.4th at 221; *Pilgrim's Pride*, 2010 WL 3257369, at *32.

## CONCLUSION

For the reasons above, the Defendants' Motions should be denied. [40]

---

[40] If the Court finds that the Complaint fails to state a claim, Plaintiffs respectfully request that it grant Plaintiffs the opportunity to amend under Rule 15(a) before dismissing with prejudice. *See Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.").

Dated: June 18, 2025

Respectfully submitted,

By: */s/ Edwin S. Gault, Jr.*
**FORMAN WATKINS & KRUTZ LLP**
Edwin S. Gault, Jr. (TX No. 24049863)
K. B. Battaglini (TX No. 01918060)
C. Mitch McGuffey (admitted *pro hac vice*)
4900 Woodway Drive, Suite 940
Houston, TX 77056-1800
Tel: (713) 402-1717
Fax: (713) 621-6746
win.gault@formanwatkins.com
kb.battaglini@formanwatkins.com
mitch.mcguffey@formanwatkins.com

*Local Counsel for Lead Plaintiff SEPTA and the Class*

**COHEN MILSTEIN SELLERS**
 **& TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
Jan Messerschmidt (admitted *pro hac vice*)
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

Christina D. Saler (admitted *pro hac vice*)
100 N. 18th Street, Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707
Fax: (267) 479-5701
csaler@cohenmilstein.com

Alexandra Gray (admitted *pro hac vice*)
88 Pine St., 14th Floor
New York, NY 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
agray@cohenmilstein.com

*Attorneys for Lead Plaintiff SEPTA and Lead Counsel for the Class*

**GIRARD SHARP LLP**
Adam E. Polk (admitted *pro hac vice*)

46

601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
apolk@girardsharp.com

**THE HALL FIRM, LTD**
David W. Hall (*pro hac vice forthcoming*)
Four Embarcadero Center, Suite 1400
San Francisco, CA 94104
Telephone: (415) 766-3534
Facsimile: (415) 402-0058
dhall@hallfirmltd.com

*Attorneys for Mark Bonta*

47