EXHIBIT H

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Melissa J. Baily (Bar No. 237649)
melissabaily@quinnemanuel.com
Duncan C. Hall (Bar No. 345369)
duncanhall@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone: (415) 875-6600
Facsimile: (415) 875-6700

Christopher Lindsay (Bar No. 280525)
christopherlindsay@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

Kaitlin E. Keohane (Bar No. 301421)
kaitlinkeohane@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

Attorneys for Defendants

ELECTRONICALLY FILED
Superior Court of California,
County of San Diego
1/24/2025 7:26:03 PM

Clerk of the Superior Court
By N. Lopez                ,Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO, CENTRAL DIVISION

| | |
|---|---|
| KEITH VALENTINE, et al.<br><br>Plaintiffs,<br><br>vs.<br><br>CATHERINE BURZIK, et al.<br><br>Defendants. | Case No. 24CL010340C<br><br>[Assigned for all purposes to Hon. Matthew C. Braner]<br><br>**DEFENDANTS' SPECIAL MOTION TO STRIKE PURSUANT TO CALIFORNIA CODE OF CIVIL PROCEDURE SECTION 425.16**<br><br>Hearing Date: July 11, 2025<br>Hearing Time: 9:00 a.m. |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on July 11, 2025 at 9:00 a.m., or as soon as the matter may be heard, before the Honorable Matthew C. Braner, in Department C-60 of the San Diego County Superior Court, located at 330 W. Broadway, San Diego, California 92101, Defendants Catherine Burzik and Wayne Burris will and hereby do move the Court for an order striking the First, Second, and Third Causes of Action from the plaintiffs' Complaint pursuant to California Code of Civil Procedure section 425.16 (the "anti-SLAPP statute").

The plaintiffs' First, Second, and Third Causes of Action should be stricken under the anti-SLAPP statute because they arise from protected activity in furtherance of Defendants' right of petition and free speech in connection with a public issue. Likewise, the plaintiffs have not and cannot establish a probability that they will prevail on those causes of action because they seek to impose personal liability on corporate directors for a corporation's speech, and because they target statements that are substantially true, as well as statements of opinion and other statements that are not actionable because they are not provably false statements of fact.

Defendants are also entitled to recover attorneys' fees and costs associated with this motion pursuant to section 425.16(c)(1) of the anti-SLAPP statute.

This Motion is based on this Notice of Motion and Motion, as well as the accompanying Memorandum of Points and Authorities and Declaration of Catherine Burzik, the other documents on file in this action, and any argument presented at the hearing on this Motion.

Dated:  January 24, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:  _/s/ Melissa J. Baily_
Melissa J. Baily

DEFENDANTS' SPECIAL MOTION TO STRIKE

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION..................................................................................................1

II.   FACTUAL AND PROCEDURAL BACKGROUND..........................................2

    A.    The Plaintiffs' Workplace Conduct and Orthofix's Response.................2

    B.    The Plaintiffs' Litigation Campaign. ........................................................6

III.  THIS COURT SHOULD STRIKE THE PLAINTIFFS' DEFAMATION CLAIMS UNDER THE ANTI-SLAPP STATUTE..................................................................7

IV.   THE PLAINTIFFS' DEFAMATION CLAIMS TARGET SPEECH SUBJECT TO THE ANTI-SLAPP STATUTE. ........................................................................7

V.    THE PLAINTIFFS CANNOT ESTABLISH A PROBABILITY OF SUCCEEDING ON THEIR DEFAMATION CLAIMS, SO THIS COURT SHOULD STRIKE THEM................................................................................................................9

    A.    The Plaintiffs Cannot Hold Ms. Burzik and Mr. Burris Liable for Orthofix's Speech. ..................................................................................9

    B.    The Plaintiffs' Defamation Claims Fail As A Matter of Law..................10

        1.    The Statements Plaintiffs Target In the Press Release And The 8-K Regarding Their Terminations Are True, And Therefore Not Actionable As A Matter of Law......................................................................................11

        2.    Orthofix's Statements About Its Own Beliefs In the Press Release And 8-K And Obligations Are Non-Actionable Opinions.......................................13

        3.    The Statements In Orthofix's 10-Q Are Indisputably True. ....................14

        4.    The Plaintiffs' Reliance On Innuendo Does Not Save Their Defamation Claims......................................................................................................15

VI.   CONCLUSION. ..................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Ampex Corp. v. Cargle*
(2005) 128 Cal.App.4th 1569 ................................................................................................ 8

*Balla v. Hall*
(2021) 59 Cal.App.5th 652 ................................................................................................ 10

*Barker v. Fox & Associates*
(2015) 240 Cal.App.4th 333 ........................................................................................ 10, 15

*Bartholomew v. YouTube, LLC*
(2017) 17 Cal.App.5th 1217 .............................................................................................. 13

*Campanelli v. Regents of University of California*
(1996) 44 Cal.App.4th 572 .......................................................................................... 11, 14

*Charney v. Standard Gen., L.P.*
(2017) 10 Cal.App.5th 149 ................................................................................................ 13

*Daniel v. Wayans*
(2017) 8 Cal.App.5th 367 .................................................................................................... 8

*Ferlauto v. Hamsher*
(1999) 74 Cal.App.4th 1394 .............................................................................................. 13

*Francis v. Dun & Bradstreet, Inc.*
(1992) 3 Cal.App.4th 535 .................................................................................................. 12

*Gertz v. Robert Welch, Inc.*
(1974) 418 U.S. 323 .......................................................................................................... 13

*GetFugu, Inc. v. Patton Boggs LLP*
(2013) 220 Cal.App.4th 141 .............................................................................................. 11

*Gregory v. McDonnell Douglas Corp.*
(1976) 17 Cal.3d 596 .................................................................................................... 13, 14

*Hawran v. Hixson*
(2012) 209 Cal.App.4th 256 ............................................................................................ 8, 9

*Issa v. Applegate*
(2019) 31 Cal.App.5th 689 ................................................................................................ 15

*J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP*
(2016) 247 Cal.App.4th 87 .................................................................................................. 7

*Jackson v. Mayweather*
(2017) 10 Cal.App.5th 1240 ................................................................................ 11

*Kashian v. Harriman*
(2002) 98 Cal.App.4th 892 ............................................................................. 9, 10

*Masson v. New Yorker Magazine, Inc.*
(1991) 501 U.S. 496 ........................................................................................... 11

*Nygard, Inc. v. Uusi-Kerttula*
(2008) 159 Cal.App.4th 1027 .............................................................................. 7

*Seelig v. Infinity Broad. Corp.*
(2002) 97 Cal.App.4th 798 ........................................................................... 13, 14

*Smith v. Maldonado*
(1999) 72 Cal.App.4th 637 ........................................................................... 11, 15

*Sugarman v. Benett*
(2021) 73 Cal.App.5th 165 .............................................................................. 8, 9

*Summit Bank v. Rogers*
(2012) 206 Cal.App.4th 669 ......................................................................... 11, 13

*Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.*
(2021) 59 Cal.App.5th 995 .................................................................................. 9

*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc.*
(1970) 1 Cal.3d 586 ............................................................................................. 9

*Weller v. Am. Broad. Cos.*
(1991) 232 Cal. App. 3d 991 ............................................................................. 13

*Wilson v. Parker, Covert & Chidester*
(2002) 28 Cal.4th 811 .......................................................................................... 9

*Wong v. Jing*
(2010) 189 Cal.App.4th 1354 ............................................................................ 10

**Statutes**

Cal. Civ. Proc. Code § 425.16(a) ........................................................................... 7

Cal. Civ. Proc. Code § 425.16(c)(1) ................................................................... 2, 7

Cal. Civ. Proc. Code § 425.16(e)(2) ....................................................................... 8

Cal. Civ. Proc. Code § 425.16(e)(3) ....................................................................... 8

Cal. Civ. Proc. Code § 425.16(e)(4) ....................................................................... 8

## I.    **INTRODUCTION.**

Plaintiffs' complaint purports to assert three causes of action that are based on Defendants' constitutionally protected activities and speech.  But those claims fail as a matter of law and must be struck under California Code of Civil Procedure section 425.16 (the "anti-SLAPP statute") because they improperly seek to impose liability for speech in conjunction with matters directed to an executive agency—the Securities and Exchange Commission ("SEC")—and about matters of public concern:  the leadership of a publicly traded corporation.

Defendants Catherine Burzik and Wayne Burris are a former and current director of Orthofix Medical, Inc., a global leader in developing medical products and solutions to address a range of spinal and orthopedic concerns.  Plaintiffs are Keith Valentine, Orthofix's former Chief Executive Officer, John Bostjancic, its former Chief Financial Officer, and Patrick Keran, its former Chief Legal Officer.  These former Orthofix executives commenced this case (and others) after Orthofix rightfully terminated them for their graphically inappropriate workplace conduct, which made it untenable for them to remain as high officers in a public company.  This case (and the others) have been filed by plaintiffs in a misguided effort to obscure the misconduct that more than justified their terminations.

Orthofix fired the former executives only after it uncovered proof that each repeatedly made gross and improper sexist, homophobic, racist, and other vulgar and demeaning comments about co-workers and third-parties in the workplace.  This graphic commentary was often made *during* meetings and calls while the very individuals that the former executives demeaned were speaking.  If that were not sufficient cause for their terminations (and it is), Orthofix also discovered evidence that the former executives engaged in significant and repeated bullying and other mistreatment of Orthofix's employees, that the culture the three managed demeaned and devalued the contributions of female employees, and that the three executives acted frequently with aggression, and accepted and promoted vulgarity and personal attacks.  None of this is permissible in the workplace.

As a result of this misconduct, Orthofix had no choice but to remove the three from their positions.  To explain its actions to its shareholders and the investing public, Orthofix disclosed the former executives' terminations in a press release and in subsequent filings with the SEC.  The

-1-

former executives responded by commencing multiple matters against Orthofix and its directors, including this one, which purports to state claims against Ms. Burzik and Mr. Burris for their involvement in the plaintiffs' terminations—including three defamation-based claims arising from Orthofix's statements about those terminations.

This motion addresses those three defamation-based claims. Each claim targets statements Orthofix made about the plaintiffs' terminations, all of which were made in the context of Orthofix describing its employment actions regarding three of its most senior executives to the SEC and to the investing public. Consequently, each of Orthofix's statements falls squarely within the ambit of the anti-SLAPP statute.

Because the plaintiffs' claims target speech protected by the anti-SLAPP statute, they must come forward with evidence establishing that they have a probability of success on the merits of their defamation claims. They cannot meet that burden. *First*, because the plaintiffs seek to hold Ms. Burzik and Mr. Burris liable in their *personal* capacities for Orthofix's statements, they are obligated to show that Ms. Burzik and Mr. Burris are *personally* responsible for any alleged defamation. They cannot meet that burden.

*Second*, even assuming that Ms. Burzik and Mr. Burris *could* be held personally liable for Orthofix's public statements, the plaintiffs' defamation claims would fail anyway. Orthofix's statements were true, so they cannot form the basis for any cause of action under California defamation law, which only requires an allegedly defamatory statement to be *substantially* true for the claim to fail. Moreover, Orthofix's statements predominately amount to statements of its own opinion, which cannot be actionable as a matter of longstanding First Amendment law.

Because the plaintiffs' defamation claims target protected speech, and because they fail as a matter of law, this Court should strike them under the anti-SLAPP statute. It should also award Defendants their fees and costs for this motion. (Cal. Civ. Proc. Code § 425.16(c)(1).)

## II.    FACTUAL AND PROCEDURAL BACKGROUND.

### A.    The Plaintiffs' Workplace Conduct and Orthofix's Response.

In 2022, the plaintiffs were senior executives at SeaSpine Holdings Corporation. (Compl. ¶¶ 1–3.) That year, SeaSpine and Orthofix entered into an agreement by which Orthofix merged

with SeaSpine. (Burzik Decl. ¶ 3.) Mr. Valentine—SeaSpine's CEO—was to lead the surviving entity, which would continue to trade on the NASDAQ stock exchange. (Compl. ¶ 1.) Mr. Bostjancic, SeaSpine's CFO was to serve as the surviving entity's CFO. (Compl. ¶ 2.) Toward the conclusion of those negotiations, Mr. Valentine demanded that Orthofix hire Mr. Keran as a senior executive as well. (Burzik Decl. ¶ 5.) Orthofix acquiesced, ultimately signing Messrs. Valentine, Bostjancic, and Keran to lucrative contracts. (*Id.*)

In June 2023, about six months after the merger closed, Orthofix's Board received an internal complaint from the President of one of Orthofix's divisions about concerns that Orthofix's employees expressed about the plaintiffs' workplace conduct. The complaint focused on, among other things, the plaintiffs' overconsumption of alcohol, regular inappropriate comments, vulgarity, harassment of employees, and disregard of compliance obligations. (*See id.* ¶ 6.) Following the receipt of the executive's complaint, Orthofix's Board initiated an internal investigation led by external counsel and overseen by Mr. Burris (the "Investigation"). (*Id.* ¶ 7.) The Investigation ultimately cost Orthofix millions of dollars to conduct. (*Id.*) Ultimately, the evidence demonstrated that while acting as executives, Messrs. Valentine, Bostjancic, and Keran regularly engaged in discussions of graphic and violent sexual acts on directors, employees, investors, and others associated with Orthofix and SeaSpine, in addition to routinely making homophobic and racist comments. (*See* Burzik Decl. Ex. A)

As just one example, during a call between Orhtofix executives and market makers, Mr. Valentine texted with Messrs. Bostjancic and Keran that he "is always so patient and happy to answer any and all questions in these investor meetings with cute chicks!" Mr. Keran replied, "I would like to get more involved in IR activities!" Mr. Bostjancic replied that, "This one may not be of the drinking age yet! And seems fanatically over-interested in Orthobiologics." And Mr. Valentine said, "***She likes a good bone!***"

Messrs. Valentine, Bostjancic, and Keran also repeatedly commented on female coworkers in crude and inappropriate terms, frequently using sexual and other derogatory language:

- August 27, 2022: Mr. Valentine wrote that a female co-worker was "completely turned on" by Mr. Keran, and added "[t]hat could be a fun time, indeed!" Mr.

-3-

Valentine later wrote that the co-worker had "*[l]ovely bolt ons*" and "*[m]aybe too thick in the back for you*, but shame on you if that's a deterrent."

- September 29, 2022: Mr. Keran wrote that an Orthofix director needed "to get off her ass[,]" and should plan to work until closing "*with my fist up her ass*." Mr. Bostjancic responded that his "fist will be right next to" Mr. Keran's. Mr. Keran wrote "[r]ibbed, for her pleasure[,]" and Mr. Bostjancic replied "*[d]ry [f]ist fuck her ass, with a cast*."

- November 9, 2022: Mr. Bostjancic wrote of a female employee, "Hot or Not?" Mr. Keran wrote, "Will require an in person evaluation…" Mr. Bostjancic replied, "*Just keep your fist away from her*." And Mr. Keran replied, "No promises."

- December 30, 2022: Mr. Keran wrote that Mr. Valentine "love[d]" the former President of an Orthofix business unit, and that he thought she was "*blowing*" him. Then, he wrote that Mr. Valentine was "*absolutely jerking her off*" during a work call.

- February 9, 2023: Mr. Bostjancic wrote to Mr. Keran regarding an issue with a human-resources executive that his "*balls are on her chin*[,]" and Mr. Keran wrote that he did not want to *"ramrod" the issue "up her ass."*

- May 9, 2023: Mr. Valentine asked Messrs. Bostjancic and Keran about recommending a female former board member for a new position, and Mr. Keran replied "Will you use the phrase '*tits on a bull*' in your response?" Mr. Bostjancic piled on: "Seems like a totally appropriate response!"

The three also used demeaning and homophobic language to discuss their current and future co-workers:

- May 8, 2023: Mr. Keran writes, "I'm just glad they have wifi in your jail cell Boz … wtf are you?" Mr. Valentine writes, "No doubt. *Are you at that gay bar in the office upstairs* [?]" Mr. Bostjancic writes, "Las Vegas airport. Flying on to Lewisville in 3 hours. LV feels like fucking jail to me. I'd actually rather be in jail or a gay bar than this fucking shithole city." Mr. Bostjancic wrote of a former executive, "*Verbal diarrhea*." Mr. Keran writes, "*I figured you'd be into that kind of thing, maybe after a few hours in the gay bar*."

Racist and other seriously inappropriate commentary was not uncommon:

- September 14, 2022: Mr. Bostjancic writes, "I hope we're going to a sushi place…" Mr. Valentine replies, "Why? 'Cause he's Asian? *What a racist*." Later on, Mr. Valentine writes, "You blow Boz. Where are you? … You need a kick I. [sic] The nuts." Mr. Bostjancic replies, "I got a gif for that!" Mr. Valentine says, "This fella is all Pat!" Mr. Keran replies, "Hey, you're not married to an Asian!" Mr. Valentine writes, "I meant you are gay! Could care less that you are Asian!" Later on, Valentine writes, "*Check out the black dude! Why is he the rapper*?" Mr. Bostjancic replies, "He looks like he's ready to throw down!" Mr. Valentine replies, "Racist RSM!"

-4-

Later on, Mr. Valentine writes, "Rammed it up their…..errrr….I mean down their throats… Here we go…. ***Let's buy her a hair relaxing product*****….."**

- January 8, 2023:  Mr. Keran wrote that a board member was "pissing me off.  From what I can tell, the OFIX [Compensation Committee] gave a 10% discretionary bump, presumably for the merger (and in addition to the PSU conversion). [He] wants not only to delay our approval to somehow keep us aligned with OFIX, but is limiting us to the formula. I think KV should jump in the message and [the board member] ***can go fuck himself*** and his sensitivities."

Nor was commentary demeaning and degrading Orthofix's compliance personnel and their efforts:

- August 5, 2023: Mr. Valentine writes, "***Fuckin' prick auditors*** have more questions so I have another 1-2 hours with [Orthofix's counsel]" the following day.  Mr. Bostjancic writes, "***Insist on the hot one to interview you***."

 Once Orthofix's Board became aware of the plaintiffs' grossly inappropriate workplace conduct in September 2023, it was justifiably appalled.  (*See id*. ¶ 9.)  Consequently, Orthofix's Board unanimously voted to terminate the plaintiffs' employments for cause.  (Compl. ¶¶ 48, Exs. E–G.)

On September 12, 2023, Orthofix publicly announced the plaintiffs' termination of Claimants in a press release (the "Press Release"), stating the following:

> The Board's decision follows an investigation conducted by independent outside legal counsel and directed and overseen by the Company's independent directors. As a result of the investigation, the Board determined that each of these executives engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture. These matters are unrelated to and do not impact the Company's strategy, results of operations or previously filed financial statements.

> Catherine Burzik, Chair of the Orthofix Board, said, "Orthofix's core values are built around fostering, cultivating and preserving a culture that is respectful, and we do not condone harassing or inappropriate conduct or statements of any kind. We require all employees – and especially our leaders – to behave in accordance with the Company's values. The Board did not make these decisions lightly. We believe they are necessary to ensure our employees, investors, customers, and other stakeholders have confidence in the Company's leaders."

(Compl. ¶ 54.)

Two days later, Orthofix publicly disclosed the plaintiffs' terminations in a Form 8-K it submitted to the SEC (the "8-K"), stating that:

> On September 11, 2023, the Board of Directors (the "Board") of Orthofix Medical Inc. ("Orthofix" or the "Company") terminated the employment of Keith Valentine, the Company's Chief Executive Officer, John Bostjancic, the Company's Chief Financial Officer and Patrick Keran, the Company's Chief Legal Officer. The Board's decision follows an investigation conducted by independent outside legal counsel and directed and overseen by the Company's independent directors. As a result of the investigation, the Board determined that each of these executives engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture. The Company has notified Mr. Valentine, Mr. Bostjancic and Mr. Keran that such terminations have been made for "Cause," as defined in applicable employment-related agreements (including each executive's respective Change in Control and Severance Agreement, dated June 19, 2023). As a result, the Company does not believe it is required to make any further payments to the terminated executives, other than payment of salary for the days worked in the current pay period through September 12, 2023 and unused paid time off. In connection with Mr. Valentine's termination, the Board has asked him to resign from the Board.

(Compl. ¶ 55.)

Then, about six weeks after that, Orthofix submitted its regular quarterly disclosure to the SEC (the "10-Q"). In the 10-Q, Orthofix noted that it had incurred "approximately $3.4 million in costs associated with the Board of Directors' independent investigation conducted by independent outside legal counsel, which resulted in the termination of three former executives." (*Id*. ¶ 56.)

### B. The Plaintiffs' Litigation Campaign.

Following their terminations, the plaintiffs commenced a vindictive legal campaign against Orthofix and members of its Board of Directors, encompassing (so far) three separate arbitrations, two cases in this court, and at least one trip to the Court of Appeal. This case—one front in the plaintiffs' scorched-earth litigation strategy—attempts to state claims against Ms. Burzik and Mr. Burris in conjunction with their involvement in the plaintiffs' terminations, purporting to assert seven causes of action: three defamation-based claims arising from Orthofix's public statements, three fraud-based claims centering on the investigation into the plaintiff's conduct that ultimately

resulted in their terminations, and a final intentional-interference claim purporting to hold Ms. Burzik and Mr. Burris liable for allegedly harming the plaintiffs' future relationship with Orthofix. (*See* Compl. ¶¶ 85–156.)  The defamation claims—the plaintiffs' First, Second, and Third Causes of Action—are specifically and explicitly predicated on Orthofix's Press Release, its 8-K, and its 10-Q. (*Id.* ¶¶ 86, 101, 116.)

**III.   THIS COURT SHOULD STRIKE THE PLAINTIFFS' DEFAMATION CLAIMS UNDER THE ANTI-SLAPP STATUTE.**

The anti-SLAPP statute is intended to "encourage continued participation in matters of public significance" and to prevent restriction of such participation "through abuse of the judicial process." (Cal. Civ. Proc. Code § 425.16(a).)  It empowers defendants to make a "special motion to strike" if a cause of action against them arises "from any act . . . in furtherance of the person's right of petition or free speech . . . in connection with a public issue[.]" (*Id.* § 425.16(b)(1).)  The anti-SLAPP statute is construed broadly in favor of protecting defendants' rights. (*Nygard, Inc. v. Uusi-Kerttula* (2008) 159 Cal.App.4th 1027, 1039 [citing Cal. Civ. Proc. Code § 425.16(a)].)  If a movant prevails on a motion to strike, that movant "shall be entitled to recover [his or her] attorney's fees and costs." (Cal. Code Civ. Proc. § 425.16(c)(1).)

A court considering an anti-SLAPP motion proceeds in two steps.  *First*, the defendant must make a prima facie showing that the plaintiff's suit arises from an act by the defendant made in connection with a public issue in furtherance of the defendant's right to petition or right to free speech under the United States or California Constitution. (*J-M Manufacturing Co., Inc. v. Phillips & Cohen LLP* (2016) 247 Cal.App.4th 87, 96.)  Once the defendant makes that showing, "the burden shifts to the plaintiff to demonstrate a 'probability'" that it will prevail on whatever claims are asserted against the defendant. (*Id.*)

**IV.   THE PLAINTIFFS' DEFAMATION CLAIMS TARGET SPEECH SUBJECT TO THE ANTI-SLAPP STATUTE.**

The plaintiffs' claims arise from protected activity.  Speech subject to the anti-SLAPP statute includes "any written or oral statement or writing made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other official proceeding authorized by law" and "any written or oral statement or writing made in a place open to the public

-7-

or a public forum in connection with an issue of public interest." (Cal. Civ. Proc. Code §§ 425.16(e)(2), (e)(3).) The movant's burden under step one "is not a particularly demanding one." (*Daniel v. Wayans* (2017) 8 Cal.App.5th 367, 387.)

California law makes clear that a public corporation's disclosures to the SEC qualify as statements subject to the anti-SLAPP statute because they are made in connection with matters under consideration by an executive body. (*Sugarman v. Benett* (2021) 73 Cal.App.5th 165, 175 [holding that statements made in SEC 8-K and 10-Q forms are subject to the anti-SLAPP statute]; *Hawran v. Hixson* (2012) 209 Cal.App.4th 256, 269.) It is equally clear that a public corporation's press releases related to its SEC filings constitute protected statements under the anti-SLAPP statute, applying the same rationale. (*Id*.)

Beyond that, California courts have held that publicly traded companies' statements to the investing public are subject to the anti-SLAPP statute as having been made "in connection with a public issue or an issue of public interest." (*See Sugarman*, *supra*, 73 Cal.App.5th at 177 [holding that statements made in earnings calls in conjunction with SEC filings "were public statements . . . likely to impact individual investors and the market" and that "[t]hey therefore qualify as protected activity"] [citing Cal. Civ. Proc. Code § 425.16(e)(4)]; *Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1576–77 [speech that discussed the internal management of a publicly traded company with over 59 million traded shares constituted a matter of public interest because the company frequently issued press releases to update the public on its management and products].)

The Orthofix public statements challenged by plaintiffs fall squarely within those rules. Orthofix's 8-K and 10-Q (*see* Compl. ¶¶ 55–56) constitute disclosures that Orthofix—as a publicly traded entity—was required to make by the government body charged with its oversight, which is precisely why statements contained in those submissions are subject to the anti-SLAPP statute. As the *Sugarman* Court explained:

> The SEC's reporting requirement is designed to make accurate information available to the investing public, and the mandatory filings allow the SEC to determine whether to investigate a particular transaction. These requirements subject the information reported to SEC review, and accordingly the statements in the reports are protected under section 425.16, subdivision (e)(2).

-8-

(73 Cal.App.5th at 175 [internal citation and quotation marks omitted].)

The Press Release that accompanied the filing of Orthofix's 8-K informed the investing public about the termination of the three executives, as required by SEC rules.  (Compl. ¶¶ 54, 63 [alleging that the value Orthofix's stock dropped by 30% the day the press release was issued].)  Accordingly, the statements it contains are also subject to the anti-SLAPP statute.  (*Sugarman*, *supra*, 73 Cal.App.5th at 175; *Hawran*, *supra*, 209 Cal.App.4th at 269.)

Each of the statements at issue in the plaintiffs' defamation claims satisfies step one of the anti-SLAPP statute, so the burden shifts to the plaintiffs to satisfy step two.

## V.    THE PLAINTIFFS CANNOT ESTABLISH A PROBABILITY OF SUCCEEDING ON THEIR DEFAMATION CLAIMS, SO THIS COURT SHOULD STRIKE THEM.

To meet their obligations under step two of the anti-SLAPP statute, the plaintiffs must present competent, admissible evidence establishing that they have a probability of success on the merits.  (*Kashian v. Harriman* (2002) 98 Cal.App.4th 892, 906.)  In addition, the plaintiffs must overcome any substantive legal defenses that exist against their claims.  (*Trinity Risk Management, LLC v. Simplified Labor Staffing Solutions, Inc.* (2021) 59 Cal.App.5th 995, 1006.)  The plaintiffs bear the burden under step two of the anti-SLAPP statute.  (*Wilson v. Parker, Covert & Chidester* (2002) 28 Cal.4th 811, 821 ["the plaintiff 'must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited'"] [citation omitted].)

Because established legal defenses bar the plaintiffs' defamation claims, they cannot meet their burden.  Accordingly, this Court should strike those claims.

### A.    The Plaintiffs Cannot Hold Ms. Burzik and Mr. Burris Liable for Orthofix's Speech.

In general, individual corporate directors and officers are not personally liable for actions taken on the corporation's behalf "unless they participate in the wrong or authorize or direct that it be done."  (*United States Liab. Ins. Co. v. Haidinger-Hayes, Inc*. (1970) 1 Cal.3d 586, 595.)  That rule applies here.  Plaintiffs' complaint alleges very little about any public statements by Ms. Burzik, and *nothing at all* about any public statements by Mr. Burris.

-9-

As for Ms. Burzik, the only public statement attributed to her is a four-sentence excerpt from the Press Release, in which she is quoted as saying the following:

> Orthofix's core values are built around fostering, cultivating and preserving a culture that is respectful, and we do not condone harassing or inappropriate conduct or statements of any kind. We require all employees – and especially our leaders – to behave in accordance with the Company's values. The Board did not make these decisions lightly. We believe they are necessary to ensure our employees, investors, customers, and other stakeholders have confidence in the Company's leaders.

(Compl. ¶ 54.)  As described in section V(B)(2), *infra*, that statement is not actionable at all.

Beyond that single statement, the plaintiffs' only allegation about Ms. Burzik's and Mr. Burris's involvement in the alleged defamation is an unadorned boilerplate assertion that "Burris (as Chair of the Special Committee) and Burzik (as Chair of the Board and subsequently interim CEO) were both directly involved in the decision-making, drafting and publication of the statements." (Compl. ¶¶ 88, 118.)  That's it.  There is no additional support for the plaintiffs' contentions about Ms. Burzik's or Mr. Burris's involvement and—to reiterate—it is the plaintiffs' burden to substantiate their claims with admissible evidence.  (*Kashian*, *supra*, 98 Cal.App.4th at 906.)  Because the plaintiffs cannot meet that burden, their defamation claims against Ms. Burzik and Mr. Burris should be stricken.

**B.    The Plaintiffs' Defamation Claims Fail As A Matter of Law.**

On their merits, the plaintiffs' defamation claims reduce to the allegation that Orthofix's public statements discussing their terminations—including that they were terminated because of workplace conduct and that the terminations followed an investigation—harmed their reputations. Those statements cannot support a defamation (or defamation-adjacent) claim as a matter of law.

"The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage." (*Wong v. Jing* (2010) 189 Cal.App.4th 1354, 1369.)  When a statement is defamatory on its face*,* "it is said to be libelous per se, and actionable without proof of special damage." (*Barker v. Fox & Associates* (2015) 240 Cal.App.4th 333, 351.)  "To establish a false light claim based on a defamatory publication, a plaintiff 'must meet the same requirements' as for a defamation claim." (*Balla v. Hall*

-10-

(2021) 59 Cal.App.5th 652, 687 [citation omitted.])  True statements and matters of opinion are not actionable under any of those theories as a matter of law.  (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645–46; *Summit Bank v. Rogers* (2012) 206 Cal.App.4th 669, 695–96.)

**1.     The Statements Plaintiffs Target In the Press Release And The 8-K Regarding Their Terminations Are True, And Therefore Not Actionable As A Matter of Law.**

"A publication 'must contain a false statement of *fact*' to give rise to liability for defamation."  (*Campanelli v. Regents of University of California* (1996) 44 Cal.App.4th 572, 578 [citation omitted] [emphasis in original].)  And "[t]ruth, of course, is an absolute defense to any libel action."  (*Id.* at 581; *see also Smith, supra,* 72 Cal.App.4th at 646 ["In all cases of alleged defamation, whether libel or slander, the truth of the offensive statements or communication is a complete defense against civil liability, regardless of bad faith or malicious purpose."].)

Moreover, it is a longstanding rule that statements that are substantially true are not actionable.  (*GetFugu, Inc. v. Patton Boggs LLP* (2013) 220 Cal.App.4th 141, 154 [citation omitted]; *Masson v. New Yorker Magazine, Inc.* (1991) 501 U.S. 496, 517 [a defamation plaintiff cannot prevail if "the substance, the gist, the sting, of the libelous charge [is] justified"] [citation omitted].)  "Put another way, the statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1262–63 [citation omitted].)  Whether the plaintiff has satisfied this requirement is for the court to decide as a matter of law.  (*See Masson, supra*, 501 U.S. at 517.)

Orthofix's Press Release and 8-K contain materially identical language about the plaintiffs' terminations, stating that they:

- "follow[ed] an investigation conducted by independent outside legal counsel and directed and overseen by the Company's independent directors" (Compl. ¶¶ 54, 55); and

- that as "a result of the investigation, the Board determined that each of these executives engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with [Orthofix's] values and culture" (*id*. ¶¶ 54, 55). The 8-K adds that Orthofix:

-11-

- "notified Mr. Valentine, Mr. Bostjancic and Mr. Keran that such terminations have been made for 'Cause,' as defined in applicable employment-related agreements" (*id*. ¶ 55); and

- that "[i]n connection with Mr. Valentine's termination, the Board has asked him to resign from the Board" (*id*. ¶ 55).

Every one of those statements is true.   Indeed, the *plaintiffs' own complaint* and its accompanying exhibits make clear that those statements reflect *exactly what happened*.  (*See, e.g.*, *id*. ¶ 48 & Exs. E–G [quoting the plaintiffs' termination notices as stating that Orthofix's "independent directors on the Board have directed and overseen an independent investigation … the Board has determined that you have breached multiple duties, obligations and agreements held with the Company"].).   The statement that Orthofix's Board determined that the plaintiffs "engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture" is also manifestly true.   Orthofix's Board said exactly that in terminating their employment.   (*See id*. [discussing the Board's conclusions that the plaintiffs had taken part in "highly offensive and inappropriate business-related" communications that constituted "willful and material violations of applicable Company policies and codes of conduct"].)   Indeed, as described in detail above, Orthofix's Board's conclusion was indisputably correct—the obscene degree of workplace misconduct the Board uncovered in September 2023 rendered any other conclusion untenable.   The plaintiffs' own allegations make clear that the remainder of Orthofix's 8-K is also obviously true:  it cannot be disputed that Orthofix notified the plaintiffs about their terminations and informed them that the terminations would be for cause within the meaning of their agreements with Orthofix.  (*See id*. ¶ 48.)  It is also indisputably true that Orthofix's Board asked Mr. Valentine to resign as a member in connection with his termination.  (*See id*. ¶ 55.)  Because all of the cited language is true, it cannot be defamatory as a matter of law.  (*Francis v. Dun & Bradstreet, Inc.* (1992) 3 Cal.App.4th 535, 540.)

**2.    Orthofix's Statements About Its Own Beliefs In the Press Release And 8-K And Obligations Are Non-Actionable Opinions.**

"Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected."  (*Summit Bank*, *supra*, 206 Cal.App.4th at 695–96 [citation omitted]; *see also Gertz v. Robert Welch, Inc*. (1974) 418 U.S. 323, 339 ["Under the First Amendment there is no such thing as a false idea."].)  California defamation law requires that an offending statement "expressly or impliedly assert a fact that is susceptible to being proved false," and must be able to be reasonably "interpreted as stating actual facts."  (*Weller v. Am. Broad. Cos.* (1991) 232 Cal. App. 3d 991, 1001 [citations omitted].)

"The critical determination of whether an allegedly defamatory statement constitutes fact or opinion is a question of law for the court[.]"  (*Ferlauto v. Hamsher* (1999) 74 Cal.App.4th 1394, 1401 [citation omitted].)   In making that determination, courts consider all the facts and circumstances, including the language used, the statement's full context, the nature and full content of the communication, and the knowledge and understanding of the audience to whom it was directed.  (*Seelig v. Infinity Broad. Corp*. (2002) 97 Cal.App.4th 798, 809–10; *see also Bartholomew v. YouTube, LLC* (2017) 17 Cal.App.5th 1217, 1227–28 ["[T]he publication . . . may not be divided into segments and each portion treated as a separate unit . . . ."] [citation omitted].)

Multiple California courts have applied that rule to hold that statements about the propriety of terminating employees or about an individual's fitness for a particular role are non-actionable statements of opinion.  (*Charney v. Standard Gen., L.P.* (2017) 10 Cal.App.5th 149, 158 n.10 ["Even if the press release could be interpreted as somehow stating [plaintiff] was terminated for unidentified improper conduct, the fact that there may be some dispute over whether there was 'improper' conduct that justified termination is a matter of opinion."]; *Gregory v. McDonnell Douglas Corp.* (1976) 17 Cal.3d 596, 604 [statements concerning the fitness of a vice president and president of a union to hold office are opinions not subject to an action for libel].)  Those rules bar any liability for the remainder of the Press Release and the 8-K.

*First*, the Press Release and the 8-K note the Board's "determin[ation] that each of these executives engaged in repeated inappropriate and offensive conduct that violated multiple code of

-13-

conduct requirements and was inconsistent with the Company's values and culture." (Compl. ¶¶ 54, 55.)  That is manifestly a statement of the Board's own opinion about the severity of the plaintiffs' misconduct (and a correct one, at that).  (*Gregory*, *supra*, 17 Cal.3d 596, 604 [affirming a demurrer because the statements "that plaintiffs are not performing their duties competently [which] relate directly to their fitness for the offices they held" "constitute protected statements of opinion which are not properly the subject of a libel action"].)

*Second*, as described above, the remainder of the Press Release quotes Ms. Burzik as describing Orthofix's values and culture.  Ms. Burzik's descriptive statements are quintessential statements of opinion.  None of them are falsifiable, instead, they represent qualitative, judgmental notes.  They are not actionable as a matter of law.  (*See Seelig, supra,* 97 Cal.App.4th at 810–11.)

*Finally*, the 8-K noted that Orthofix "does not believe it is required to make any further payments to the terminated executives, other than payment of salary for the days worked in the current pay period through September 12, 2023 and unused paid time off." (Compl. ¶ 55.)  Again, Orthofix's beliefs regarding its own future obligations are not falsifiable, so they cannot support defamation liability as a matter of law.

### 3.    The Statements In Orthofix's 10-Q Are Indisputably True.

As for the 10-Q, the statement that the plaintiffs challenge is a dry recitation of Orthofix's expenses—in its entirety, the text they quote states: "General and administrative expense increased $7.8 million . . . Increase also driven by approximately $3.4 million in costs associated with the Board of Directors' independent investigation conducted by independent outside legal counsel, which resulted in the termination of three former executives." (Compl. ¶ 56; *see also* Burzik Decl. ¶ 7.)  That's it.  Plaintiffs will not be able to establish that any point in that excerpt is inaccurate.  Orthofix's expenses were what they were.  And the investigation *did* "result[] in" the plaintiffs' "termination" as Orthofix executives—they've alleged as much. (Compl. ¶¶ 18–28, 46–48.)  While the plaintiffs contend at length that their terminations shouldn't have been for cause, it is not disputable that they were—as stated in the 10-Q—terminated following an investigation. These true statements in Orthofix's 10-Q cannot support a defamation claim as a matter of law. (*Campanelli*, *supra*, 44 Cal.App.4th at 578.)

**4.      The Plaintiffs' Reliance On Innuendo Does Not Save Their Defamation Claims.**

The plaintiffs periodically allege that the defendants are liable for defamation based not on what Orthofix actually said in its public statements, but what it did not say.  (*See* Compl. ¶ 57 ["The press release, Form 8-K, and Form 10-Q were misleading for what they didn't say, and defamatory for what they . . . impl[ied] about Plaintiffs."].)  But that resort to innuendo cannot save their claims.[1]

"[A] plaintiff may not construct an actionable statement by reading whatever implication it wishes into the defendants' words[.]"  (*Issa v. Applegate* (2019) 31 Cal.App.5th 689, 707 [citation omitted].)  Instead, "the plaintiff must plead and prove that as used, the words had a particular meaning, or 'innuendo,' which makes them defamatory . . . [and] the plaintiff must also allege the extrinsic circumstances which show the third person reasonably understood it in its derogatory."  (*Smith v. Maldonado* (1999) 72 Cal.App.4th 637, 645–46.)  Here, the plaintiffs have not alleged that the words used in the Press Release or SEC filings "had a particular meaning, or 'innuendo'" that make them defamatory.  Instead, the plaintiffs argue that Orthofix should have spun their terminations in the way they'd prefer.  (*See* Compl. ¶¶ 57–59.)  But that does not mean that Orthofix's statements were defamatory.  To make that claim, the plaintiffs bear the burden to show that Orthofix's statements weren't substantially true.  (*See id.*)  Because they cannot meet that burden, (*see*, *supra*, section V(B)(1)), their claims should be stricken.

## VI.      CONCLUSION.

For the foregoing reasons, Ms. Burzik and Mr. Burris respectfully request that this Court strike the plaintiffs' First, Second, and Third Causes of Action under the anti-SLAPP statute.  This Court should also order the plaintiffs to pay the attorneys' fees and costs incurred in this motion.

---

[1]  As a threshold matter, an innuendo-based allegation cannot support a defamation per se claim as a matter of law, because a plaintiff cannot establish a claim for defamation per se if the statement at issue only has a defamatory meaning if the reader has some specialized knowledge of the situation.  (*Barker v. Fox & Associates* (2015) 240 Cal.App.4th 333, 351–52 ["if the reader would be able to recognize a defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances, extrinsic to the publication, which are not matters of common knowledge rationally attributable to all reasonable persons, then . . . the libel cannot be libel per se."] [citation omitted].)

-15-

Dated:  January 24, 2025

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By: _/s/ Melissa J. Baily_
Melissa J. Baily

DEFENDANTS' SPECIAL MOTION TO STRIKE