**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| *In re Orthofix Medical, Inc. Securities Litigation* | No. 2:24-cv-00690-JRG<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |

**SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

GLOSSARY OF TERMS .......... v

I. INTRODUCTION .......... 1

II. JURISDICTION AND VENUE .......... 7

III. PARTIES .......... 7

A. Plaintiffs .......... 7

B. Defendants .......... 8

1. Exchange Act Defendants .......... 8

2. The Securities Act Defendants .......... 14

IV. ORTHOFIX AND ITS BUSINESS .......... 14

V. FACTUAL BACKGROUND .......... 16

A. Orthofix Explores a Strategic Transaction .......... 16

B. Orthofix's Deficient Due Diligence Process .......... 18

C. Orthofix Touts a Merger with SeaSpine and the Appointment of Defendant Valentine to Lead the Combined Company .......... 30

D. Orthofix Announces That It Carefully Selected the Incoming Executive Leadership Team and Announces its Selection of Defendants Bostjancic and Keran .......... 34

E. Orthofix's Due Diligence Overlooked Discriminatory and Abusive Conduct at SeaSpine That Fostered a Hostile Work Environment .......... 36

1. SeaSpine's "Good Old Boys' Club" Culture of Rampant Drinking and Partying .......... 37

2. SeaSpine's Deficient Human Resources Department .......... 40

3. SeaSpine's History of Sex-Based Discrimination .......... 43

4. SeaSpine's History of Sexual Harassment and Assault .......... 53

5. SeaSpine's Culture of Bullying .......... 54

F. Orthofix Overlooked Issues at SeaSpine Because of Its Own Similar Issues ..... 56

G. Orthofix Files the Registration Statement and Joint Proxy Seeking Shareholder Approval of the Merger ..... 59

H. The Merger Closes ..... 65

I. Problems at the Combined Company Persist Post-Merger ..... 70

J. Orthofix Files Its 2022 Form 10-K Touting Its Compliance and Ethics Program and Its Robust Human Capital Resources ..... 75

K. Orthofix Touts the Stability of the Combined Company's Leadership, Its Application of the Codes of Conduct to Executives, and Its Implementation of Robust Risk Management Programs ..... 76

L. After Closing, Unbeknownst to the Market, Orthofix Launches an Internal Investigation into the Terminated Executive Defendants' Misconduct ..... 78

M. Orthofix Announces That It Has Terminated the Terminated Executive Defendants "For Cause" ..... 83

N. Orthofix Discloses That the Termination of the Terminated Executive Defendants Negatively Impacted Its Market Capitalization ..... 90

VI. EXCHANGE ACT VIOLATIONS ..... 91

A. Defendants' Materially False and Misleading Statements and Omissions During the Class Period ..... 91

1. October 11, 2022 Form 8-K ..... 92

2. November 8, 2022 Form S-4 ..... 95

3. November 18, 2022 Form 425 and Press Release ..... 100

4. November 22, 2022 Form S-4/A ..... 102

5. November 23, 2022 Joint Proxy Statement/Prospectus ..... 107

6. March 6, 2023 Form 10-K ..... 110

7. April 27, 2023 Definitive Proxy Statement ..... 115

B. Loss Causation and Economic Loss ..... 122

C. Summary of Scienter Allegations ..... 130

1. The Severity and Systemic Nature of the Misconduct Establishes the Terminated Executive Defendants' Scienter .................................... 131

2. The Terminated Executive Defendants' Control Over SeaSpine Pre-Merger and Orthofix Post-Merger Demonstrates Their Scienter..... 131

3. The Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Director Defendants Disregarded Red Flags at SeaSpine Pre-Merger and/or Orthofix Post-Merger, Which Demonstrates Scienter .............................................................................. 133

4. The Exchange Act Defendants Had the Motive and the Opportunity to Perpetuate the Fraud ..................................................... 134

5. The Scienter of the Legacy Orthofix Officer and Director Defendants, the Orthofix Post-Merger Director Defendants, and the Terminated Executive Defendants Is Imputed to Defendant Orthofix .......................................................................................... 135

6. The Terminated Executive Defendants' Pre-Merger Scienter Is Imputed to SeaSpine ............................................................... 136

D. Inapplicability of Statutory Safe Harbor and Bespeaks-Caution Doctrine......... 136

E. Presumption of Reliance ......................................................................... 137

F. Exchange Act Class Action Allegations ........................................................ 138

G. Exchange Act Causes of Action ................................................................ 139

COUNT I .................................................................................................. 140

COUNT II ................................................................................................. 142

COUNT III ................................................................................................ 144

COUNT IV ................................................................................................ 144

VII. SECURITIES ACT VIOLATIONS ............................................................... 145

A. False and Misleading Statements in the Offering Documents ........................... 147

1. November 22, 2022 Form S-4/A ......................................................... 147

2. November 23, 2022 Joint Proxy Statement/Prospectus .......................... 150

B. Documents Incorporated by Reference into the Registration Statement Contain Material Misstatements and Omit Material Facts ................................ 154

C. Post-Merger Revelations ..... 157

D. Securities Act Class Action Allegations ..... 158

E. The Securities Act Defendants Failed to Conduct a Reasonable Investigation and Exercise Reasonable Care in Connection with the Offering Documents ..... 160

F. Securities Act Causes of Action ..... 162

COUNT V ..... 162

COUNT VI ..... 163

COUNT VII ..... 165

VIII. PRAYER FOR RELIEF ..... 168

IX. JURY DEMAND ..... 169

Appendix A ..... 1A

## GLOSSARY OF TERMS

| ABBREVIATION | DEFINITION |
|---|---|
| **PLAINTIFFS** | |
| Lead Plaintiff or SEPTA | Lead Plaintiff Southeastern Pennsylvania Transportation Authority |
| Securities Act Plaintiffs | SEPTA and additional named plaintiff Mark Bonta ("Bonta") |
| **DEFENDANTS** | |
| Exchange Act Defendants | Defendants Orthofix Medical Inc. ("Orthofix" or the "Company"), SeaSpine Holdings Corp. ("SeaSpine"), and the Individual Exchange Act Defendants |
| Individual Exchange Act Defendants | The Legacy Orthofix Officer and Director Defendants; the Orthofix Post-Merger Director Defendants; and the Terminated Executive Defendants |
| Legacy Orthofix Officer and Director Defendants | Defendants Jon C. Serbousek ("Serbousek"), Douglas C. Rice ("Rice"), Catherine M. Burzik ("Burzik"), Wayne Burris ("Burris"), Jason M. Hannon ("Hannon"), James F. Hinrichs ("Hinrichs"), Lilly Marks ("Marks"), Michael E. Paolucci ("Paolucci"), John E. Sicard ("Sicard"), Thomas A. West ("West"), and Kimberley A. Elting ("Elting") |
| Orthofix Post-Merger Director Defendants | Burzik, Hannon, Hinrichs, Paolucci, Serbousek, and the SeaSpine-Orthofix Director Defendants |
| SeaSpine-Orthofix Director Defendants | Stuart Essig ("Essig"), John Henneman, III ("Henneman"), Shweta Singh Maniar ("Maniar") |
| Securities Act Defendants | Defendant Orthofix, Defendant SeaSpine, and the Signer Defendants |
| Signer Defendants | The Legacy Orthofix Officer and Director Defendants, Defendant Keith Valentine ("Valentine"), and Defendant Patrick Keran ("Keran"), all of whom signed the Offering Documents |
| Terminated Executive Defendants | Defendants Valentine, John Bostjancic ("Bostjancic"), and Keran |
| **ADDITIONAL TERMS** | |
| 2022 Form 10-K | Orthofix Medical Inc., Form 10-K, for the year ended Dec. 31, 2022, filed Mar. 6, 2023. |
| Amended Registration Statement | Orthofix Medical Inc., Form S-4/A, filed Nov. 22, 2022. |
| Boston | Kathryn Boston |
| *Boston* Compl. | First Amended Compl., Sept. 25, 2019, *Boston v. Orthofix Medical, Inc.*, No. 4:19-cv-00438-ALM (E.D. Tex.) (ECF No. 26) |
| Burzik Declaration or Burzik Decl. | Decl. of Catherine Burzik in Support of Defs. Special Mot. to Strike Pursuant to California Code of Civil Procedure Section 425.16, Jan. 24, 2025, *Valentine v. Burzik*, No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) (ROA No. 15) |

| ABBREVIATION | DEFINITION |
|---|---|
| Class Period | October 11, 2022 to September 12, 2023 |
| CW | Confidential Witness |
| Defamation Complaint or Defam. Compl. | Compl., Sept. 10, 2024, *Valentine v. Burzik* No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) (ROA No. 4) |
| Defamation Lawsuit | *Valentine v. Burzik*, No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) |
| Defamation Motion to Strike or Defam. Mot. to Strike | Def.'s Special Mot. to Strike Pursuant to Cal. Code of Civ. Proc. Section 425.16, Jan. 24, 2025, *Valentine v. Burzik*, No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) (ROA No. 14) |
| Discrimination Class Action | *Johnson v. SeaSpine Holdings Corp.*, Case No. 30-2017-00949804-CU-OE-CXC (Cal. Super. Ct. Orange Cnty.) |
| Discrimination Class Action Settlement | Settlement agreement reached in the Discrimination Class Action |
| Exchange Act | The Securities Exchange Act of 1934 |
| EA | Executive Assistant |
| Internal Investigation | Internal investigation at Orthofix that culminated in the termination of the Terminated Executive Defendants |
| Johnson | Maryanne Johnson |
| *Johnson* Complaint or *Johnson* Compl. | Second Amended Compl., July 20, 2020, *Johnson v. SeaSpine Holdings Corp.*, Case No. 30-2017-00949804-CU-OE-CXC (Cal. Super. Ct. Orange Cnty.) (ROA No. 154) |
| Merger | January 2023 stock-for-stock transaction by which Orthofix acquired and merged with SeaSpine |
| Merger Agreement | Agreement and Plan of Merger by and among Orthofix Medical Inc., Orca Merger Sub Inc., and SeaSpine Holdings Corporation, dated October 10, 2022 |
| O'Connor | Catherine O'Connor |
| *O'Connor* Complaint or *O'Connor* Compl. | Pl.'s First Amended Compl., Feb. 15, 2024, *O'Connor v. SeaSpine Holdings Corp.*, No. 37-2023-00051028-CU-OE-CTL (Cal. Super. Ct. San Diego Cnty.) (ROA No. 8) |
| *O'Connor* Notice of Lodgment | Notice of Lodgment in Supp. of Pl. Catherine O'Connor's Opp'n to Defs.' Mot. for Summ. J., or in the Alternative, Summ. Adjudication, Aug. 29, 2025, *O'Connor v. SeaSpine Holdings Corp.*, No. 37-2023-00051028-CU-OE-CTL (Cal. Super. Ct. San Diego Cnty.) (ROA No. 98) |
| Offering Documents | The Registration Statement and Prospectus (both of which are inclusive of amendments thereto, related prospectuses, and documents incorporated therein) issued in connection with the Merger |
| Orthofix Board | Orthofix Board of Directors |

| ABBREVIATION | DEFINITION |
|---|---|
| Prospectus | 424B3 Prospectus (inclusive of amendments thereto, related prospectuses, and documents incorporated therein) issued in connection with the Merger |
| Registration Statement | S-4 Registration Statement (inclusive of amendments thereto and documents incorporated therein) issued in connection with the Merger |
| SeaSpine Board | SeaSpine Board of Directors |
| Securities Act | The Securities Act of 1933 |
| Strategic Steering Committee | Orthofix Board's Strategic Steering Committee, formed in September 2021 |

Court-appointed Lead Plaintiff Southeastern Pennsylvania Transportation Authority ("SEPTA" or "Lead Plaintiff") and additional named Plaintiff Mark Bonta ("Bonta," and with SEPTA, "Plaintiffs"), by and through their counsel, allege the following upon information and belief, except as to those allegations concerning SEPTA and Bonta, which are alleged upon personal knowledge. SEPTA's and Bonta's information and belief is based upon, *inter alia*, counsel's investigation, which includes review and analysis of (i) regulatory filings made by Orthofix Medical Inc. ("Orthofix" or the "Company") and SeaSpine Holdings Corporation ("SeaSpine") with the U.S. Securities and Exchange Commission ("SEC"); (ii) press releases and media reports issued by, disseminated by, or concerning the Company and SeaSpine; (iii) analyst reports concerning the Company and SeaSpine; (iv) transcripts of Orthofix's and SeaSpine's investor conference calls; (v) interviews of former Orthofix and SeaSpine employees; and (vi) other public information regarding the Company and SeaSpine.

## I. INTRODUCTION

1. Lead Plaintiff brings this federal securities class action (the "Action") against Orthofix, SeaSpine, and certain of Orthofix's and SeaSpine's current and former senior executives and directors under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 on behalf of all investors who purchased or acquired Orthofix's common stock between October 11, 2022 and September 12, 2023, inclusive (the "Class Period"). SEPTA and Bonta also bring exclusively non-fraud claims sounding in negligence and strict liability under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") against Orthofix, SeaSpine, and certain current and former officers and directors of Orthofix and SeaSpine, on behalf of all former SeaSpine shareholders who acquired newly issued Orthofix common stock pursuant to the S-4 registration statement (inclusive of amendments thereto and documents incorporated therein, the "Registration Statement") and the related 424B3 prospectus

(inclusive of amendments thereto, related prospectuses, and documents incorporated therein, the "Prospectus") (collectively, the "Offering Documents") issued in connection with the January 2023 stock-for-stock transaction by which Orthofix acquired and merged with SeaSpine.[1]

2. Lewisville, Texas-based Orthofix is a global spine and orthopedics company that offers, among other things, biologics, spinal hardware, bone growth therapies, and specialized orthopedic solutions to healthcare professionals throughout the world.

3. When Orthofix announced on October 11, 2022 that it had entered into a definitive agreement (the "Merger Agreement") to combine in an all-stock merger of equals with SeaSpine, a California-based global medical technology company focused on surgical solutions for the treatment of spinal disorders (the "Merger"), the market reacted favorably. According to the press release (which was filed by the SEC) and corresponding conference call with securities analysts, Defendant Keith Valentine ("Valentine"), SeaSpine's then-President and Chief Executive Officer ("CEO"), would serve as President and CEO of Orthofix following the Merger, and would be appointed to its Board of Directors (the "Board"). The Merger Agreement, which was attached to the corresponding Form 8-K, included representations regarding the absence of harassing and discriminatory misconduct and related formal and informal complaints or settlements at SeaSpine in the past four years.

[1] On March 9, 2026, the Court granted in part and denied in part Defendants' motions to dismiss Plaintiffs' First Amended Complaint ("FAC"), holding that: (i) only certain representations and warranties contained in the Merger Agreement ("Statement Type 2")—which Defendants included in several SEC filings—were material misstatements, so the motions to dismiss were denied as to Counts V, VI, and VII; and (ii) loss causation was not sufficiently alleged as to the Exchange Act claims (ECF No. 83 at 17). Accordingly, since the Exchange Act claims with respect to "Statement Type 2" were dismissed without prejudice, Plaintiffs file this Second Amended Complaint to "amend its FAC to address the deficiencies the Court has identified regarding loss causation." *Id*. Plaintiffs retain herein the dismissed claims predicated on statements other than the publicly-filed Merger Agreement representations solely for the purpose of safeguarding them should the need to appeal arise.

4. In the following month, Orthofix and SeaSpine announced that after a purported evaluation process, it was determined that effective upon the completion of the Merger, Defendant Valentine's close friends and fellow SeaSpine executives would join the ranks of the combined Company's leadership: Defendant John Bostjancic ("Bostjancic"), SeaSpine's then-Chief Financial Officer ("CFO") and Chief Operating Officer ("COO"), would serve as CFO of Orthofix; and Defendant Patrick Keran ("Keran"), SeaSpine's then-Senior Vice President and General Counsel, would serve as Orthofix's Chief Legal Officer ("CLO"). In addition, in soliciting investor votes through their Registration Statement and Joint Proxy Statement/Prospectus, Orthofix and SeaSpine again attached the Merger Agreement that included representations attesting to the absence of harassing and discriminatory misconduct and related formal and informal complaints or settlements at SeaSpine in the past four years.

5. Less than three months after the announcement of the Merger Agreement, in January 2023, Orthofix solicited and exchanged 16 million new shares of Orthofix common stock directly to former shareholders of SeaSpine as follows: each former share of SeaSpine common stock was exchanged for 0.4163 shares of newly issued Orthofix common stock (and, if applicable, cash in lieu of fractional shares). All of these new shares of Orthofix common stock were registered, solicited, and exchanged pursuant to the Offering Documents.

6. On January 4, 2023, Orthofix and SeaSpine announced the successful completion of the Merger, which became effective as of 12:01 AM EST on January 5, 2023.

7. Throughout the Class Period, beginning on the day that the Merger Agreement was announced, the Exchange Act Defendants' (as defined below) statements to investors were knowingly or recklessly false and misleading when made and/or failed to disclose adverse facts relating to the extent of discrimination and misconduct that had been occurring at SeaSpine for

years and the role that Defendants Valentine, Bostjancic, and Keran, part of the promised leadership team, played in fostering SeaSpine's hostile and misogynistic workplace—information readily available to Orthofix during the due diligence process. Further, the Exchange Act Defendants made materially false and misleading statements about the robustness of Orthofix's ethics and compliance program, which, in reality, was grossly deficient.

8. Separately, the Offering Documents contained untrue statements of material fact and omitted material facts, both required by governing regulations, necessary to make the statements made not misleading. The Securities Act Defendants (as defined below) made a series of representations touting SeaSpine's and Orthofix's complementary cultures of integrity as a basis for the Merger and attesting to the absence of workplace harassment and inappropriate conduct at SeaSpine.

9. In truth, leading up to and throughout the Class Period, Defendants' conduct that was concealed from investors posed a risk to Orthofix as Defendants planned to and ultimately installed Defendants Valentine, Bostjancic, and Keran to lead the post-Merger Company. Further, SeaSpine had a long-standing history of workplace discrimination and other forms of misconduct that belied Defendants' representations during the Class Period and in the Offering Documents. Despite Defendants' representations to the contrary, for years, the Terminated Executive Defendants (defined below), with Defendant Valentine as their ringleader, engendered a "good old boys' club" culture at SeaSpine in which female employees were the targets of harassment, were paid less for equal work, and were silenced—and sometimes fired—when they tried to raise concerns. The situation at SeaSpine was so egregious that a former SeaSpine employee filed a lawsuit in California state court against SeaSpine alleging systemic gender discrimination. The court approved a class action settlement as recently as July 2021, which resulted in funds being

disbursed to over 270 class members and required SeaSpine to undergo an overhaul to its compensation and job titling structures and parity pay analysis. All of this information was readily available to Orthofix during due diligence, which should have prompted Orthofix to investigate further. In fact, during the due diligence period and leading up to the Merger, the Terminated Executive Defendants engaged in acts of "moral turpitude" (as eventually stated by the Orthofix Board and confirmed by a neutral arbitrator), including by exchanging improper sexist, homophobic, racist, and other vulgar and demeaning comments about co-workers and third-parties in the workplace. But Orthofix's careless approach to conducting due diligence on HR and personnel issues was rooted in Orthofix's own indifference to those issues. Indeed, Orthofix too had a history of sex-based discrimination and harassment with a non-functional HR department. For example, Orthofix was the defendant in a lawsuit brought by a woman named Kathryn Boston in June 2016 that resulted from her being sexually harassed and assaulted by a surgeon while marketing Orthofix products. In her amended complaint, she alleged that the then-President of Orthofix Spine did not investigate Boston's internal Complaint.

10. When the Terminated Executive Defendants took over Orthofix, they carried with them their problematic management style, continuing to devalue and discriminate against women, even in light of the problems that had been raised during the discrimination class action lawsuit. But eventually, Orthofix's Board of Directors (the "Orthofix Board") could not turn a blind eye. On September 12, 2023, the risk to Orthofix's business posed by the Terminated Executive Defendants since before the Merger, which was entirely foreseeable, materialized: Orthofix publicly disclosed that it had terminated "for cause" Defendants Valentine, Bostjancic, and Keran following an internal investigation ("Internal Investigation") that uncovered that they had "violated multiple code of conduct requirements," sharing with the market for the first time the egregious

behavior of the Terminated Executive Defendants involving "harassing [and] inappropriate conduct [and] statements." The Board considered the three men's conduct from before as well as after the Merger in reaching its decision.

11. When the "for cause" terminations were disclosed to the market through a press release issued by Orthofix on the early morning of September 12, 2023, the price of Orthofix common stock plummeted 30% on unusually high trading volume, wiping out $206.5 million of market capitalization. As a result, Plaintiffs and other Class members have suffered significant losses and damages. The timing and magnitude of Orthofix's stock price declines immediately following the "for cause" termination indicate that the market viewed the company as less valuable because of the harassment scandal and the reputational harm that such scandals are documented to cause. Further, on the day of the disclosure, there were no other changed market conditions, macroeconomic factors, or even Orthofix-specific facts unrelated to Defendants' fraudulent conduct that could have caused the severe stock decline and the resulting economic losses and damages suffered by Plaintiffs and the other members of the Class.

12. By this Complaint, SEPTA brings two different sets of claims on behalf of purchasers of Orthofix's securities during the Class Period. Counts I, II, III, and IV assert securities-fraud and related control-person claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 against the Exchange Act Defendants (defined below). SEPTA, with additional plaintiff Bonta joining, brings Counts V, VI, and VII, which assert strict liability, negligence, and control-person causes of action against those Securities Act Defendants (defined below) who are statutorily responsible under Sections 11, 12(a)(2) and 15 of the Securities Act for materially untrue statements and misleading omissions in the Offering Documents.

## II. JURISDICTION AND VENUE

13. The claims asserted in this Action arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), SEC Rules 10b-5 (17 C.F.R. §§ 240.10b-5), and Sections 11, 12(a)(2) and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o).

14. This Court has jurisdiction over this Action under 28 U.S.C. §§ 1331 and 1337, Section 27 of the Exchange Act (15 U.S.C. § 78aa), and Section 22 of the Securities Act (15 U.S.C. § 77v).

15. Venue is proper in this District under 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and Section 22 of the Securities Act (15 U.S.C. § 77v(a)), because Orthofix maintains its principal executive offices in Lewisville, Texas, which is located within this District, Defendants conduct business in this District, and many of the acts giving rise to the violations complained of in this Action, including the preparation and dissemination of materially false and misleading statements, occurred in substantial part in this District.

16. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Plaintiffs

17. Lead Plaintiff SEPTA is one of the largest transportation systems in the United States and is a sophisticated institutional investor based in Philadelphia, Pennsylvania. SEPTA purchased shares of Orthofix common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein. SEPTA also owned SeaSpine shares, which it exchanged for shares of Orthofix common stock

issued pursuant to certain offering materials issued in connection with the Merger, and suffered damages as a result of the violations of the federal securities laws alleged herein.

18. Additional named plaintiff Bonta is a former SeaSpine shareholder who participated directly in the January 2023 stock-for-stock Merger and as a result suffered substantial losses. SEPTA and Bonta are collectively referred to herein as the "Securities Act Plaintiffs."

### B. Defendants

#### 1. Exchange Act Defendants

*a. Corporate Defendants*

19. Defendant Orthofix is incorporated under the laws of Delaware and maintains its principal executive offices at 3451 Plano Parkway, Lewisville, Texas, 75056. The Company's common stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the ticker symbol "OFIX."

20. Defendant SeaSpine has been a wholly-owned subsidiary of Orthofix since the completion of the Merger on January 5, 2023. SeaSpine was incorporated in Delaware on February 12, 2015 and its headquarters were located in Carlsbad, California. SeaSpine formerly traded on the NASDAQ under the ticker symbol "SPNE."

*b. Officer Defendants*

21. Defendant Jon C. Serbousek ("Serbousek") served as Orthofix's President, CEO, and Director before the Merger and then Executive Chairman of the Board after the Merger. He reviewed, contributed to, participated in the drafting of, and signed the Offering Documents, and otherwise participated in the process that allowed the Offering Documents to be completed; and also reviewed, contributed to, and participated in the drafting of Orthofix's periodic filings with the Securities and Exchange Commission ("SEC") throughout the Class Period.

22. Defendant Douglas C. Rice ("Rice") provided, at the time of the Merger, assistance with integration activities. He was formerly Orthofix's Chief Financial Officer (principal financial and accounting officer). He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

23. Defendant Valentine served as the Company's President and CEO upon the completion of the Merger and at all relevant times thereafter, until the Board terminated his employment in September 2023. He was formerly SeaSpine's President, CEO, and a member of its Board until the Merger. He reviewed, contributed to, participated in the drafting of, and signed the Offering Documents, and otherwise participated in the process that allowed the Offering Documents to be completed; and following the Merger he reviewed, contributed to, and participated in the drafting of Orthofix's periodic filings with the SEC. Defendant Valentine also signed a written consent to being named in the Offering Documents as an individual to become a director of the Company.

24. Defendant Bostjancic served as the Company's CFO upon the completion of the Merger and at all relevant times thereafter, until the Board terminated his employment in September 2023. He was formerly the CFO, Treasurer, and Senior Vice President at SeaSpine until the Merger. As CFO of Orthofix, he reviewed, contributed to, participated in the drafting of, and signed Orthofix's periodic filings with the SEC.

25. Defendant Keran served as the Company's CLO upon the completion of the Merger and at all relevant times thereafter, until the Board terminated his employment in September 2023. He was formerly SeaSpine's Senior Vice President, General Counsel, and Secretary until the Merger. He reviewed, contributed to, and participated in the drafting of, and signed the Offering

Documents. As CLO of Orthofix, he reviewed, contributed to, and participated in the drafting of Orthofix's periodic filings with the SEC.

26. Defendants Valentine, Bostjancic, and Keran are referred to herein as the "Terminated Executive Defendants." According to a complaint that they filed on September 10, 2024 to challenge Orthofix's public-facing statements about their termination ("Defamation Complaint" or "Defam. Compl."), the Terminated Executive Defendants "began working together at SeaSpine in 2015 and, over the following eight years, developed an extensive working relationship, and close friendship." *See* Compl., Sept. 10, 2024, *Valentine v. Burzik*, No. 24CL010340C (Cal. Super. Ct. San Diego Cnty.) ("Defamation Lawsuit"), ROA No. 4. They also "live[] close to each other, frequently interact[] outside of work, [are] familiar with intimate details of one another's personal and private lives, and ha[ve] a shared sense of humor." Defam. Compl. ¶ 39.

*c. Director Defendants*

27. Defendant Catherine M. Burzik ("Burzik") served, at the time of the Merger, as Orthofix's Chair of the Board of Directors, a position she held since 2021. After the Merger, she was named Lead Independent Director of Orthofix's Board. She reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

28. Defendant Wayne Burris ("Burris") served, at the time of the Merger, as a member of Orthofix's Board and on its Audit and Finance Committee from September 2021 to the closing of the Merger. He also served on Orthofix's Compensation and Talent Committee from June 2022 until January 2023. He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

29. Defendant Jason M. Hannon ("Hannon") served, at the time of the Merger, as a director on Orthofix's Board. He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents. Hannon had current social and former professional relationships with two of the SeaSpine executives in the months leading up to the Merger.

30. Defendant James F. Hinrichs ("Hinrichs") served, at the time of the Merger, as a director on Orthofix's Board. He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents. Hinrichs had a former professional relationship with one of the then-current SeaSpine executives and a social relationship with a SeaSpine director leading up to the Merger.

31. Defendant Lilly Marks ("Marks") served, at the time of the Merger, as a director on Orthofix's Board. She reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

32. Defendant Michael E. Paolucci ("Paolucci") served, at the time of the Merger, as a director on Orthofix's Board, and also served on the Compensation and Talent Development Committee. He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

33. Defendant John E. Sicard ("Sicard") served, at the time of the Merger, as a director on Orthofix's Board. He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

34. Defendant Thomas A. West ("West") served, at the time of the Merger, as a director on Orthofix's Board, and also served on the Compensation and Talent Development Committee.

He reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

35. Defendant Kimberley A. Elting ("Elting") served, at the time of the Merger, as the Company's Chief Legal and Development Officer where she assumed leadership responsibilities for Business Development and oversaw Orthofix's Legal, Business Development, and Corporate Communications teams. In April 2022, Elting also became the Company's President of Global Orthopedics. She reviewed, contributed to, participated in the drafting and solicitation of, and signed the Offering Documents.

36. Defendants Serbousek, Rice, Burzik, Burris, Hannon, Hinrichs, Marks, Paolucci, Sicard, West, and Elting are referred to below as the "Legacy Orthofix Officer and Director Defendants."

37. Defendant Stuart Essig ("Essig"), served, following the Merger, as a Director on the Orthofix Board at all relevant times. He was formerly on the SeaSpine Board of Directors ("SeaSpine Board") from 2015 until the Merger, and was SeaSpine's Lead Independent Director. He reviewed, contributed to, participated in the drafting of, and signed Orthofix's periodic filings with the SEC.

38. Defendant John Henneman, III ("Henneman") served, following the Merger, as a Director on the Orthofix Board at all relevant times. He was formerly on the SeaSpine Board from 2015 until the Merger. He reviewed, contributed to, participated in the drafting of, and signed Orthofix's periodic filings with the SEC.

39. Defendant Shweta Singh Maniar ("Maniar"), served, following the Merger, as a Director on the Orthofix Board at all relevant times. She was formerly on the SeaSpine Board from

2021 until the Merger. She reviewed, contributed to, participated in the drafting of, and signed Orthofix's periodic filings with the SEC.

40. Defendants Essig, Henneman, and Maniar are referred to below as the "SeaSpine-Orthofix Director Defendants." The SeaSpine-Orthofix Director Defendants, together with Defendants Burzik, Hannon, Hinrichs, Paolucci, and Serbousek, are referred to as the "Orthofix Post-Merger Director Defendants").

* * *

41. The Terminated Executive Defendants, together with the Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Director Defendants (the latter of which is inclusive of certain of the Legacy Orthofix Officer and Director Defendants), are hereinafter referred to as the "Individual Exchange Act Defendants."

42. For purposes of Counts I, II, III, and IV under the Exchange Act, Orthofix, SeaSpine, and the Individual Exchange Act Defendants are referred to as the "Exchange Act Defendants."

43. The Individual Exchange Act Defendants possessed the power and authority to control the contents of the Company's SEC filings, press releases, and other market communications. The Individual Exchange Act Defendants were provided with copies of the Company's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Orthofix and SeaSpine which afforded them access to material information available to them but not to the public, the Individual Exchange Act Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially

false and misleading. The Individual Exchange Act Defendants are liable for the false statements and omissions pleaded herein.

**2. The Securities Act Defendants**

44. For purposes of Counts V, VI, and VII under Sections 11, 12(a)(2) and 15 of the Securities Act, the Legacy Orthofix Officer and Director Defendants, Defendant Valentine, and Defendant Keran are referred to as the "Signer Defendants." The Signer Defendants each signed and were identified as officers or directors or incoming officers or directors in the Offering Documents, solicited shareholder proxy votes in favor of the Merger, planned and contributed to the Merger and Offering Documents, and attended promotions to meet with and present favorable information to Orthofix and SeaSpine investors.

45. For purposes of Counts V, VI, and VII under the Securities Act, Orthofix, SeaSpine, and the Signer Defendants are referred to below as the "Securities Act Defendants."

## IV. ORTHOFIX AND ITS BUSINESS

46. Orthofix describes itself as a leading global spine and orthopedics company with a comprehensive portfolio of biologics, innovative spinal hardware, bone growth therapies, specialized orthopedic solutions, and a leading surgical navigation system. It has been recognized as the eighth largest orthopedic medical device company in the world. Founded in Verona, Italy, Orthofix's medical device company is headquartered in Lewisville, Texas, where it conducts general business, product development, medical education, and manufacturing. Since the Merger, SeaSpine's former headquarters in Carlsbad, California has served as Orthofix's primary office to focus on spinal product innovation and surgeon education. Orthofix's Verona, Italy office has an emphasis on product innovation, production and medical education for orthopedics. The Company's global R&D, commercial, and manufacturing footprint also includes facilities and offices in Irvine, CA; Sunnyvale, CA; Toronto, Canada; Maidenhead, UK; Munich, Germany;

Paris, France; and São Paulo, Brazil. Orthofix products are distributed in more than 60 countries worldwide.

47. Orthofix manages the business by two reporting segments, Global Spine and Global Limb Reconstruction (formerly "Global Orthopedics"), which accounted for 85% and 15% of their total net sales in 2023, respectively.

48. Orthofix's Global Spine segment provides implantable medical devices, biologics, enabling technologies, and other regenerative solutions for patients suffering from diseases and traumas of the spine. The Global Spine reporting segment is largely represented by two principal product categories, (i) Bone Growth Therapies and (ii) Spinal Implants, Biologics, and Enabling Technologies.

49. Orthofix's Global Limb Reconstruction reporting segment offers products and solutions for the underserved limb reconstruction market that encompasses four pillars: deformity correction, limb lengthening, complex fracture management, and limb preservation. This reporting segment specializes in the design, development, and marketing of external and internal fixation limb reconstruction products that are coupled with enabling digital technologies to support the entire patient care continuum. Orthofix sells these products to hospitals, healthcare organizations, and healthcare providers through a global network of distributors and sales representatives.

50. Prior to the Merger, SeaSpine historically managed its business as one operating segment, but with revenue reported in two product categories: (i) Biologics (formerly recognized as Orthobiologics) and (ii) Spinal Implants and Enabling Technologies. Following the Merger, Orthofix stated that it would reassess its reporting segments.

## V. FACTUAL BACKGROUND

### A. Orthofix Explores a Strategic Transaction

51. Orthofix began to contemplate engaging in a strategic transaction at least as early as September 2021, when the Orthofix Board formed a strategic steering committee ("Strategic Steering Committee") to assist Orthofix management in exploring, reviewing, and evaluating potential opportunities for corporate strategic planning. One of the primary responsibilities of the Strategic Steering Committee was to oversee a process to review and evaluate opportunities for strategic business combinations. The Strategic Steering Committee met periodically between October 2021 and February 2022, including with outside advisors, to identify, evaluate, and consider potential strategic opportunities for Orthofix.

52. Orthofix already had experience with strategic transactions, having engaged in acquisitions previously in 2019, 2020 and 2022.

53. Prior to the Class Period, Defendants repeatedly told investors that they take a disciplined approach to M&A activity such that when the SeaSpine Merger was announced, investors expected the same purported disciplined approach to be applied to the due diligence.

54. On May 23, 2022, at the UBS Global Healthcare Conference, Defendant Serbousek touted Orthofix's "experienced management team with a strong corporate infrastructure, including finance, legal, compliance and other functions," and noted that Orthofix would be "investing in strategic partnerships and continuing to look into disciplined M&A activities." Serbousek also noted that "[i]norganically, we will continue to be disciplined acquirers as we continue to look for a series of innovative or disruptive products and procedures." In response to a question from analyst Carlos Vazquez about Orthofix's appetite for M&A activity in light of current market dynamics, Serbousek boasted that Orthofix had already done "small tuck-ins and technology deals," including the FITBONE deal that closed on March 26, 2020 "right when everything was

in pretty much a free spin." Serbousek also previewed that Orthofix had the "capacity . . . to do larger deals, should they be available." However, Serbousek hedged that Orthofix would "look within [its] capacity to do these deals" and would "always be disciplined," but that Orthofix was "actively pursuing those" opportunities. Then-Orthofix CFO and CAO Securities Defendant Rice echoed Serbousek's comments, stating, "[a]t our size, we have to be very disciplined and choosy about the assets that we go after and acquire. We can't simply buy revenue for the sake of buying revenue. We look to longer term, more strategic investments."

55. On August 5, 2022, during the Q2 Earnings Call, Defendant Serbousek again made reference to Orthofix's ongoing "disciplined" approach to M&A: "[A]s previously demonstrated with our successful disciplined approach, we will continue our inorganic business development and see a great deal of opportunity with our balance sheet capacity to execute in the current macro environment."

56. Orthofix made these references to "disciplined" M&A while it was in discussions with SeaSpine about a potential business combination. According to the Registration Statement that Orthofix filed in connection with the Merger, those discussions originated on January 20, 2022. The Orthofix Strategic Steering Committee concluded after discussion with advisors that a potential combination with SeaSpine would be a compelling strategic option for Orthofix and determined that Orthofix should focus its analysis of a merger with SeaSpine before analyzing any other opportunities.

57. On February 16, 2022, the Orthofix Strategic Steering Committee engaged in a discussion and concluded that an all-stock "merger of equals" transaction structure would be the most compelling transaction structure for Orthofix stockholders, including with respect to likelihood of consummation. At the conclusion of the meeting, the Orthofix Strategic Steering

Committee directed Defendant Serbousek to contact Defendant Valentine to determine SeaSpine's level of interest for such a transaction.

58. On February 23, 2022, Defendant Serbousek called Defendant Valentine to express Orthofix's interest in exploring a potential business combination with SeaSpine. Orthofix and SeaSpine signed a confidentiality agreement five days later.

59. Going forward, Orthofix and SeaSpine and each of their advisors were in regular conversations with each other and internally about the potential strategic transaction through October 11, 2022, when the parties ultimately executed the Merger Agreement. All of these negotiations took place as Orthofix informed the market that it was engaging in a "disciplined" approach to M&A.

60. Further, as Orthofix was touting its "disciplined" approach to M&A, it knew that the future CEO position would likely go to Defendant Valentine. On May 31, 2022, just about a week after the UBS Global Healthcare Conference and as SeaSpine and Orthofix were still negotiating the terms of a potential business combination, Serbousek previewed to Valentine on a phone call that Orthofix's next Indication of Interest ("IOI") would propose that Valentine serve as the combined Company's CEO and Serbousek would serve as the combined Company's Executive Chairman. Orthofix sent SeaSpine an updated IOI that same day. At the time that Defendant Serbousek made the offer to Defendant Valentine, upon information and belief, Orthofix had not yet engaged in any diligence on SeaSpine.

**B. Orthofix's Deficient Due Diligence Process**

61. Despite Orthofix's representations to investors that it would take a "disciplined" approach to any potential strategic business transactions, Orthofix engaged in a woefully inadequate due diligence process as to HR and personnel issues by disregarding the mountain of

evidence that the Terminated Executive Defendants fostered a hostile and discriminatory environment at SeaSpine.

62. Most egregiously, Orthofix and the Legacy Orthofix Officer and Director Defendants disregarded and/or failed to probe into the history of pay inequity, discrimination, and harassment at SeaSpine. It should have been obvious to Orthofix to ask questions about HR and personnel matters at SeaSpine, particularly in light of a class action lawsuit that SeaSpine had settled with a former employee relating to discriminatory compensation at the company, as described below. Information about this lawsuit was publicly available, including the disclosure of the settlement payment in SeaSpine's Form 10-K for the year ended 2021, which stated that it had settled legal proceedings with current or former employees and reported a loss of $919,000 as "Other" under its Operating Activities. Defendant SeaSpine also purportedly named the discrimination class action lawsuit in a confidential side letter submitted to Orthofix in connection with the Merger Agreement ("SeaSpine Side Letter"), which letter was not available to the public.

63. The discrimination lawsuit was brought in 2017 by former SeaSpine employee Maryanne Johnson ("Johnson"). She filed the lawsuit in the Superior Court of California on behalf of herself and all other aggrieved employees against SeaSpine and related defendants for their failure to provide equal pay to her and other women employed by SeaSpine in violation of the California Fair Pay Act and Private Attorneys General Act. *See Johnson v. SeaSpine Holdings Corp.*, Case No. 30-2017-00949804-CU-OE-CXC (Cal. Super. Ct. Orange Cnty.) ("Discrimination Class Action"). News of this complaint was reported in *Law360*. On July 20, 2020, Johnson filed a second amended complaint, which was a representative and class action complaint. Second Amended Compl., July 20, 2020, *Johnson*, (ROA No. 154) ("Johnson Complaint" or "*Johnson* Compl.").

64. The *Johnson* Complaint alleged that the male-dominated, "exclusive leadership team"—whose eight-member Board and nine-member senior leadership team each had only one female member—"exemplifie[d] and perpetuate[d] SeaSpine's good old boys club, which is hostile to women." *Johnson* Compl. ¶ 3. As an example of this hostility, Johnson alleged that SeaSpine systemically paid women less than it paid men for performing substantially similar work. *Johnson* Compl. ¶ 4. Johnson also called out Defendants Bostjancic and Valentine by name, alleging that they "expressed their greater regard for men by favoring them in a variety of personnel decisions including but not limited to hiring, titling, and other terms and conditions of employment." *Johnson* Compl. ¶ 23. Johnson explained that to mask the unequal pay for women, Defendants created multiple job titles—"over 200 for only 300 employees"—to justify their illegal actions. *Johnson* Compl. ¶ 28. However, in reality, the titular differences did not correspond to differences in responsibilities. *Johnson* Compl. ¶ 28.

65. A notice of settlement was filed in the *Johnson* case on September 3, 2019 (a condition of which included that Johnson would file a Second Amended Complaint containing PAGA and class claims against defendants based on violations of California's Fair Pay Act and related Labor Code violations), at which point the parties were negotiating the terms of the stipulated settlement. On June 17, 2021—less than a year before Defendant Serbousek told Defendant Valentine that Orthofix was interested in acquiring SeaSpine—Johnson filed a motion for final approval of a settlement, which stated that the settlement was the product of nearly 3.5 years of litigation, including a failed mediation and approximately eight months of intense settlement negotiations. The court approved that settlement ("Discrimination Class Action Settlement") on July 26, 2021. As part of the settlement, SeaSpine was required to pay $919,500.87 in settlement funds, with over $600,500 of those funds disbursed to a total of 276 participating

settlement class members. That class included all then-current and former female employees who worked for the defendants within the State of California from July 1, 2015 to December 31, 2019. The settlement funds were disbursed as of September 17, 2021. In addition, the settlement included targeted programmatic relief under which SeaSpine agreed to hire an outside vendor to review their work departments with an emphasis on high pay gaps including between male and female employees (when not controlling for title, job code, or other substantially similar criteria) to assess pay equity, to evaluate whether the titles and pay structures in those departments accurately reflected the work being performed, and to recommend adjustments to titles, pay, or both. This programmatic relief was to be funded separately at SeaSpine's expense. All of this information about the lawsuit was available online, and thus to Orthofix, who also purportedly was made aware of the lawsuit through the confidential SeaSpine Side Letter. Further, as described below (¶¶ 132-134), former employees said that the Discrimination Class Action Settlement led SeaSpine to hire a third-party investigator to analyze pay and equity at the company, and to attempt an overhaul of its compensation and titling structures to remediate the discrimination.

66. All this information should have surfaced during the due diligence process for the Merger, particularly given the nature of the Discrimination Class Action and the Discrimination Class Action Settlement, and the financial liability and systemic overhaul that the latter entailed. Documents involving the lawsuit would have been present across departments at SeaSpine, ranging from legal and compliance, to HR and personnel, to financial accounting.

67. Indeed, SeaSpine's pay equity analyses were detecting discriminatory compensation and were still ongoing around the time that the Merger Agreement was signed. According to a discrimination-based complaint filed post-Merger in California state court by Catherine O'Connor ("O'Connor"), a former SeaSpine attorney, Defendant Keran informed

O'Connor in December 2022 that the SeaSpine HR team had conducted a compensation benchmarking exercise and determined that O'Connor's bonus target was below-market. Pl.'s First Amended Compl., Feb. 15, 2024, *O'Connor*, No. 37-2023-00051028-CU-OE-CTL ¶ 33 ("*O'Connor* Complaint" or "*O'Connor* Compl."). O'Connor had also filed complaints with the California Civil Rights Department, which authorized O'Connor to file complaints in court. *See O'Connor* Compl. at Exhibits A, B. O'Connor alleged to have been underpaid since at least January 2022. *Id.* ¶ 28. If SeaSpine was conducting benchmark analyses for pay inequities, and these analyses were significant enough such that one or more of the Terminated Executive Defendants were aware of them, then a reasonable inquiry during due diligence should have led Orthofix to conclude that such analyses were ongoing and still required.

68. Accordingly, Defendant Orthofix and the Legacy Orthofix Officer and Director Defendants ignored red flags during the due diligence process raised by the Discrimination Class Action, the Discrimination Class Action Settlement, and the required pay and equity remediation effort by neglecting to probe the current workplace conditions at SeaSpine.

69. Other red flags about the severe workplace issues at SeaSpine were also available to Orthofix—namely, online employee reviews. Multiple current and former SeaSpine employees of SeaSpine posted anonymous reviews on platforms such as Glassdoor and Indeed that speak to the hostile and discriminatory culture of SeaSpine, as described below. These sorts of reviews should have prompted Defendant Orthofix and the Legacy Orthofix Officer and Director Defendants to investigate more closely into the egregious conduct alleged in the reviews and in the Discrimination Class Action.

70. Many of the reviews expressed their abhorrence of the boys' club culture, and like Johnson did in her complaint, specifically called out the role of SeaSpine leadership in fueling

such a culture. For instance, on March 8, 2020, a self-reported current employee posted a review titled, "Debilitating culture," which stated that SeaSpine had "[d]aily happy hour and cubicle parties" and that "***leadership hires their buddies to run things and they are all lazy, inadequate and untalented***, who hire their own of the same . . . ***They discriminate against gender and race and HR is incompetent***."

71. Further, on April 24, 2018, a self-reported then-current employee who had been at SeaSpine for over three years posted a review on Glassdoor titled "Unhappy Manager." The post insinuated that Defendant Valentine used SeaSpine as his "personal Tinder," stating:

> When will the BOD do something about the highest level of Senior Leadership? ***The CEO is self centered and everything revolves around his own self interests and not for the good of the company. Hires his friends to protect the cult***. […] ***Stop using SeaSpine as your personal Tinder with the employees. Have some class! BOD…..time to make a few changes for those of us who are stockholders and want to grow this company and stay here***.

72. The same types of negative reviews of SeaSpine had been ongoing for years. For example, on April 6, 2018, a self-reported then-current Marketing employee posted a review on Glassdoor titled "Smoke and Mirrors," which stated that the SeaSpine Senior Leadership Team engaged in "cheesy, outdated and down-right patronizing corporate tactics of buying loyalty" through office perks and events, but ***failed to "truly respect[] employees," "embrac[e] diversity in opinions, backgrounds and personalities," and provide "fairness in compensation and benefits.***" The post suggested that Senior Leadership Team was overly interested in supporting people who were physically attractive. And a Glassdoor post by a former Manager on May 8, 2017, titled "Unemployment Might be Better," stated, "[t]here will always be a need for warm, breathing bodies here since turnover is high, ***especially if your breathing body is young, looks***

***good in yoga pants and is comfortable with the role of eye candy for a C-suite full of male leaders.*** Stay politically correct, quiet and obedient [especially if female]."

73. Several other online reviews described the toxic culture of SeaSpine more generally. For example, shortly before the announcement of the Merger Agreement, a Glassdoor post from September 14, 2022 titled "Not a company I would recommend" stated that there was "***drinking at all hours of the day at cubicles***" and that there was "***favoritism when promotions come around, hiring friends with no skills relevant to the job***." A post from about three months later agreed that "***employees tend to drink too much***." Earlier, on December 14, 2018, a former Material Handler and Forklift Operator posted an Indeed review titled, "Management is callous and inept. Not a good fit for industrious and conscientious workers," writing that SeaSpine had "***parties with alcohol provided during work hours***," which "***leaves the company wide open for liability lawsuits***." A May 15, 2018 Glassdoor post titled "Get Out While You Can" stated that "turnover is extremely high" and that there was a ***"[t]oxic environment"*** where ***"[p]romotions are based on popularity rather than merit***. Executive Assistants are the company mean girls." And a Glassdoor post from February 15, 2018 titled "Seacult" stated that SeaSpine had a "***cult environment that induces fear and insecurity in some departments coupled with a complete lack of accountability at the upper echelons for their poor leadership***" and complained that SeaSpine favored hiring "friends of the family with little or no experience over qualified candidates who are greatly lacking here." On January 29, 2018, a self-reported then-current Manufacturing Technician went so far as to say on Indeed that SeaSpine engaged in "***[p]olitics, being petty, favoritism, nepotism, and good ol' discrimination***."

74. These public complaints provide a wealth of information about which Defendant Orthofix and the Legacy Orthofix Officer and Director Defendants could or should have inquired

to assess SeaSpine's workplace culture, and in the case of the *Johnson* lawsuit, should have prompted Defendant Orthofix and the Legacy Orthofix Officer and Director Defendants to conduct additional due diligence into the executive leadership of SeaSpine. However, Defendant Orthofix and the Legacy Orthofix Officer and Director Defendants failed to take those steps, opening the post-Merger Company to what were foreseeable risks to it. That foreseeability was underscored by the fact that that the Merger Agreement ended up including representations and warranties concerning labor and employment matters (*infra* ¶¶ 84, 168, 176).

75. Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, SeaSpine, and the Terminated Executive Defendants are all responsible for the due diligence inadequacies relating to HR and personnel issues at SeaSpine, as they were involved in the due diligence process. On the SeaSpine side, the Terminated Executive Defendants stated in their Defamation Complaint that Defendants Bostjancic and Keran led the due diligence process. Defam. Compl. ¶ 11. On the Orthofix side, the Orthofix Board and Defendant Serbousek were particularly involved in the process, and Defendant Burzik oversaw the sales process for the Orthofix Board.

76. In sum, though the due diligence process would have revealed red flags relating to HR and personnel issues at SeaSpine, Orthofix disregarded those issues in order to proceed with the Merger. Had Orthofix probed further, it would have been easy to uncover the myriad troubling problems at SeaSpine and risks they posed to the post-Merger Company. *See infra*, Section V.E. Orthofix's lack of due diligence into the competency of the Terminated Executive Defendants and related HR matters is not entirely surprising given that Orthofix has also ignored and/or condoned discriminatory employment matters that have targeted its own employees. *See infra*, Section V.F. Orthofix's disregard for these problems and the risks they posed to the post-Merger Company

ultimately manifested in the continuation of a hostile and discriminatory work environment, *see infra*, Section V.I, and ultimately, the materialization of the risks as demonstrated through the costly investigation into the Terminated Executive Defendants for their misconduct and ultimately the terminations, which had an immediate negative market reaction that lowered the Company's value. *See infra*, V.L-M.

77. The haphazardness of the due diligence process is underscored by the Terminated Executive Defendants' admissions of their own reckless approach to the due diligence process. As they admitted in contemporaneous text messages amongst themselves that were surfaced to the public in the Defamation Lawsuit,[2] the Terminated Executive Defendants recognized that SeaSpine fulfilled diligence requests and answered questions at a slow pace. Decl. of Catherine Burzik in Support of Defs.' Special Mot. to Strike Pursuant to Cal. Code of Civ. Proc. Section 425.16, Jan. 24, 2025, *Valentine*, No. 24CL010340C, at PDF p. 24 (ROA No. 15) ("Burzik Declaration" or "Burzik Decl."). Further, they acknowledged on September 29, 2022 that if the Merger Agreement was signed on October 6, they were "unprepared," it might be a "train wreck," and they would not have answers to certain open diligence matters by then. Burzik Decl. at PDF pp. 21, 24, 25. In fact, the Terminated Executive Defendants admitted that there were at least seven open diligence issues as of that date. Burzik Decl. at PDF p. 24. However, these issues were not dealbreakers for SeaSpine: the Terminated Executive Defendants recognized that even if Deloitte,

[2] All descriptions and screenshots of the Terminated Executive Defendants' text messages in this Complaint come from Defs.' Special Mot. to Strike Pursuant to Cal. Code of Civ. Proc. Section 425.16, Jan. 24, 2025, *Valentine*, No. 24CL010340C (ROA No. 14) ("Defamation Motion to Strike" or "Defam. Mot. to Strike") and the Burzik Declaration in support thereof, to which Securities Act Defendant Burzik attached an exhibit containing text messages between the Terminated Executive Defendants.

their auditing firm, could not finish its work by the target signing date, the Terminated Executive Defendants would still sign the Merger Agreement. Burzik Decl. at PDF p. 24.

78. As displayed in these due diligence text messages and several others, the Terminated Executive Defendants were sending each other barrages of inappropriate messages during the negotiation process and leading up through the Due Diligence Period, many of a sexually violent nature or that were demeaning to gay people, women, and racial minorities. Many of these text messages appeared to discuss individuals with whom the Terminated Executive Defendants worked, demonstrating their lack of fitness to lead the combined Company. However, it would take months following the Merger for the Orthofix Board to finally investigate workplace issues involving the Terminated Executive Defendants. The investigation identified these pre-Merger text messages, which, among other factors, prompted the Orthofix Board to terminate the Terminated Executive Defendants for harassment and other inappropriate conduct.

79. For example, during a call between Orthofix executives and market makers, Defendant Valentine texted with Defendants Bostjancic and Keran that he "***is always so patient and happy to answer any and all questions in these investor meetings with cute chicks!***" Defendant Keran replied, "***I would like to get more involved in IR activities***!" Mr. Bostjancic responded, "***This one may not be of the drinking age yet!*** And seems fanatically over-interested in Orthobiologics." And Defendant Valentine said, "***She likes a good bone!***" This text exchange is reproduced below:

**Messages in chronological order** (times are shown in GMT +00:00)

**9PRK0W - 8/18/2022**

JB John Bostjancic [redacted] 8/18/2022, 1:11 PM
KV is always so patient and happy to answer any and all questions in these investor meetings with cute chicks!

JB John Bostjancic [redacted] 8/18/2022, 1:11 PM

*Attachment: IMG_6424.heic (2 MB)*

M Mobile [redacted] 8/18/2022, 1:12 PM
I would like to get more involved in IR activities!

JB John Bostjancic [redacted] 8/18/2022, 1:22 PM
This one may not be of the drinking age yet!

*Attachment: IMG_6425.heic (5 MB)*

JB John Bostjancic [redacted] 8/18/2022, 1:23 PM
And seems fanatically over-interested in Orthobiologics.

KV Keith Valentine [redacted] 8/18/2022, 2:02 PM
She likes a good bone!

80. On August 27, 2022, Defendant Valentine wrote that a "female co-worker," Defam. Mot. to Strike at 3-4, was "***completely turned on***" by Defendant Keran, and added "***[t]hat could be a fun time, indeed***!" Defendant Valentine later wrote that the co-worker had "***[l]ovely bolt ons***" and "***[m]aybe too thick in the back for you, but shame on you if that's a deterrent.***" The text message exchange is reproduced below:

KV Keith Valentine [redacted] 8/27/2022, 11:31 AM
For the record, [redacted] was completely turned on when I told her yesterday that you were approaching/approached 50. She thought you were in your 30's. That could be a fun time, indeed!

KV Keith Valentine [redacted] 8/27/2022, 11:31 AM
Lovely bolt ons

KV Keith Valentine [redacted] 8/27/2022, 11:32 AM
Maybe too thick in the back for you, but shame on you if that's a deterrent.

81. And during the midst of due diligence, in September 2022, the Terminated Executive Defendants engaged in the below exchanges:

- On September 14, 2022, Defendant Keran wrote, "Hey, you're not married to an Asian!" and Defendant Valentine replied, "***I meant you are gay! Could care less that you are Asian!***"

KV Keith Valentine [redacted] 9/14/2022, 11:56 AM
You blow Boz

KV Keith Valentine [redacted] 9/14/2022, 11:56 AM
Where are you?

JB John Bostjancic [redacted] 9/14/2022, 11:56 AM
I'm on17

KV Keith Valentine [redacted] 9/14/2022, 11:56 AM
You need a kick I. The nuts

JB John Bostjancic [redacted] 9/14/2022, 11:57 AM
I got a gif for that!

KV Keith Valentine [redacted] 9/14/2022, 2:19 PM
This fella is all Pat!

M Mobile [redacted] 9/14/2022, 2:21 PM
Hey, you're not married to an Asian!

KV Keith Valentine [redacted] 9/14/2022, 2:22 PM
I meant you are gay! Could care less that you are Asian!

- The same day, Defendant Valentine texted, "***Rammed it up their…..errrrr….I mean down their throats…***"

KV Keith Valentine [redacted] 9/14/2022, 2:58 PM
Rammed it up their…..errrr….I mean down their throats…..

KV Keith Valentine [redacted] 9/14/2022, 3:01 PM
Here we go….

- On September 29, 2022, Defendant Keran wrote that an Orthofix director, Defam. Mot. to Strike at 4, needed "to get off her ass[,]" and should plan to work until closing "***with my fist up her ass***." Defendant Bostjancic responded that his "fist will be right next to" Defendant Keran's. Defendant Keran wrote, "[r]ibbed, for her pleasure[,]" and Defendant Bostjancic replied "***[d]ry [f]ist fuck her ass, with a cast***." Later in the morning, Defendant Bostjancic wrote, "***Lube up the thumb cast PK. You're gonna be shoving up multiple asses!***" Later in the chat, Defendant Keran said, "I can cast fuck you, too. No grease!"

M Mobile [redacted] 9/29/2022, 7:05 AM
Then [redacted] needs to get off her ass and help Orca fulfill diligence requests, answer questions, and then start drafting communication streams. She should expect not to sleep between now and Oct 6. And she should do all this with my fist up her ass. [redacted] needs to grow some balls and tell her we're not fucking ready.

JB John Bostjancic [redacted] 9/29/2022, 7:05 AM
It's not even half baked. We haven't even turned on the fucking oven.

JB John Bostjancic [redacted] 9/29/2022, 7:06 AM
My fist will be right next to PKs!

JB John Bostjancic [redacted] 9/29/2022, 7:06 AM
PK you gotta use the fist with the thumb cast on.

M Mobile [redacted] 9/29/2022, 7:06 AM
Ribbed, for her pleasure …

JB John Bostjancic [redacted] 9/29/2022, 7:06 AM
Dry Fist fuck her ass, with a cast.

| | | | |
|---|---|---|---|
| JB | John Bostjancic [redacted]<br>Lube up the thumb cast PK. You're gonna be shoving up multiple asses! | 9/29/2022, 7:24 AM |
| M | Mobile [redacted]<br>I'm about to insert it into my own … | 9/29/2022, 7:25 AM |
| JB | John Bostjancic [redacted]<br>Laughed at "I'm about to insert it into my own … " | 9/29/2022, 7:25 AM |
| JB | John Bostjancic [redacted]<br>So fucking frustrating. I'm almost ready to call [redacted] and unload on him how fucking unprepared we are. | 9/29/2022, 7:26 AM |
| JB | John Bostjancic [redacted]<br>But that would be career suicide. | 9/29/2022, 7:27 AM |
| M | Mobile [redacted]<br>Nah, do it! | 9/29/2022, 7:27 AM |
| JB | John Bostjancic [redacted]<br>But the alternative of getting killed in the collateral damage of the fucking train wreck isn't that appealing. | 9/29/2022, 7:27 AM |
| M | Mobile [redacted]<br>I can cast fuck you, too. No grease! | 9/29/2022, 7:27 AM |

- On September 30, 2022, Defendant Keran wrote, "Every time he opens his mouth he puts his dick in it." Defendant Valentine replied, "Phew….was worried it was your dick!" to which Defendant Keran said, "I'm saving that for closing." Defendant Bostjancic added, "***Keep the ass fucking cast for closing as well***." Keran then said that someone was on his "***ass fucking list***."

| | | |
|---|---|---|
| M | Mobile [redacted]<br>Every time he opens his mouth he puts his dick in it | 9/30/2022, 7:20 AM |
| KV | Keith Valentine [redacted]<br>Phew….was worried it was your dick! | 9/30/2022, 7:22 AM |
| M | Mobile [redacted]<br>I'm saving that for closing | 9/30/2022, 7:22 AM |
| JB | John Bostjancic [redacted]<br>Keep the ass fucking cast for closing as well. | 9/30/2022, 7:27 AM |
| M | Mobile [redacted]<br>[redacted] is now on my ass fucking list. Dude is completely fucking useless | 9/30/2022, 7:57 AM |

### C. Orthofix Touts a Merger with SeaSpine and the Appointment of Defendant Valentine to Lead the Combined Company

82. Following the deficient due diligence process that failed to address the toxic workplace culture that posed serious enterprise risk, on October 11, 2022 after the market closed, Orthofix and SeaSpine issued a joint press release that they also filed with the SEC, announcing that they would combine in a "merger of equals" to create "a leading global spine and orthopedics company with highly complementary portfolios of biologics, innovative spinal hardware, bone

growth therapies, specialized orthopedic solutions and a leading surgical navigation system." The press release touted a long list of strategic and financial benefits of the Merger, including the benefits of their combined product folders, strengthened commercial reach, revenue synergies and cost savings, and enhanced opportunities for self-funded investment. Further, the press release stated that under the terms of the agreement, which was unanimously approved by the Boards of Directors of both companies, SeaSpine shareholders would receive 0.4163 shares of Orthofix common stock for each share of SeaSpine common stock owned. Following the Merger, Orthofix shareholders would own approximately 56.5% of the combined Company, and SeaSpine shareholders would own approximately 43.6% of the combined Company, respectively, on a fully diluted basis.

83. The press release also announced that Defendant Valentine would serve as President and CEO and member of the Board of Orthofix, and that Defendant Serbousek would serve as Executive Chairman of the Board. Valentine expressed his support for the Merger:

> This transaction brings together two complementary organizations to create an industry leader with the immediate financial strength to self-fund investments that deliver both growth and better patient outcomes. We are excited about the value we can create for the combined company's shareholders, the new opportunities opened for employees and our ability to now provide surgeons and hospital partners a complete procedural solution using cutting-edge technology at every level.

84. The same day, Orthofix also filed with the SEC a Form 8-K that attached a copy of the Merger Agreement, stating that the Merger Agreement was "incorporated herein by reference." The Form 8-K, incorporating the Merger Agreement, represented in Section 3.20 that SeaSpine was in compliance with all employment and labor laws, including laws relating to civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. Further, it represented that there had been no formal or informal complaints of sexual or racial

harassment, sexual or racial misconduct, sex/gender or racial discrimination, or similar behavior in the past four years against any officer, director, manager, or supervisory-level SeaSpine employee; that there were no misconduct-related allegations pending or threatened, nor was there any reasonable basis for such a misconduct allegation; and that in the past four years, SeaSpine had not entered into any settlement agreement, non-disparagement agreement, confidentiality agreement, non-disclosure agreement, or any other contract or similar provision relating to any misconduct-related allegation against SeaSpine or any SeaSpine officer, director, manager, employee, or independent contractor. The Form 8-K made the same representations as to Orthofix. The Merger Agreement also included a general provision at the top of the section on SeaSpine's representations and warranties that referred to the confidential SeaSpine Side Letter. Of the almost 20-page list of SeaSpine's representations and warranties, only eight of those representations and warranties specifically referenced the SeaSpine Side Letter that purportedly modified them. Tellingly, SeaSpine and Orthofix opted to not include such a reference in section 3.20 of the Merger Agreement. This suggested to investors that section 3.20, unlike other representations and warranties, may not have been qualified by the SeaSpine Side Letter.

85. For reasons described further below (Section V.E), it was false and misleading for the Form 8-K to assert that:

a. SeaSpine was in compliance with labor laws;

b. There were no formal or informal complaints of misconduct against senior-level SeaSpine employees in the past four years;

c. There was no reasonable basis for any harassment or other misconduct allegations in the past four years; and

d. SeaSpine had not entered into a settlement agreement involving misconduct in the past four years.[3]

86. The market recognized the importance of leadership at Orthofix and SeaSpine in the success of the Merger, particularly as to Defendant Valentine and Defendant Bostjancic (who was announced the following month, per ¶¶ 90-92, below). On October 12, 2022, Ladenburg Thalmann published an analyst report on both Orthofix and SeaSpine that responded positively to the news of the Merger Agreement, recommending that the market buy both OFIX and SPNE shares. The analyst report recognized "Management and Board Stability" at SeaSpine as one of the primary risks to its recommendation to buy SeaSpine shares.

87. The Merger was advertised to the market as mutually beneficial. Defendants described the Merger as one of "equals," and touted that the combined company would be led by "an experienced Board of Directors and leadership team that leverages the talent within both organizations," and that the companies had highly synergistic portfolios and opportunities.

88. What the market did not know at the time was the risks posed to the Company by Defendants Valentine, Bostjancic, and Keran, who for years had cultivated a toxic workplace culture at SeaSpine. Indeed, just days before the announcement of the Merger Agreement, the Terminated Executive Defendants sent each other inappropriate text messages. Per the Burzik Declaration, Defendant Valentine sent a message asking, "***[c]an you still do this, Pat, with your thumb?***" He then sent a highly graphic, pornographic image, writing, "Dohhhh," "[n]ope," "[y]ou can't." Defendant Keran responded, "No, I don't have that reach." Defendant Valentine said,

[3] SeaSpine purportedly named the Discrimination Class Action lawsuit in the confidential SeaSpine Side Letter shared with Orthofix. However, the market did not have access to this letter, and even if it did, the reference to the lawsuit was so non-descript as to provide limited meaningful information.

"[m]ore like a less shallow 'glide plane,'" and, "***I do like how she caresses her ass.***" Defendant Keran replied, "[c]lassy girl," and, ***"[s]he ain't seen nothing yet.***"

89. Although these texts were not shared company-wide, they only amplify the Terminated Executive Defendants' public objectification of and discrimination against women. And they served as part of the basis for the Orthofix Board's decision to terminate the Terminated Executive Defendants for cause, concluding that they were perpetrators of "harassing or inappropriate conduct or statements."

### D. Orthofix Announces That It Carefully Selected the Incoming Executive Leadership Team and Announces its Selection of Defendants Bostjancic and Keran

90. Not too long after the announcement of the Merger Agreement, Orthofix touted to the market that it had carefully selected the incoming leadership team and also announced in mid-November that two other key executive roles for the combined Company would come to be filled by Defendant Valentine's close friends and SeaSpine colleagues, Defendants Bostjancic and Keran.

91. Specifically, on November 18, 2022, Orthofix filed with the SEC a Form 425 containing a letter that it had sent to employees dated November 17, 2022. The Form 425 stated that "***ELT candidates were selected based not only on their individual merit but also with consideration for the overall composition of the executive team.***" This statement was false and misleading because it conveys the misleading impression that Orthofix had engaged in a vetting process that evaluated candidates' competency and accomplishments that would warrant leading the combined Company. However, if Orthofix had engaged in such a process, the Terminated Executive Defendants' misconduct would have been exposed.

92. Also on November 18, 2022, Orthofix and SeaSpine announced that Bostjancic would serve as CFO of the combined Company. The announcement touted Bostjancic's industry

and leadership experience, and Valentine assured the public that Bostjancic would excel in the role:

> John has been a key leader of SeaSpine dating back to the successful spin-out of the organization in 2015. I am confident his background and experience in the medical device industry coupled with his cultural influence will benefit the newly combined company as we continue to grow. . . . I believe John is well positioned to help lead us through the successful integration of the two companies, ensuring accountability across all levels of the organization, as we focus on the key initiatives that will drive growth, scalability and shareholder value.

93. Defendant Valentine's statements were false and misleading because they assured the market that Defendant Bostjancic was a force for accountability, when in reality, Defendant Bostjancic—like the other Terminated Executive Defendants—perpetuated a hostile and discriminatory work environment, including by engaging in harassing and inappropriate conduct.

94. This news was reported by various news outlets. On November 18, 2022, *MassDevice* wrote that "SeaSpine CFO John Bostjancic will continue as the top financial officer of the to-be-named orthopedic device giant created through a merger with Orthofix," and added, "[w]hen the two companies announced their plans to merge last month, they said that Bostjancic's present boss, SeaSpine CEO Keith Valentine, would be CEO." The article quoted Defendant Valentine's false and misleading statements from the press release about Bostjancic.

95. In addition, on November 21, 2022, Orthofix filed a Form 8-K with the SEC disclosing that four days prior, Defendants Serbousek and Valentine announced to Orthofix and SeaSpine employees the future Executive Leadership Team. That team included Defendant Keran as Chief Legal Officer. According to Securities Act Defendant Burzik, Orthofix agreed to appoint Keran as CLO only at Valentine's urging. Burzik Decl. ¶ 5.

### E. Orthofix's Due Diligence Overlooked Discriminatory and Abusive Conduct at SeaSpine That Fostered a Hostile Work Environment

96. Despite the rosy image of the Merger that was presented to the public, there were severe HR and personnel issues at SeaSpine that had been ongoing for years under the leadership of the Terminated Executive Defendants. Given the pervasiveness of those issues, Orthofix's due diligence on SeaSpine clearly overlooked overwhelming evidence of discriminatory and abusive conduct at SeaSpine that fostered a hostile work environment, and thus Defendants concealed from investors the risk that the Terminated Executive Defendants posed to the success of the Merger.

97. Though this misconduct had long been lurking close to the surface of SeaSpine leading up to the Merger, it was not something investors would have known about. The public was first alerted to the existence of it on September 12, 2023, when Orthofix made the shocking disclosure that the Orthofix Board had terminated the Terminated Executive Defendants "for cause" following the Internal Investigation due to "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements," including "harassing or inappropriate conduct or statements." The investigation and termination are further described below (*infra* Sections V.L, V.N).

98. This late disclosure of the Terminated Executive Defendants' misconduct in September 2023, which came on the heels of a woefully belated investigation into their fitness for leading the combined Company, is striking in light of the fact that this outcome was entirely foreseeable: the Terminated Executive Defendants had been engaging in workplace misconduct for years—since at least as early as 2016, when Johnson filed her original complaint. In fact, multiple confidential witnesses confirmed that misconduct had been ongoing at SeaSpine long before and leading up to the Merger. In particular, former employees reported on the troubling "good old boys' club" culture fueled by the Terminated Executive Defendants, and in particular,

Defendant Valentine; SeaSpine's toothless HR department, which the Terminated Executive Defendants controlled and strong-armed into discarding discrimination-related complaints; SeaSpine's history of sex-based discrimination and sexual harassment and/or assault; SeaSpine's pervasive culture of bullying; and pay inequities based on gender. Had Orthofix undertaken an adequate due diligence process, it would have readily uncovered fallout from the Johnson lawsuit and the pay equity audit, as well as all the additional HR violations; wisely declined to bring the Terminated Executive Defendants to Orthofix; and avoided the Internal Investigation. Instead, the risk of hiring the Terminated Executive Defendants materialized as shown by the costly investigation and subsequent termination that culminated in a diminishment of company value and concomitant massive loss to investors.

**1. SeaSpine's "Good Old Boys' Club" Culture of Rampant Drinking and Partying**

99. From a birds'-eye view, SeaSpine could have looked like a "fun" workplace with an informal start-up culture, where onsite happy hours were aplenty and where management went all out for company events. But in reality, the Terminated Executive Defendants—particularly Defendant Valentine—had cultivated a "good old boys' club" in the workplace, where they surrounded themselves with managers and employees who did not threaten their sense of control, and where they were free to do what they wanted: show up intoxicated to work, flirt with female employees, inappropriately touch female Executive Assistants ("EAs" or "EA") at work parties, and more. Understandably, this boys' club culture that revolved around Defendant Valentine at its center made SeaSpine employees, particularly female employees, feel deeply uncomfortable and devalued, which was also reinforced by the known pay inequities.

100. As described below, multiple former employees described the top-down, male-dominated culture at SeaSpine as a "good old boys' club" where rampant drinking and partying was pervasive, pointing to senior leadership as responsible for setting that tone.

101. For example, CW 1, a former Operations Manager from SeaSpine and then Orthofix from 2019 until October 2024, said that SeaSpine was a very social environment, and that alcohol was the norm on the SeaSpine premises. He said that there were several refrigerators at SeaSpine that all contained alcohol, which he thought was a liability issue. In addition, CW 2, who worked as an EA for Defendant Bostjancic from February 2020 to September 2021 (and also provided support to Defendant Keran), recalled times that men were drinking in the office during the workday. CW 2 said that men at SeaSpine could do whatever they wanted.

102. Further, CW 3, who worked as a Talent Acquisition Coordinator contractor for SeaSpine from July 2016 to October 2016 and overlapped with Johnson, said that the "the good old boys' club" culture operated at the behest of Defendant Valentine. CW 3 said that whatever Valentine wanted as CEO is what happened, and that SeaSpine did a lot to protect Valentine. Further, CW 3 said that prior to filing the Discrimination Class Action lawsuit, Johnson made a formal internal complaint about the SeaSpine culture of following Valentine's every wish and protecting him at all costs, but that Johnson's concern was dismissed or not deemed important at the time.

103. Echoing CW 3, CW 2 said that SeaSpine was essentially Defendant Valentine's world, where he was the villain and everyone else was just trying to survive. CW 2 said that standing up to Valentine could get employees fired. Further, CW 2 said that SeaSpine's male-dominated leadership treated and reacted negatively to women who were straightforward and attempted to exert agency in their roles. By comparison, CW 2 said that leadership treated

favorably women who were "cute and flirty," drank a lot of alcohol at firm events, and hung out and drank alcohol on the accounting floor after the workday with Defendant Valentine.

104. Another defining feature of the SeaSpine culture, as described below by a former employee, SeaSpine executives often drank excessively at SeaSpine functions, sometimes even during the work hours. The executives also reportedly engaged in inappropriate and/or unprofessional behavior while intoxicated.

105. CW 4, a former VP of Human Resources at SeaSpine from January 2020 to May 2020, said that alcoholism was a problem at the executive level at SeaSpine. She said that she saw the Terminated Executive Defendants intoxicated at almost every SeaSpine event, since the events all involved consuming large quantities of alcohol. CW 4 said that she was uncomfortable learning that this was the culture at SeaSpine, and did not want to be part of it. As a VP of HR, CW 4 felt uncomfortable and would leave the events. In addition, CW 4 could recall a time that she was on a legal call with Defendant Keran and two other attorneys in March 2020, when Keran was "drunker than a skunk" leading the call, working while completely intoxicated. CW 4 said that Keran was slurring words, had delayed speech, was repeating things, and was saying things that did not make sense. According to CW 4, during the call, one of SeaSpine's two female attorneys texted CW 4, expressing that Keran's intoxication was a problem, and asking what they could do about it.

106. In addition, CW 4 described how there was an annual marketing summit in San Diego in April, and SeaSpine employees stayed in a hotel despite living in the city because they were consuming alcohol and "fucking around." Before departing from the event, CW 4 recalled seeing Defendant Valentine with his hands up the shirt of an EA. CW 4 said that Valentine did this in front of a packed room, and that he was "totally drunk." CW 4 said that Defendants Valentine,

Keran, and Bostjancic had some sort of "dirty old boys' club," and that there was "weird stuff" that went on between the EAs and the executives, such as inappropriate relationships and interactions. CW 4 said that as a result of this conduct, there was high EA and HR turnover.

107. In addition, CW 4 described an annual SeaSpine event where executives would perform comedic acts, such as rapping and acting in skits. CW 4 explained that alcohol was a prevalent feature at the event, so SeaSpine bused employees to and from the event. CW 4 said that a video was taken at the event of executives taking shots of alcohol backstage before going out and performing "completely obliterated." CW 4 said that people got so intoxicated such that one of the employees vomited on the bus.

**2. SeaSpine's Deficient Human Resources Department**

108. On top of SeaSpine's "good old boys" culture of drinking, partying, and executive worship, its HR department was woefully ineffective, in large part due to the Terminated Executive Defendants' ultimate control over HR priorities and investigations, as well as the HR department's own history of enabling discrimination at SeaSpine.

109. Former SeaSpine employees remarked that the HR department was not independent from the Terminated Executive Defendants, in particular, Defendants Valentine and Keran. CW 4, a former VP of HR from January 2020 to May 2020, explained that in deciding whether to investigate complaints, she reported to Defendant Keran, but Defendant Keran received direction from Defendant Valentine. CW 4 found this highly problematic because the CEO should not have the authority to determine what HR investigated. As a result of the HR department's lack of independence and ability to investigate complaints, CW 4 struggled to be effective, explaining that people who worked at SeaSpine for long enough knew that her role as VP of HR had been replaced eight times in three years and that the role was powerless. CW 4 said that the lack of independence of the HR department was pervasive enough that no one would seek help from the HR department.

110. CW 4 also explained that the Terminated Executive Defendants intentionally tried to consolidate control over SeaSpine's HR department. According to CW 4, Defendant Valentine deliberately did not assign her (or anybody else) the role of Chief People Officer because he did not want anyone at SeaSpine to have the authority to conduct investigations without his sign-off. CW 4 said that Defendant Valentine wanted himself and Defendant Keran to retain that investigative authority. Prior to her joining SeaSpine, CW 4 said that Defendant Bostjancic had overseen HR instead of Defendant Keran. However, CW 4 said that Defendant Valentine was concerned that Defendant Bostjancic was not exerting sufficient control over HR, and so he transferred oversight to Defendant Keran, whom Defendant Valentine considered to be more aggressive. Relatedly, CW 4 said that SeaSpine did not take seriously the turnover in its HR department and neglected to facilitate smooth transitions. When she showed up on her first day, the VP of HR whom CW 4 was clearly sent to replace was still sitting in the office and had no idea that CW 4 was there to replace her. CW 4 said that she eventually became close friends with her predecessor as well as another VP of HR, since they all went through what CW 4 described as "the same horrible experiences."

111. In addition, CW 4 said that HR's inability to adequately process and investigate complaints deterred employees from raising issues with HR. CW 4 explained that people knew not to file complaints because nothing would happen. CW 4 said that her direct reports, who had worked at SeaSpine for longer than her, told her stories about how nothing ever happened in HR, nothing ever changed in HR, and no one in HR ever looked at anything. Even worse, CW 4 said that employees who filed complaints were targeted and let go from the company. As an example, CW 4 said that an individual who worked in marketing filed a complaint and was fired prior to when CW 4 joined the company.

112. As described below, the ineffectiveness of SeaSpine's HR—and pressure from executive leadership—had the direct result of enabling the persistence of discrimination and harassment at SeaSpine. Former HR employees reported being hamstrung in, and at times actively prohibited from, addressing these issues, and other employees reported that they either were not comfortable raising discrimination- or harassment-related complaints, or that such complaints were ignored.

113. For example, CW 4 stated that because of the HR's ineffectiveness, women were completely marginalized. CW 4 explained that she was asked either to not report incidents or to cover things up. Specifically, CW 4 said that she was asked to cover up issues relating to women's pay and women complaining about being uncomfortable.

114. CW 2, Defendant Bostjancic's former EA, said that she had reported a (female) colleague who openly made racist comments about Black people to HR. However, CW 2 said that nothing was done, because the perpetrator who CW 2 reported was protected from repercussions by Troy Woolley ("Woolley"), then-Vice President, Integrated Enabled Procedures at SeaSpine. As discussed *infra* ¶ 139, according to CW 4, Woolley himself was a problematic figure because he harassed women at company events.

115. CW 5, who worked in a benefits role at SeaSpine from July 2022 to July 2024 and who handled SeaSpine employees' leaves of absence, also witnessed a complaint—this one relating to harassment—go unaddressed. Sometime in the last three months of 2022, CW 5 worked with another employee who had received a doctor's note to take stress leave for one month because she was being harassed by a male employee who had tried to commit suicide. CW 5 said that the male employee would not leave the female employee alone. The employee who took leave told CW 5 that she had submitted a complaint to SeaSpine's anonymous hotline, but that nothing was

done. CW 5 also personally raised the issue with Chris Essman, who was Senior Manager, HR Business Partner at SeaSpine, but she does not know what happened from there. Regardless, despite the complaint, CW 5 said that SeaSpine continued to place the male employee on the same team as the female employee who filed the complaint. According to CW 5, that female employee was laid off during the Merger while she was on leave.

116. Further, the HR department itself had a history of perpetuating gender discrimination within its own ranks, so much so that it propelled a former female employee to file a class action lawsuit against SeaSpine. As described above (¶¶ 63-66), former HR employee Johnson settled a class action lawsuit against SeaSpine relating to its discriminatory treatment of female employees based on her own experience of working in SeaSpine's HR department.

117. In fact, several former female employees, including Johnson via her complaint and CW 3, discussed how Dennis Raposa ("Raposa"), who was the head of the HR department between 2015 and 2017, fostered an environment that was hostile to women, ranging from favoring men in hiring and compensation to making outright misogynistic comments about women in the workplace, as described below (¶¶ 119-120, 141). According to CW 3, Raposa dictated what HR did and did not listen to others. And as Johnson alleged in the Discrimination Class Action, "Raposa admitted . . . that he knew there was inequity at the Company," *Johnson* Compl. ¶ 45, and "routinely expressed sexist attitudes that belied a lower value of women," *id.* ¶ 22. Based on the extent of Raposa's discriminatory practices, as Johnson alleged, SeaSpine's male-dominated senior leadership knew or should have known about Raposa's conduct but took no steps to correct it for over a year. *Johnson* Compl. ¶ 24.

**3. SeaSpine's History of Sex-Based Discrimination**

118. Against this backdrop of the Terminated Executive Defendants' "good old boys' club" with heavy drinking and a toothless HR department, SeaSpine's workplace was ripe for

discrimination towards female employees. This discrimination was evident during all stages of the employment relationship: from hiring, to pay inequity, and ultimately to retaliation and firing. Men at SeaSpine, including those in supervisory roles, also exhibited discriminatory and condescending attitudes towards female employees. The presence of pervasive discrimination at SeaSpine is also evidenced by the reasons that the Orthofix Board decided to fire the Terminated Executive Defendants. According to the Special Motion to Strike, the Terminated Executive Defendants managed a "culture" that "demeaned and devalued the contributions of female employees," "acted frequently with aggression," and "accepted and promoted vulgarity and personal attacks." Defam. Mot. to Strike at 1. In addition, Defendant Burzik indicated in the Company's September 12, 2023 press release that the three men had engaged in "conduct" that was "harassing" and "inappropriate." As discussed herein, a significant portion of this conduct occurred prior to the closing of the Merger.

*a. Discriminatory Hiring and Promotion Decisions*

119. According to a former SeaSpine employee who worked at SeaSpine during the Discrimination Class Action class period, SeaSpine passed her over for a job opening due to being a woman. Defendant Bostjancic was involved in this decision-making. CW 3, a Talent Acquisition Coordinator contractor for SeaSpine from July 2016 to October 2016, shared that during her first week at SeaSpine, the Talent Acquisition Manager, Michael Galvin—to whom she was supposed to report—vacated his role without notice, so Defendant Bostjancic and Raposa oversaw the HR department and told CW 3 to start recruiting for the now vacant position. CW 3 said that she was interested in that full-time role herself, but that Bostjancic and Raposa did not seem open to her applying, and that three months into her work at SeaSpine, Raposa excluded her from conversations about recruiting strategy all together. Indeed, Johnson also alleged in the

Discrimination Class Action that Raposa had "discouraged" a female Talent Acquisition Coordinator (likely a reference to CW 3) from applying for the position even though she was already performing many of the tasks of the role's predecessor. *Johnson* Compl. ¶ 38.

120. CW 3 suspected that Raposa had wanted to fill the position with one of his friends, and CW 3 spoke with Johnson and another HR Business Partner about her concern that SeaSpine would provide preferential treatment towards Raposa's friend. CW 3 ended up going through the interview process with Defendant Bostjancic, Raposa, and another HR Business Partner once she learned that SeaSpine policy technically required that she be allowed to interview, but the interview was a farce. CW 3 sensed that a decision had already been made about who would fill the role, and the position ultimately went to a friend of Raposa's, David Wallace, who had only one or two years more experience than CW 3. Johnson similarly alleged in the Discrimination Class Action that in or around October 2016, SeaSpine hired a personal friend of Raposa into a role with the title "Talent Acquisition Business Partner." *Johnson* Compl. ¶ 38. CW 3 felt that she did not receive an equal and fair opportunity to be considered for the position, since the person who was ultimately hired was "buddy buddy" with Raposa and that, at the end of the day, it was the "good old boys' club." According to Johnson's allegations in the Discrimination Class Action, Raposa's friend ended up receiving a significantly higher salary than both Johnson and the female Talent Acquisition Coordinator. *Johnson* Compl. ¶ 38.

121. Further, CW 3 said that even outside of her own circumstances, Defendants Valentine and Bostjancic appeared to have a greater regard for men and favored them in personnel decisions. CW 3 explained that the executives would join the deliberation sessions after interviews to help determine who should be hired. CW 3 said that it was very apparent that the people they selected for leadership positions were almost always male.

*b. Discriminatory Payment Practices*

122. One of the most significant structural inequalities at SeaSpine (which necessarily leaked into Orthofix post-Merger when the workforces were combined), was its disparate pay for female and male employees of comparable backgrounds and responsibilities. Pay inequity at SeaSpine had been ongoing for years and still existed at the time of the Merger and featured heavily in the Discrimination Class Action described above (¶¶ 63-66) and the more recent *O'Connor* case.

123. Multiple former employees described the discriminatory compensation structure at SeaSpine. CW 3 and Johnson spoke about the Talent Acquisition Manager (a man) that SeaSpine hired over CW 3 who received a salary of around $100,000 with only two or three years of experience, which was not warranted in the world of HR. CW 3 said that the $100,000 amount was a number that Raposa decided arbitrarily, so under most compensation practices, it could be deemed discriminatory. According to CW 3, it was possible to see the new hire's salary because everyone in the HR department had access to everyone's salary. CW 3 said that this salary was also higher than what Johnson and another HR Business Partner were making. CW 3 recalled that Johnson told her that she felt that the pay discrepancy was unjust.

124. Similarly, Johnson's lawsuit against SeaSpine, described *supra* (¶¶ 63-66), alleged that there was widespread pay inequity at SeaSpine. According to Johnson, SeaSpine paid her tens of thousands of dollars per year less than it paid her male colleagues (who often lacked her qualifications, experiences, skills, and a strong record of performance), and Johnson was informed that the same was done to other female employees. *Johnson* Compl. ¶¶ 4, 6, 25, 29-43.

125. Former employees also elaborated that the higher salaries received by men were not justified by additional experience or greater responsibilities. CW 3 said that the higher salary for the new Talent Acquisition Manager (a male, who was friends with Raposa) vis-à-vis the

salaries of Johnson and another HR Business Partner was not warranted. He had only two to three years of experience, whereas Johnson and the other HR Business Partner had ten or fifteen years of experience in multiple industries. Further, CW 3 said that both Johnson and the other HR Business Partner had demanding roles requiring a lot of work. Similarly, Johnson alleged in the Discrimination Class Action that to mask the unequal pay for women, Defendants created multiple job titles—"over 200 for only 300 employees"—to justify their illegal actions. *Johnson* Compl. ¶ 28. However, in reality, the titular differences did not correspond to differences in responsibilities. *Johnson* Compl. ¶ 28.

126. As referenced above (¶ 67), another former SeaSpine employee, O'Connor, raised issues of unequal pay in a complaint that she filed in November 2023 in the Superior Court of California (a case which appears to have settled in or around late 2025). O'Connor joined SeaSpine as Corporate Counsel in November 2018 and was eventually promoted to Vice President, Legal about a year after the Merger. She named SeaSpine, Orthofix, and other related entities as defendants, and alleged that she experienced sexual harassment, gender discrimination, and retaliation during her employment.[4] O'Connor alleged that despite her stellar performance, her assumption of responsibilities that belonged to more senior roles, and the internal recognition she received for contributing on the SeaSpine side to the Merger process, she was paid below-market. *See O'Connor* Compl. ¶¶ 3-34. O'Connor alleged that this problem existed before the Merger and

[4] Though during summary judgment briefing O'Connor dropped all her claims other than those relating to retaliation and wrongful termination, she did so only "to facilitate judicial efficiency, and for strategic purposes," and maintained that she "reasonably believed" that she was "sexually harassed." Pl. Catherine O'Connor's Opp'n to Defs.' Mot. for Summ. J., or in the Alternative, Summ. Adjudication, Aug. 29, 2025, *O'Connor v. SeaSpine Holdings Corp.*, No. 37-2023-00051028-CU-OE-CTL (Cal. Super. Ct. San Diego Cnty.) (ROA No. 93) at 8, 12. The court denied defendants' motion for summary judgment as to O'Connor's retaliation and wrongful termination claims. Tentative Ruling, Sep. 24, 2025, *O'Connor*, No. 37-2023-00051028-CU-OE-CTL (ROA No. 128) at 1.

persisted post-Merger as well. *See supra* ¶ 67 (pre-Merger); *infra* ¶¶ 203-205 (post-Merger). O'Connor alleged that Orthofix retaliated against her and wrongfully terminated her employment in January 2024. *O'Connor* Compl. ¶¶ 48-61.

127. SeaSpine had been aware of these issues for years, even prior to Johnson commencing her lawsuit in 2017.

128. Before filing her lawsuit, Johnson had tried to raise her concerns internally while she worked at SeaSpine to no avail. CW 3 said that Johnson voiced her opinions on the pay discrimination to Raposa but he would dismiss them. Indeed, Johnson alleged in the Discrimination Class Action that she raised her concerns multiple times with senior leadership, including Defendant Bostjancic. Specifically, the *Johnson* Complaint alleges that Johnson: (i) made a verbal complaint to Raposa on or around January 2, 2016 raising concerns that a the salary of a male employee who was hired a few months ago was unjustifiably higher than hers; (ii) met with Raposa in or around April 2016 regarding gender discrimination against women; (iii) complained along with another female HR employee to Raposa around May 2016 that a new, inexperienced male hire in HR received a newly-coined job title and a salary that exceeded Johnson's; (iv) spoke with Raposa in September 2016 about receiving promotion for higher pay, which he refused; and (v) raised the pay disparity issue with Raposa on at least four other occasions. *Johnson* Compl. ¶¶ 31-36, 44-45. In one of the conversations, Raposa allegedly responded that SeaSpine was not "the right place" for Johnson, reminding her that SeaSpine was "Keith Valentine's Company." *Johnson* Compl. ¶ 6.

129. Johnson also alleged that after SeaSpine hired Raposa's personal friend as a "Talent Acquisition Business Partner," she emailed Defendant Bostjancic in Fall 2016 and requested an in-person meeting to discuss pay equity at SeaSpine. *Johnson* Compl. ¶ 39. She alleged that when

Bostjancic wrote her back to schedule a meeting, he called it a "comp discussion," but she replied to correct him by stating that it was a meeting to discuss ***pay equity*** at the company. *Johnson* Compl. ¶ 39 (emphasis added). Further, Johnson alleged that she met with Bostjancic only after she sent several follow-up emails, and eventually told him about her concerns regarding pay inequities and gender discrimination. *Johnson* Compl. ¶ 40. Johnson alleged that after the meeting, Bostjancic told Johnson that he had contacted another female HR Business Partner and that they should discuss these concerns together, but there was no follow-up meeting. *Johnson* Compl. ¶ 40.

130. There were other women who were affected by the discriminatory payment practices and supported Johnson from the sidelines but were too afraid of retaliation or other professional repercussions to come forward. For example, CW 3 said that she would have joined in Johnson's legal action, but she was just starting her HR career and did not want to cause a stir. Female employees' reticence to support Johnson's efforts was warranted in the face of internal retaliation. *See infra* ¶¶ 135-139.

131. In at least tacit recognition of its unequal practices, SeaSpine ended up settling the Discrimination Class Action. As described *supra* (¶ 65), a notice of settlement was filed in the *Johnson* case on September 3, 2019, and on July 26, 2021 the court approved the settlement. SeaSpine was required to pay over $919,500 in settlement funds, with over $600,500 of those funds disbursed to a total of 276 participating settlement class members, which consisted of all then-current and former female employees who worked for the defendants within the State of California from July 1, 2015 to December 31, 2019.

132. The 2021 settlement also required SeaSpine to implement targeted programmatic relief under which SeaSpine would hire an outside vendor to review their work departments with an emphasis on high pay gaps including between male and female employees (when not

controlling for title, job code, or other substantially similar criteria) to assess pay equity, to evaluate whether the titles and pay structures in those departments accurately reflect the work being performed, and to recommend adjustments to titles, pay, or both. This programmatic relief was to be funded separately at SeaSpine's expense. This programmatic relief was still ongoing at the time between the signing of the Merger Agreement and the close of the Merger. Former employees, such as CW 4, stated that SeaSpine agreed to hire outside consultants for the purpose of assessing pay and gender equity and evaluating whether SeaSpine workers were receiving compensation in accordance with the law.

133. However, despite SeaSpine's formal launch of the pay and gender equity audit, the actual process was riddled with problems that inhibited true progress and demonstrated the Terminated Executive Defendants' lack of genuine commitment to the effort. Former employees reported the difficulties that they faced in implementing equity remediation efforts.

134. For instance, CW 4, a former SeaSpine VP of HR from January 2020 to May 2020, said that she joined SeaSpine amidst the pay and equity investigation and that there were mistakes everywhere. Further, she said that her predecessor had worked on the same project, and that her successor must have taken it over as well, since the project was so riddled with problems that SeaSpine was constantly trying to restructure everything to make it work. While CW 4 did not recall specific numbers, she thought that women comprised around less than 5% of all employees and less than 2% or 1% were in upper management. Thus, CW 4 said that SeaSpine was changing and playing around with its numbers to appease the outside third-party auditing company, including by making superficial changes to the titles of female employees to make it seem like there were more women in senior leadership positions than there were in practice. But CW 4 said

that SeaSpine was not doing more than merely changing titles, and neglected to actually change women's pay.

*c. Discriminatory Retaliation*

135. Another example of gender-based discrimination at SeaSpine was the culture of retaliation against female employees. As described below, multiple former female employees reported that they had been retaliated against for calling out gender inequality in the workplace. This was a stark contrast against the lack of or inadequate repercussions that many male employees accused of misconduct faced.

136. For example, despite the extent of Raposa's discriminatory practices, as Johnson alleged in Discrimination Class Action, SeaSpine's male-dominated senior leadership knew or was reckless in not knowing about Raposa's conduct but took no steps to correct it for over a year. *Johnson* Compl. ¶ 24.

137. A few years prior, SeaSpine terminated another woman employee who engaged in efforts to support other woman employees in the workplace. CW 4, a former VP of HR from January 2020 to May 2020, said that Defendant Keran told her that she was being fired because she put free tampons in the women's bathroom, rather than installing a new machine for quarters. SeaSpine ultimately allowed her to resign, even though they told her she was fired, and CW 4 received a very small severance. However, when CW 4 found a job four weeks later, SeaSpine spitefully sued her for the severance, saying that she had poached another female employee from their HR department, who had joined CW 4 at her next job. Because CW 4 could not afford the attorneys' fees to fight them, she paid SeaSpine.

138. In addition, CW 2, Defendant Bostjancic's EA from February 2020 to September 2021 (who also supported Defendant Keran and CW 4), said that people like CW 4, who were

straightforward with the executive team and tried to maintain some sense of control over her responsibilities were fired for "being a woman." CW 2 said that CW 4 was directly fired for trying to create policies that furthered equality in the workplace.

139. CW 4 also said that Troy Woolley, then-Vice President, Integrated Enabled Procedures at SeaSpine since 2015, made women very uncomfortable. Specifically, CW 4 said that before she began working at SeaSpine, Woolley was written up for showing up to work events (both during work and after work) intoxicated and harassing women. However, he continued his inappropriate behavior without repercussions, other than undergoing coaching regarding the situation.

*d. Discriminatory Attitudes*

140. Aside from overt retaliatory actions against women, men in leadership positions—including the Terminated Executive Defendants—made misogynistic remarks towards female employees and treated them with condescension.

141. According to CW 3, a Talent Acquisition Coordinator contractor for SeaSpine from July 2016 to October 2016, Raposa made jokes that were uncomfortable, disrespectful, and not reciprocated by others, including by making sexual or discriminatory comments in a joking way. By way of example, CW 3 said that Raposa referred to a female employee with a Latina name as a "little Mexican girl doing her work job," and also made an inappropriate comment about another employee being gay. Similarly, Johnson alleged in the Discrimination Class Action that Raposa made "comments ranging from chauvinist to abusive," often referring to female employees as "gossipy" or "bitchy," and commenting on women's breasts, proposing to "do a brief walk around to take a look at the […] sisters." *Johnson* Compl. ¶ 22. CW 3 said that she had attended talent acquisition meeting with Raposa and Defendant Bostjancic before, and their jokes were definitely

"locker room talk." Similarly, CW 2 said that she heard the SeaSpine executives using derogatory language regarding women.

142. Relatedly, CW 4 recounted that Defendant Valentine had asked her to start a women's leadership or mentoring group. When CW 4 gathered ten of the most senior women employees at SeaSpine to discuss a vision for the group, word got back to Defendant Valentine about the meeting, and he told CW 4 that she invited the "wrong women" and that she had not received approval for the meeting. CW 4 then realized that the whole women's group was a farce, and that Valentine had just wanted to create the illusion of a women's group. Relatedly, CW 4 said she was asked to take down pictures of people she admired, which happened to be three women, because the pictures sent "the wrong message." CW 4 said that Defendant Keran told her it looked like she was too supportive of women.

**4. SeaSpine's History of Sexual Harassment and Assault**

143. SeaSpine also faced employee complaints of sexual harassment and/or assault based on conduct that took place during work-sanctioned events. Former employees stated that reporting these incidents did not yield adequate redress.

144. As referenced above, CW 4, said that Woolley made women very uncomfortable, as it was documented that Woolley was showing up to work events intoxicated and harassing women, both during and after the workday.

145. Separately, CW 2 shared that in 2019, a female employee was verbally and sexually assaulted by another (female) SeaSpine employee on a SeaSpine party bus. According to CW 2, the entire company—including the Terminated Executive Defendants—apparently knew about the incident because it was done so publicly. However, CW 2 said that even though the victim filed a complaint with HR, because the perpetrator was in the "in-crowd" there were no repercussions. The only fallout from the event was that SeaSpine got rid of party buses to events.

146. In addition, inappropriate relationships with employees have also been attributed to each of Defendants Valentine and Keran. During her deposition in the *O'Connor* Lawsuit, O'Connor stated that that she had heard "rumors" that Keran was "sexually harassing" in the form of a potential "inappropriate relationship with an employee at the company." Notice of Lodgment in Supp. of Pl. Catherine O'Connor's Opp'n to Defs.' Mot. for Summ. J., or in the Alternative, Summ. Adjudication, Aug. 29, 2025, *O'Connor*, No. 37-2023-00051028-CU-OE-CTL (ROA No. 98) ("*O'Connor* Notice of Lodgment"), Ex. A-1 at 37:5-12 . In addition, she was asked whether Defendant Valentine had engaged in sexual harassment. *Id.*, Ex. A-2 at 312:15-25.

147. The presence of pervasive harassment at SeaSpine is also evidenced by the reasons that the Orthofix Board decided to investigate and ultimately fire the Terminated Executive Defendants. For instance, the Internal Investigation was prompted in part by an internal complaint that the Terminated Executive Defendants engaged in the "harassment of employees." In addition, Defendant Burzik indicated in the Company's September 12, 2023 press release that the three men had engaged in "conduct" that was "harassing." The investigation and termination each considered the Terminated Executive Defendants' misconduct that took place before the Merger.

**5. SeaSpine's Culture of Bullying**

148. SeaSpine's hostile workplace environment was not limited to allegations of sex-based discrimination and harassment. As described further below, SeaSpine also had a pervasive culture of bullying among female employees, perpetrated by a certain group of EAs often referred to as the "Mean Girls." Defendant Valentine's EA, Emi Aquino ("Aquino") was the ringleader of this clique. Defendants Valentine, Bostjancic, and Keran endorsed the actions of these EAs, even amidst complaints from other female employees at the company.

149. The carte-blanche that SeaSpine leadership provided to the "Mean Girl" EAs to engage in bullying derived from their close relationships. Multiple former SeaSpine employees

said that Defendants Valentine, Keran, and Bostjancic had personal relationships—likely romantic relationships—with the SeaSpine EAs who bullied other women.

150. According to CW 2—who was a target of bullying—one of the women who bullied her would go drinking with Defendant Valentine, and the two went on vacation together, including bourbon tasting in Tennessee. According to CW 2, the close relationship between the Terminated Executive Defendants and the EAs made it difficult to redress the bullying. CW 2 stated that early in her time at SeaSpine, she reported the culture of bullying to CW 4, then-VP of HR, and would talk to anyone who would listen to her and tell them about the treatment of herself, treatment against others, and racist comments that one of the Mean Girls made (and who received protection from Woolley in connection with these comments, *see supra* ¶¶ 114, 139, 144). However, CW 2 said that no one was able to rectify the situation, because it was a pointless effort and employees could be fired for trying. The Terminated Executive Defendants protected the "Mean Girls," even in the face of complaints to HR, and sometimes they even egged on the bullying.

151. Former SeaSpine employees recalled particularly egregious bullying by the "Mean Girls" towards a receptionist with learning disabilities, which the Terminated Executive Defendants condoned. CW 2 said she witnessed the receptionist constantly being reduced to tears because the other EAs were so cruel to her, particularly Valentine's EA, Aquino. At some point, CW 2 reported the bullying behavior towards the receptionist to CW 4.

152. CW 4—who had also received a complaint from the receptionist herself—brought the issue up the chain to Defendants Valentine, Keran, and Bostjancic, telling them that the EAs' behavior was unacceptable and asking that they write up the behavior, but the Terminated Executive Defendants responded that because Aquino was the "lead" EA, she was free to do whatever she wanted and would be protected. CW 2 recalled that CW 4 told her that Defendant

Valentine took particular offense, telling CW 4 to never come into his office again to complain about his EA.

153. The bullying at SeaSpine was so over-the-top that it caused former employees to leave SeaSpine, including CW 2. After announcing her notice to leave the company, CW 2 said that she sent a letter to Defendant Keran describing the behavior that she witnessed, and noting her concern for SeaSpine employees, shareholders, and herself. In that letter, she noted that she had voiced all her concerns to HR and to Defendant Bostjancic on many occasions, as had other employees, but nothing was ever done to correct the toxic work environment.

154. A few years later, after learning that Defendants Valentine, Bostjancic, and Keran were fired in September 2023, CW 2 sent a LinkedIn message to Puja Leekha ("Leekha"), SeaSpine's then-Senior VP, Chief Ethics & Compliance Officer, Chief Legal Officer & Corporate Secretary, about what she described as the terrible culture at SeaSpine. CW 2 also attached the letter that she had sent to Keran.

### F. Orthofix Overlooked Issues at SeaSpine Because of Its Own Similar Issues

155. In light of the pervasive and long-standing culture at SeaSpine of discriminatory practices, harassing behavior, and general toxicity—much of which has been documented in public litigation—it is shocking that Orthofix would have agreed to install the very leaders of SeaSpine that oversaw such an environment into the leadership of the combined Company. But Orthofix's cavalier attitude towards investigating HR and personnel issues at SeaSpine made sense, as Orthofix similarly had a deficient HR department and a history of unredressed discrimination, assault, and harassment.

156. As with SeaSpine, former employees reported that Orthofix had a "good old boys' club" culture that propped up men who engaged in inappropriate behavior and disregarded women. CW 6, who worked in various marketing roles at Orthofix from January 2012 to August 2018,

described Orthofix's leadership as being part of the "good old boys'" network, which believed that women were incompetent and would not be able to advance as far as men, even though at Orthofix the women tended to work harder than the men. CW 6 also said that male Orthofix leaders used their disproportionate amount of power in an "interpersonal" way, by engaging in sexual relations with other team members. For example, she said that two VPs of Biologics, Cory Brenner and Collin Begley, were both notorious for stories of engaging in extramarital affairs with colleagues.

157. In addition, former employees experienced or witnessed discrimination, harassment, and/or assault at Orthofix. Many of these former employees further stated that Orthofix's HR department had a reputation for ignoring employees' complaints, particularly Suzanne Armstrong, who worked in HR at Orthofix since July 2007 until September 2024, and who was selected as Senior Vice President, Global Human Resources for the combined Company's Executive Leadership Team pursuant to the Merger. For example, CW 8, who was employed as a member of the Regional Sales Team at Orthofix from Fall of 2016 to Fall of 2019, said that Armstrong was known for frequently "pushing things under the rug" and looking the other way in the face of serious misconduct, and that she had been doing this for years.

158. CW 6 said that in early 2018, a colleague told her that a woman who worked in sales was being harassed by either Brenner or Begley, which CW 6 ended up raising in her exit interview with HR. However, CW 6 said that to her understanding, nothing came of her report. CW 6 said that she did not think that any women would ever come forward themselves to report being subject to gender discrimination or sexual harassment, since that was the culture of Orthofix.

159. Similarly, CW 7, who worked in Bone Growth Therapies at Orthofix from January 2018 to March 2021, said that she reported to Armstrong an inappropriate, lewd comment that Brenner made at a dinner in 2018 or early 2019, and Armstrong responded that HR had previously

received similar complaints about Brenner. However, to CW 7's knowledge, nothing came of her complaint and no further action was taken by HR. CW 7 said that she raised the disturbing incident again during her exit interview.

160. The condoning of discrimination and harassment was also the subject of litigation against Orthofix. In June 2016, a woman named Kathryn Boston ("Boston") filed a civil rights lawsuit—which ended up featuring in the news—against Orthofix in connection with its response to her being sexually harassed and assaulted by a surgeon while marketing Orthofix products. *See* First Amended Compl. Sept. 25, 2019, *Boston v. Orthofix Medical, Inc.*, No. 4:19-cv-00438-ALM (E.D. Tex.) (ECF No. 26). In Boston's amended complaint, filed on September 25, 2019 ("*Boston* Compl."), Boston alleged that she reported the harassment and assault around August 7, 2017 to Brad Niemann, who at the time of Boston's complaint was the President of Orthofix Spine. *Boston* Compl. ¶¶ 20-23. However, Boston alleged that Orthofix did not conduct any investigation into her complaint, but instead, the night after her report, Niemann invited Boston to go to a night club with her and then asked one of Boston's colleagues to inform her that Niemann would like to date her. *Boston* Compl. ¶ 23. According to CW 8, Niemann habitually sexually assaulted and/or harassed Orthofix female sales representatives and was inappropriate "all the time."

161. Further, due to the misogynistic culture at Orthofix, there was a fear of retaliation among female employees, particularly since many of the perpetrators were powerful men. According to CW 6, there were many instances at Orthofix of women being harassed but afraid to speak up. CW 6 said that the perpetrators' abuse of power and the misogynistic culture at Orthofix created a fear of retaliation. CW 6 felt that Orthofix's leaders were "grooming" young women who were impressionable, by using the Company's large entertainment budget to do fun things.

**G. Orthofix Files the Registration Statement and Joint Proxy Seeking Shareholder Approval of the Merger**

162. On November 8, 2022, Defendants filed its original Registration Statement with the SEC, which, with the other Offering Documents, were used to effectuate the Merger between Orthofix and SeaSpine.[5]

163. The November 8, 2022 Registration Statement, which described the Merger, stated that both Orthofix's and SeaSpine's boards of directors had approved the Merger and recommended to the shareholders of the respective companies that they approve the Merger at special shareholder meetings.

164. The November 8, 2022 Registration Statement included materially false and misleading statements about the Merger. For instance, according to the Registration Statement, Orthofix's then-serving board of directors unanimously approved the merger, in part, because of the ***"complementary cultures of Orthofix and SeaSpine, including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate responsibility."***

165. In addition, the November 8, 2022 Registration Statement attached and incorporated by reference the Merger Agreement, with the "Summary" section of the joint proxy statement/prospectus stating, "[t]he terms and conditions of the merger are contained in the merger agreement, a copy of which merger agreement is attached as Annex A to this joint proxy statement/prospectus. ***We encourage you to read the merger agreement carefully*** and in its entirety, as it is the legal document that governs the merger."

166. The section titled "The Merger Agreement" similarly stated:

[5] The November 8, 2022 Registration Statement was incorporated into the November 22, 2022 amended Registration Statement, the latter of which included the same false and misleading statements as the former.

> The descriptions of the merger agreement in this section and elsewhere in this joint proxy statement/prospectus are qualified in their entirety by reference to the complete text of the merger agreement, a copy of which merger agreement is attached as Annex A and is incorporated by reference into this joint proxy statement/prospectus. This summary does not purport to be complete and may not contain all of the information about the merger agreement that is important to you. You are encouraged to carefully read the entire merger agreement.

167. Further, the section titled "SeaSpine Proposal I" also provided:

> The description of the merger agreement in this section and elsewhere in this joint proxy statement/prospectus is qualified in its entirety by reference to the complete text of the merger agreement, a copy of which is attached as Annex A, and is incorporated by reference into this joint proxy statement/prospectus.

168. The November 8, 2022 Registration Statement, incorporating the Merger Agreement by reference, represented that:

a. SeaSpine was in compliance with all employment and labor laws, including laws relating to civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity;

b. There had been no formal or informal complaints of sexual or racial harassment, sexual or racial misconduct, sex/gender or racial discrimination, or similar behavior in the past four years against any officer, director, manager, or supervisory-level SeaSpine employee;

c. There were no misconduct-related allegations pending or threatened, nor was there any reasonable basis for such a misconduct-related allegation; and

d. In the past four years, SeaSpine had not entered into any settlement agreement, non-disparagement agreement, confidentiality agreement, non-disclosure agreement, or any other contract or similar provision relating to any misconduct-related allegation

against SeaSpine or any SeaSpine officer, director, manager, employee, or independent contractor.

The Registration Statement made the same representations as to Orthofix.

169. The statements referenced in ¶¶ 164, 168 are at odds with the reported culture and history of SeaSpine as a company rife with discrimination, harassment, and retaliation, including allegations of the same against senior-level employees and managers as well as the class action settlement regarding many of these issues.[6]

170. On November 22, 2022, Orthofix filed an amendment to its Registration Statement on a Form S-4/A ("Amended Registration Statement"), and the SEC declared it effective the same day. Like the Registration Statement filed on November 8, 2022, the Amended Registration Statement attached and incorporated by reference the Merger Agreement, with the "Summary" section of the joint proxy statement/prospectus stating, "[t]he terms and conditions of the merger are contained in the merger agreement, a copy of which merger agreement is attached as Annex A to this joint proxy statement/prospectus. ***We encourage you to read the merger agreement carefully and in its entirety, as it is the legal document that governs the merger***."

171. The section titled "The Merger Agreement" similarly stated:

> The descriptions of the merger agreement in this section and elsewhere in this joint proxy statement/prospectus are qualified in their entirety by reference to the complete text of the merger agreement, a copy of which merger agreement is attached as Annex A and is incorporated by reference into this joint proxy statement/prospectus. This summary does not purport to be complete and may not contain all of the information about the merger agreement that is important to you. You are encouraged to carefully read the entire merger agreement.

172. Further, the section titled "SeaSpine Proposal I" also provided:

---

[6] *See supra* note 3.

> The description of the merger agreement in this section and elsewhere in this joint proxy statement/prospectus is qualified in its entirety by reference to the complete text of the merger agreement, a copy of which is attached as Annex A, and is incorporated by reference into this joint proxy statement/prospectus.

173. The Amended Registration Statement, incorporating by reference the Merger Agreement, again made the same false and misleading statements as the Registration Statement.

174. For instance, the Amended Registration Statement stated that Orthofix's then-serving board of directors unanimously approved the merger, in part, because of the ***"complementary cultures of Orthofix and SeaSpine, including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate responsibility."***

175. On November 23, 2022, Orthofix and SeaSpine filed a Joint Proxy Statement pursuant to Rule 424(b)(3). The November 23, 2022 Joint Proxy Statement made the same false and misleading statements as the Registration Statement and Amended Registration Statement.

176. For instance, the November 23, 2022 Joint Proxy Statement, which attached the Merger Agreement, represented that:

a. SeaSpine was in compliance with all employment and labor laws, including laws relating to civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity;

b. There had been no formal or informal complaints of sexual or racial harassment, sexual or racial misconduct, sex/gender or racial discrimination, or similar behavior in the past four years against any officer, director, manager, or supervisory-level SeaSpine employee;

c. There were no misconduct-related allegations pending or threatened, nor is there any reasonable basis for such a misconduct-related allegation; and

d. In the past four years, SeaSpine had not entered into any settlement agreement, non-disparagement agreement, confidentiality agreement, non-disclosure agreement, or any other contract or similar provision relating to any misconduct-related allegation against SeaSpine or any SeaSpine officer, director, manager, employee, or independent contractor.

The Joint Proxy Statement made the same representations as to Orthofix.

177. The statements referenced in ¶¶ 174, 176 are at odds with the reported culture and history of SeaSpine that was rife with discrimination, harassment, and retaliation, including allegations of the same against senior-level employees and managers, SeaSpine's settlement of a class action settlement regarding many of these issues, and was also failing to adequately implement the programmatic relief it had promised as part of that settlement. [7]

178. The Offering Documents also incorporated by reference documents that themselves contained materially false and misleading statements, namely the Form 8-K described above (¶ 84) that Defendants filed in connection with announcing the Merger Agreement.

179. In addition, the Offering Documents incorporated by reference a SeaSpine Schedule 14A, dated April 22, 2022. That Schedule 14A represented that its code of business conduct and ethics applied to its officers:

> Our code of business conduct and ethics, corporate governance guidelines, audit committee charter, compensation committee charter and nominating and corporate governance committee charter are available, free of charge, under the "Investors > Governance > Governance Overview" section of our website at www.seaspine.com. ***Our code of business conduct and ethics applies to all our employees, officers and directors.*** We intend to disclose any amendment to, or a waiver from, a provision of our code of conduct and ethics that applies to our principal executive officer, principal financial officer, principal accounting officer or

[7] *See supra* note 3.

> controller, or persons performing similar functions and that relates to any element of the code of ethics definition enumerated in paragraph (b) of Item 406 of Regulation S-K by posting such information on our website at the address specified above.

180. SeaSpine's Code of Business Conduct and Ethics (the "SeaSpine Code") applied to all officers, employees, directors, and other representatives of SeaSpine. Importantly, Defendant Valentine signed the SeaSpine Code as the President and CEO of the company, despite the fact that he and the other Terminated Executive Defendants failed to abide by it and likely the worst offenders.

181. For instance, the SeaSpine Code noted that "[b]uilding and maintaining a culture of compliance and ethical behavior is a priority for the Company." The SeaSpine Code further stated that the company did not engage in discrimination and based employment decisions on experience and work performance:

> ***SeaSpine bases employment decisions on business needs, skills, experience, and work performance. We do not discriminate based on race, color, gender, marital status, disability, age, sexual orientation, religion, citizenship, ancestry, nationality, military history, or any other legally protected status.***

182. In addition, the SeaSpine Code explicitly prohibited harassment, and directed personnel to report acts of harassment:

> ***You are required to treat your colleagues with dignity and respect. Harassment of any kind is prohibited.*** Harassment can take many forms, including unsolicited and unwelcome comments about race, color, gender, marital status, disability, age, sexual orientation, religion, citizenship, ancestry, nationality, military history, or any other legally protected status. ***You should report any act of harassment to your manager, Human Resources, or the Legal Department.***

183. The SeaSpine Code also prohibited working under the influence of alcohol and stated that it was the "duty" of personnel to report violations:

> To ensure that our employees are kept healthy and safe, you must not only follow all health and safety requirements but must also take personal responsibility for your safety and the safety of those you work with***. This includes never reporting to work in a state that could impair your ability to work safely and conscientiously (such as under the influence of drugs or alcohol).***
>
> ***If you are involved in, or know of, an accident or dangerous situation in the workplace, it is your duty to report it promptly.***

184. The last section of the SeaSpine Code directed compliance with "policies and procedures," which included a requirement to report suspected misconduct:

> SeaSpine is committed to complying with applicable local, state, and federal laws, rules and regulations, and its own policies and procedures. ***You are required to immediately report concerns about any business practice or individual conduct that you feel is unethical, illegal, or in violation of SeaSpine's policies and procedures.***

185. This section also specified that retaliation against an employee who reports suspected misconduct in good faith was "prohibit[ed]":

> ***The Company prohibits retaliation against any employee or director of the Company who, in good faith, seeks help, reports known or suspected violations, or participates in the investigation of such a report.*** Raising a concern in "good faith" means that you have made a genuine attempt to provide honest and accurate information even if you are later proven to be mistaken. If you believe that you have been retaliated against in association with reporting a concern in good faith, you should report this behavior to your manager, the Human Resources Department or the Legal Department. ***The Company takes allegations of retaliation very seriously and will review all complaints of threatened, attempted, or actual retaliatory action. Any reprisal or retaliation against an employee because the employee, in good faith, sought help, submitted a report, or participated in an investigation of such a report will be subject to disciplinary action, up to and including potential termination of employment.***

## H. The Merger Closes

186. On January 4, 2023, Orthofix and SeaSpine announced the completion of the Merger following the approval of each company's stockholders at their respective special meetings

of stockholders held that day. The combined press release stated that of the votes cast, 99% of SeaSpine common shares were voted in approval of the Merger, and 98% of Orthofix common shares were voted in approval of the same. The Merger became effective as of 12:01 AM EST on January 5, 2023.

187. Upon the completion of the Merger, the Terminated Executive Defendants became accountable to Orthofix's Code of Conduct, which was posted on Orthofix's website under the section "Investors."

188. According to the "Workplace Conduct" section in Orthofix's Code of Conduct in place at that time, Orthofix had a number of policies regarding "***respectful employee conduct, safety, and diversity and inclusion.***" For example, Orthofix had a policy "***to provide equal opportunities to all qualified employees and job applicants, regardless of numerous categories of characteristics, including race, color, sex, sexual orientation, or gender identity or expression, and any characteristic protected by applicable federal, state, or local laws.***"

189. The Code of Conduct further stated:

> ***We expect all employees to be respectful of the diversity of our employees***. . . ***Orthofix is also committed to providing fair and/or living wages to all our employees.***

190. The Orthofix Code of Conduct also had a policy on "Alcohol and Substance Abuse." That section stated:

> ***The possession, consumption, sale or purchase of alcohol or illegal drugs on Orthofix property is prohibited. Orthofix also prohibits the use of alcohol or illegal drugs by employees either directly before or during the workday.***

191. Accordingly, the Code of Conduct laid out certain "responsibilities" for Orthofix employees regarding Workplace Conduct, including:

- ***Never treat another employee differently because of their race, color, age, sex, religion, sexual orientation, gender identity or expression, disability, ancestry, marital status, national origin, pregnancy or because of any other protected characteristic.***

- ***Ensure your actions and words toward other employees are respectful and not harassing or discriminatory in violation of policy or law.***

- ***Never drink alcohol before or during your working hours*** or have possession of or use illegal drugs.

192. Further, the Code of Conduct stated that "***[m]anagers must ensure that their teams comply with laws, regulations, and policies, and must work to resolve ethical dilemmas.***"

193. The Orthofix Code of Conduct included a certification for employees and officers to sign and provide to the Company, which included a representation that the signatory was ***"not in violation of any of the policies of the Code of Conduct"*** and would "***abide by and support the policies set forth in the Code of Conduct."***

194. The Terminated Executive Defendants, for reasons described above, had been acting in contravention to these codes of conduct for years, as well as in the lead up to the consummation of the Merger. For instance, while finalizing the terms of the Merger Agreement and in the time between the announcement of the Merger Agreement on October 11, 2022 and the closing of the Merger after market close on January 4, 2023, the Terminated Executive Defendants had continued to send each other inappropriate messages (*supra* ¶¶ 79-81, 88, 195-200). Many of these inappropriate messages appeared to demean and degrade women with whom the Terminated Executive Defendants conducted business in their roles as leaders of SeaSpine.

195. For instance, on October 28, 2022, Defendant Bostjancic wrote, "***[w]ho is that hot little minky?***" Defendant Valentine responded, "***[l]ove that librarian look.***"

| | | |
|---|---|---|
| JB | John Bostjancic [redacted]<br>Who is that hot little minky [redacted]? | 10/28/2022, 9:46 AM |
| KV | Keith Valentine [redacted]<br>Love that librarian look | 10/28/2022, 9:58 AM |
| M | Mobile [redacted]<br>What was the point of that call??? | 10/28/2022, 10:06 AM |

196. Further, on November 9, 2022, Defendant Bostjancic inquired about a "a female employee," Defam. Mot. to Strike at 4, "***[h]ot or Not?***" Defendant Keran wrote that the matter "***[w]ill require an in person evaluation...***" to which Defendant Bostjancic replied, "***[j]ust keep your fist away from her.***" Defendant Keran then replied, "***[n]o promises.***"

| | | |
|---|---|---|
| JB | John Bostjancic [redacted]<br>[redacted], Hot or Not? | 11/9/2022, 10:32 AM |
| M | Mobile [redacted]<br>Will require an in person evaluation… | 11/9/2022, 10:32 AM |
| JB | John Bostjancic [redacted]<br>Just keep your fist away from her. | 11/9/2022, 10:34 AM |
| M | Mobile [redacted]<br>No promises | 11/9/2022, 10:34 AM |

197. The next day, Defendant Keran reiterated, "***[m]y fist remains ready and eager...***" Defendant Bostjancic noted that the individual being discussed "***is a weak and ignorant dipshit of a leader.***"

| | | |
|---|---|---|
| M | Mobile [redacted]<br>My fist remains ready and eager … | 11/10/2022, 12:08 PM |
| JB | John Bostjancic [redacted]<br>[redacted] is a weak and ignorant dipshit of a leader. | 11/10/2022, 1:03 PM |

198. On November 22, 2022, Defendant Bostjancic wrote that a woman had "***been up my butt to book travel,***" to which Defendant Keran later responded "***[d]o you want her out?***" Defendant Valentine noted "***I love butt play now!***" In response, Defendant Keran stated, "***[y]ou pervert!***"

JB John Bostjancic [redacted] 11/22/2022, 1:30 PM
KV, any initial thoughts about having any one of us on site in Lewisville on Day 1? [redacted] been up my butt to book travel back east to see family, so asking from a purely selfish perspective…

KV Keith Valentine [redacted] 11/22/2022, 1:40 PM
Haven't considered yet

JB John Bostjancic [redacted] 11/22/2022, 1:40 PM
You're not helping me get [redacted] out of my butt…

JB John Bostjancic [redacted] 11/22/2022, 1:40 PM
Wait— that sounds really weird…

M Mobile [redacted] 11/22/2022, 1:40 PM
Do you want her out?

M Mobile [redacted] 11/22/2022, 1:41 PM
Is there any tongue involved?

M Mobile [redacted] 11/22/2022, 1:41 PM
KV, tell him nothing, he loves it!

KV Keith Valentine [redacted] 11/22/2022, 1:45 PM
I love butt play now!

M Mobile [redacted] 11/22/2022, 1:46 PM
You pervert!

199. On November 25, 2022, Defendant Valentine wrote, in reference to a colleague, that Defendant Bostjancic "***would give him ass play......***" Defendant Bostjancic responded "***[a]s long as I can wear gloves.***" Defendant Keran added, "***Time to step up to the big time. Mr. CFO.... You need to demonstrate that you're ready.***"

KV Keith Valentine [redacted] 11/25/2022, 12:00 PM
Hopefully my awkward dinner was worth it!

JB John Bostjancic [redacted] 11/25/2022, 12:04 PM
[redacted] likes him some Keith Valentine. What did you have to do to win his support?!?

KV Keith Valentine [redacted] 11/25/2022, 12:06 PM
Told him a guy named Boz would give him ass play……

JB John Bostjancic [redacted] 11/25/2022, 12:07 PM
As long as I can wear gloves.

M Mobile [redacted] 11/25/2022, 12:18 PM
Time to step up to the big time, Mr CFO.

JB John Bostjancic [redacted] 11/25/2022, 12:24 PM
This sounds more like a COO type responsibility…

M Mobile [redacted] 11/25/2022, 12:25 PM
You need to demonstrate that you're ready.

KV Keith Valentine [redacted] 11/25/2022, 12:47 PM
Exactly! It's a tight of passage!

JB John Bostjancic [redacted] 11/25/2022, 1:03 PM
Tight? Is that a clue you learned "first hand"??

KV Keith Valentine [redacted] 11/25/2022, 1:05 PM
Sorry Right

200. On December 20, 2022, Defendant Keran wrote Defendant Valentine "love[d]" the "former President of an Orthofix business unit" (Defam. Mot. to Strike at 4), and that he thought she was "***blowing [Defendant Valentine].***" Then, he wrote that Defendant Valentine was

"***absolutely jerking her off***" during "a work call" (Defam Mot. to Strike at 4). Defendant Keran then wrote, "***I think she has a small penis,***" to which Defendant Bostjancic added that she "***has a little nub.***"

M Mobile [redacted] 12/30/2022, 9:08 AM
KV loves [redacted]!

M Mobile [redacted] 12/30/2022, 11:36 AM
On my god, I think [redacted] is blowing KV. On a call with those two and [redacted] and he's absolutely jerking her off … yes, I think she has a small penis

JB John Bostjancic [redacted] 12/30/2022, 12:19 PM
Awww, [redacted] has a little nub.

## I. Problems at the Combined Company Persist Post-Merger

201. Unsurprisingly, the cult of the Terminated Executive Defendants, with Defendant Valentine at its helm, did not slow down following the Merger. Rather, the Terminated Executive Defendants continued with business as usual—that is, treating the Company like a social playground where they demeaned and discriminated against female employees. The ability of this type of behavior to persist unchecked for so long made sense in light of the fact that Orthofix blatantly disregarded SeaSpine's history of such problems—particularly at the time Orthofix was conducting due diligence—and the fact that Orthofix had similar problems at home leading up to the Merger. Following the Merger, in recognition of the injustice at the workplace, several employees attempted to raise their concerns about these issues to leadership in the combined Company. However, Orthofix—now under the control of the Terminated Executive Defendants—for the most part ignored those concerns.

202. As one prominent example, gender-based pay inequity continued to persist at the combined Company. As set forth above, SeaSpine did not sufficiently address the systemic inequalities that the Discrimination Class Action Settlement were intended to address, as former

employees noted that the remediation effort was riddled with errors and falsification of information (¶¶ 132-134).

203. In addition, former employees shared individual accounts of facing gender-based discrimination at the combined Company after the Merger.

204. Most significantly, O'Connor, a former attorney for SeaSpine and the combined Company, alleged in her 2023 lawsuit referenced above that even after her promotion to Vice President, Legal in around January 30, 2023, and even after she attempted to negotiate a higher salary than what she was offered, the final salary she received was below that of her male peers in the legal department. *See O'Connor* Compl. ¶¶ 35-38. O'Connor alleged that she worked directly with Defendant Keran during the salary negotiation process. *See O'Connor* Compl. ¶¶ 37-38. However, the Terminated Executive Defendants did not take seriously O'Connor's request for greater pay equity. As O'Connor would come to learn during the course of the Internal Investigation, a text exchange between Defendant Bostjancic and Defendant Keran that was discussing O'Connor's request for a salary increase referred to "balls on her chin" or words to that effect. *See O'Connor* Compl. ¶ 40. O'Connor alleged that she was "humiliated" upon learning about these exchanges, particularly since the comments were made at the same time that O'Connor was engaging in salary negotiations with the Company. *O'Connor* Compl. ¶ 40.

205. Such a text message exchange was revealed to the public in the Burzik Declaration that was part of the Defamation Lawsuit, where Defendant Bostjancic wrote, "***balls are on her chin***," per the below. According to the Defamation Motion to Strike (Defam. Mot. to Strike at 4), this text exchange involved "an issue with a human-resources executive."

| | | | |
|---|---|---|---|
| M | **Mobile** [redacted]<br>Bait is on the water! | | 2/9/2023, 8:56 PM |
| M | **Mobile** [redacted]<br>^in | | 2/9/2023, 8:56 PM |
| JB | **John Bostjancic** [redacted]<br>And your balls are on her chin. | | 2/9/2023, 9:39 PM |
| M | **Mobile** [redacted]<br>Yes, but you need to add on before she negs it! | | 2/9/2023, 9:40 PM |
| JB | **John Bostjancic** [redacted]<br>Pile on complete. | | 2/9/2023, 9:56 PM |

206. Notably, O'Connor alleged that after the termination of the Terminated Executive Defendants, O'Connor filed a complaint with Interim CLO Leekha and Armstrong to discuss the text messages about her, but that Leekha and Armstrong stopped responding. *See O'Connor* Compl. ¶ 42. O'Connor also alleged that around September 2023, she filed a complaint with HR and Leekha regarding allegedly demeaning and discriminatory treatment by Orthofix's VP of IP, Pete Lando, towards multiple female employees, but she received no response. *See O'Connor* Compl. ¶¶ 43-47. Instead, O'Connor alleged that the Company began to retaliate against O'Connor by removing essential job duties, abruptly placing her on leave, and then ultimately wrongfully terminating her employment. *See O'Connor* Compl. ¶¶ 47-61.

207. These problems at Orthofix post-Merger are no different from what was happening at SeaSpine before the Merger. Employees continued to post anonymously about the conditions of the combined Company online. For example, on March 29, 2023, a self-reported then-current employee posted a review on Glassdoor titled, "Don't Drink the Kool-Aid," which stated, "[p]eople will try to get any excuse to have a drink at this place. Good luck getting promoted as it's based on favoritism and not skill. ***If you don't fit what they're looking for in terms of physical appearance or personality, you'll have a hard time here . . . Managers can get away with a lot and the C-suite is a complete joke***."

208. And as previewed above, the Terminated Executive Defendants continued to engage in the same type of inappropriate conversations as leaders of the newly combined

Company. On February 9, 2023, in reference to "a human-resources executive," Defam. Mot. to Strike at 4, Defendant Keran wrote "***I kinda don't give a shit, but I also don't want to ramrod it up her ass.***"

JB John Bostjancic [redacted] 2/9/2023, 8:39 PM
I wouldn't propose this for very many people, but you run a very lean Legal team and [redacted] is fucking fantastic.

M Mobile [redacted] 2/9/2023, 8:41 PM
I appreciate all the support! And I'm sure [redacted] will, too. She is that good. Do you think [redacted] would accept it? I kinda don't give a shit, but I also don't want to ramrod it up her ass.

209. On May 8, 2023, Defendant Bostjancic, commenting on the city of Las Vegas, wrote, "***I'd actually rather be in jail or a gay bar than this fucking shithole city.***" Later, Defendant Bostjancic wrote "of a former executive" (Defam. Mot. to Strike at 4), "***Verbal diarrhea,***" to which Defendant Keran replied, "***I figured you'd be into that kind of thing, maybe after a few hours in the gay bar.***"

M Mobile [redacted] 5/8/2023, 12:41 PM
I'm just glad they have wifi in your jail cell Boz ... wtf are you?

KV Keith Valentine [redacted] 5/8/2023, 12:42 PM
No doubt. Are you at that gay bar in the office upstairs

JB John Bostjancic [redacted] 5/8/2023, 12:48 PM
Las Vegas airport. Flying on to Lewisville in 3 hours. LV feels like fucking jail to me. I'd actually rather be in jail or a gay bar than this fucking shithole city.

JB **John Bostjancic** [redacted] 5/8/2023, 12:54 PM
Verbal diarrhea



*Image: tmp_136.gif (3 MB)*

M **Mobile** [redacted] 5/8/2023, 12:55 PM
I figured you'd be into that kind of thing, maybe after a few hours in the gay bar

210. The next day, Defendant Valentine asked Defendants Bostjancic and Keran "about recommending a female former board member for a new position," Defam. Mot. to Strike at 4, and Defendant Keran replied, "[w]ill you use the phrase '***tits on a bull***' in your response***?***" Defendant Bostjancic piled on: "***Seems like a totally appropriate response!***"

KV **Keith Valentine** [redacted] 5/9/2023, 1:00 PM
Ha!


3:59

[redacted]

iMessage
Today 3:54 PM

Mr V

Quick question for you - confidentially of course. How was [redacted] as a board member? Was she able to add value in the merger?

Thank you if you can share anything with us!

[redacted]

*Image: Screenshot 2023-05-09 at 3.59.53 PM.jpeg (135 KB)*

M **Mobile** [redacted] 5/9/2023, 1:01 PM
Will you use the phrase "tits on a bull" in your response?

KV **Keith Valentine** [redacted] 5/9/2023, 1:02 PM
Laughed at "Will you use the phrase "tits on a bull" in your r…"

JB **John Bostjancic** [redacted] 5/9/2023, 1:02 PM
Seems like a totally appropriate response!

### J. Orthofix Files Its 2022 Form 10-K Touting Its Compliance and Ethics Program and Its Robust Human Capital Resources

211. On March 6, 2023, the combined Company filed with the SEC its annual report on Form 10-K for the full fiscal year 2022 ("2022 Form 10-K"). The 2022 Form 10-K was signed by Defendants Valentine, and Bostjancic, as well as the Orthofix Post-Merger Director Defendants.

212. The 2022 Form 10-K included multiple materially false and misleading statements, such as that it was Orthofix's "***fundamental policy to conduct business in accordance with the highest ethical legal standards***," that it had a "***comprehensive compliance and ethics program***," and that the program was "***intended to promote lawful and ethical business practices throughout [their] domestic and international business***" and was "***designed to prevent and detect violations of applicable federal, state, and local laws***."

213. The 2022 Form 10-K also made several materially false and misleading statements relating to Human Capital Resources at Orthofix. For example, the 2022 Form 10-K said that Orthofix's "key human capital objectives in managing [their] business" included "***attracting, developing, and retaining top talent while integrating diversity, equity, and inclusion principles and practices into our core values***." Relatedly, the 2022 Form 10-K touted that as part of "Talent Development," Orthofix "***believe[d] that success comes from investing in our people and ensuring our workforce is aligned with our mission and values***" and "***str[o]ve to support [their] teams in the areas of development, mentoring, engagement, and health and wellness, enabling them to do their best work as they grow in their careers***." Orthofix also touted that it supported initiatives within Orthofix such as "***the Orthofix Women's Network, a program that provides opportunities for women to learn from each other and grow within our company and industry.***" Further, Orthofix stated that it "***[sought] to embrace and encourage our employees' differences***

***and know that diversity, equity and inclusion help build a truly global, transformative business and will continue to be a source of our strength***."

214. This statement, like the others, is at odds with the reported manner in which Orthofix handled personnel matters. The Terminated Executive Defendants' troubled approach to leadership at SeaSpine carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation.

**K. Orthofix Touts the Stability of the Combined Company's Leadership, Its Application of the Codes of Conduct to Executives, and Its Implementation of Robust Risk Management Programs**

215. The same day that Orthofix filed its 2022 Form 10-K, on March 6, 2023, it hosted an earnings call. During the earnings call, an analyst asked about the stability of the sales force at the Company for the fourth quarter of 2022 and for commentary on retaining employees. Defendant Valentine answered the analyst, commenting generally that there was "a great deal of strength" in the kick-off to the new fiscal year, and stating, "***I think the sales management process and the selections we've made and what the team looks like is a nice combination of leadership that also brings with it, I think, a good stability to those sales teams.***"

216. This statement was at odds with Defendants' actual adherence to the corporate governance and codes of conduct set forth in the Definitive Proxy Statement on a Schedule 14A ("Proxy Statement" or "Proxy"), which Defendants filed on April 27, 2023.

217. For example, the Proxy stated that Orthofix maintained codes of conduct for each of its legacy Orthofix and SeaSpine businesses (together, "Codes of Conduct"), and that the Code of Conduct for the legacy Orthofix business ***applied to all directors and executive officers***, and that this Code of Conduct was available for review on the Orthofix website. Orthofix posited that its Codes of Conduct and its general corporate compliance and ethics program had the goals of "***deter[ring] wrongdoing and promot[ing] (i) honest and ethical conduct, including the ethical***

***handling of actual or apparent conflicts of interest between personal and professional relationships, (ii) full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in other public communications made by us, (iii) compliance with applicable governmental laws, rules, and regulations, (iv) the prompt internal reporting of violations of our Codes of Conduct to appropriate persons identified therein, and (v) accountability for adherence to our Codes of Conduct.*** " The Proxy Statement further stated that their "***Codes of Conduct apply to all areas of professional conduct,***" including "***workplace conduct***." Later in the document, the Proxy reiterated that it "***maintain[ed] corporate codes of conduct"*** and stated that they were "***applicable to all [their] directors, officers, and employees.***"

218. In addition, the Proxy represented that Orthofix "***demonstrate[d] [their] commitment to providing equal and equitable opportunities to all employees through training, mentoring, education and an inclusive culture,"*** and that it "***engage[d] employees in a number of ways, including [their] Moving 4ward Program, which was created to improve diversity equity and inclusion, and through the Orthofix Women's Network, which strives to support the women of Orthofix around the globe in the areas of development, mentoring and engagement."*** Similarly, the Proxy Statement stated that Orthofix "***[sought] to embrace and encourage [their] employees' differences and [knew] that diversity, equity, and inclusion help build a truly global, transformative business and will continue to be a source of [Orthofix's] strength.***"

219. Finally, the Proxy Statement touted the governance of Orthofix, stating that Orthofix had a "***fundamental policy to conduct business in accordance with the highest ethical and legal standards***" and a "***comprehensive compliance and ethics program to promote lawful and ethical business practices throughout [their] domestic and internal businesses."*** Orthofix

also represented that it "***implement[s] robust risk management programs to ensure compliance with applicable laws and regulations governing ethical business practices, including [Orthofix's] relationships with suppliers, customers and business partners, and our industry.***"

220. During this time, the market looked favorably upon Orthofix's new management team and expressed that integration risks were already baked into the Company's share price. For example, on July 19, 2023, BTIG published a positive analyst report about Orthofix, writing:

> The merger establishes a leading global spine and orthopedics company with significant portfolio depth and scale. The new Orthofix is targeting sizable markets with solid growth opportunities by leveraging a larger, combined distribution network. ***We believe that the new Orthofix leadership team has proven its ability to execute, is well-known by investors, and with shares assuming some integration risk based on current valuation, we think OFIX shares are inexpensive enough that risk is accounted for.*** We recognize that there is a period over the next few quarters where investors may take a wait-and-see approach before owning the stock. It's incumbent upon Orthofix to exceed expectations early on and this isn't a given. That said, as we move past the integration period, we think the company is well-positioned to execute within its given markets.

### L. After Closing, Unbeknownst to the Market, Orthofix Launches an Internal Investigation into the Terminated Executive Defendants' Misconduct

221. Though the newly-combined Company touted the progress of its integration and forecasted success for the future of the Company, in reality, behind closed doors it was undergoing internal turmoil during integration. Once the Orthofix Board recognized that it had committed a grave error during the due diligence process by failing to properly vet the Terminated Executives, thereby exposing the Company and its investors to significant risks, it launched an Internal Investigation into the pre-Merger and post-Merger conduct of the Terminated Executive Defendants.

222. According to filings in the Defamation Lawsuit—including (i) the Defamation Complaint (which named as defendants Defendants Burzik and Burris and Does 1-10), (ii) the

Motion to Strike, and (iii) the Burzik Declaration—roughly six months after the Merger closed, Orthofix's Board received a complaint from then-President of Orthofix Global Spine, Kevin Kenny, detailing multiple workplace issues and inappropriate conduct by the Terminated Executive Defendants, including overconsumption of alcohol, regular inappropriate comments, vulgarity, harassment of employees, and disregard of compliance obligations. Defam. Mot. to Strike at 3; Burzik Decl. at 1; Defam. Compl. ¶ 18. This misconduct complaint—lodged by a senior, male officer of the Company—finally prompted the Board to take action and commence an investigation of "various workplace issues, including those detailed in the complaint," spending millions of dollars in the process. Burzik Decl. ¶ 7. At this point, however, the Terminated Executive Defendants had already been wreaking havoc within their workplace and towards female employees for ***years***, putting SeaSpine and then Orthofix at serious risk, as discussed at detail above.

223. According to the Defamation Complaint, the investigation was initially spearheaded by a Board member, Defendant Hannon, and outside counsel DLA Piper, and eventually was transferred to the purview of Burzik and Burris, who brought on Latham & Watkins LLP ("Latham"). Defam. Compl. ¶ 19.

224. This Internal Investigation was a Company-wide affair and involved interviewing employees about the Company's operations. According to CW 9, a former employee, Orthofix employees received a litigation hold in connection with the Internal Investigation. In addition, CW 9 said that attorneys from Latham & Watkins asked CW 9 and O'Connor about their work on Sunshine Act reporting and physician consulting agreements reporting. O'Connor also testified that Latham had asked "a lot of employment-related questions" involving the legal department, where she and Keran worked. *O'Connor* Notice of Lodgment, Ex. A-1 at 230:20-23. The

Terminated Executive Defendants were also involved in the Internal Investigation. For instance, Valentine sat for multiple interviews and Keran participated in numerous meetings, sat for an interview, and assisted Latham with contacting witnesses and facilitating the collection of documents. Defam. Compl. ¶ 21.

225. Around August 17, 2023 members of the Board and Latham told Valentine that they required the Terminated Executive Defendants to provide their phones to be imaged for purposes of the Internal Investigation. Defam. Compl. ¶ 22. Valentine's personal phone was imaged around August 18, 2023, Keran's on August 25, 2023, and Bostjancic's on September 5, 2023. Defam. Compl. ¶¶ 22, 23, 27. Text messages collected from the Terminated Executive Defendants included those that dated at least as far back as 2021. Specifically, Latham collected almost 7,000 text messages among the Terminated Executive Defendants from Keran's phone that were sent between June 3, 2021 and August 22, 2023. Defam. Compl. ¶ 23. In addition, according to CW 9, Latham had asked not only Valentine, Bostjancic, and Keran to provide their devices, but also O'Connor.

226. Through the Internal Investigation, the Company identified the Terminated Executives' "repeated[] . . . gross and improper sexist, homophobic, racist, and other vulgar and demeaning comments about co-workers and third-parties in the workplace." Defam. Mot. to Strike at 1. The Terminated Executive Defendants' "regular[] . . . discussions of graphic and violent sexual acts" concerned directors, employees, investors, and others associated with both Orthofix and SeaSpine. Defam. Mot. to Strike at 3.

227. In fact, even as the investigation was ongoing, the Terminated Executive Defendants continued to demean women that they encountered in a professional capacity, including those who assisted with the internal investigation. Per the below, Defendant Valentine

wrote, "Fuckin' prick auditors have more questions so I have another 1-2 hours," and Defendant Bostjancic replied, "***Insist on the hot one to interview you***":

KV Keith Valentine [redacted] 8/5/2023, 4:30 PM
Fuckin' prick auditors have more questions so I have another 1-2 hours with [redacted] tomorrow.

JB John Bostjancic [redacted] 8/5/2023, 4:37 PM
Insist on the hot one to interview you.

228. Separate from the text messages, the Internal Investigation looked into other aspects of the Terminated Executive Defendants' workplace conduct, such as their treatment of and relationships with employees. As stated in the Defamation Motion to Strike, Orthofix uncovered during the investigation "evidence that the former executives engaged in significant and repeated bullying and other mistreatment of Orthofix's employees, that the culture the three managed demeaned and devalued the contributions of female employees, and that the three executives acted frequently with aggression, and accepted and promoted vulgarity and personal attacks." Defam. Mot. to Strike at 1. The investigation included inquiring into pre-Merger conduct: O'Connor testified during her deposition in the *O'Connor* Lawsuit that Latham had asked Keran about whether he and O'Connor, who had worked at SeaSpine since 2018, "had an inappropriate sexual relationship." *O'Connor* Notice of Lodgment, Ex. A-1 at 228:18-21.

229. The findings of the Internal Investigation regarding the Terminated Executive Defendants' pre-Merger and post-Merger conduct were reviewed by the Board, including the multiple inappropriate text messages, Burzik Decl. ¶ 7, many of which are included throughout this Complaint. On September 10, 2023, Latham sent counsel for the Terminated Executive Defendants 24 text exchanges to provide a "sense of the Board's concerns," 18 of which were written and received in 2022 before the three men joined Orthofix. Defam. Compl. ¶¶ 30, 38. As detailed above in this Complaint, the inappropriate text message exchanges between the

Terminated Executive Defendants are in line with the discriminatory and abusive conduct that former employees experienced at SeaSpine and the combined Company.

230. On September 11, 2023, Orthofix sent written notices of termination to Valentine and Keran (and one to Bostjancic the following day), which stated that their "highly offensive text messages . . . formed part of the Board's determinations" to fire them for cause. Defam Compl. ¶ 48. Many of these messages demonstrated that before the Merger, the Terminated Executive Defendants "repeatedly commented on female coworkers in crude and inappropriate terms, frequently using sexual and other derogatory language" and "racist and seriously inappropriate commentary was not uncommon." Defam. Mot. to Strike at 3, 4. The termination letter for Valentine, which was substantially similar to those for Bostjancic and Keran, further stated that the Board "determined that [he had] breached multiple duties, obligations and agreements held with the company, including that [he]":

> (A) engaged in acts of moral turpitude, (B) committed willful misconduct in connection with the performance of your duties, (C) caused material and demonstrable injury to the Company and its subsidiaries as a result of your commission of willful misconduct in connection with the performance of your duties, (D) committed willful and material violations of applicable Company policies and codes of conduct, and (E) engaged in breaches of fiduciary duty in connection with your employment with the Company and its subsidiaries (and in connection with your service as a director of the Company and SeaSpine Holdings Corporation).

231. In concluding that the Terminated Executives' misconduct "caused material and demonstrable injury to the Company," Orthofix essentially stated that they had diminished the value of the Company.

232. Though the Terminated Executive Defendants have challenged through arbitration and litigation the Orthofix Board's "for cause" terminations, (along with defamation-related claims), according to Orthofix's FY2025 Form 10-K, in January 26, 2026, an arbitrator in

Defendant Valentine's matter issued a decision denying the defamation-related claims and agreeing that his conduct met the legal definition of "acts of moral turpitude." However, the arbitrator found that the misconduct took place before the execution of his severance agreement (signed in June 2023)—which likely encompassed the pre-Merger conduct considered by the Orthofix Board—and concluded that as a result, he should have been terminated "without cause" and was owed breach of contract damages.[8]

233. Separately, shortly before firing the Terminated Executive Defendants, Orthofix was concerned about being subject to legal liability for their misconduct towards employees. It is believed that Orthofix asked some employees to sign an agreement releasing the Company from liability relating to sexual assault and/or discrimination in the days leading up to the executives' termination. But their attempt to silence women was not completely successful, as evidenced by the lawsuit that O'Connor filed against Orthofix, as described above.

### M. Orthofix Announces That It Has Terminated the Terminated Executive Defendants "For Cause"

234. The truth about Orthofix's failure to properly vet the Terminated Executive Defendants and probe the widespread misconduct at SeaSpine during the due diligence period and the misleading nature of the Merger Agreement representations about employment and labor matters at SeaSpine was first revealed on September 12, 2023, when Orthofix issued a press release announcing the termination of the Terminated Executive Defendants for cause as a result of the Internal Investigation, effective immediately. The press release stated in relevant part:

> Orthofix Medical Inc. (NASDAQ: OFIX), a leading global spine and orthopedics company, today announced that Catherine Burzik, Chair of the Orthofix Board of Directors, has been appointed Interim Chief Executive Officer; Geoffrey Gillespie, Orthofix Vice

[8] The FY2025 Form 10-K further states that arbitration hearings for Defendants Bostjancic and Keran are expected to occur sometime in 2026.

> President, Corporate Controller, has been appointed Interim Chief Financial Officer; and Puja Leekha, Orthofix Senior Vice President, Chief Ethics and Compliance Officer, has been appointed Interim Chief Legal Officer. The appointments are effective immediately and follow the ***unanimous decision by the Board's independent directors to terminate for cause Keith Valentine, John Bostjancic and Patrick Keran from those respective roles. The Board also requested that Mr. Valentine resign from the Board.*** The Board will immediately begin a search for permanent successors.

235. The press release explained that the termination was the result of an internal investigation at the Company, which was conducted by outside legal counsel and directed and overseen by the Orthofix Board. As discussed above, that investigation was extensive, reaching back to at least 2022. It revealed that both prior to and after the Merger, including during the due diligence period, the Terminated Executive Defendants had engaged in harassing and inappropriate conduct, creating a toxic work environment. In that vein, the press release stated:

> ***The Board's decision follows an investigation conducted by independent outside legal counsel and directed and overseen by the Company's independent directors. As a result of the investigation, the Board determined that each of these executives engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture***. These matters are unrelated to and do not impact the Company's strategy, results of operations or previously filed financial statements.

236. Burzik, Chair of the Orthofix Board, was quoted and emphasized that Orthofix did not "condone harassing or inappropriate conduct or statements of any kind":

> Catherine Burzik, Chair of the Orthofix Board, said, "***Orthofix's core values are built around fostering, cultivating and preserving a culture that is respectful, and we do not condone harassing or inappropriate conduct or statements of any kind. We require all employees – and especially our leaders – to behave in accordance with the Company's values. The Board did not make these decisions lightly. We believe they are necessary to ensure our employees, investors, customers, and other stakeholders have confidence in the Company's leaders.***"

237. These statements were directly relevant or related to Defendants' pre-Merger representations regarding the existence of formal or informal complaints of harassment, misconduct, discrimination, or similar behavior in the past four years against supervisory-level SeaSpine employee; misconduct-related allegations pending or threatened; any reasonable basis for such a misconduct allegation; and settlement agreements in the past four years relating to any misconduct-related allegation against SeaSpine or any SeaSpine officer, director, manager, employee, or independent contractor. As discussed above, the Internal Investigation had uncovered evidence of harassment and inappropriate conduct, and court documents from the later-filed Defamation Lawsuit detailed that the abrupt terminations were based in part on pre-Merger and post-Merger communications and conduct (*supra* ¶¶ 225-231). This included certain text messages exchanged between the Terminated Executive Defendants from at least as early as August 2022, before the Merger was announced (when they were leaders of SeaSpine), and through at least as late as August 2023 (when they were leaders of Orthofix), as well as "multiple workplace issues and inappropriate conduct" in violation of the code of conduct requirements, Burzik Decl. ¶ 6. In fact, in the Defamation Lawsuit, Defendant Burzik submitted to the court screenshots of the Terminated Executive Defendants' offensive, sexually violent, and degrading text messages, Burzik Decl. ¶ 8, including fifteen text message chains from before the Merger. Burzik's attestations regarding the Terminated Executive Defendants' behavior are fully corroborated by the extensive allegations herein. More recently, in January 2026, an arbitrator agreed that Orthofix's public statements about Defendant Valentine's termination were true and denied his defamation and related claims.

238. Following issuance of the Company's September 12, 2023, 7:03 AM press release announcing the "for cause" terminations, the Company's stock took an immediate hit during pre-

market trading. In less than five minutes, at 7:07 AM, *MarketWatch* reported that Orthofix's "stock tumble[d] 11.3% premarket after CEO, CFO, and CLO terminated for cause." The decline quickly doubled: when the market opened at 9:30 AM, *Bloomberg* reported, "Orthofix declines 22%, Most in 15 years; Trading volume surges," noting that the "shares declined to $14.59" and the "stock was the worst performer among its peers." The stock continued to fall throughout the trading day so that by closing, it had declined in total $5.62 per share, or 30%, to close at $13.01 per share on September 12, 2023, on unusually heavy volume, wiping out $206.5 million of market capitalization

239. The majority of Orthofix's stock drop, *i.e.*, 22% out of 30%, occurred before any analyst reports were issued or there was any downgrading of the stock. Indeed, the immediacy of the stock drop on news of the "for cause" terminations evidences investors' belief that the Company's value had been diminished by the scandalous conduct.

240. The first analyst to downgrade its rating of Orthofix did so only after the steep pre-market drop in Orthofix stock price. At around 10:05 AM, Stifel downgraded its rating of Orthofix to Hold from Buy.

241. Similarly, at around 10:46 AM on September 12, 2023 quoting from the Company's press release, BTIG downgraded its rating of Orthofix, highlighted that the terminations were "for cause" and that "there was a lot to unpack here," and expressed serious concerns about how the sudden change in leadership could impact the value of the business. BTIG wrote:

> ***We are downgrading to Neutral, suspending our PT, and moving to the sidelines in reaction to the updates announced today. There is a lot to unpack here, but OFIX surprised investors this morning with a sudden leadership change. Management of the company was terminated with cause, including the CEO, CFO, and GC.*** Interim management was appointed effective immediately. We spoke with Board members and interim management of the company and while they highlighted that this was confined to

> personal matters (and code of conduct) and not specific to company financials, ***it's hard to separate the public-facing management that investors knew well and the potential impact to the business.***

242. Aside from the immediate impact on the stock price from the "for cause" announcement, BTIG reported the following:

> We're unaware of any further legal fallout from this update, but our next worry would be what type of further entanglements come from this as a result. The interim management we spoke with have noted the matter to be closed.
>
> Valuation: Our OFIX rating is Neutral. While shares are inexpensive at current levels, given the lack of permanent leadership, the timelines to stabilize the company in the midst of a merger, and the longer-term potential business impacts from the lost leadership, we believe remaining on the sidelines is best.

As with similar scandals involving executives of publicly traded companies, BTIG appears to have warned that the terminations for ongoing misconduct caused reputational harm to Orthofix, which could result in further diminishing of corporate value.

243. Later in the day of the announcement,[9] analyst JMP issued a report titled, "Orthofix Medical Inc. (OFIX) Board decides to terminate CEO, CFO, and CLO for Cause." JMP also reacted to the termination of the Terminated Executive Defendants, quoting from the Company's press release the reasons for the "for cause" terminations:

> ***Of note, the release indicated that the move came as a result of "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements",*** and that the matters are unrelated to results of operations nor do they impact previously filed financial statements.
>
> OFIX also appointed interim executives to fill these roles which include, Catherine Burzik as CEO (Chair of the OFIX Board of Directors), Geoffrey Gillespie as CFO (VP and Corporate Controller), and Puja Leekha (SVP and Chief Ethics and Compliance Officer) as Chief Legal Officer. In our discussion with

[9] Timing of the JMP report was determined by evaluating metadata from Westlaw.

> the interim management team, OFIX commented that they have business leaders in place to continue to execute on the ongoing strategic and merger integration efforts.

JMP recognized the reputational harm to Orthofix and remarked that it had never seen a situation like this and expected that there could be a "prolonged integration process between the two companies" and "the timeline could remain fluid as the company will now look to deploy damage control and find permanent replacements for those released."

244. The announcement also resulted in news coverage of the incident. For example, on the day of the announcement, at 2:56 PM, *FierceBioTech* published an article titled, "Orthofix Board Gives CEO, Other C-Suite Members the Boot for Offensive Conduct," summarizing Orthofix's press release concerning the reasons for the "for cause" termination and noting that "Orthofix's stock price dropped about 25% following its announcement, down to about $13.56."

245. The same day, *Orthopedics This Week* published an article titled "Purge at Orthofix," describing the shock of the news—particularly as to Defendant Valentine:

> ***In a shocking move, Orthofix's board of directors announced today that they have terminated for cause three of the top executives in the world of spinal implant manufacturing: Keith Valentine, John Bostjancic and Patrick Keran*.**
>
> * * *
>
> ***We, like everyone, are shocked and wait for more explanations and information.***

246. Two other articles published on September 12, 2023 also reported on the "for cause" terminations resulting from the Terminated Executive Defendants misconduct: *MDDI* published "Orthofix Terminates Executives Over Inappropriate & Offensive Conduct" and *MedtechDrive* published "Orthofix fires CEO CFO after investigation finds misconduct."

247. Analyst reactions carried over to the next day and, like the other analysts, others reported that the terminations were "for cause." On September 13, 2023, analyst Ladenburg Thalmann published a report titled, "Orthofix Sudden Changes to Leadership Resulting in Updates to Our Models" and stated that it was lowering its price target. The analyst report summarized the reasons for the "for cause" terminations, and described the Company's announcement as involving "***significant leadership changes***" and noting that the decision to terminate "for cause" was based on the result of the Internal Investigation "that determined that each of the executives engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements."

248. In addition, Ladenburg Thalman expressed surprise that the Company had not yet issued a Form 8-K, since it considered the scandalous announcement and change to corporate valuation to be material:

> As a result of the news, we are making the following modifications to our financial models. ***We are somewhat surprised that no SEC documentation as of the time of this report has been released as we believe the announcement and change to corporate valuation is material.***

Ladenburg Thalman linked the loss of market capitalization or corporate value to the "for cause" terminations. While recognizing a higher level of risk related to the impact on commercial channels, they did not seem overly concerned with a change in management, stating that they "are confident with the leadership changes and future modifications."

249. *MarketWatch* also published coverage on September 13, 2023, explaining that "Orthofix's stock has worst day in nearly 30 years after 3 top executives are fired for 'offensive conduct.'" It quoted directly from the Company's press release announcing the "for cause" terminations based on "harassing [and] inappropriate conduct."

250. As foreshadowed by Ladenburg Thalmann, on September 14, 2023, Orthofix filed with the SEC a Form 8-K disclosing its termination of the Terminated Executive Defendants and attaching the September 12, 2023 press release, stating:

> ***On September 11, 2023, the Board of Directors (the "Board") of Orthofix Medical Inc. ("Orthofix" or the "Company") terminated the employment of Keith Valentine, the Company's Chief Executive Officer, John Bostjancic, the Company's Chief Financial Officer and Patrick Keran, the Company's Chief Legal Officer. The Board's decision follows an investigation conducted by independent outside legal counsel and directed and overseen by the Company's independent directors. As a result of the investigation, the Board determined that each of these executives engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture.***

251. The Form 8-K explained that because the termination was due to repeated violations of the code of conduct requirements and therefore for cause, Orthofix did not believe that it was required to make any further payments to the Terminated Executive Defendants:

> The Company has notified Mr. Valentine, Mr. Bostjancic and Mr. Keran that such terminations have been made for "Cause," as defined in applicable employment-related agreements (including each executive's respective Change in Control and Severance Agreement, dated June 19, 2023). As a result, the Company does not believe it is required to make any further payments to the terminated executives, other than payment of salary for the days worked in the current pay period through September 12, 2023 and unused paid time off. In connection with Mr. Valentine's termination, the Board has asked him to resign from the Board.

### N. Orthofix Discloses That the Termination of the Terminated Executive Defendants Negatively Impacted Its Market Capitalization

252. About two months after the Orthofix Board terminated the Terminated Executive Defendants, Orthofix admitted that the termination negatively impacted the Company's market capitalization. On November 8, 2023, with the filing of its Form 10-Q for the third quarter of 2023,

Orthofix disclosed there was a decrease in the Company's market capitalization following the termination of the Terminated Executive Defendants:

> ***In the third quarter of 2023, the Company announced the termination of the former President and Chief Executive Officer, former Chief Financial Officer, and former Chief Legal Officer, from their respective roles. Immediately following the announcement, the Company's market capitalization decreased by approximately 30%,*** indicating that an impairment may exist. As a result, the Company performed an interim quantitative assessment of its goodwill as of September 30, 2023.

253. Defendants also made the same statement in their annual report for the year ended December 31, 2023, which they filed on a Form 10-K on March 5, 2024:

> ***In the third quarter of 2023, we announced the termination of the former President and Chief Executive Officer, former Chief Financial Officer, and former Chief Legal Officer, from their respective roles. Immediately following the announcement, our market capitalization decreased by approximately 30%, indicating that an impairment may exist***. As a result, we performed an interim quantitative assessment of our goodwill as of September 30, 2023. Upon performing our assessment, we determined the Global Spine reporting unit's fair value exceeded its carrying value as of September 30, 2023.

## VI. EXCHANGE ACT VIOLATIONS

### A. Defendants' Materially False and Misleading Statements and Omissions During the Class Period

254. Defendants made several materially false and/or misleading statements or omissions throughout the Class Period. As detailed further below, these misstatements generally concerned: (1) SeaSpine's purported compliance with employment laws, the absence of misconduct allegations or a reasonable basis for misconduct allegations at SeaSpine, and the absence of settlement agreements involving misconduct; (2) the purported performance-based culture at SeaSpine that focused on integrity, diversity, and corporate responsibility; (3) the deliberate selection of the executive leadership team and their ability to lead the successful

integration of SeaSpine and Orthofix; including the selection of the Terminated Executive Defendants; (4) Orthofix's supposed implementation of a robust, comprehensive compliance and ethics program post-Merger; (5) Orthofix's purported commitment to equity and supporting women employees post-Merger; and (6) Orthofix's enforcement of corporate codes of conduct post-Merger.

**1. October 11, 2022 Form 8-K**

255. On October 11, 2022, Orthofix filed a Form 8-K that attached and incorporated by reference Merger Agreement. The Form 8-K included the following false and misleading statements:[10]

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or***

[10] Plaintiffs allege that the statements in ***bold and italics*** within this Section were materially false, misleading, and/or omitted to disclose material information.

***racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine***.

256. The statements set forth in ¶ 255 above were false and misleading when made for the following reasons.

(a) Defendants SeaSpine's and Valentine's statement set forth in ¶ 255(a)("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine, including the Terminated Executive Defendants, was blatantly inconsistent with such employment laws. In addition, as described above (¶ 134), former employees stated that SeaSpine did not meaningfully redress the

pay and equity issues raised in the Discrimination Class Action, and actually changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(b) Defendants SeaSpine's and Valentine's statement set forth in ¶ 255(b) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for misconduct allegations. For instance, as mentioned above: the Terminated Executive Defendants were sending deeply offensive text messages in their professional capacities, which formed part of the basis for their termination (¶¶ 225-227, 229-30, 237); the Terminated Executive Defendants reportedly had inappropriate relationships with employees (¶¶ 106, 146); a former employee reported seeing Defendant Valentine place his hands up the shirt of a female employee at a work event (¶ 106); Woolley, a VP, had been written up for harassing women while intoxicated (¶ 139); a former employee reported a colleague for racial discrimination, but the colleague was protected from repercussions by Woolley (¶ 114); a former employee stated that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 113); a female employee formally reported, including to HR, harassment by a male employee that went unaddressed (¶ 115); a former employee stated that SeaSpine fudged its pay and equity numbers to appease the outside auditing company (¶ 134); there was gender-based pay inequity (¶ 67); Defendant Keran retaliated against a former employee for placing tampons in the women's bathroom by firing her (¶ 137); a former employee was chastised by Defendants Valentine and Keran for gathering the most senior women

employees at SeaSpine to discuss a vision for a women's leadership group and for hanging up pictures in her own office of women she admired (¶ 142). In addition, it was false and misleading to suggest that there were no misconduct allegations "pending" when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 108-116). Further, the Independent Investigation determined that the Terminated Executive Defendants engaged in repeated "harassing or inappropriate conduct" prior to and after the Merger (¶¶ 235-37).

(c) Defendants SeaSpine's and Valentine's statement set forth in ¶ 255(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 131-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement—less than four years before the misstatement was made.[11]

**2. November 8, 2022 Form S-4**

257. On November 8, 2022 Orthofix and SeaSpine filed with the SEC a Draft Registration Statement on Form S-4, which, incorporating and in combination with related documents including a proxy statement and prospectus, would be used to effectuate the Merger between Orthofix and SeaSpine with the SEC. The Form S-4 included the following false and misleading statements:

---

[11] *See supra* note 3.

(a) In recommending that Orthofix stockholders vote their shares of Orthofix common stock in favor of the Orthofix share issuance, the Orthofix Board considered a number of factors, including the following (not necessarily listed in order of relative importance): . . . ***The complementary cultures of Orthofix and SeaSpine, including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate social responsibility.***

(b) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages***, ***hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(c) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity,***

***nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(d) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine.***

258. The statements set forth in ¶ 257 above were false and misleading when made for the following reasons.

(a) Defendant Orthofix's and the Orthofix Officers and Directors Defendants' statement set forth in ¶ 257(a)("Integrity Statement") was materially false and misleading. It was materially false and misleading for Defendants to represent that Orthofix and SeaSpine had "complementary cultures" that included "a strong performance-based culture focused on integrity . . . diversity and corporate responsibility" when Defendants knew or recklessly disregarded that this statement did *not* describe the culture of SeaSpine. Indeed, as set forth above, Defendants knew that SeaSpine had a culture of favoring male employees in hiring and pay, regardless of "performance," as SeaSpine was still ostensibly resolving systemic gender-based pay and equity issues following the Discrimination Class Action Settlement. Further, as described above, SeaSpine and the Terminated Executive Defendants knew or recklessly disregarded that SeaSpine was a hostile work

environment where senior leaders demeaned, devalued, and silenced female employees.

(b) Defendants SeaSpine's and Valentine's statement set forth in ¶ 257(b) ("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine, including the Terminated Executive Defendants, was blatantly inconsistent with such employment laws. In addition, as described above (¶ 134), former employees stated that SeaSpine did not meaningfully redress the pay and equity issues raised in the Discrimination Class Action, and actually changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(c) Defendants SeaSpine's and Valentine's statement set forth in ¶ 257(c)("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for misconduct allegations. For instance, as mentioned above: the Terminated Executive Defendants were sending deeply offensive text messages in their professional capacities, which formed part of the basis for their termination (¶¶ 225-227, 229-30, 237); the Terminated Executive Defendants reportedly had inappropriate relationships with employees (¶¶ 106, 146); a former employee reported seeing Defendant Valentine place his hands up the shirt of a female employee at a work event (¶ 106); Woolley, a VP,

had been written up for harassing women while intoxicated (¶ 139); a former employee reported a colleague for racial discrimination, but the colleague was protected from repercussions by Woolley (¶ 114); a former employee stated that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 113); a female employee formally reported, including to HR, harassment by a male employee that went unaddressed (¶ 115); a former employee stated that SeaSpine fudged its pay and equity numbers to appease the outside auditing company (¶ 134); there was gender-based pay inequity (¶ 67); Defendant Keran retaliated against a former employee for placing tampons in the women's bathroom by firing her (¶ 137); a former employee was chastised by Defendants Valentine and Keran for gathering the most senior women employees at SeaSpine to discuss a vision for a women's leadership group and for hanging up pictures in her own office of women she admired (¶ 142). In addition, it was false and misleading to suggest that there were no misconduct allegations "pending" when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 108-116). Further, the Independent Investigation determined that the Terminated Executive Defendants engaged in repeated "harassing or inappropriate conduct" prior to and after the Merger (¶¶ 235-37).

(d) Defendants SeaSpine's and Valentine's statement set forth in ¶ 257(d) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶

62-65, 131-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement—less than four years before the misstatement was made.[12]

**3. November 18, 2022 Form 425 and Press Release**

*a. November 18, 2022 Form 425*

259. On November 18, 2022, Orthofix filed with the SEC a Form 425 containing a letter that it had sent to employees dated November 17, 2022. The Form 425 included the following false and misleading statements.

(a) ***ELT candidates were selected based not only on their individual merit but also with consideration for the overall composition of the executive team.*** It was critical to appoint leaders from both legacy organizations to bring forth the best of both worlds.

[...] Looking ahead, there are numerous details to be worked out as part of the integration planning. We know you are eager to know who will be a part of the next level of leadership but there is still much work to be done to align our organizations as we harmonize our processes and systems. Leadership teams are continuing to work together to shape the organization to determine what is best to drive the combined company's success and ensure we are competitive. This work is ongoing and we will keep you informed as the integration progresses. For now, please focus on the great work you do and help us finish the year strong.

We would like to close by saying that we are both very excited about our bright future ahead. Our new Executive Leadership Team brings the experience and

[12] *See supra* note 3.

strategic vision to drive our business to new heights. Each of our leaders has shared their enthusiasm for what lies ahead, and we are confident our combined businesses will be Stronger Together!

260. The statements set forth in ¶ 259 above were false and misleading when made for the following reasons.

(a) Defendants Orthofix's, Serbousek's, SeaSpine's, and Valentine's statement set forth in ¶ 259(a) ("ELT Selection Statement") was false and misleading because it conveys the misleading impression that Orthofix had engaged in a vetting process that evaluated candidates' competency and accomplishments that would warrant leading the combined Company. However, as set forth above (¶¶ 61-81), Orthofix's due diligence was minimal into HR and personnel issues despite the presence of red flags surrounding misconduct by SeaSpine leadership. If Orthofix had engaged in such a process, the Terminated Executive Defendants' misconduct would have been exposed.

*b. November 18, 2022 Press Release*

261. That same day, on November 18, 2022, Orthofix issued a press release entitled, "Orthofix and SeaSpine Announce John Bostjancic to Serve as CFO for Combined Company Post Closing." The Form 8-K included the following false and misleading statements:

(a) "John has been a key leader of SeaSpine dating back to the successful spin-out of the organization in 2015. ***I am confident his background and experience in the medical device industry coupled with his cultural influence will benefit the newly combined company as we continue to grow***," said Keith Valentine, President and CEO of SeaSpine. "I believe ***John is well positioned to help lead us through the***

***successful integration of the two companies, ensuring accountability across all levels of the organization, as we focus on the key initiatives that will drive growth, scalability and shareholder value*.”

262. The statements set forth in ¶ 261 above were false and misleading when made for the following reasons.

(a) Defendants Orthofix’s, SeaSpine’s, and Valentine’s statement set forth in ¶ 261(a) (“Bostjancic Statement”) was false and misleading because they assured the market that Defendant Bostjancic was a force for accountability, and omitted facts that in reality, Defendant Bostjancic—like the other Terminated Executive Defendants—perpetuated a hostile and discriminatory work environment. Indeed, Defendant Valentine knew that Defendant Bostjancic, with whom he worked closely and shared a years-long friendship, was a co-conspirator in maintaining the hostile and discriminatory workplace at SeaSpine. Indeed, the allegations set forth above demonstrate that Defendant Bostjancic’s “cultural influence” would *not* “benefit the newly combined company,” nor would he “ensur[e] accountability across all levels of the organization.” In addition, as set forth above, former employees stated that Defendant Bostjancic (in many circumstances, along with Defendant Valentine) expressed discriminatory preferences for men, engaged in inappropriate behavior with EAs, failed to sufficiently redress complaints about pay equity, and endorsed bullying at SeaSpine.

**4. November 22, 2022 Form S-4/A**

263. On November 22, 2022, Orthofix filed a Form S-4/A amendment to its November 8, 2022 Registration Statement, which attached and incorporated by reference the Merger Agreement. The Form S-4/A included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation***

***against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine***.

(d) In recommending that Orthofix stockholders vote their shares of Orthofix common stock in favor of the Orthofix share issuance, the Orthofix Board considered a number of factors, including the following (not necessarily listed in order of relative importance): . . . ***The complementary cultures of Orthofix and SeaSpine, including a strong performance-based culture focused on integrity, collaboration, innovation, diversity and corporate social responsibility.***

264. The statements set forth in ¶ 263 above were false and misleading when made for the following reasons.

(a) Defendants SeaSpine's and Valentine's statement set forth in ¶ 263(a)("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine, including the Terminated Executive Defendants, was blatantly inconsistent with such employment laws. In addition, as described above (¶ 134), former employees stated that SeaSpine did not meaningfully redress the pay and equity issues raised in the Discrimination Class Action, and actually changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(b) Defendants SeaSpine's and Valentine's statement set forth in ¶ 263(b) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for misconduct allegations. For instance, as mentioned above: the Terminated Executive Defendants were sending deeply offensive text messages in their professional capacities, which formed part of the basis for their termination (¶¶ 225-227, 229-30, 237); the Terminated Executive Defendants reportedly had inappropriate relationships with employees (¶¶ 106, 146); a former employee reported seeing Defendant Valentine place his hands up the shirt of a female employee at a work event (¶ 106); Woolley, a VP, had been written up for harassing women while intoxicated (¶ 139); a former employee reported a colleague for racial discrimination, but the colleague was protected from repercussions by Woolley (¶ 114); a former employee stated that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 113); a female employee formally reported, including to HR, harassment by a male employee that went unaddressed (¶ 115); a former employee stated that SeaSpine fudged its pay and equity numbers to appease the outside auditing company (¶ 134); there was gender-based pay inequity (¶ 67); Defendant Keran retaliated against a former employee for placing tampons in the women's bathroom by firing her (¶ 137); a former employee was chastised by Defendants Valentine and Keran for gathering the most senior women employees at SeaSpine to discuss a vision for a women's leadership group and for hanging up pictures in her own office of women she admired (¶ 142). In addition, it was false and misleading to suggest that there were no misconduct allegations

"pending" when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 108-116). Further, the Independent Investigation determined that the Terminated Executive Defendants engaged in repeated "harassing or inappropriate conduct" prior to and after the Merger (¶¶ 235-37).

(c) Defendant SeaSpine's and Defendant Valentine's statement set forth in ¶ 263(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 131-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement—less than four years before the misstatement was made.[13]

(d) Defendant Orthofix's and the Legacy Orthofix Officer and Director Defendants' statement set forth in ¶ 263(d) ("Integrity Statement") was materially false and misleading. It was materially false and misleading for Defendants to represent that Orthofix and SeaSpine had "complementary cultures" that included "a strong performance-based culture focused on integrity . . . diversity and corporate responsibility" when Defendants knew or recklessly disregarded that this statement did *not* describe the culture of SeaSpine. Indeed, as set forth above, Defendants knew that SeaSpine had a culture of favoring male employees in hiring and pay, regardless of "performance," as SeaSpine was still ostensibly resolving systemic

[13] *See supra* note 3.

gender-based pay and equity issues following the Discrimination Class Action Settlement. Further, as described above, SeaSpine and the Terminated Executive Defendants knew or recklessly disregarded that SeaSpine was a hostile work environment where senior leaders demeaned, devalued, and silenced female employees.

**5. November 23, 2022 Joint Proxy Statement/Prospectus**

265. On November 23, 2022, Orthofix and SeaSpine filed a Joint Proxy Statement/Prospectus pursuant to Rule 424(b)(3), which incorporated by reference the Merger Agreement. The Joint Proxy Statement/Prospectus included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment***, reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was***

***an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine***.[14]

266. The statements set forth in ¶ 265 above were false and misleading when made for the following reasons.

(a) Defendants SeaSpine's and Valentine's statement set forth in ¶ 265(a) ("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine, including the Terminated Executive Defendants, was blatantly inconsistent with such employment laws. In addition, as described above (¶ 134), former employees stated that SeaSpine did not meaningfully redress the pay and equity issues raised in the Discrimination Class Action, and actually

[14] *See supra* note 3.

changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(b) Defendants SeaSpine's and Valentine's statement set forth in ¶ 265(b) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for misconduct allegations. For instance, as mentioned above: the Terminated Executive Defendants were sending deeply offensive text messages in their professional capacities, which formed part of the basis for their termination (¶¶ 225-227, 229-30, 237); the Terminated Executive Defendants reportedly had inappropriate relationships with employees (¶¶ 106, 146); a former employee reported seeing Defendant Valentine place his hands up the shirt of a female employee at a work event (¶ 106); Woolley, a VP, had been written up for harassing women while intoxicated (¶ 139); a former employee reported a colleague for racial discrimination, but the colleague was protected from repercussions by Woolley (¶ 114); a former employee stated that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 113); a female employee formally reported, including to HR, harassment by a male employee that went unaddressed (¶ 115); a former employee stated that SeaSpine fudged its pay and equity numbers to appease the outside auditing company (¶ 134); there was gender-based pay inequity (¶ 67); Defendant Keran retaliated against a former employee for placing tampons in the women's bathroom by firing her (¶ 137); a former employee was chastised by Defendants Valentine and Keran for gathering the most senior women employees at SeaSpine to discuss a vision for a women's leadership group and for

hanging up pictures in her own office of women she admired (¶ 142). In addition, it was false and misleading to suggest that there were no misconduct allegations "pending" when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 108-116). Further, the Independent Investigation determined that the Terminated Executive Defendants engaged in repeated "harassing or inappropriate conduct" prior to and after the Merger (¶¶ 235-37).

(c) Defendants SeaSpine's and Valentine's statement set forth in ¶ 265(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 131-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement—less than four years before the misstatement was made.[15]

**6. March 6, 2023 Form 10-K**

267. On March 6, 2023, the combined Company filed with the SEC its annual report on Form 10-K for the full fiscal year 2022. The 2022 Form 10-K was signed by Defendants Valentine and Bostjancic and the Orthofix Post-Merger Director Defendants. The Form 10-K contains the following materially false and misleading statements:

(a) ***It is our fundamental policy to conduct business in accordance with the highest ethical and legal standards. We have a comprehensive compliance and ethics program***, which is overseen by a Chief Ethics and Compliance Officer, who reports

[15] *See supra* note 3.

directly to our Chief Executive Officer and the Compliance Committee of the Board of Directors. ***The program is intended to promote lawful and ethical business practices throughout our domestic and international businesses. It is designed to prevent and detect violations of applicable federal, state, and local laws*** in accordance with the standards set forth in guidance issued by the U.S. Department of Justice ("U.S. DOJ") ("Evaluation of Corporate Compliance Programs" (updated June 2020)), the Office of Inspector General (HCCA-OIG "Measuring Compliance Program Effectiveness: A Resource Guide" (March 2017)), and the U.S. Sentencing Commission ("Effective Compliance and Ethics Programs" (November 2014)).

(b) ***Our key human capital objectives in managing our business include attracting, developing, and retaining top talent while integrating diversity, equity, and inclusion principles and practices into our core values.***

(c) ***We believe that success comes from investing in our people and ensuring our workforce is aligned with our mission and values***. To achieve this goal, we devote time and resources to assist our employees in being familiar with our business, industry, and product offerings. We have developed a robust onboarding program for our newly hired associates that provides a comprehensive overview of our product portfolio and company history. We put an emphasis on training our employees and sales representatives to understand our business, including the underlying medical conditions that our products treat. ***In addition, we strive to support our teams in the areas of development, mentoring, engagement, and***

***health and wellness, enabling them to do their best work as they grow their careers.***

(d) ***We are committed to fostering, cultivating, and preserving a culture that promotes diversity, equity, and inclusion. We seek to demonstrate our commitment to providing equal and equitable opportunities to all employees through programs*** such as our Moving 4ward initiative, a program created to embrace the value of diversity and reflect the communities where we live and work. ***Additionally, we proudly support the Orthofix Women's Network, a program that provides opportunities for women to learn from each other and grow within our company and our industry.*** Throughout the year, we promote a variety of diverse voices to our employees by recognizing events such as Black History Month, Martin Luther King Jr. Day, Women's History Month, Asian Pacific American Heritage Month, LGBTQ Pride Month, Juneteenth, and Hispanic Heritage Month. ***We seek to embrace and encourage our employees' differences and know that diversity, equity and inclusion help build a truly global, transformative business and will continue to be a source of our strength.*** Building on this belief, we launched companywide, and incorporated into our new hire orientation, a training titled, "Hiring, Leading and Fostering Diverse and Inclusive Teams". We intend that by end of 2023, all hiring managers, leaders, and interviewers will have completed this training.

268. The statements set forth in ¶ 267 above were materially false and misleading when made for the following reasons.

(a) Defendants Orthofix's, Valentine's, and Bostjancic's and the Orthofix Post-Merger Director Defendants' statement set forth in ¶ 267(a)("Compliance and Ethics Program Statement 1") was materially false and misleading because in stating that Orthofix had a "fundamental policy to conduct business in accordance with the highest ethical and legal standards" and had a "comprehensive compliance and ethics program," the Exchange Act Defendants falsely assured the market that it had robust protections against unethical behavior, including workplace misconduct. In reality, as set forth above, Orthofix did not have a comprehensive compliance and ethics program, which resulted in lax vetting of incoming executive hires; senior management and directors engaging in rampant harassment and other inappropriate misconduct in violation of the Company's purported ethical and professional standards; and the Company's failure to ensure that its SEC filings and public disclosures were free of material misstatements.

(b) Defendants Orthofix's, Valentine's, and Bostjancic's and the Orthofix Post-Merger Director Defendants' statement set forth in ¶ 267(b) ("Human Capital Statement") was false and misleading because it falsely suggests that Defendants operated a merits- and performance-based workplace culture that was based on equity. But as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them, denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their

management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation.

(c) Defendants Orthofix's, Valentine's, and Bostjancic's and the Orthofix Post-Merger Director Defendants' statement set forth in ¶ 267(c)("Talent Development Statement") was false and misleading because it falsely suggested that Defendants supported their employees, including by supporting them in the areas of "development, mentoring, engagement, and health and wellness" so as to help employees "do their best work as they grow in their careers." But as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them, denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation.

(d) Defendants Orthofix's, Valentine's, and Bostjancic's and the Orthofix Post-Merger Director Defendants' statement set forth in ¶ 267(d) ("Equal Opportunity Statement") was false and misleading because it falsely suggested that Orthofix made efforts to cultivate a diverse and equitable culture and that Orthofix championed programming that provided opportunities to women to "grow within our company and our industry." But as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them, denying them equal

opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation.

**7. April 27, 2023 Definitive Proxy Statement**

269. On April 27, 2023, Orthofix filed a Definitive Proxy Statement on a Schedule 14A. The Definitive Proxy Statement made the following false and misleading statements:

(a) Corporate Governance Highlights

* * *

• ***Corporate codes of conduct enforced at all levels of the Company and its subsidiaries***

• ***Commitment to attracting, retaining, and promoting a diverse workforce through programs such as the Moving 4Ward Diversity, Equity & Inclusion Program, the Orthofix Women's Network ("OWN"), and the Orthofix Young Professionals Group***

(b) ***We maintain codes of conduct (our "Codes of Conduct") for each of our legacy Orthofix and SeaSpine businesses that are applicable to all employees worldwide of the respective business. The Code of Conduct for the legacy Orthofix business, to which all of our directors and executive officers are subject***, is available for review under the "Investors > Governance > Governance Documents" section of our website at www.orthofix.com.

***The goals of our Codes of Conduct, as well as our general corporate compliance and ethics program (which we have branded the Integrity Advantage™***

***Program), are to deter wrongdoing and to promote (i) honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships, (ii) full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in other public communications made by us, (iii) compliance with applicable governmental laws, rules, and regulations, (iv) the prompt internal reporting of violations of our Codes of Conduct to appropriate persons identified therein, and (v) accountability for adherence to our Codes of Conduct. Our Codes of Conduct apply to all areas of professional conduct, including*** customer relationships, conflicts of interest, financial reporting, use of company assets, insider trading, intellectual property, confidential information, and ***workplace conduct.*** Under our Codes of Conduct, employees, directors, and executive officers are responsible for promptly reporting potential violations of any law, regulation, or our Codes of Conduct to appropriate personnel or via a hotline we have established.

We intend to disclose any substantive amendment to, or a waiver from, a provision of the Code of Conduct for the legacy Orthofix business that applies to our principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions and that relates to any element of the code of ethics definition enumerated in paragraph (b) of Item 406 of Regulation S-K by posting such information on our website at the address specified above.

(c) Our People: ***We demonstrate our commitment to providing equal and equitable opportunities to all employees through training, mentoring, education, and an inclusive culture. We engage our employees in a number of ways, including our Moving 4ward Program, which was created to improve diversity, equity and inclusion, and through the Orthofix Women's Network, which strives to support the women of Orthofix around the globe in the areas of development, mentoring and engagement. Throughout the year, we promote a variety of diverse voices to our employees by*** recognizing events such as Black History Month, Martin Luther King Jr. Day, Women's History Month, Asian Pacific American Heritage Month, LGBTQ Pride Month, Juneteenth, and Hispanic Heritage Month. ***We seek to embrace and encourage our employees' differences and know that diversity, equity and inclusion help build a truly global, transformative business and will continue to be a source of our strength.*** Building on this belief, we launched a new companywide, training titled, "Hiring, Leading and Fostering Diverse and Inclusive Teams". We intend that by end of 2023, all hiring managers, leaders, and interviewers will have completed this training.

(d) Governance: ***It is our fundamental policy to conduct business in accordance with the highest ethical and legal standards. We have a comprehensive compliance and ethics program to promote lawful and ethical business practices throughout our domestic and international businesses*** and offer compliance training to all of our employees. Similarly, we require that our suppliers adopt sound human rights practices designed to treat workers fairly and with dignity and respect. We responsibly manage and influence the impacts of our distributors through our robust

compliance and governance training***. We implement robust risk management programs to ensure compliance with applicable laws and regulations governing ethical business practices, including our relationships with suppliers, customers and business partners, and our industry.***

(e) ***Codes of Conduct: We maintain corporate codes of conduct that are applicable to all our directors, officers, and employees.*** The codes of conduct set forth our policies and expectations on several topics, including conflicts of interest, compliance with laws, human rights, use of our assets, business conduct and fair dealing. All employees and directors participate in annual training on our corporate codes of conduct and related Company policies.

270. The statements set forth in ¶ 269 above were materially false and misleading when made for the following reasons.

(a) Defendants Orthofix's, Burzik's, and Keran's statement set forth in ¶ 269(a) ("Corporate Governance Highlights Statement") was false and misleading because it falsely suggested that Orthofix's codes of conduct were being "enforced at all levels," including at the senior leadership level, and that Orthofix endeavored to "attract[], retain[], and promote" a diverse workforce. In reality, as set forth above, Orthofix did not enforce its code of conduct, which resulted in lax vetting of incoming executive hires and senior management and directors engaging in rampant harassment and other inappropriate misconduct in violation of the Company's purported ethical and professional standards. In addition, as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and

devaluing them, denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation. And as was revealed by Orthofix in the September 12, 2023 press release, the Terminated Executive Defendants' conduct "violated multiple code of conduct requirements and was inconsistent with the Company's values and culture."

(b) Defendants Orthofix's, Burzik's, and Keran's statement set forth in ¶ 269(b) ("Code of Conduct Statement 1") was false and misleading because it falsely suggested that Orthofix "maintained" codes of conduct "appl[ied]" the codes of conduct to "workplace conduct." In reality, as set forth above, Orthofix did not enforce its code of conduct, which resulted in lax vetting of incoming executive hires and senior management, and directors engaging in rampant harassment and other inappropriate misconduct in violation of the Company's purported ethical and professional standards. In addition, as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them, denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation. And as was revealed by Orthofix in the September 12, 2023 press

release, the Terminated Executive Defendants' conduct "violated multiple code of conduct requirements and was inconsistent with the Company's values and culture."

(c) Defendants Orthofix's, Burzik's, and Keran's statement set forth in ¶ 269(c) ("Equal Opportunity Statement 2") was false and misleading because it falsely suggested that Orthofix made efforts to cultivate a diverse and equitable culture and that Orthofix championed programming that supported women in "development, mentoring and engagement." But as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them, denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation

(d) Defendants Orthofix's, Burzik's, and Keran's statement set forth in ¶ 269(d) ("Compliance and Ethics Program Statement 2") was false and misleading because in stating that Orthofix had a "fundamental policy to conduct business in accordance with the highest ethical and legal standards" and a "comprehensive compliance and ethics program," and that Orthofix "implement[s] robust risk management programs," the Exchange Act Defendants falsely assured the market that Orthofix took proactive steps to effectuate robust protections against unethical behavior, including workplace conduct. In reality, as set forth above, Orthofix did not have such a policy, nor did it implement any comprehensive or robust program,

which resulted in lax vetting of incoming executive hires; senior management and directors engaging in rampant harassment and other inappropriate misconduct in violation of the Company's purported ethical and professional standards; and the Company's failure to ensure that its SEC filings and public disclosures were free of material misstatements.

(e) Defendants Orthofix's, Burzik's, and Keran's statement set forth in ¶ 269(e) ("Code of Conduct Statement 2") was materially false and misleading because it falsely suggested that Orthofix "maintained" codes of conduct "to which all our directors, officers, and employees," including the Terminated Executive Defendants, were subject. In reality, as set forth above, Orthofix did not maintain its code of conduct, which resulted in lax vetting of incoming executive hires and senior management, and directors engaging in rampant harassment and other inappropriate misconduct in violation of the Company's purported ethical and professional standards. In addition, as set forth above, the Terminated Executive Defendants had for years declined to support competent and qualified women in the workplace, instead demeaning and devaluing them, denying them equal opportunity in the workplace, and retaliating against women who dared to speak up about the mistreatment. The Terminated Executive Defendants' troubled approach to leadership carried into their management of Orthofix, where, as set forth above, female employees continued to be demeaned, devalued, and subjected to retaliation. And as was revealed by Orthofix in the September 12, 2023 press release, the Terminated Executive Defendants' conduct "violated multiple code of conduct requirements and was inconsistent with the Company's values and culture."

**B. Loss Causation and Economic Loss**[16]

271. During the Class Period, as detailed in this Complaint, the Exchange Act Defendants made materially false and misleading statements and omissions, including statements regarding the Merger, and engaged in a scheme to deceive the market. This artificially inflated the price of Orthofix common stock and operated as a fraud or deceit on the Class. Later, when the Exchange Act Defendants' prior misrepresentations and risks concealed by the fraudulent conduct alleged in this Complaint materialized and were disclosed to the market starting on September 12, 2023, the price of Orthofix common stock fell precipitously. As a result of their acquisition of Orthofix common stock during the Class Period and the Exchange Act Defendants' material misstatements and omissions, Plaintiff and other members of the Class (defined below) suffered economic loss, *i.e.*, damages, under the federal securities laws.

272. The artificial inflation in Orthofix's stock price began to be removed when the conditions and risks misstated and omitted by the Exchange Act Defendants were revealed to the market on September 12, 2023. That day, as set forth above, Orthofix reported in a press release that it had terminated the Terminated Executive Defendants "for cause" following an Internal Investigation conducted by outside counsel. Orthofix explained in the press release that as a result of the investigation, its Board determined that Valentine, Bostjancic, and Keran had engaged in "repeated inappropriate and offensive conduct that violated multiple code of conduct requirements and was inconsistent with the Company's values and culture." Further, Defendant Burzik was

[16] As referenced *supra* note 1, per the Court's March 9, 2026 opinion, Lead Plaintiff has amended its allegations in this Second Amended Complaint that relate to loss causation for the purposes of its Exchange Act claims. Lead Plaintiff notes that loss causation is not an element of a Securities Act claim (though negative causation can be raised as an affirmative defense to such a claim).

quoted in the press release as stating that Orthofix did "not condone harassing or inappropriate conduct or statements of any kind."

273. In response to these disclosures that were made before the market opened on September 12, 2023, Orthofix shares declined $5.62 per share, or over 30%, to close at $13.01 per share on September 12, 2023, on unusually heavy volume, wiping out $206.5 million of market capitalization.

274. Most of Orthofix's stock decline occurred during pre-market trading within just minutes of the Company's 7:03 AM "for cause" termination announcement (and then in the first two hours after the market opened). There was no analyst commentary during pre-market trading that raised concerns about future leadership of the Company—only various news outlets reporting the termination of Orthofix's CEO, CFO, and CLO and the reasons for the "for cause" firings:

a. In less than five minutes after the announcement, at 7:07 AM, *MarketWatch* reported: "stock tumbles 11.3% premarket after CEO, CFO, and CLO terminated for cause."



09/12/2023 07:07:57 [DJ]

**Orthofix Medical's stock tumbles 11.3% premarket after CEO, CFO and CLO terminated for cause**

(MarketWatch) -- This content was created by MarketWatch, which is operated by Dow Jones & Co. MarketWatch is published independently from Dow Jones Newswires and The Wall Street Journal.

(END) Dow Jones Newswires



b. After the market opened at 9:30 AM, *Bloomberg* reported, "Orthofix declines 22%, Most in 15 years; Trading volume surges" and noting the "shares declined to $14.59," and the "stock was the worst performer among its peers."



09/12/2023 09:30:14 [BN]

Subscribe Stock Movers on a Ticker List

**Orthofix Declines 22%, Most in 15 Years; Trading Volume Surges**

By Bloomberg Automation

(Bloomberg) -- Orthofix Medical Inc. fell 22%. Trading volume was 122 times the average for this time of day.

- The shares declined to $14.59, lower than any close since Oct. 24, from $18.63.
- The stock was the worst performer among its peers.
- The Russell 3000 Medical Supplies Subsector fell less than 0.1%, while the Russell 3000 lost 0.3%.

275. The chart below of intraday trading shows that the greatest decline in Orthofix's stock was during premarket trading right after the termination announcement at 7:03 AM and soon after the market opened.




276. On September 12, 2023, other than the "for cause" termination disclosure, there was no other company specific information released that day nor was there any industry specific information released related to Orthofix. But for the "for cause" termination disclosure, Orthofix's

stock would not have declined by 30% erasing $206.5 million in market capitalization. Orthofix was a less valuable company after the curative disclosure.

277. The market's reaction to the "for cause" terminations based upon the Independent Investigation's findings that each of the Terminated Executive Defendants "engaged in repeated inappropriate and offensive conduct that violated multiple code of conduct requirements" was far greater than historic market reaction to the news of a CEO's dismissal without a permanent replacement. For example, academic studies show that the average market impact on a company's stock price from the announcement of an executive departure without a successor is negative 5.52%.[17] When Orthofix made the disclosure of the "for cause" terminations and the reasons for the terminations, Orthofix's stock plummeted 30%, which is over five times greater than the average market impact for an executive dismissal.

278. The magnitude of the negative market impact on Orthofix's stock price from the termination disclosure indicates that the market was reacting to more than just the executive dismissals, but also the scandalous circumstances of the departures and the import of that scandal on the Company's reputation. The "for cause" terminations for "engag[ing] in repeated and inappropriate and offensive conduct" revealed that, contrary to the statements made in the Merger Agreement, and according to Defendant Burzik, Chair of the Orthofix Board, the Terminated Defendants had a pattern of engaging in serious workplace misconduct that included "harassing and inappropriate conduct [and] statements." The disclosure damaged Orthofix's reputation and, therefore, its market value.

---

[17] Jihun Bae & Jeong Hwan Joo, "CEO turnover, leadership vacuum, and stock market reactions," *Applied Economics*, 2021, Vol. 58, 6752-6769.

279. Building upon prior academic literature, a recent study published in the *Journal of Corporate Finance*[18] (the "JCF Study") used a granular event study methodology to measure the effect of news being published about sexual harassment on company stock returns. The study found that following a disclosure of sexual harassment, there was a negative impact on a company's market value that is "significant and robust" and that "a highly significant negative market reaction to sexual harassment scandals [] can wipe off enormous amounts of market value in the matter of days." The negative impact on market value is immediate, but the JCF Study found that the "short-term result[s] . . . persist over a longer horizon," which "highlights the strong economic impact of sexual harassment scandals."

280. According to the JCF Study, loss of reputation, which the authors call a "a channel of negative impact," can lead to customers moving away from the scandalized company. For customers who value using products "from a firm of good reputation . . . , then a loss of reputation following a scandal can arguably lead to perceived lower value of products in the eyes of customers, employees, investors, suppliers, collaborators or other stakeholders" that can result in "lost goodwill, lost business relationships and opportunities, lower future sales of the company's products, etc.," all of which "should [] get factored in the market's overall perception of the scandal as it is announced."

281. Although the negative impact on the disclosing company's stock is magnified when the CEO of the company is involved in the reported harassment scandal and is fired, the JCF Study concluded that "the costs associated with loss of personnel are unlikely to drive the negative impact, since the market reacts relatively milder to cases in which the accused CEO gets fired," so

[18] Mads Borelli-Kjaer, Laurids Moehl Schack, Ulf Nielsson, "#MeToo: Sexual harassment and company value," *Journal of Corporate Finance* 67 (2021) 101875.

"reputation [loss] and public sentiment is a more viable channel through which the company is affected."

282. Given the well-documented market impact of such harassment in the workplace and the #MeToo movement, studies show that large asset managers, participants in M&A transactions, as well as shareholders have "increase[d] protection towards the detrimental effects of harassment scandals because they view them as more damaging now than before." For example, as the JCF Study notes, large institutional investors "require that anti sexual harassment principles be put in place across their entire portfolio." Similarly, some merging companies include M&A clauses related to sexual harassment.

283. The Terminated Executive Defendants occupied the C-suite and worked together at Orthofix's primary research and development facility in Carlsbad, California. Their "for cause" terminations diminished the value of the Company, as evidenced by the loss of $206.5 million in market capitalization on the day of the disclosure. As illustrated in the chart below, the stock price plummeted with minimal recovery in the months after the "for cause" termination disclosure despite the appointment of permanent CFO and CEO replacements in early January 2024. This reaction suggests the market viewed Orthofix as less valuable given that the harassment and inappropriate conduct was fostered by the Company's most senior officers.




284. The Misconduct Statement in the Merger Agreement is the type of sexual harassment clause that merging companies include in merger agreements. The Misconduct Statement, as well as the Compliance Statement, assured Orthofix and SeaSpine investors that the companies' cultures were free of harassment and in compliance with federal and state laws and the Company's code of conduct, such that the combined Company would be free of this type of enterprise risk that could negatively affect its reputation and value. This was part of the information that investors considered when they voted for the Merger.

285. Two days after the "for cause" termination disclosure, Orthofix filed with the SEC a Form 8-K disclosing its termination of the Terminated Executive Defendants and attaching the September 12, 2023 press release.

286. Later, Orthofix also admitted that the termination of the Terminated Executive Defendants negatively impacted its share price in its Form 10-Q for the third quarter of 2023, filed November 8, 2023. Orthofix disclosed that there may be an impairment in their calculation of

goodwill due to the decrease of the Company's market capitalization following the termination of the SeaSpine Executive Defendants:

> ***In the third quarter of 2023, the Company announced the termination of the former President and Chief Executive Officer, former Chief Financial Officer, and former Chief Legal Officer, from their respective roles. Immediately following the announcement, the Company's market capitalization decreased by approximately 30%, indicating that an impairment may exist.*** As a result, the Company performed an interim quantitative assessment of its goodwill as of September 30, 2023.

287. Defendants also made the same statement in their annual report for the year ended December 31, 2023, which they filed on a Form 10-K on March 5, 2024:

> ***In the third quarter of 2023, we announced the termination of the former President and Chief Executive Officer, former Chief Financial Officer, and former Chief Legal Officer, from their respective roles. Immediately following the announcement, our market capitalization decreased by approximately 30%, indicating that an impairment may exist.*** As a result, we performed an interim quantitative assessment of our goodwill as of September 30, 2023. Upon performing our assessment, we determined the Global Spine reporting unit's fair value exceeded its carrying value as of September 30, 2023.

288. Orthofix's September 12, 2023 press release and September 14, 2023 Form 8-K disclosed the relevant or related truth that corrected Defendants' prior materially misleading statements and omissions, including those contained in the Merger Agreement regarding the existence of formal or informal complaints of harassment, misconduct, discrimination, or similar behavior in the past four years against supervisory-level SeaSpine employee; misconduct-related allegations pending or threatened; any reasonable basis for such a misconduct allegation; and settlement agreements in the past four years relating to any misconduct-related allegation against SeaSpine or any SeaSpine officer, director, manager, employee, or independent contractor (¶¶ 255(a)-(c), 257(b)-(d), 263(a)-(c), 265(a)-(c)). In addition, the disclosures corrected Defendants'

materially misleading statements and omissions concerning the culture of ethics and compliance at the Company.

289. The declines in Orthofix's stock price were a direct and proximate result of the false and misleading nature of the Exchange Act Defendants' statements being revealed to investors and to the market. The timing and magnitude of Orthofix's stock price declines on September 12, 2023 negate any inference that the economic losses and damages suffered by Plaintiffs and the other members of the Class were caused entirely by concerns about future leadership of the Company, changed market conditions, macroeconomic factors, or even Orthofix-specific facts unrelated to Defendants' fraudulent conduct.

### C. Summary of Scienter Allegations

290. As set forth above and below, numerous facts demonstrate that the Exchange Act Defendants knew or were deliberately reckless in not knowing that the statements identified in Section VI.A above were materially false or misleading when made. The Terminated Executive Defendants' scienter is clear given the severity and systemic nature of the misconduct at SeaSpine, some of which was the subject of litigation; the Terminated Executive Defendants' active role in facilitating that culture and as agents of the misconduct themselves; and their control over SeaSpine pre-Merger and Orthofix post-Merger. In addition, the scienter of the Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Director Defendants is demonstrated through their controlling role at Orthofix before and/or after the Merger, through which they deliberately or recklessly disregarded red flags concerning the Terminated Executive Defendant's misconduct. All the Exchange Act Defendants also had the motive and opportunity to perpetuate the fraud, concealing the misconduct to close the Merger and/or facilitate the post-Merger integration of the companies. Finally, the scienter of Defendants SeaSpine and Orthofix as corporate entities is derived from the scienter of the Individual Exchange Act Defendants.

**1. The Severity and Systemic Nature of the Misconduct Establishes the Terminated Executive Defendants' Scienter**

291. As alleged in this Complaint, the discrimination and harassment at SeaSpine was open, notorious and widespread, and was spearheaded by the Terminated Executive Defendants. The misconduct also continued at Orthofix after the Terminated Executive Defendants took over post-Merger. The accounts of former female SeaSpine and Orthofix employees set forth above, including women who had to resort to litigation against SeaSpine or Orthofix, demonstrate that misogyny was endemic to SeaSpine's culture. Indeed, the Terminated Executive Defendants were the engines of this hostile environment, which they carried with them to Orthofix. As described in detail above, for years, they had fueled a toxic workplace culture, organizing alcohol-fueled events where they engaged in inappropriate conduct; developing inappropriate relationships with female employees; promoting and condoning discriminatory behavior at the company; overseeing a compensation system that systematically underpaid women employees; retaliating against women who attempted to achieve greater gender equality in the workplace; and engaging in demeaning, lewd conversations about women with whom they worked, just to name a few examples. The extent and severity of the misconduct, and the Terminated Executive Defendants' leading role in perpetuating it at SeaSpine pre-Merger and Orthofix post-Merger, demonstrate their scienter.

**2. The Terminated Executive Defendants' Control Over SeaSpine Pre-Merger and Orthofix Post-Merger Demonstrates Their Scienter**

292. In their roles as leaders of SeaSpine, and then the combined Company, the Terminated Executive Defendants were required to keep themselves informed of SeaSpine's and the combined Company's day-to-day business and operations. Their seniority at SeaSpine and then Orthofix and their control over each company's operations demonstrates their scienter. Indeed, in the words of CW 2 and Raposa, SeaSpine had been "[Defendant] Valentine's world."

293. As set forth above, the Terminated Executive Defendants exerted control and influence across SeaSpine, including over HR and personnel matters (¶¶ 108-117). Most egregiously, the Terminated Executive Defendants—particularly Defendant Valentine, but all three—deliberately prevented the HR department from operating independently, and hampered its ability to conduct investigations without the approval of the Terminated Executive Defendants. In fact, former HR employees reported that they were told to ignore discrimination-related complaints. Further, Defendant Valentine was responsible for overseeing the creation of a women's mentorship group at SeaSpine, but then disbanded the group when he was displeased with its members (¶ 142). Defendant Keran even reprimanded women for hanging posters in the workplace that depicted inspirational women, saying that it sent the wrong message. *Id.*

294. Further, the Terminated Executive Defendants were aware of material litigation facing SeaSpine, such as the Discrimination Class Action, which spanned multiple years and resulted in a settlement in 2021 that required SeaSpine to pay $900,000 and to implement a company-wide program to assess and redress pay and equity at SeaSpine. They were also aware that gender disparities in pay and titling at SeaSpine. These disparities continued during their time at Orthofix, as evidenced by the accounts of former employees, such as O'Connor.

295. In sum, the Terminated Executive Defendants' ultimate control over SeaSpine, including their efforts to conceal complaints and HR investigations involving misconduct, demonstrates their scienter for the pre-Merger statements. Further, their seniority at Orthofix after the Merger—where gender based pay-inequity persisted—demonstrates their scienter for post-Merger statements.

### 3. The Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Director Defendants Disregarded Red Flags at SeaSpine Pre-Merger and/or Orthofix Post-Merger, Which Demonstrates Scienter

296. The Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Officer Defendants (which is inclusive of certain of the Legacy Orthofix Officer and Director Defendants) were also responsible with overseeing the operations of Orthofix. As the President, CEO, and Director of Orthofix before the Merger, Defendant Serbousek was required to keep himself informed of Orthofix's day-to-day business and operations—including during the due diligence process involving SeaSpine. As the CFO of Orthofix before the Merger, Defendant Rice was required to be attendant to the financial aspects of due diligence and related risks that might be attendant to the Merger—including liabilities standing from litigation. Further, the other Legacy Orthofix Officer and Director Defendants were responsible for overseeing Orthofix's pursuit of a strategic transaction. The Legacy Orthofix Officer and Director Defendants were heavily involved in the negotiation process, and Defendant Serbousek specifically liaised with Defendant Valentine on several occasions. However, despite this involvement, the Legacy Orthofix Officer and Director Defendants deliberately or recklessly ignored severe red flags at SeaSpine relating to the Terminated Executive Defendants' misconduct and other related troubling aspects of SeaSpine, as set forth above. For instance, at the very least, the Legacy Orthofix Officer and Director Defendants necessarily learned about the Discrimination Class Action and the ongoing company-wide pay equity remediation effort.

297. In addition, the Orthofix Post-Merger Director Defendants—with Serbousek leading as the Executive Chairman of Orthofix's Board after the Merger—were required to oversee the Company, including its senior management, the Terminated Executive Defendants. Once again, the Orthofix Post-Merger Director Defendants ignored or recklessly disregarded red flags regarding the Terminated Executive Defendants. The SeaSpine-Orthofix Director Defendants in

particular would have had even greater insight into the issues with the Terminated Executive Defendants due to their oversight of SeaSpine affairs prior to the Merger. It took months after the Merger for the Orthofix Board to decide that it could no longer look away from the misconduct, ultimately firing the Terminated Executive Defendants.

#### 4. The Exchange Act Defendants Had the Motive and the Opportunity to Perpetuate the Fraud

298. The Exchange Act Defendants had the motive and opportunity to perpetuate the fraud. As set forth herein, the Individual Exchange Act Defendants held senior officer and director positions at SeaSpine and Orthofix, which provided them with the opportunity to know the true state of affairs at their respective companies and to disseminate materially false and misleading information about them.

299. Pre-Merger, on the SeaSpine side, the Terminated Executive Defendants were knowledgeable of—and direct participants in—the misconduct at SeaSpine, controlled the company's HR department, and involved in the resolution of material litigation. Defendant Serbousek similarly was the leader of Orthofix and he and the other Legacy Orthofix Officer and Director Defendants were involved in the negotiation and due diligence processes leading up to the Merger. As parties to the impending Merger, the Exchange Act Defendants were incentivized to push the Merger through at all costs, even if it involved deliberately or recklessly disregarding mountains of evidence of misconduct; and were incentivized to ignore or downplay the misconduct at SeaSpine so as to minimize the touted enterprise risk of the post-Merger Company.

300. There were also professional and financial incentives to complete the Merger. For example, the Terminated Executive Defendants were motivated to obscure their discriminatory conduct and commit the fraud alleged herein so they could secure employment contracts at the combined Company and obtain lucrative pay. As the Terminated Executive Defendants conceded

in the Defamation complaint, their compensation in 2023 ended up being "significant," which value expected to collectively exceed $10 million, and included base compensation, target bonuses, and LTIP grants as well as additional miscellaneous compensation and benefits. Defam. Compl. ¶ 32. Securities Act Defendant Burzik also stated in her declaration that the Terminated Executive Defendants had signed "lucrative contracts" with Orthofix. Burzik Decl. ¶ 5. So too were the SeaSpine-Orthofix Director Defendants incentivized to complete the Merger, since they would be able to secure spots on the combined Company's Board as part of the integration.

301. After the Merger, the Terminated Executive Defendants and the Orthofix Post-Merger Director Defendants were all control persons of Orthofix, and thus had insight into misconduct at the Company that the Terminated Executive Defendants' brought with them—particularly the SeaSpine-Orthofix Director Defendants, who had served on SeaSpine's Board of Directors until the Merger. The Terminated Executive Defendants and the Orthofix Post-Merger Director Defendants were incentivized to conceal the truth and to ignore or downplay the misconduct to facilitate the integration process and minimize risk to the Company after the Merger.

**5. The Scienter of the Legacy Orthofix Officer and Director Defendants, the Orthofix Post-Merger Director Defendants, and the Terminated Executive Defendants Is Imputed to Defendant Orthofix**

302. By virtue of their high-level positions as the most senior officers or directors of the Company; participation in and awareness of Orthofix's day-to-day operations; oversight over the SeaSpine executive leadership team; and/or control over the issuance of the false or misleading statements alleged above Section VI.A; the knowledge or recklessness of the Legacy Orthofix Officer and Director Defendants (pre-Merger) and the Terminated Executive Defendants and the Orthofix Post-Merger Director Defendants (post-Merger) concerning the Exchange Act Defendants' false or misleading statements is imputed to Defendant Orthofix. In addition, the knowledge or recklessness of other senior employees and managers, whether or not named herein,

concerning the false or misleading statements alleged above Section VI.A, is also imputed to Orthofix.

### 6. The Terminated Executive Defendants' Pre-Merger Scienter Is Imputed to SeaSpine

303. Further, by virtue of their high-level positions as the most senior officers of SeaSpine pre-Merger, participation in and awareness of SeaSpine's day-to-day operations, and control over the issuance of the false or misleading statements alleged above in Section VI.A, the knowledge or recklessness of the Terminated Executive Defendants concerning SeaSpine's false or misleading statements is imputed to SeaSpine. In addition, the knowledge or recklessness of other former SeaSpine senior employees and managers, whether or not named herein, concerning the false or misleading statements alleged above in Section VI.A, is also imputed to SeaSpine.

## D. Inapplicability of Statutory Safe Harbor and Bespeaks-Caution Doctrine

304. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements described in this complaint. Many of the specific statements described in this complaint were not identified as "forward-looking" when made. To the extent that there were any forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements described in this complaint, the Exchange Act Defendants are liable for those false forward-looking statements because at the time each was made, the particular speaker knew that the particular forward-looking statement was false or misleading, or the forward-looking statement was authorized or approved by an executive officer of SeaSpine or Orthofix who knew that the statement was false or misleading when made.

## E. Presumption of Reliance

305. At all relevant times, the market for Orthofix's common stock was an efficient market for the following reasons, among others:

(a) Orthofix stock met the requirements for listing and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b) Orthofix filed periodic public reports with the SEC and NASDAQ;

(c) As a "well-known seasoned issuer," as defined by SEC Rule 405, Orthofix was eligible to and did register securities for public offerings on Form S-3;

(d) Orthofix regularly publicly communicated with investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(e) Orthofix was followed by securities analysts employed by numerous major brokerage firms, who wrote reports that were distributed to the sales forces and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

306. As a result of the foregoing, the market for Orthofix securities promptly digested current information regarding Orthofix from all publicly available sources and reflected that information in the price of Orthofix stock. Under these circumstances, all purchasers of Orthofix common stock during the Class Period suffered similar injury through their purchase of Orthofix common stock at artificially inflated prices, and the presumption of reliance applies.

307. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972),

because the claims asserted herein against the Exchange Act Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

### F. Exchange Act Class Action Allegations

308. SEPTA brings this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all those who purchased or otherwise acquired the common stock of Orthofix between October 11, 2022 and September 12, 2023, inclusive, and who were damaged thereby. Excluded from the Class are the Exchange Act Defendants; the officers and directors of Orthofix and SeaSpine at all relevant times; members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns; the Exchange Act Defendants' liability insurance carriers and any affiliates or subsidiaries thereof; and any entity in which the Exchange Act Defendants or their immediate families have or had a controlling interest.

309. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Orthofix shares were actively traded on the NASDAQ Stock Market.

310. As of August 4, 2023, Orthofix had 36,738,681 shares of common stock outstanding, owned by thousands of investors. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are tens of thousands of members in the proposed Class. Class members who purchased Orthofix common stock may be identified from records maintained by Orthofix or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

311. SEPTA's claims are typical of Class members' claims, as all members of the Class were similarly affected by the Exchange Act Defendants' wrongful conduct in violation of federal law as complained of herein.

312. SEPTA will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

313. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether the federal securities laws were violated by the Exchange Act Defendants' acts and omissions as alleged herein;

(b) whether the Exchange Act Defendants made statements to the investing public during the Class Period that were false, misleading, or omitted material facts;

(c) whether the Exchange Act Defendants acted with scienter; and

(d) the proper way to measure damages.

314. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

**G. Exchange Act Causes of Action**

315. The claims alleged in this complaint under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b), 78t-1, and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5, sound in fraud and are based on knowing or reckless misconduct of the Exchange Act Defendants. These claims are independent of all other claims asserted in this complaint, and the allegations of fraud pertaining to the claims under Sections 10(b) and 20(a) of the Exchange Act and SEC Rule 10b-5 do not apply in any way to the other claims for relief asserted in this complaint.

## COUNT I

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants

316. SEPTA repeats, incorporates, and realleges every allegation above as if fully set forth herein.

317. During the Class Period, Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did (i) deceive the investing public, including SEPTA and other Class members, as alleged in this complaint; and (ii) cause SEPTA and other Class members to purchase Orthofix common stock at artificially inflated prices.

318. Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Orthofix common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

319. Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

320. During the Class Period, Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

321. Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this complaint, or recklessly disregarded the true facts that were available to them. These Defendants engaged in this misconduct to conceal Orthofix's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

322. SEPTA and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Orthofix common stock. SEPTA and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Orthofix common stock had been artificially inflated by Defendant Orthofix's, the Legacy Orthofix Officer and Director Defendants', and the Orthofix Post-Merger Director Defendants' fraudulent course of conduct.

323. As a direct and proximate result of Defendant Orthofix's, the Legacy Orthofix Officer and Director Defendants', and the Orthofix Post-Merger Director Defendants' wrongful conduct, SEPTA and other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

324. By virtue of the foregoing, Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT II

### For Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against SeaSpine and the Terminated Executive Defendants

325. SEPTA repeats, incorporates, and realleges every allegation above as if fully set forth herein.

326. During the Class Period, Defendant SeaSpine and the Terminated Executive Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did (i) deceive the investing public, including SEPTA and other Class members, as alleged in this complaint; and (ii) cause SEPTA and other Class members to purchase Orthofix common stock at artificially inflated prices.

327. Defendant SeaSpine and the Terminated Executive Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Orthofix common stock in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5.

328. Defendant SeaSpine and the Terminated Executive Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about SeaSpine and the Company's financial well-being, operations, and prospects.

329. During the Class Period, Defendant SeaSpine and the Terminated Executive Defendants made the false statements specified above, which they knew or recklessly disregarded to be false or misleading in that the statements contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

330. Defendant SeaSpine and the Terminated Executive Defendants had actual knowledge of the misrepresentations and omissions of material fact alleged in this complaint, or recklessly disregarded the true facts that were available to them. These Defendants engaged in this misconduct to conceal SeaSpine's and Orthofix's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

331. SEPTA and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Orthofix common stock. SEPTA and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Orthofix common stock had been artificially inflated by the Defendant SeaSpine's and the Terminated Executive Defendants' fraudulent course of conduct.

332. As a direct and proximate result of Defendant SeaSpine's and the Terminated Executive Defendants' wrongful conduct, SEPTA and other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

333. By virtue of the foregoing, Defendant SeaSpine and the Terminated Executive Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## COUNT III

**For Violations of Section 20(a) of the Exchange Act**
**Against the Legacy Orthofix Officer and Director Defendants and the Orthofix Post-Merger Director Defendants**

334. Lead Plaintiff SEPTA repeats, incorporates, and realleges every allegation above as if fully set forth herein.

335. As alleged above, Orthofix violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged in this complaint.

336. Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants acted as controlling persons of Orthofix within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Orthofix, Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants had the power and ability to control the actions of Orthofix and its employees. By reason of this conduct, Defendant Orthofix, the Legacy Orthofix Officer and Director Defendants, and the Orthofix Post-Merger Director Defendants are liable under Section 20(a) of the Exchange Act.

## COUNT IV

**For Violations of Section 20(a) of the Exchange Act**
**Against the Terminated Executive Defendants**

337. Lead Plaintiff SEPTA repeats, incorporates, and realleges every allegation above as if fully set forth herein.

338. As alleged above, Orthofix and SeaSpine violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by its acts and omissions as alleged in this complaint.

339. During their tenure at SeaSpine before the Merger, the Terminated Executive Defendants acted as controlling persons of SeaSpine within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the SeaSpine's operations, direct involvement in the day-to-day operations of SeaSpine, and intimate knowledge of SeaSpine's actual performance, and their power to control public statements about SeaSpine, the Terminated Executive Defendants had the power and ability to control the actions of SeaSpine and its employees. By reason of this conduct, the Terminated Executive Defendants are liable for pre-Merger statements under Section 20(a) of the Exchange Act

340. In addition, during their tenure at Orthofix after the Merger, the Terminated Executive Defendants acted as controlling persons of Orthofix within the meaning of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). By virtue of their high-level positions, participation in and awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and intimate knowledge of the Company's actual performance, and their power to control public statements about Orthofix, the Terminated Executive Defendants had the power and ability to control the actions of Orthofix and its employees. By reason of this conduct, the Terminated Executive Defendants are liable for post-Merger statements under Section 20(a) of the Exchange Act.

## VII. <u>SECURITIES ACT VIOLATIONS</u>

341. The Securities Act Plaintiffs bring the claims in Counts V, VI, and VII under Sections 11, 12(a)(2), and 15 of the Securities Act on behalf of former SeaSpine shareholders who

acquired newly issued Orthofix common stock pursuant to the Offering Documents issued in connection with the January 2023 stock-for-stock Merger.

342. The Sections 11, 12(a)(2), and 15 claims are based solely on negligence or strict liability. They are not based on any knowing or reckless conduct by or on behalf of any Defendant, and the Securities Act Plaintiffs specifically disclaim any allegations of fraud, scienter, or recklessness in these non-fraud claims, except that any challenged statements of opinion or belief made in the Offering Documents are alleged to have been materially misstated statements of opinion or belief when made and at the time the Registration Statement was filed and stockholders voted on the Merger.

343. As explained herein, the Offering Documents were negligently prepared and, as a result, contained untrue statements of material fact, omitted material facts necessary to make the statements contained in them not misleading, and failed to make adequate disclosures required under the statute, rules, and regulations governing the preparation of public offering documents for securities.

344. To the extent that any challenged statement is construed as a statement of opinion, belief, or projection made in connection with the Offering, any such statement is alleged to have been a materially misstated statement of opinion, belief, or projection when made at and at the time of the Offering.

345. This action was originally brought within one year after the discovery of the untrue statements and omissions (and within one year after such discovery should have been made in the exercise of reasonable diligence) and within three years of the Offering.

### A. False and Misleading Statements in the Offering Documents

346. The Offering Documents contain multiple following false and misleading statements, as described below.[19]

#### 1. November 22, 2022 Form S-4/A

347. On November 22, 2022, Orthofix filed a Form S-4/A amendment to its November 8, 2022 Registration Statement, which attached and incorporated by reference the Merger Agreement. The Form S-4/A included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was***

[19] Plaintiffs allege that the statements in ***bold and italics*** within this Section were materially false, misleading, and/or omitted to disclose material information.

***an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine***.

348. The statements set forth in ¶ 347 above were false and misleading when made for the following reasons.

(a) Defendants SeaSpine's and Valentine's statement set forth in ¶ 347(a) ("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine, including the Terminated Executive Defendants, was blatantly inconsistent with such employment laws. In addition, as described above (¶ 134), former employees stated that SeaSpine did not meaningfully redress the pay and equity issues raised in the Discrimination Class Action, and actually

changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(b) Defendants SeaSpine's and Valentine's statement set forth in ¶ 347(b) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for misconduct allegations. For instance, as mentioned above: the Terminated Executive Defendants were sending deeply offensive text messages in their professional capacities, which formed part of the basis for their termination (¶¶ 225-227, 229-30, 237); the Terminated Executive Defendants reportedly had inappropriate relationships with employees (¶¶ 106, 146); a former employee reported seeing Defendant Valentine place his hands up the shirt of a female employee at a work event (¶ 106); Woolley, a VP, had been written up for harassing women while intoxicated (¶ 139); a former employee reported a colleague for racial discrimination, but the colleague was protected from repercussions by Woolley (¶ 114); a former employee stated that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 113); a female employee formally reported, including to HR, harassment by a male employee that went unaddressed (¶ 115); a former employee stated that SeaSpine fudged its pay and equity numbers to appease the outside auditing company (¶ 134); there was gender-based pay inequity (¶ 67); Defendant Keran retaliated against a former employee for placing tampons in the women's bathroom by firing her (¶ 137); a former employee was chastised by Defendants Valentine and Keran for gathering the most senior women employees at SeaSpine to discuss a vision for a women's leadership group and for

hanging up pictures in her own office of women she admired (¶ 142). In addition, it was false and misleading to suggest that there were no misconduct allegations "pending" when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 108-116). Further, the Independent Investigation determined that the Terminated Executive Defendants engaged in repeated "harassing or inappropriate conduct" prior to and after the Merger (¶¶ 235-37).

(c) Defendants SeaSpine's and Valentine's statement set forth in ¶ 347(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 131-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement—less than four years before the misstatement was made.[20]

**2. November 23, 2022 Joint Proxy Statement/Prospectus**

349. On November 23, 2022, Orthofix and SeaSpine filed a Joint Proxy Statement/Prospectus pursuant to Rule 424(b)(3), which attached and incorporated by reference the Merger Agreement. The Joint Proxy Statement/Prospectus included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in***

[20] *See supra* note 3.

***employment***, reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine***.

350. The statements set forth in ¶ 349 above were false and misleading when made for the following reasons.

(a) Defendants SeaSpine's and Valentine's statement set forth in ¶ 349(a) ("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine, including the Terminated Executive Defendants, was blatantly inconsistent with such employment laws. In addition, as described above (¶ 134), former employees stated that SeaSpine did not meaningfully redress the pay and equity issues raised in the Discrimination Class Action, and actually changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(b) Defendants SeaSpine's and Valentine's statement set forth in ¶ 349(b) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for misconduct allegations. For instance, as mentioned above: the Terminated Executive Defendants were sending deeply offensive text messages in their professional capacities, which formed part of the basis for their termination (¶¶ 225-227, 229-30, 237); the Terminated Executive Defendants reportedly had inappropriate relationships with employees (¶¶ 106, 146); a former employee reported seeing Defendant Valentine place his hands up the shirt of a female employee at a work event (¶ 106); Woolley, a VP, had been written up for harassing women while intoxicated (¶ 139); a former employee reported a colleague for racial discrimination, but the colleague was

protected from repercussions by Woolley (¶ 114); a former employee stated that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 113); a female employee formally reported, including to HR, harassment by a male employee that went unaddressed (¶ 115); a former employee stated that SeaSpine fudged its pay and equity numbers to appease the outside auditing company (¶ 134); there was gender-based pay inequity (¶ 67); Defendant Keran retaliated against a former employee for placing tampons in the women's bathroom by firing her (¶ 137); a former employee was chastised by Defendants Valentine and Keran for gathering the most senior women employees at SeaSpine to discuss a vision for a women's leadership group and for hanging up pictures in her own office of women she admired (¶ 142). In addition, it was false and misleading to suggest that there were no misconduct allegations "pending" when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 108-116). Further, the Independent Investigation determined that the Terminated Executive Defendants engaged in repeated "harassing or inappropriate conduct" prior to and after the Merger (¶¶ 235-37).

(c) Defendants SeaSpine's and Valentine's statement set forth in ¶ 349(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 131-133), a notice of settlement was filed in the Discrimination Class Action

on September 3, 2019, and on July 26, 2021, the court approved the settlement—less than four years before the misstatement was made.[21]

**B. Documents Incorporated by Reference into the Registration Statement Contain Material Misstatements and Omit Material Facts**

351. On October 11, 2022, Orthofix filed a Form 8-K that attached the Merger Agreement. The Registration Statement incorporated the entire Form 8-K by reference, stating that it "contain[s] important information about Orthofix and SeaSpine and their respective financial performance."

352. The October 11, 2022 Form 8-K incorporated by reference in the Registration Statement included the following false and misleading statements:

(a) ***SeaSpine is in compliance in all material respects with all Laws relating to the employment of labor, including all such Laws relating to wages, hours, civil and/or human rights, harassment, discrimination and/or retaliation in employment,*** reasonable accommodation, unfair competition, affirmative action, ***pay equity, employment equity***, workers' compensation, safety and health, worker classification (including employee-independent contractor classification and the proper classification of employees as exempt employees and non-exempt employees), the Worker Adjustment and Retraining Notification Act ("WARN") and any similar foreign, state, provincial or local "mass layoff" or "plant closing" Law.

(b) ***No allegation, complaint, charge or claim (formal or otherwise) of sexual or racial harassment, sexual assault, sexual or racial misconduct, sex/gender or***

[21] *See supra* note 3.

***racial discrimination or similar behavior (a "Misconduct Allegation") has been made at any time within the past four (4) years against any Person who is or was an officer, director, manager or supervisory-level employee of SeaSpine in such person's capacity as such or, to the knowledge of SeaSpine, in any other capacity, nor are any Misconduct Allegations pending or, to the knowledge of SeaSpine, threatened, nor is there any reasonable basis for such a Misconduct Allegation.***

(c) ***Within the past four (4) years, SeaSpine has not entered into any settlement agreement, tolling agreement, non-disparagement agreement, confidentiality agreement or non-disclosure agreement, or any Contract or provision similar to any of the foregoing relating directly or indirectly to any Misconduct Allegation against SeaSpine or any person who is or was an officer, director, manager, employee or independent contractor of SeaSpine***.

353. The statements set forth in ¶ 352 above were false and misleading when made for the following reasons.

(a) Defendants SeaSpine's and Valentine's statement set forth in ¶ 352(a) ("SeaSpine Compliance Statement") was materially false and misleading because it falsely represented that SeaSpine was in compliance with employment laws, including relating to wages, civil rights, harassment, discrimination and/or retaliation in employment, pay equity, and employment equity. However, as described above (¶¶ 119-146), multiple former employees indicated that the behavior of senior management at SeaSpine, including the Terminated Executive Defendants, was blatantly inconsistent with such employment laws. In addition, as described above (¶ 134), former employees stated that SeaSpine did not meaningfully redress the

pay and equity issues raised in the Discrimination Class Action, and actually changed its numbers to appear compliant—indicating noncompliance with pay equity laws.

(b) Defendants SeaSpine's and Valentine's statement set forth in ¶ 352(b) ("SeaSpine Misconduct Statement") was false and misleading because of the existence of misconduct allegations and the reasonable basis for misconduct allegations. For instance, as mentioned above: the Terminated Executive Defendants were sending deeply offensive text messages in their professional capacities, which formed part of the basis for their termination (¶¶ 225-227, 229-30, 237); the Terminated Executive Defendants reportedly had inappropriate relationships with employees (¶¶ 106, 146); a former employee reported seeing Defendant Valentine place his hands up the shirt of a female employee at a work event (¶ 106); Woolley, a VP, had been written up for harassing women while intoxicated (¶ 139); a former employee reported a colleague for racial discrimination, but the colleague was protected from repercussions by Woolley (¶ 114); a former employee stated that they were asked to not report or to cover up issues relating to women's pay and women's complaints about discrimination (¶ 113); a female employee formally reported, including to HR, harassment by a male employee that went unaddressed (¶ 115); a former employee stated that SeaSpine fudged its pay and equity numbers to appease the outside auditing company (¶ 134); there was gender-based pay inequity (¶ 67); Defendant Keran retaliated against a former employee for placing tampons in the women's bathroom by firing her (¶ 137); a former employee was chastised by Defendants Valentine and Keran for gathering the most senior women

employees at SeaSpine to discuss a vision for a women's leadership group and for hanging up pictures in her own office of women she admired (¶ 142). In addition, it was false and misleading to suggest that there were no misconduct allegations "pending" when the Terminated Executive Defendants were responsible for asking HR to not investigate discrimination issues (¶¶ 108-116). Further, the Independent Investigation determined that the Terminated Executive Defendants engaged in repeated "harassing or inappropriate conduct" prior to and after the Merger (¶¶ 235-37).

(c) Defendant SeaSpine's and Defendant Valentine's statement set forth in ¶ 352(c) ("SeaSpine Settlements Statement") was false and misleading because it was blatantly incorrect to state that SeaSpine had not entered into any settlement agreement within the past four years relating to any misconduct allegation. As described in detail above (¶¶ 62-65, 131-133), a notice of settlement was filed in the Discrimination Class Action on September 3, 2019, and on July 26, 2021, the court approved the settlement—less than four years before the misstatement was made.[22]

**C. Post-Merger Revelations**

354. Orthofix's and SeaSpine's stockholders approved the Merger at special meetings on January 4, 2023, and the Merger became effective the following day.

355. On September 12, 2023, as set forth above (¶¶ 234-236), Orthofix issued a press release announcing the termination of the Terminated Executive Defendants for cause based on the unanimous decision by the Board's independent directors. The press release explained that the

[22] *See supra* note 3.

termination was the result of an internal investigation at the company, which was conducted by outside legal counsel and directed and overseen by the Orthofix Board, and which revealed that the Terminated Executive Defendants had engaged in inappropriate and offensive conduct.

356. Two days later, Orthofix filed with the SEC a Form 8-K disclosing its termination of the Terminated Executive Defendants and attaching the September 12, 2023 press release (¶¶ 250-51).

**D. Securities Act Class Action Allegations**

357. The Securities Act Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3) on behalf of a Class consisting of all SeaSpine stockholders at the time of the Merger who acquired the common stock of Orthofix in or traceable to the Offering in exchange for their shares of SeaSpine pursuant to the Offering Documents and who were damaged thereby. Excluded from the Class are the Securities Act Defendants; the officers and directors of Orthofix and SeaSpine at all relevant times; members of their immediate families and their legal representatives, heirs, agents, affiliates, successors or assigns; the Securities Act Defendants' liability insurance carriers and any affiliates or subsidiaries thereof; and any entity in which the Securities Act Defendants or their immediate families have or had a controlling interest.

358. The members of the Class are so numerous that joinder of all members is impracticable. Orthofix shares were actively traded on the NASDAQ Stock Market. As of August 4, 2023, Orthofix had 36,738,681 shares of common stock outstanding, owned by thousands of investors. Although the exact number of Class members is unknown to the Securities Act Plaintiffs at this time and can only be ascertained through appropriate discovery, the Securities Act Plaintiffs believe that there are at least tens of thousands of members of the proposed Class. Class members who acquired Orthofix common stock through the Merger may be identified from records

maintained by SeaSpine and/or Orthofix or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

359. The Securities Act Plaintiffs' claims are typical of Class members' claims, as all members of the Class were similarly affected by Securities Act Defendants' wrongful conduct in violation of federal law as complained of herein.

360. The Securities Act Plaintiffs will fairly and adequately protect Class members' interests and have retained competent counsel experienced in class actions and securities litigation.

361. Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. Among the questions of fact and law common to the Class are:

(a) whether the federal securities laws were violated by Securities Act Defendants' acts and omissions as alleged herein;

(b) whether the Securities Act Defendants made statements to the investing public in the Offering Documents that were inaccurate or omitted material facts; and

(c) the proper way to measure damages.

362. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

### E. The Securities Act Defendants Failed to Conduct a Reasonable Investigation and Exercise Reasonable Care in Connection with the Offering Documents

363. None of the Securities Act Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were accurate and complete and not misstated in all material respects.

364. Red flags should have been uncovered during the Merger due diligence process in which SeaSpine and Orthofix engaged.

365. Even a cursory review of SeaSpine's practices and circumstances—including its company-wide pay and equity remediation effort following the Discrimination Class Action Settlement and the volume of HR complaints about SeaSpine management—would have revealed to the Legacy Orthofix Officer and Director Defendants that there were systemic deficiencies in SeaSpine's ability to maintain a workplace free of discrimination and harassment, particularly against women employees, and that the Terminated Executive Defendants fueled the hostile environment.

366. Given Orthofix's stated importance of engaging in "disciplined" M&A and bringing in SeaSpine management to lead the "complementary cultures" of the combined Company, it was incumbent upon the Legacy Orthofix Officer and Director Defendants to determine whether the Terminated Executive Defendants would be fit to lead the post-Merger Company. Yet, none of the Legacy Orthofix Officer and Director Defendants made a reasonable investigation regarding the severe compliance and personnel issues that pervaded SeaSpine, even in light of the public information that SeaSpine settled a pay equity lawsuit shortly before SeaSpine and Orthofix began negotiations and the purported confidential SeaSpine Side Letter. By failing to adequately investigate, the Legacy Orthofix Officer and Director Defendants did not possess reasonable grounds for the belief that the statements regarding SeaSpine's compliance with laws

and regulations; the absence of any allegations or complaints, formal or otherwise, of discrimination and harassment at SeaSpine in the past four years; the absence of any reasonable basis for any harassment or other misconduct allegations in the past four years; and the absence of any settlements relating to discrimination or harassment against SeaSpine or its officers or employees in the past four years, were, from the vantage point of investors, accurate and complete and not misstated in material respects.

367. Similarly, given Defendant Valentine's and Keran's involvement with SeaSpine HR, their role in fostering the hostile work environment at SeaSpine in advance of filing the Offering Documents, and their involvement in resolving the Discrimination Class Action, they also did not possess reasonable grounds for the belief that the statements regarding SeaSpine's compliance with laws and regulations; the absence of any allegations or complaints, formal or otherwise, of discrimination and harassment at SeaSpine in the past four years; the absence of any reasonable basis for any harassment or other misconduct allegations in the past four years; and the absence of any settlements relating to discrimination or harassment against SeaSpine or its officers or employees in the past four years, were, from the vantage point of investors, accurate and complete and not misstated in material respects.

368. The foregoing red flags should have caused the Legacy Orthofix Officer and Director Defendants, who signed the Offering Documents, to conduct additional due diligence before disseminating the Offering Documents. By overlooking these red flags, the Legacy Orthofix Officer and Director Defendants negligently failed to conduct reasonable due diligence into the accuracy and completeness of the representations contained in the Offering Documents and are liable for the misstatements and omissions contained therein. Had the Legacy Orthofix Officer and

Director Defendants exercised reasonable care, they would have known of the material misstatements and omissions alleged herein.

369. Similarly, Defendants Valentine and Keran, who signed the Offering Documents, failed to conduct a reasonable investigation of the statements contained in those documents and the documents incorporated therein by reference and did not possess reasonable grounds for believing that the statements therein were true and not materially misstated. A reasonable investigation would have disclosed to Defendants Valentine and Keran that the Offering Documents contained material misstatements and omissions concerning the subjects noted above.

370. These Signer Defendants were sophisticated in financing and internal control issues given their collective industry experience and yet failed to reasonably inquire as to the misstatements and omissions notwithstanding numerous red flags noted above.

### F. Securities Act Causes of Action

## COUNT V

### For Violations of Section 11 of the Securities Act Against Defendant Orthofix and the Signer Defendants

371. The Securities Act Plaintiffs repeat, incorporate, and reallege every allegation in the Factual Background Section and the Securities Act Violations Section above as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Securities Act Defendants to defraud the Securities Act Plaintiffs or members of the Class.

372. This claim is brought by the Securities Act Plaintiffs under Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all persons who acquired the common stock of Orthofix in exchange for their shares of the common stock of SeaSpine pursuant to the Offering Documents.

373. For the purposes of this Section 11 claim, the Securities Act Plaintiffs do not allege that any Securities Act Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 11 of the Securities Act. This claim is predicated upon the Securities Act Defendants' liability for making false and materially misleading statements in the Offering Documents.

374. The Offering Documents were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated in it.

375. Orthofix is the registrant for the shares issued and distributed to the Class members in the Merger. The Securities Act Defendants named in this Count were responsible for the contents and dissemination of the Offering Documents.

376. At a minimum, as the issuer of the shares, the Securities Act Defendants are strictly liable to the Securities Act Plaintiffs and the Class for the Offering Documents' material misstatements and omissions.

## COUNT VI

### For Violations of Section 12(a)(2) of the Securities Act Against the Securities Act Defendants

377. The Securities Act Plaintiffs repeat, incorporate, and reallege every allegation in the Factual Background Section and the Securities Act Violations Section above as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Securities Act Defendants to defraud the Securities Act Plaintiffs or members of the Class.

378. This Count is brought under Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77*l*, against the Securities Act Defendants, on behalf of all persons who acquired the common stock of

Orthofix in exchange for their shares of the common stock of SeaSpine pursuant to the Offering Documents.

379. For the purposes of this Section 12(a)(2) claim, the Securities Act Plaintiffs do not allege that any Securities Act Defendant acted with scienter or fraudulent intent, which are not elements of a claim under Section 12(a)(2) of the Securities Act. This claim is predicated upon the Securities Act Defendants' liability for making false and materially misleading statements in the Offering Documents.

380. By means of the defective Prospectus and related oral communications, the Securities Act Defendants promoted, solicited, and sold Orthofix shares to Plaintiff and other members of the Class.

381. The Prospectus and related oral communications contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. The Securities Act Defendants owed the Securities Act Plaintiffs and the other members of the Class who acquired Orthofix shares pursuant to the Merger the duty to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of a material fact required to be stated in order to make the statements contained therein not misleading. The Securities Act Defendants, in the exercise of reasonable care, should have known of the misstatements and omissions contained in the Prospectus and related oral communications as set forth above.

382. By means of the Prospectus and related oral communications, the Securities Act Defendants promoted, solicited, and sold Orthofix shares to the Securities Act Plaintiffs and Class members. The Securities Act Defendants were sellers to and direct solicitors of purchasers of the Company's securities offered pursuant to the Merger. The Securities Act Defendants issued,

caused to be issued, or signed or authorized the signing of the Prospectus in connection with the offering, and used it to directly induce investors, including the Securities Act Plaintiffs and the other Class members, to purchase the Company's shares.

383. The Securities Act Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time they acquired Orthofix shares.

384. By reason of the conduct alleged herein, the Securities Act Defendants violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, the Securities Act Plaintiffs and the other members of the Class who acquired Orthofix shares pursuant to the Merger sustained substantial damages in connection with their purchases of the stock. Accordingly, the Securities Act Plaintiffs and the other members of the Class who hold the common stock issued pursuant to the Prospectus have the right to rescind and recover the consideration paid for their shares, and hereby tender their common stock to the Securities Act Defendants sued herein. Class members who have sold their common stock seek damages to the extent permitted by law.

## COUNT VII

### For Violations of Section 15 of the Securities Act Against the Signer Defendants

385. The Securities Act Plaintiffs repeat, incorporate, and reallege every allegation in the Factual Background Section and the Securities Act Violations Section above as if fully alleged in this Count and only to the extent, however, that the allegations do not allege fraud, scienter, or the intent of the Securities Act Defendants to defraud the Securities Act Plaintiffs or members of the Class.

386. This Count is brought under Section 15 of the Securities Act, 15 U.S.C. § 77o, against the Signer Defendants, on behalf of all purchasers of Orthofix common stock in connection

with, and traceable to, the Merger. This Count does not allege, and does not intend to allege, fraud or fraudulent intent, which is not a required element of Section 15, and any implication of fraud or fraudulent intent is expressly disclaimed.

387. Each of the Legacy Orthofix Officer and Director Defendants was a control person of Orthofix by virtue of his or her position as a director or senior officer of the Company. Similarly, Defendants Valentine and Keran were each a control person of SeaSpine by virtue of their respective positions as a director and/or senior officer of SeaSpine. Each of the Signer Defendants (inclusive of the Legacy Orthofix Officer and Director Defendants and Defendants Valentine and Keran) was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts V and VI above, based on having signed the Offering Documents and having otherwise participated in the process that allowed the Merger to be completed.

388. Because of their high-ranking positions and direct involvement in the everyday business of the Company, the Legacy Orthofix Officer and Director Defendants directly participated in the management of Orthofix's operations, including its accounting and reporting functions, and possessed and exercised the power and authority to control the contents of Orthofix's Offering Documents. Similarly, because of their high-ranking positions and direct involvement in the everyday business of SeaSpine, Defendants Valentine and Keran directly participated in the management of SeaSpine's operations, including its accounting and reporting functions, and possessed and exercised the power and authority to control the contents of Orthofix's Offering Documents.

389. The Signer Defendants were directly involved in controlling the content of and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged herein, and approved or ratified these misstatements and omissions in violation

of the federal securities laws. The Signer Defendants are liable for the false statements and omissions pleaded herein under the Securities Act.

390. Each of the Signer Defendants, by virtue of his or her management and/or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related to their respective companies (either Orthofix or SeaSpine). The Signer Defendants were required to exercise reasonable care and prudent supervision over the dissemination of information concerning the business, operations, and financial reporting of their respective companies. By virtue of these duties, these officers and directors were required to supervise the preparation of and dissemination of the Offering Documents and ensure that they were accurate and complete.

391. All of the Signer Defendants were control persons of their respective companies within the meaning of Section 15 of the Securities Act by reason of their own involvement in the daily business of their respective companies and as senior executives or directors of their respective companies. The Signer Defendants, at the time they held positions with their respective companies, were able to, and did, exercise substantial control over the operations of their respective companies, including control of the materially false and misleading statements, omissions, and course of conduct complained of herein.

392. As officers, directors, and/or controlling persons of a publicly held company and under the federal securities laws, the Signer Defendants had a duty (a) to disseminate promptly complete, accurate, and truthful information with respect to their respective companies; (b) to correct any previously issued statements that had become materially misleading or untrue; and (c) to disclose any trends, events, and uncertainties that would materially affect their respective companies' earnings and present and future operating results, so that the market price of their

respective companies' publicly traded securities would be based upon truthful and accurate information.

393. Defendants Serbousek, Rice, Valentine, and Keran, because of their high-ranking officer positions and direct involvement in the everyday business of their respective companies (Orthofix in the case of Serbousek and Rice, and SeaSpine in the case of Valentine and Keran), directly participated in the management of their respective companies' operations, including their accounting and reporting functions; possessed and exercised the power and authority to control the contents of the Offering Documents; and were privy to confidential information concerning their respective companies and their respective business, operations and financial statements, and strategy. Defendants Serbousek, Rice, Valentine, and Keran were directly involved in controlling the content of and in drafting, reviewing, publishing, and/or disseminating the false and misleading statements and information alleged, and approved or ratified these misstatements and omissions in violation of the federal securities laws. Serbousek, Rice, Valentine, and Keran are liable for their respective companies' false statements and omissions pleaded under the Securities Act, as well as any of their own.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B. awarding compensatory or rescissory damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest;

C. awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. awarding any equitable, injunctive, or other further relief that the Court may deem just and proper.

## IX. JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: April 8, 2026

Respectfully submitted,

By: */s/ Christina D. Saler w/ permission Rudolph Fink IV*
**DAVIS FIRM PC**
William E. Davis, III (TX No. 24047416)
Rudolph "Rudy" Fink IV (TX No. 24082997)
213 N. Fredonia Street, Suite 230
Longview, TX 75601
Tel: (903) 230-9090
Fax: (903) 230-9661
bdavis@davisfirm.com
rfink@davisfirm.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Steven J. Toll (admitted *pro hac vice*)
Jan Messerschmidt (admitted *pro hac vice*)
1100 New York Avenue, N.W., Suite 800
Washington, D.C. 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
stoll@cohenmilstein.com
jmesserschmidt@cohenmilstein.com

Christina D. Saler (admitted *pro hac vice*)
100 N. 18th Street, Suite 1820
Philadelphia, PA 19103
Tel: (267) 479-5707
Fax: (267) 479-5701
csaler@cohenmilstein.com

Alexandra Gray (admitted *pro hac vice*)
88 Pine St., 14th Floor
New York, NY 10005
Tel: (212) 838-7797
Fax: (212) 838-7745
agray@cohenmilstein.com

*Attorneys for Lead Plaintiff SEPTA and Lead Counsel for the Class*

**GIRARD SHARP LLP**
Adam E. Polk (admitted *pro hac vice*)
601 California Street, Suite 1400
San Francisco, CA 94108
Tel: (415) 981-4800
Fax: (415) 981-4846
apolk@girardsharp.com

**THE HALL FIRM, LTD**
David W. Hall (*pro hac vice forthcoming*)
One Embarcadero Center, Suite 1200
San Francisco, CA 94104
Telephone: (415) 426-5648
Facsimile: (415) 402-0058
dhall@hallfirmltd.com

*Attorneys for Mark Bonta*

## Appendix A

## CONFIDENTIAL WITNESSES

**Confidential Witness #1 ("CW 1")** worked at SeaSpine and then Orthofix post-Merger from 2019 until 2024 as an Operations Manager. While at SeaSpine, he reported to a Director of Logistics and then Vice President ("VP") of Supply Chain, Ray McDonagh. After the Merger, he reported to Bill Boykin at Orthofix.

**Confidential Witness #2 ("CW 2")** was employed as an Executive Assistant at SeaSpine from the first quarter of 2020 to the third quarter of 2021. She reported to Defendant Bostjancic during her entire tenure and also provided support to Defendant Keran and two different VPs of Human Resources ("HR").

**Confidential Witness #3 ("CW 3")** held a contract position as a Talent Acquisition Coordinator at SeaSpine from July 2016 to October of 2016. She first reported to Michael Galvin, and upon his departure, reported to Defendant Bostjancic and Dennis Raposa.

**Confidential Witness #4 ("CW 4")** was employed at SeaSpine from January 2020 to May 2020. She was the VP of HR and reported to Defendant Keran.

**Confidential Witness #5 ("CW 5")** was employed in the HR team at SeaSpine and then Orthofix post-Merger from July of 2022 until July 2024. CW 5 reported to Kaylo Greenwell while at SeaSpine and Christina Penland after the Merger.

**Confidential Witness #6 ("CW 6")** worked at Orthofix as a Marketing/Sales Assistant from January 2012 to November 2014, an Associate Marketing Manager until December 2016, and then a Marketing Manager until August 2018. She reported to Cory Brenner while she was a Marketing/Sales Assistant and then to Terry Riley Hudak while she was an Associate Marketing Manager and Marketing Manager.

**Confidential Witness #7 ("CW 7")** was employed at Orthofix from January 2018 to March 2021. She started as an Associate Biologics Account Manager and worked her way up to Marketing Associate for Bone Growth Therapies and then to Associate Product Manager for Bone Growth Therapies.

**Confidential Witness #8 ("CW 8")** was employed as a member of the Regional Sales Team at Orthofix from autumn of 2016 to autumn of 2019.

**Confidential Witness #9 ("CW 9")** was employed at a predecessor of SeaSpine, Integra Life Sciences Corp., and then eventually SeaSpine, beginning in January 2013. She stayed at SeaSpine through the Merger and left Orthofix in September 2023 as a Senior Manager, Strategic Contracting & Compliance. She worked in each company's legal department during her tenure, reporting to Defendant Keran pre-Merger and Catherine O'Connor post-Merger.